ak

# 03-60741
## CIV-FERGUSON

**MAGISTRATE JUDGE**
12BF ~~CLOSED~~
**SNOW**

U.S. District Court
District of New Jersey (Newark)

CIVIL DOCKET FOR CASE #: 02-CV-5433

MARCUS v. LIEBOWITZ, et al                     Filed: 11/12/02
Assigned to: Judge Harold A. Ackerman
Demand: $0,000                          Nature of Suit:  190
Lead Docket: None                       Jurisdiction: Diversity
Dkt# in other court: None

Cause: 28:1332 Diversity-Injunctive & Declaratory Relief

PAUL MARCUS                    ROBERT P SHAPIRO
     plaintiff                 [COR LD NTC]
                               SHAPIRO & SHAPIRO
                               411 HACKENSACK AVENUE
                               CONTINENTAL PLAZA II
                               HACKENSACK, NJ 07601
                               (201) 488-3900


     v.


MURRAY LIEBOWITZ                cat/div  Broward    -transfer
     defendant                 Case #   03-60741-CIV-
                               Judge Ferguson  Mag Snow
M.S.L. PROPERTY MANAGEMENT,    Motn fp  ✓        Fee pd $
INC., a Florida corporation    Receipt #
     defendant


HARBOR INN OF CS ASSOCIATES,
LTD., a Florida limited
partnership
     defendant


PARK PLAZA ASSOCIATES, LTD., a
Florida limited partnership
     defendant


LIEBOWITZ FAMILY LIMITED
PARTNERSHIP, a Florida limited
partnership
     defendant


Docket as of April 15, 2003 9:18 am            Page 1

```
Proceedings include all events.                      12BF
2:02cv5433 MARCUS v. LIEBOWITZ, et al                CLOSED
```

11/12/02  1    COMPLAINT filed    FILING FEE $ 150.00   RECEIPT # 311768
               (dc) [Entry date 11/14/02]

11/14/02  2    NOTICE of Allocation and Assignment filed. ( NEWARK - Judge
               Harold A. Ackerman - Magistrate Judge Stanley R. Chesler)
               (NM) (dc)

11/14/02  --   SUMMONS(ES) issued for MURRAY LIEBOWITZ, M.S.L. PROPERTY
               MANA, HARBOR INN OF CS ASS, PARK PLAZA ASSOCIATE, LIEBOWITZ
               FAMILY LIM ( 20 Days) (Mailed to Counsel) (dc)

11/14/02  --   CASE REFERRED to arbitration (dc)

3/21/03   3    NOTICE of Call for Dismissal Pursuant to Rule 4(m)
               Motion hearing set for 4/10/03 (JB) [Entry date 03/25/03]

3/27/03   4    ACKNOWLEDGEMENT OF SERVICE as to MURRAY LIEBOWITZ, M.S.L.
               PROPERTY MANA, HARBOR INN OF CS ASS, PARK PLAZA ASSOCIATE,
               LIEBOWITZ FAMILY LIM 1/21/03 Answer due on 2/10/03 for
               LIEBOWITZ FAMILY LIM, for PARK PLAZA ASSOCIATE, for HARBOR
               INN OF CS ASS, for M.S.L. PROPERTY MANA, for MURRAY
               LIEBOWITZ (ar) [Entry date 03/28/03]

4/3/03    13   ORDER  denying [8-1] cross motion to authorize pltf. to
               conduct jursdictional discovery prior to mot. to dismiss
               and/or transfer action; setting a schedule for the
               completion of jurisdictional discovery; ordering defts. to
               manage & administer the deft. partnership in ordinary
               course pending action; compel defts. to distribute their
               Cash Flow from the last calendar quarter of 2002 denying
               [8-2] hearing Motion set for 4/28/03 on [8-1] cross motion
               granting [6-1] dispositive motion to dismiss complaint
               granting [6-2] hearing Motion set for 4/28/03 on [5-1]
               dispositive motion notice dismissing complaint granting
               [5-1] dispositive motion notice dismissing complaint (
               signed by Mag. Judge Ronald J. Hedges ) (NM) (ak)
               [Entry date 04/15/03]

4/4/03    5    Notice of Intent to submit a Dispositive motion dismissing
               complaint  by MURRAY LIEBOWITZ, M.S.L. PROPERTY MANA,
               HARBOR INN OF CS ASS, PARK PLAZA ASSOCIATE, LIEBOWITZ
               FAMILY LIM (mn) [Entry date 04/07/03]

4/4/03    6    Notice of MOTION to dismiss complaint  by MURRAY
               LIEBOWITZ, M.S.L. PROPERTY MANA, HARBOR INN OF CS ASS, PARK
               PLAZA ASSOCIATE, LIEBOWITZ FAMILY LIM, & cert. of service.
               Motion set for 4/28/03 on [5-1] dispositive motion notice
               dismissing complaint . (Brief/PO Subm) (mn)
               [Entry date 04/07/03]

4/4/03    7    CERTIFICATION of Murray Liebowitz on behalf of MURRAY
               LIEBOWITZ  Re: [6-1] dispositive motion to dismiss
               complaint (mn) [Entry date 04/07/03]

```
Proceedings include all events.                              12BF
2:02cv5433 MARCUS v. LIEBOWITZ, et al                        CLOSED
```

| | | |
|---|---|---|
| 4/4/03 | 8 | Notice of CROSS MOTION to authorize pltf. to conduct jursdictional discovery prior to mot. to dismiss and/or transfer action; setting a schedule for the completion of jurisdictional discovery; ordering defts. to manage & administer the deft. partnership in ordinary course pending action; compel defts. to distribute their Cash Flow from the last calendar quarter of 2002 by PAUL MARCUS, Motion set for 4/28/03 on [8-1] cross motion (mn) [Entry date 04/07/03] |
| 4/4/03 | 9 | CERTIFICATION of David O. Marcus on behalf of PAUL MARCUS Re: [8-1] in support of cross motion to authorize pltf. to conduct jursdictional discovery prior to mot. to dismiss and/or transfer action; setting a schedule for the completion of jurisdictional discovery; ordering defts. to manage & administer the deft. partnership in ordinary course pending action; compel defts. to distribute their Cash Flow from the last calendar quarter of 2002 (mn) [Entry date 04/07/03] |
| 4/4/03 | 10 | CERTIFICATION of Paul Marcus on behalf of PAUL MARCUS  Re: [6-1] in opposition to dispositive motion to dismiss complaint (mn) [Entry date 04/07/03] |
| 4/4/03 | 11 | REPLY CERTIFICATION of Murray Liebowitz on behalf of MURRAY LIEBOWITZ, M.S.L. PROPERTY MANA, HARBOR INN OF CS ASS, PARK PLAZA ASSOCIATE, LIEBOWITZ FAMILY LIM  Re:  papers submitted by pltf. (mn) [Entry date 04/07/03] |
| 4/4/03 | 12 | CERTIFICATE OF SERVICE by MURRAY LIEBOWITZ, M.S.L. PROPERTY MANA, HARBOR INN OF CS ASS, PARK PLAZA ASSOCIATE, LIEBOWITZ FAMILY LIM  Service Re: defts' motion do dismiss complt., certification & briefs, pltf's cross mot., briefs & certifications. (mn) [Entry date 04/07/03] |
| 4/15/03 | -- | Case closed (ak) |

Certified as a true copy on
This Date: APr. 18th 2003
By: Adwea-Krafat
Clerk
Deputy

William D. Grand, Esq. (WG-9206)
**GREENBAUM, ROWE, SMITH, RAVIN, DAVIS & HIMMEL LLP**
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, New Jersey 07095
(732) 549-5600
Attorneys for Defendants

<div align="center">

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| PAUL MARCUS,<br><br>               Plaintiffs,<br><br>v.<br><br>MURRAY LIEBOWITZ, M.S.L. PROPERTY MANAGEMENT, INC., a Florida corporation, HARBOR INN OF CS ASSOCIATES, LTD., a Florida limited partnership, and PARK PLAZA ASSOCIATES, LTD., a Florida limited partnership, and LIEBOWITZ FAMILY LIMITED PARTNERSHIP, a Florida limited partnership,<br><br>               Defendants. | Hon. Harold A. Ackerman, U.S.D.J.<br><br>Civil Action No. 2:02cv05433 (HAA)<br><br>**CERTIFICATION OF SERVICE**<br><br> |

**KIMBERLY MURCHISON,** of full age hereby certifies as follows:

     1. I am a legal secretary with the law firm of Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP, attorneys for defendants in the above captioned matter.

     2. On 4th day of April, 2003, I caused the following documents to be delivered via Hand Delivery to the Clerk's Office, United States District Court, Martin Luther King, Jr. Federal Bldg. & Courthouse, 50 Walnut Street, Newark, New Jersey 07101

**Original and Four Copies**

A.              Defendants' Notice of Motion to Dismiss Complaint;

B.              Defendants' Brief in Support of Motion to Dismiss Complaint;

C.              Defendants' Certification of Murray Liebowitz; and

D.              Defendants' Certification of Service.

485153.02

**Original and Four Copies**

A.              Plaintiff's Notice of Cross Motion;

B.              Plaintiff's Memorandum of Law,

C.              Plaintiff's Certification of Paul Marcus;

D.              Plaintiff's Certification of David O. Marcus; and

E.              Plaintiff's Proposed Order.


**Original and Four Copies**

A.              Defendants' Reply Brief in Further Support of Motion to Dismiss or Transfer Based Upon Improper Venue and Lack of Personal Jurisdiction;

B.              Defendants' Reply Certification of Murray Liebowitz; and

C.              Defendants' Proposed Order.


**Original and Four Copies**

A.              Certification of Service identifying all above motion papers.

3.      On this 4th day of April, 2003, I caused to be delivered via Hand Delivery one copy of the transmittal letter for the above documents and defendants Reply Brief in Further Support of Motion to Dismiss or Transfer Based Upon Improper Venue and Lack of Personal Jurisdiction to: Honorable Harold A. Ackerman; United States District Court of New Jersey 50 Walnut Street, Newark, New Jersey 07102.

4.      On this 4th day of April, 2003, I caused to be delivered via telecopier and regular mail one copy of the transmittal letter for the above documents and defendants Reply Brief in Further Support of Motion to Dismiss or Transfer Based Upon Improper Venue and Lack of Personal Jurisdiction; Defendants Reply Certification of Murray Liebowitz; Defendants Proposed Order; and Certification of Service to: David O. Marcus, Esq., Shapiro & Croland, Continental Plaza II, 411 Hackensack Avenue, Hackensack, NJ 07601.

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

                                                  Kimberly Murchison

Dated: April 4, 2003

-2-

485153.02

William D. Grand, Esq. (WG-9206)
**GREENBAUM, ROWE, SMITH, RAVIN, DAVIS & HIMMEL LLP**
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, New Jersey 07095
(732) 549-5600
Attorneys for Defendants

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAUL MARCUS,<br><br>                      Plaintiffs,<br><br>v.<br><br>MURRAY LIEBOWITZ, M.S.L. PROPERTY MANAGEMENT, INC., a Florida corporation, HARBOR INN OF CS ASSOCIATES, LTD., a Florida limited partnership, and PARK PLAZA ASSOCIATES, LTD., a Florida limited partnership, and LIEBOWITZ FAMILY LIMITED PARTNERSHIP, a Florida limited partnership,<br><br>                      Defendants. | Hon. Harold A. Ackerman, U.S.D.J.<br><br>Civil Action No. 2:02cv05433 (HAA)<br><br>**REPLY CERTIFICATION OF MURRAY LIEBOWITZ**<br><br> |

**MURRAY LIEBOWITZ,** of full age, certifies as follows:

1.   I am a resident of the State of Florida, residing at 7070 Sienna Court, Boca Raton, Florida.  I am making this certification in reply to the papers submitted by plaintiff.  I have personal knowledge of the matters set forth herein.

### Personal Jurisdiction and Venue

2.   Plaintiff, in his papers, does not offer any evidence in support of his position that Harbor Inn of CS Associates, Ltd. ("Harbor Inn") and Park Plaza Associates, Ltd. ("Park Plaza")

are subject to personal jurisdiction in New Jersey. The sole asset of each partnership is an apartment complex located in Florida. Neither entity does business anywhere else. None of the partners has a principal residence in New Jersey. Of the ten partners, eight reside (or, in the case of the corporate partners, maintain their offices) in Florida, one resides in New York, and one (plaintiff) has his primary residence in New Hampshire.

3.   All of the business records of Harbor Inn and Park Plaza are located in Florida at the offices of M.S.L. Property Management, Inc. ("MSL"). The accountant for the partnerships, Bruce Weinberg, is located in Florida. Mr. Weinberg has been the accountant for Park Plaza since 1993 and for Harbor Inn since 1996.

4.   In Paragraph 31 of the Complaint, plaintiff refers to the refinancing of Park Plaza. The closing took place in Florida, and the attorney that represented Park Plaza at the loan closing, Jeff Mandler, Esq., has his office in Florida.

5.   A Florida attorney, Alan Werksman, Esq., represented Park Plaza and Harbor Inn in connection with the original financings in 1993.

6.   Mr. Werksman also requested both Park Plaza and Harbor Inn in the purchase of the properties that are the subject of this lawsuit.

7.   The contractors that have provided services to the partnerships (and who, plaintiff alleges, provided personal benefits to me), are located in Florida.

8.   All witnesses and records related to plaintiff's claim of negligent management of Park Plaza and Harbor Inn (Complaint, Para. 34) are located in Florida.

9.   With respect to MSL, a Florida corporation, all of its work related to Harbor Inn and Park Plaza was performed in Florida. It conducts no business activity in New Jersey.

-2-

10. Plaintiff refers to Crossroads Manor Realty Co, L.P. ("Crossroads"), the owner of an apartment complex in New Jersey.  I am a limited partner in that entity and a member of the general partner.  While MSL performs some of the bookkeeping functions for Crossroads, it performs those functions in Florida.  An on-site staff manages the property, and Crossroads, not MSL, employs the staff. There is no management agreement between Crossroads and MSL.

11. Plaintiff makes certain statements about me that need to be clarified.

12. I do not own a residence in New Jersey, and I visit New Jersey approximately four times per year, primarily to visit my daughter and grandchildren.  I own a house in Egremont, Massachusetts (which is more than 100 miles from Newark, New Jersey), but I reside most of the year in Florida.

13. I am not currently involved in any business in New Jersey other than as an investor in Crossroads, as set forth above.

14.  I did not visit New Jersey for the purpose of soliciting plaintiff to become a partner in either of the defendant-limited partnerships.  Plaintiff, since 1978, has invested in a number of partnerships that I brought to his attention, each one located in Florida.

15. With respect to Harbor Inn and Park Plaza, plaintiff had asked me to look for additional investments.  After some time, I telephoned plaintiff that I had found Harbor Inn as a possible investment opportunity.  Shortly thereafter, I told him I had found Park Plaza as an additional investment opportunity.  Plaintiff came to Florida to inspect each property and to talk to my son Sheldon and I about each property.

16. I have known Lawrence Bathgate, Esq. for many years.  His office prepared the Park Plaza and Harbor Inn partnership agreements in 1993.  Robert Krim, an accountant, did provide

-3-

certain accounting services to Harbor Inn between 1993 and 1996, but he has not provided any services to Harbor Inn since that time. Mr. Kirm never provided any accounting services to Park Plaza.

17. There have never been any partnership meetings for either of the partnerships at Mr. Bathgate's offices or anywhere else in New Jersey.

### Distributions

18. Plaintiff alleges that distributions of profits should have been made from both Harbor Inn and Park Plaza.

19. Section 5.1 (a) of the partnership agreements (Exhibits "D" and "E" to the Marcus Certification) provides that distributions from "Cash Flow" shall be made at the end of each fiscal quarter. Section 1.12(l) defines "Cash Flow" as "[t]he excess of cash revenue from Partnership operations over cash disbursements...and a reasonable allowance for cash reserves for repairs, replacement, contingencies and anticipated obligations...as determined by the General Partners." (emphasis added)

20. Harbor Inn has no cash available for distribution at this time. While the spreadsheet attached as Exhibit "F" to the Marcus Certification shows $53,208.51 as "Cash available," the partnership's accounting is on a cash basis. If accrued interest and expenses as of December 31, 2002 were subtracted, there would be no cash available.

21. With respect to Park Plaza, the net cash available as of December 31, 2002 was $161,546. (See page 3 of spread sheet attached as Exhibit "G" to the Marcus Certification). However, the partnership's accounting is on a cash basis. If accrued mortgage interest and accrued expenses totaling $94,425 were subtracted, the cash available would be reduced to

-4-

$67,121. Further, the definition of "Cash Flow" in the partnership agreements requires the General Partner (MSL) to establish cash reserves. The cash reserves are to include reasonable amounts for contingencies and cash obligations. (See Para. 17, supra.) MSL, as General Partner, has deemed it prudent to place, and has placed, the monies that might otherwise be available to the partners of Park Plaza in the reserve account to cover contingencies and potential cash obligations, including the indemnification responsibilities of the partnership in connection with this lawsuit. (See Sec. 3.8 of Park Plaza Partnership Agreement, Ex. "E" to the Marcus Certification).

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

MURRAY LIEBOWITZ

DATED: April 4, 2003

-5

## ATTORNEY CERTIFICATION

1.     I am an attorney-at-law of the State of New Jersey and a member of the law firm of Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP, counsel for defendants in this matter.

2.     I was not able to meet with Murray Liebowitz in person to obtain his signature. However, filed herewith is a facsimile of Mr. Liebowitz's original signature.   Mr. Liebowitz acknowledged the genuineness of his signature to me.

3.     I am filing this Certification pursuant to R. 1:4-4(c) so that the Court may accept Mr. Liebowitz's facsimile signature on his Certification.   An original signature will be filed if requested by the Court.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
WILLIAM D. GRAND


Dated: April 4, 2003

-6-

RS (1631)
**SHAPIRO & CROLAND**
Attorneys at Law
Continental Plaza II
411 Hackensack Avenue
Hackensack, New Jersey 07601
Tel. (201) 488-3900
Fax (201) 488-9481
Attorneys for Plaintiff

*FILED*

*APR - 4 2003*

*AT 8:30*
*WILLIAM T. WALSH*
*CLERK*

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAUL MARCUS, | : |
| Plaintiff, | : Civil Action No.: 02cv5433 (HAA) |
| | : |
| vs. | : |
| | : |
| MURRAY LIEBOWITZ, | : |
| M.S.L. PROPERTY MANAGEMENT, INC., | : |
| a Florida corporation, | : |
| HARBOR INN OF CS ASSOCIATES, LTD., | : |
| a Florida limited partnership, | : |
| PARK PLAZA ASSOCIATES, LTD., | : **CERTIFICATION OF** |
| a Florida limited partnership, and | : **PAUL MARCUS** |
| LIEBOWITZ FAMILY LIMITED PARTNERSHIP,: | |
| a Florida limited partnership, | : |
| | : |
| Defendants. | : |
| | : |

**PAUL MARCUS**, of full age, certifies as follows:

1.      I am the plaintiff in this action.  I make this certification in opposition to the

motion of the defendants to dismiss my Complaint for lack of personal jurisdiction, improper

venue and forum non-conveniens or, alternatively, to transfer venue to the United States District

Court for the Southern District of Florida.  I also submit this certification in support of my cross-

motion to permit jurisdictional discovery to be conducted prior to the Court's determination of the defendants' motion, to compel defendants to operate the subject limited partnerships in the ordinary course, and directing defendants to distribute the Cash Flow of these partnerships per the respective agreements.

<u>**The Formation of the Partnerships and New Jersey Contacts**</u>

2.      I became a general partner and limited partner of defendants Harbor Inn of CS Associates., Ltd. ("Harbor Inn") and Park Plaza Associates, Ltd. ("Park Plaza") in 1993. I was first introduced to Murray Liebowitz ("Liebowitz") in the mid-1980's through New Jersey accountants Robert Krim ("Krim") and Steve Grossmann ("Grossman") of the New Jersey accounting firm, Grossman, Weinberg. In turn, I was introduced by Liebowitz and Grossman to a New Jersey attorney, named Lawrence Bathgate ("Bathgate"). Bathgate is a managing partner of Bathgate, Wegener & Wolf in Newark and Lakewood, New Jersey, where he has practiced for many years. I was informed by Grossman and Bathgate that they were representing Liebowitz in connection with the acquisition of real estate in Florida. Grossman stated that Liebowitz was looking for investors for several real estate partnerships in Florida. Prior to moving to Florida, Liebowitz resided in New Jersey and owned and operated one or more businesses here. To my knowledge, he continues to own and operate substantial real estate rental properties in New Jersey.

3.      In order to solicit me to invest, Liebowitz traveled to New Jersey and we met at my offices in Paterson, my home in Saddle River, Bathgate's offices in Newark, in New York City and then I viewed the properties in Florida. I initially invested with Liebowitz in several projects between 1984 and 1988.

2

4.      In 1992 and 1993, Liebowitz solicited me in New Jersey to invest in the two real estate projects which ultimately became known as Harbor Inn and Park Plaza. I met with Liebowitz in New Jersey and New York to negotiate the investment. Bathgate was a participant in several meetings, along with Dan Siegel and Adrian Von Zon, two other investors that resided in New York.

5.      Harbor Inn entailed the acquisition of a multi-tenant rental property in Coral Springs, Florida.  Bathgate prepared all of the original documents for Harbor Inn and Park Plaza. As part of the solicitation by Liebowitz, I was presented with a Private Placement Memorandum (the "Harbor Inn Memorandum") outlining the terms of the investment, including the permitted sources and uses of partnership funds.  Bathgate was the preparer of the Harbor Inn Memorandum.  A true copy of the relevant portions of the Harbor Inn Memorandum is annexed hereto as Exhibit "A." Bathgate also prepared the Subscription Agreement, the Harbor Inn Limited Partnership Agreement, as well as a Property Management Agreement between Harbor Inn and ML Property Management, Inc., an entity owned and controlled by Liebowitz that is a general partner of Harbor Inn and is responsible for the management of the property.  ML Property Management is now known as M.L.S. Property Management, one of the defendants in this action (hereinafter "ML Management").

6.      Based on my meetings with Liebowitz and Bathgate in New Jersey, I invested $990,000.00 to acquire a 44.55% limited partnership interest in Harbor Inn.  I later gifted a small percentage of my interest to my son Deane Marcus.

7.      Once induced to invest pursuant to the Private Placement Memorandum, both the Subscription Agreements and Limited Partnership Agreements were implemented here in New

3

Jersey through counsel for the company.

8.      Thereafter, Liebowitz, with participation of Bathgate, as well as Krim, solicited me to invest in a second entity, and we negotiated an agreement for my investment in Park Plaza, which acquired an apartment complex in North Lauderdale, Florida. Those negotiations also occurred primarily in New Jersey at my offices in Paterson, my home in Saddle River and in New York City.  Park Plaza was also the subject of a Private Placement Memorandum prepared by Bathgate (the "Park Plaza Memorandum"), and, again, Bathgate prepared the Subscription Agreement, the Park Plaza Limited Partnership Agreement, as well as a Property Management Agreement between ML Management and Park Plaza.  A true copy of the relevant portions of the Park Plaza Memorandum is annexed hereto as Exhibit "B".  These negotiations resulted in my acquisition of a 40% limited partnership interest for $800,000.00, and my son Deane acquired 5% for $100,000.00, for a total investment of $900,000.00.  As with Harbor Inn, the Subscription Agreements and Limited Partnership Agreements were implemented in New Jersey through counsel.

9.      The Private Placement Memoranda indicates, as do the limited partnership agreements, that the New Jersey firm of Bathgate Wegener acted as counsel for the general partner and promoter of the partnerships, ML Management, and that all of the capital raised pursuant to the private placements was to be deposited with the Bathgate Wegener firm in New Jersey.

10.     Bathgate's representation of the partnerships, and the contacts between the defendants and New Jersey, and therefore our contacts with New Jersey, did not end upon the formation of Park Plaza and Harbor Inn and the acquisition of the properties.  The agreements were performed in New Jersey, starting with the execution of the partnership agreements and the

4

funding of the purchase of my interest upon execution, supervised and implemented by Bathgate Wegener in their Lakewood, New Jersey office. Bathgate and Krim were designated in the Property Management Agreements for both Harbor Inn and Park Plaza as the "Owner's Representatives". This designation was also subject to rights afforded to me as to the approval of capital expenditures of the partnership, which was part of the inducement for me to invest. To that end, Liebowitz and his son Sheldon executed a letter on behalf of ML Management dated March 15, 1993. (See Exhibit A annexed hereto) To my knowledge, Krim has at all times maintained his offices in New Jersey. Krim performed all the accounting work for Harbor Inn until 1996 or 1997. Bathgate has continued to act as counsel for the partnerships since their formation to date. For example, in 2000, Bathgate represented Park Plaza in a refinancing. He, along with Krim, also prepared, at the direction of Liebowitz and ML Management, a proposal for a like kind exchange of the Park Plaza property that was circulated to the partners. In 2002, Bathgate was counsel for Harbor Inn in connection with its refinancing of the entire project. Although the partnership's tax returns are now prepared by a Florida accountant, Krim, through Bathgate, continues to provide consulting services to Harbor Inn and Park Plaza. Bathgate also generally represents Liebowitz on all of his matters, including his New Jersey investments discussed more specifically below. The partnerships' current accountant is Weinberg & Company. Weinberg is a former partner of Krim in New Jersey, who subsequently formed his own firm. Grossman, Weinberg served as financial counselors and accountants for me and my business.

11.     For much of my adult life, including the time period during which the agreements at issue were negotiated and executed, I have been a resident of New Jersey. In 1997, after I sold

5

my Paterson, New Jersey business, I became a resident of New Hampshire, having an environment more in keeping with my lifestyle and more favorable tax laws for retirees. However, my time is divided almost equally between New Hampshire and New Jersey and I continue to maintain a residence in Saddle River, New Jersey, where I have lived for many years.

12.     The claims that I assert in this action arise out of the Private Placement Memoranda, Limited Partnership Agreements and Property Management Agreements that were solicited, negotiated, prepared and performed in New Jersey. It is my contention that the defendants have, by their actions, violated those agreements. Other than the parties, Bathgate and Krim (who are both New Jersey residents) are the individuals most familiar with the agreements and the activities of the partnerships. Their records relating to their work performed for the partnerships are maintained in New Jersey. As stated, most recently, Bathgate Wegener handled the 2002 refinancing of the Park Plaza property that is at the heart of the dispute.

13.     All of my records relating to my investment in Park Plaza and Harbor Inn are maintained in New Jersey. Moreover, I am not the only partner in the New York metropolitan area. There are three or four other partners that are New York residents, all within 100 miles of Newark, New Jersey and therefore subject to subpoena from this Court in this venue, according to my attorneys, which is also true of Bathgate and Krim. Approximately 75% of the equity of both Harbor Inn and Park Plaza is owned by these individuals in New Jersey and New York. Other than the parties, all main witnesses are within 100 miles of this Court.

14.     I believe that Liebowitz spends six months of the year in the Northeast, and frequently visits the New York/New Jersey metropolitan area. He maintains a residence in Massachusetts. Liebowitz and Liebowitz – controlled entities own substantial real property in

6

New Jersey. Liebowitz is an active officer in several New Jersey companies, including

Crossroads Manor, L.L.C., and Crossroads Manor Realty Co., L.P., and he is actively engaged in

real estate development in New Jersey. In describing the experience of ML Management and

Liebowitz, the Private Placement Memoranda describe Crossroads Manor Apartments as "a 264

unit apartment complex in Lakewood, New Jersey . . . [of which] Liebowitz has been a 99%

owner and the general partner since 1967." Park Plaza and Harbor Inn Memoranda, page 25,

Exhibits B and C.

15.     I am advised by my counsel that we are in the process of serving discovery requests

upon Bathgate, Krim, Liebowitz and ML Management, in order to obtain more information

pertaining to the jurisdictional issues. If any issue of jurisdiction or venue still remains, I am

asking that I be afforded the opportunity to obtain that discovery and supplement the information

contained in this certification prior to the Court's determination of this motion.

## The Improper Withholding of Partnership Distributions

16.     The defendants have used the filing of this action as an excuse to discontinue

payment of partnership distributions that I am entitled to receive under the Harbor Inn and Park

Plaza limited partnership agreements. The defendants are well aware that the partnership

distributions make up a substantial part of the income that I rely upon to pay my living expenses.

Therefore, I am asking that the Court direct the defendants to continue to pay me the distributions

due and owing to me during the pendency of this lawsuit.

17.     By way of background, Harbor Inn was formed on March 29, 1993 and an

Amended and Restated Agreement of Limited Partnership of Harbor Inn of CS Associates, Ltd.

was entered into on March 31, 1993 (the "Harbor Inn LP Agreement"). A true copy of the

7

relevant portions of the Harbor Inn LP Agreement is annexed as Exhibit "D".   Park Plaza was

formed on July 20, 1993 and an Amended and Restated Agreement of Limited Partnership of Park

Plaza Associates, Ltd. was entered into on August 11, 1993. (the "Park Plaza LP Agreement")

(collectively referred to as the "Limited Partnership Agreements").  A true copy of the relevant

portions of the Park Plaza LP Agreement is annexed as Exhibit "E".

18.     Pursuant to Section 5 of the Limited Partnership Agreements, distributions are to

be made to the Partners at the end of each fiscal quarter.  Specifically, Section 5.1(a) of the

partnership agreements, regarding Cash Flow Distributions, provides in pertinent part as follows:

> After providing for the satisfaction of the current debts and obligations of the
> Partnership, .... the General Partner shall, after the end of each fiscal quarter of the
> Partnership, make distributions of Cash Flow[1] from operations to the Partners out
> of the Partnership funds, to the extent available, which shall be allocated ninety
> nine (99%) percent to the Limited Partners and one (1%) percent to the General
> Partner, in accordance with the provisions of this Agreement.

19.     Since the inception of the Partnerships until January, 2003, the General Partner,

ML Management, which was also managing the partnerships pursuant to the Property

Management Agreements, regularly made distributions to the Partners at the end of each of the

fiscal quarters of the partnerships.  However, on January 22, 2003, approximately two months

after I filed the within lawsuit, ML Management sent out to the Partners its Fourth Quarter and

Year End Cash Flow Reports for the partnerships together with a notice advising that while the

Partners were entitled to receive distributions, no checks would be issued in light of my lawsuit.

---

[1] Section 1.12(l) defines Cash Flow as: "[t]he excess of cash revenue from Partnership
operations over cash disbursements, without deduction for depreciation or cost recovery, and a
reasonable allowance for cash reserves for repairs, replacement, contingencies and anticipated
obligations (including debt service, capital improvements and replacements) as determined by the
General Partners."

Specifically, those notices state as follows: "Enclosed please find your copy of the Year End Cash Flow Report. There is no check due to the lawsuit filed by Paul Marcus." This statement was made notwithstanding that the Cash Flow Reports reflect that there are substantial funds available for distribution to the Partners. A true copy of the January 22, 2003 correspondence from ML Management together with the Flow Reports for Park Plaza is annexed hereto as Exhibit "F". A true copy of the January 22, 2003 correspondence from ML Management together with the Flow Reports for Harbor Inn is annexed hereto as Exhibit "G".

20.     According to the attached Cash Flow Reports, the Cash Flow available for distribution by Park Plaza is $304,668.00 ($225,000.00 after reserves and hold backs), and the amount available for distribution by Harbor Inn is $151,456.00 ($120,000.00 after reserves and hold backs). The distributions due to me for the Fourth Quarter on account of my interest in Park Plaza is at least $90,000.00. The distribution due me on account of my interest in Harbor Inn is $48,000.00.

21.     ML Management's failure to make distributions directly violates the terms of the Limited Partnership Agreements, which unconditionally require that distributions be made at the end of each fiscal quarter when there is a positive Cash Flow. Based on previous correspondence that I received from Liebowitz, it appears that he is attempting to justify his withholding of my distribution to utilize the funds to pay the legal expenses he and ML Management may incur in defending the claims against them in this lawsuit, which were the consequence of defendants' breaches of the Management Agreements and their fiduciary duties to the partnerships and the limited partners. In that regard, in his January 2, 2001 correspondence to me, Liebowitz stated as follows:

9

> Sometime this month I will be reviewing the cash available for Partners Distribution. It would be helpful to know whether you still plan to litigate, since it would determine the amount I can distribute.

A copy of Liebowitz's correspondence of January 2, 2001 is annexed hereto as Exhibit "H".

Certainly, defendants cannot justify withholding $345,000.00 in Cash Flow for legal fees which have not yet been incurred, especially since each calendar quarter should yield a relatively similar Cash Flow to pay current expenses.

22.    Such action not only directly violates Section 5.1(a) of the Limited Partnership Agreements as discussed above, but also violates Section 3.3 thereof, regarding "Limitations on Power of the General Partner." Section 3.3 provides, in pertinent part, that:

> Notwithstanding the generality of the foregoing, the General Partner shall not be empowered without the consent of the Limited Partner owning at least two-thirds (2/3rds) of the Interest in the Partnership (allocated pursuant to Section 2.7 of this Agreement) to:
>
> (a)    do any act in contravention of this Agreement;
> (b)    do any act that would make it impossible to carry on the ordinary business of the Partnership; . . .
> (h)    utilize the proceeds to be received by the Partnership pursuant to Section 5.1 for purposes other than as set forth under the caption "Sources and Uses of Proceeds" in the [Private Placement] Memorandum.

The "Sources and Uses of Proceeds" section of the Private Placement Memorandum, as referenced in subsection (h) of Section 3.3, only permits such proceeds to be used for costs and expenses related to repairs and maintenance of the properties.

23.    The distributions from the partnerships make up a substantial portion of my personal cash flow and are relied upon by me to pay my personal living expenses. At the same time, I should not be penalized for pursuing legitimate claims against Liebowitz and ML Management arising from their failure to act in accordance with the agreements of the parties.

10

Therefore, it is respectfully requested the Court enter an Order directing ML Management and Liebowitz to continue the operation of the partnerships in the ordinary course, and further directing that distributions of Cash Flow of each entity be made to the Partners on an ongoing basis, including the distribution for the last quarter of 2002, as per the terms of the partnership agreements.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

PAUL MARCUS

Dated: March 17, 2003

11

# M.L. Property Management, Inc.

March 15, 1993

Paul Marcus
864 E. 25th Street
Patterson, NJ   07513

Re:  Harbor Inn Apartments
     Coral Springs, FL
     Management Contract

Dear Paul:

Please be advised that  regarding the Management Contract  in all
matters  requiring "Owners" approval, M.L.  Property Management,
Inc.  will consider  Paul Marcus  personally the "Owner".   This
agreement is not transferable to any other person or entity.

Sincerely,

Murray Liebowitz

Sheldon Liebowitz

ML.SL/jr

ATTACHMENT / EXHIBIT A

1
MEMO NO.

Prepared for the Sole Use of

PAUL MARCUS
NAME

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

HARBOR INN OF CS ASSOCIATES, LTD.

(A Florida Limited Partnership)

$2,000,000

100 Units of Limited Partnership Interests

$20,000 Per Unit

**Minimum of Five (5) Units ($100,000.00)**

GENERAL PARTNERS

M.L. PROPERTY MANAGEMENT, INC.
C/O Murray Liebowitz
2600 E. Commercial Boulevard
Suite 213, Ft. Lauderdate, Florida 33308

CDS CORPORATION
C/O Paul Marcus
2600 E. Commercial Boulevard
Suite 213, Ft. Lauderdate, Florida 33308

✳ 1

THE SECURITIES DESCRIBED IN THIS MEMORANDUM HAVE NOT BEEN FILED, REGISTERED, APPROVED, DISAPPROVED OR QUALIFIED WITH UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR WITH THE AGENCY OR REGULATORY AUTHORITY REGULATING THE SALE OF SECURITIES OF ANY STATE; NOR HAS ANY OFFICIAL CHARGED WITH THE ADMINISTRATION OF FEDERAL OR ANY OTHER JURISDICTION'S SECURITIES LAWS REVIEWED THIS MEMORANDUM OR PASSED ON OR ENDORSED THE MERITS OF THE INVESTMENT DESCRIBED IN THIS MEMORANDUM OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

ATTACHMENT / EXHIBIT ____

FOR FLORIDA RESIDENTS:   THE UNITS REFERRED TO IN THIS OFFERING MEMORANDUM WILL BE SOLD TO, AND ACQUIRED BY, THE HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061 OF THE FLORIDA SECURITIES ACT.   THE UNITS HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA.   EACH OFFEREE WHO IS A FLORIDA RESIDENT SHOULD BE AWARE THAT SECTION 517.061(12)(a)(5) OF THE FLORIDA SECURITIES ACT PROVIDES, IN RELEVANT PART, AS FOLLOWS: "...ANY SALE MADE PURSUANT TO THIS SUBSECTION...SHALL BE VOIDABLE BY THE PURCHASER... WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER, OR AN ESCROW AGENT..."EACH PERSON ENTITLED TO EXERCISE THE RIGHT TO WITHDRAW GRANTED BY SECTION 517.061(12)(a)(5) AND WHO WISHES TO EXERCISE SUCH RIGHT, MUST, WITHIN THREE (3) DAYS AFTER THE TENDER OF THE FIRST INSTALLMENT OF THE CAPITAL CONTRIBUTION TO THE PLACING BROKER, CAUSE A WRITTEN NOTICE OR TELEGRAM TO BE SENT TO THE PLACING BROKER. SUCH LETTER OR TELEGRAM MUST BE SENT AND POSTMARKED ON OR PRIOR TO THE AFOREMENTIONED THIRD DAY.   IF AN INVESTOR CHOOSES TO WITHDRAW BY LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED.   AN INVESTOR MAKING AN ORAL REQUEST FOR WITHDRAWAL MUST ASK FOR WRITTEN CONFIRMATION THAT THE REQUEST HAS BEEN RECEIVED.

FOR NEW JERSEY RESIDENTS:   THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING.   ANY FILING OF THE WITHIN OFFERING WITH THE BUREAU OF SECURITIES DOES NOT CONSTITUTE APPROVAL OF THE ISSUE OR THE SALE THEREOF BY THE BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEW JERSEY.   ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

FOR NEW YORK RESIDENTS:   THIS PRIVATE PLACEMENT MEMORANDUM HAS NOT BEEN FILED OR REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PRIOR TO ITS ISSUANCE AND USE.   THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING.   ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THE INTERESTS ARE BEING OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT FOR NON-PUBLIC OFFERINGS.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM, OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS FROM THE GENERAL PARTNERS, OR FROM THE PLACEMENT AGENT OR ANY PARTICIPATING BROKER ACTING ON THEIR BEHALF, AS LEGAL OR TAX ADVICE. INVESTORS ARE INVITED TO DISCUSS ALL ASPECTS OF THE TRANSACTION AND MATTERS DESCRIBED HEREIN WITH THE GENERAL PARTNERS, BUT EACH INVESTOR MUST RELY UPON HIS OWN REPRESENTATIVES AND ADVISORS (INCLUDING HIS OWN LEGAL COUNSEL AND ACCOUNTANT) AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING HIS INVESTMENT.

THE GENERAL PARTNERS RESERVE THE RIGHT TO WITHDRAW THIS OFFERING AT ANY TIME PRIOR TO THE ADMISSION OF LIMITED PARTNERS WHO SUBSCRIBED FOR 100 UNITS. THIS OFFERING WILL TERMINATE ON APRIL 15, 1993, UNLESS SOONER TERMINATED (OR EXTENDED) IN THE DISCRETION OF THE GENERAL PARTNERS.

IN THE EVENT THAT THE OFFERING IS TERMINATED, AND THE TRANSACTIONS CONTEMPLATED ARE NOT CONSUMMATED, ALL PAYMENTS WILL BE RETURNED WITHOUT DEDUCTION FOR EXPENSES AND WITHOUT ANY INTEREST THEREON, AND ALL SUBSCRIPTIONS WILL BE CANCELLED.

ALL PROCEEDS OF THE OFFERING WILL BE HELD IN TRUST BY THE PARTNERSHIP FOR THE BENEFIT OF THE PURCHASERS OF INTERESTS TO BE USED ONLY FOR THE PURPOSES SET FORTH IN THE USE OF PROCEEDS SECTION.

THE GENERAL PARTNERS HAVE AGREED TO MAKE AVAILABLE, PRIOR TO THE CONSUMMATION OF THE TRANSACTION CONTEMPLATED HEREIN, TO EACH PROSPECTIVE PURCHASER OF UNITS OR TO HIS REPRESENTATIVE(S) OR BOTH, THE OPPORTUNITY TO ASK QUESTIONS OF, AND RECEIVE ANSWERS FROM, THE GENERAL PARTNERS OR ANY PERSON ACTING ON THEIR BEHALF CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING, AND TO OBTAIN ANY ADDITIONAL INFORMATION, TO THE EXTENT THAT THE GENERAL PARTNERS POSSESS SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE, NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION SET FORTH HEREIN.

INVESTMENT IN THE INTERESTS MAY NOT BE SUITABLE FOR INVESTORS WHO DO NOT MEET CERTAIN NET WORTH AND OTHER REQUIREMENTS, OR WHO CANNOT AFFORD A NON-LIQUID SPECULATIVE INVESTMENT. SEE "RISK FACTORS," "FEDERAL INCOME TAX CONSEQUENCES," "INVESTOR SUITABILITY" AND "RESTRICTIONS ON TRANSFER."

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION TO ANYONE IN ANY STATE OR IN ANY OTHER JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED. IN ADDITION, THIS MEMORANDUM CONSTITUTES AN OFFER ONLY IF A NAME AND MEMORANDUM IDENTIFICATION NUMBER APPEAR IN THE APPROPRIATE SPACE PROVIDED ON THE COVER PAGE. REFERENCE SHOULD BE MADE TO THE CERTIFICATE AND AGREEMENT OF LIMITED PARTNERSHIP, SUPPORTING DOCUMENTS AND OTHER INFORMATION FURNISHED HEREWITH FOR COMPLETE INFORMATION CONCERNING THE RIGHTS AND OBLIGATIONS OF THE PARTIES THERETO.

CERTAIN  PROVISIONS  OF  SUCH  AGREEMENTS  AND  DOCUMENTS  ARE
SUMMARIZED IN THIS MEMORANDUM, BUT IT SHOULD NOT BE ASSUMED THAT
THE SUMMARIES ARE COMPLETE.

THE FOREGOING FINANCIAL STATEMENTS FURNISHED HEREWITH HAVE
BEEN PREPARED ON AN INCOME TAX BASIS AND ON THE BASIS OF
ASSUMPTIONS AND HYPOTHESES STATED THEREIN.   FUTURE OPERATING
RESULTS ARE IMPOSSIBLE TO PREDICT AND NO REPRESENTATION OF ANY
KIND IS MADE RESPECTING THE FUTURE ACCURACY OR COMPLETENESS OF
THESE PROJECTIONS.

Dated as of March 22,1993

INDEX AND TABLE OF CONTENTS

PAGE

I.  OFFERING CIRCULAR

Information Regarding this Memorandum ........... 1
Summary of the Offering ........................ 9
Terms of the Offering .......................... 13
Investor Suitability ........................... 14
Sources and Uses of Proceeds ................... 15
Risk Factors ................................... 16
Fees and Compensation Arrangements ............. 22
The Management Agreement ....................... 23
Conflicts of Interests ......................... 23
The General Partners ........................... 25
The Partnership Agreement ...................... 26
Fiduciary Responsibilities of the
     General Partners........................... 30
The Project .................................... 31
Plan of Financing .............................. 33
State and Local Taxes .......................... 33
Federal Income Tax Consequences ................ 34
Restrictions on Transfer ....................... 59
Certain Other Information ...................... 60
Absence of Material Litigation ................. 62
Glossary of Terms .............................. 62

II.  EXHIBITS

A.  Certificate and Agreement of Limited Partnership
B.  Purchase and Sale Contract
C.  John Hancock Mortgage Application
D.  Management Agreement
E.  Forecast Financial Statements

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

HARBOR INN OF CS ASSOCIATES, LTD.

$2,000,000 of Limited Partnership Interests

$20,000 per Unit

HARBOR INN OF CS ASSOCIATES, LTD. is a Florida limited partnership (the "Partnership") formed for the purpose of purchasing property and operating, leasing, managing, improving, holding, selling and otherwise dealing with, for investment purposes, a 310 apartment unit complex with related amenitites and facilities thereon and to otherwise own, operate or lease the complex. The Partnership property is located at Harbor Inn, 801 Harbor Drive, Coral Springs, Broward County, Florida (the "Property") which has been developed into buildings containing 310 apartment units, a clubhouse, four laundry buildings, two swimming pools and tennis courts and all fixtures, appliances, apparatus, equipment, furnishings, heating and air-conditioning equipment, machinery and articles of personal property and replacements thereof, including without limitation, all sewage treatment facilities and fresh water systems, and all water pumps, filters, motors, generators, lift stations, lines and accessories thereto, and all furniture and recreational equipment located in or used in conjunction with the recreational facilities, and all refrigerators, ranges, microwave ovens, dishwashers, disposals, washers and dryers (other than those owned by tenants of apartment units located on said real property) (the "Project"). This offering involves the sale of limited partnership interests in the Partnership for the purpose of raising funds to pay a portion of the Partnership's costs of acquiring the Property and costs of operating the Project.

The Partnership is offering a total of 100 limited partnership units (the "Units") at a price of $20,000 per Unit. The per Unit price of $20,000 shall be payable by check upon subscription. It should be noted that 1 Unit, in addition to the 100 Units, shall be purchased by the General Partners for the consideration of $1.00 and the agreement to serve as General Partners and incur the liability related thereto. The General Partners, in their discretion, may allow the purchase of fractional Units, in which case the percentage Interest of the Partner will be adjusted accordingly.

M. L. Property Management, Inc., one of the General Partners, will act as placement agent and conduct the Offering of the Units as the representative of the Partnership. Until

- 6 -

consummation of the Offering, subscription payments received will be deposited by Bathgate, Wegener, Dugan & Wolf, P.C., Lakewood, New Jersey, in a non-interest bearing escrow account maintained at Chemical Bank New Jersey, N.A., 1040 Route 70, Brick, New Jersey or in accordance with such other directions as may be given by the General Partner(s).  The Offering will terminate on the earliest of (i) the date the General Partners may, in their sole discretion, determine, (ii) the date on which all the Units have been sold, or (iii) April 15, 1993.  If greater than fifty (50%) percent of the Units have been sold by the Partnership on or before April 15, 1993, then the General Partners may, at their sole election, extend the subscription period or make a loan to the Partnership in an amount equal to the capital otherwise to be raised by the sale of Units, and if such a loan is made and all of the Units have not been sold by April 30, 1993, then the General Partners may, but are not required to, purchase such Units.  In the event that this Offering is not consummated, the proceeds of the Offering will be promptly and fully returned to the Investors.  Promptly after the sale of the Units, any subscriptions not accepted by the Partnership will be returned.

## INFORMATION REGARDING THIS MEMORANDUM

No Offer or Invitation:

This Memorandum has been prepared solely for informational purposes and is not an offer or an invitation to become a Limited Partner. Such an offer may be made only by the General Partners, who reserve the right to accept or reject any proposals of investment. Since this Offering is intended to qualify as a private placement, exempt from registration under the Securities Act of 1933, as amended, and other applicable securities laws, and since there will be no market for, and therefore limited transferability of, the Units, the General Partners, in their sole discretion, will accept subscriptions only from persons meeting certain suitability requirements. See "INVESTOR SUITABILITY."

Sources of Information:

This Memorandum has been prepared from sources deemed reliable, but no representation or warranty is made as to its accuracy or completeness. The obligations of the parties to this transaction will be set forth in and governed by the documents referred to in this Memorandum.

Authorized Statements:

No person is authorized to give any information or to make any statement or any representation or warranty not contained in this Memorandum. Any such information must not be relied upon as having been authorized by the Partnership or the General Partners or any employee, agent or Affiliate of the General Partners.

Supplements to Memorandum:

Neither the delivery of this Memorandum nor any sales of Units shall, under any circumstances, create any implication that there has been no change in the matters discussed in this Memorandum since the date hereof. However, in the event that the General Partners become aware of any material changes occurring prior to the completion of the Offering described in this Memorandum, this Memorandum will be amended or supplemented accordingly.

Memorandum Not Legal Advice:

Prospective Investors should not construe the contents of this Memorandum or any prior or subsequent communication from the General Partners, as legal or tax advice. Each Investor must rely solely upon his own representatives (including his legal counsel and accountant) as to legal, tax and related matters concerning a prospective investment in the Partnership.

<u>Confidential Memorandum</u>:

This Memorandum has been prepared solely for the information of persons and entities interested in the private placement of the Interests offered hereunder and may neither be reproduced nor used for any other purpose. Any reproduction or distribution of this Memorandum, in whole or in part, without the prior written consent of the General Partners, is prohibited.

<u>Miscellaneous</u>:

Certain capitalized terms used in this Memorandum are defined in "GLOSSARY OF TERMS." Cross references refer to section headings contained in this Memorandum and are referenced in the Table of Contents on page 5 of this Memorandum. The descriptions in this Memorandum of various agreements, documents, statutes, regulations and proposed legislation are not designed to be complete and are, therefor, qualified in their entirety by reference to the respective agreement, document, statute, regulation or proposed legislation described in the summaries.

## SUMMARY OF THE OFFERING

### INTRODUCTION

This Offering relates to a limited partnership whose purpose is to acquire, own and operate an apartment complex with amenities and related facilities located in Coral Springs, Florida. Several transactions are occurring concurrently with this Offering. The Offering under this Memorandum will result in the filing of a Limited Partnership Agreement to form a Florida limited partnership to acquire, own and operate a 310 unit apartment complex in Coral Springs, Florida. See, the proposed form of limited partnership agreement, "THE CERTIFICATE AND AGREEMENT OF LIMITED PARTNERSHIP OF HARBOR INN OF CS ASSOCIATES, LTD., attached hereto as Exhibit "A". The acquisition of the subject Property by the limited partnership is pursuant to a PURCHASE AND SALE CONTRACT, attached hereto as Exhibit "B". One pre-existing mortgage presently covers the Property: a first mortgage securing a loan used to finance the purchase of the Property and its development into an apartment complex. The pre-existing mortgage is expected to be modified and revised into a "new" first mortgage consistent with the terms and conditions of the John Hancock Mortgage Application referenced in the within Private Placement Memorandum. The "new" mortgage closing shall occur on the Closing Date. See the JOHN HANCOCK MORTGAGE APPLICATION, attached hereto as Exhibit "C". The subject

Property will be managed pursuant to a Management Agreement. See, PROPERTY MANAGEMENT AGREEMENT, attached hereto as Exhibit "D".

This Offering is being made to a few potential investors, all of which have had past business or personal or both relations with the General Partners or its principals. Potential Limited Partners should note that the proposed Limited Partnership Agreement for the Partnership permits The General Partners to call for additional funds from the Limited Partner, or the prospect of the subsequent dilution of a Limited Partner's interest. See "THE PARTNERSHIP AGREEMENT."

Also closing concurrently with the Offering under this Memorandum is a modification of an existing mortgage (the "New" mortgage). This New mortgage, together with the General and Limited Partner contributions, will be used to acquire the Project. See, "PLAN OF FINANCING."

The successful closing of each of these transactions is a condition of closing of the others.

### THE OFFERING

The following is a brief summary of certain information contained in this Memorandum and is qualified in its entirety by the information contained elsewhere in this Memorandum. Investors are urged to carefully review this Memorandum and the Exhibits hereto in their entirety prior to making an investment decision.

The Partnership.  Harbor Inn Of CS Associates Ltd. is a Florida limited partnership formed for the purpose of acquiring, improving, leasing and managing the 310 unit apartment complex located in Coral Springs, Florida.  A copy of the proposed form of the Certificate and Agreement of Limited Partnership of Harbor Inn of CS Associates, Ltd., a Florida Limited Partnership (the "Partnership Agreement") is attached as Exhibit "A" to this Memorandum.

Business of the Partnership.  The business of the Partnership is the ownership, operation, leasing and management sale or refinancing of the Project, a 310 apartment unit complex (the "Project"), known as Harbor Inn Apartments, located at 801 Harbor Drive, in the City of Coral Springs, Broward County, Florida.  See "THE PROJECT."

- 10 -

<u>The General Partners</u>.   The name and business addresses and telephone numbers of the General Partners of the Partnership are as follows:

M. L. Property Management, Inc.
C/O Murray Liebowitz, President
2600 E. Commercial Boulevard
Suite 213
Ft. Lauderdale, Florida 33308
(305) 491-4511

CDS Corporation
C/O Paul Marcus, President
2600 E. Commercial Boulevard
Suite 213
Ft. Lauderdale, Florida 33308
(305) 491-4511

<u>Capital Contributions of Limited Partners</u>.   Each Limited Partner shall pay $20,000 per Unit as a capital contribution of the Partnership.   The per Unit price of $20,000 shall be payable by check upon subscription.   The General Partners, in their discretion, may allow the purchase of fractional Units, in which case the percentage Interest of the purchase price will be adjusted accordingly.   See "TERMS OF THE OFFERING."

<u>Partnership Agreement</u>.   The proposed form of the Partnership Agreement is set forth in Exhibit "A" appended to this Memorandum.   Various references herein to the Partnership Agreement do not purport to be complete descriptions of the provisions of the Partnership Agreement.   Prospective Investors are advised to read the entire Partnership Agreement.

<u>Partnership Objectives</u>.   The General Partners anticipate that, given the characteristics of the Project, the nature of the investment, and the structure of the Offering, the principal investment objectives of the Partnership will be such as to allow an investor to realize the following potential benefits:

(a) preservation and protection of invested capital through ownership of real property;

(b) distribution to the Limited Partners of Cash Flow to the extent available;

(c) tax benefits through cost recovery and interest deductions allowing the deferral of taxation on Cash Flow; and

- 11 -

(d) long-term capital appreciation through potential increases in the value of the Project.

There is no assurance that the Partnership will be successful in attaining any of these objectives, or that a Limited Partner will realize these or any other benefits.

The Partnership intends to hold the Project indefinitely as an investment. In determining an appropriate time to sell the Project, or any part thereof, the General Partners will consider factors such as any current cash flow and cash distribution to Partners, potential capital appreciation that may be realized from a sale, and the maturity date of the mortgage on the Project. See "PLAN OF FINANCING."

Any net proceeds from the sale or refinancing of the assets of the Partnership will be distributed to the Partners as provided in the Partnership Agreement and will not be reinvested.

<u>Management of the Partnership</u>. The management of the Partnership will be the responsibility of the General Partners. The Partnership Agreement authorizes the General Partners to undertake various obligations and perform certain tasks on behalf of the Partnership. Pursuant to the terms of the Management Agreement, M.L. Property Management, Inc., one of the General Partners, will act as the Management Company for the Partnership. Pursuant to the Management Agreement, the Management Company will receive an initial set up fee of five thousand dollars ($5,000.00) plus a continuing fee of 5% of the gross receipts, as defined in the Management Agreement of the Project, which is included in the amounts paid by the Project tenants. See "THE MANAGEMENT AGREEMENT," "FEES AND COMPENSATION ARRANGEMENTS," "THE CERTIFICATE AND AGREEMENT OF LIMITED PARTNERSHIP OF HARBOR INN OF CS ASSOCIATES, LTD., a Florida Limited Partnership" and the Management Agreement attached hereto as Exhibit "D".

<u>Certain Risk Factors</u>. The Partnership will face all of the risks involved in operating an apartment complex. The Partnership is leveraged. The Limited Partners will have no voice in the operations of the Partnership and the General Partners have conflicts of interests with the interests of the Limited Partners. The Units are not freely transferable and no public market in the Units is expected to develop. The New mortgage is for a seven (7) year term and will need to be extended or refinanced in seven (7) years. See "RISK FACTORS" and "CONFLICTS OF INTERESTS."

Tax Aspects of the Partnership. The Partnership has not sought a ruling from the IRS with respect to its tax classification as a partnership. With respect to its depreciable real property, the Partnership expects to utilize a straight line method over a 27.5 year recovery period. With respect to its personal property, depreciation will be based on the modified accelerated cost recovery system. See the Forecast Financial Statements attached hereto as Exhibit "E". The Partnership will use the accrual method of accounting for both financial accounting and tax purposes.

Information concerning the federal income tax consequences of an investment in the Partnership is more fully set forth under "FEDERAL INCOME TAX CONSEQUENCES" below. Prospective Investors are urged to carefully review the material contained therein and to seek the advice of their independent tax counsel prior to investing in the Partnership.

Glossary. Certain terms used in this Memorandum are defined in the "GLOSSARY OF TERMS" appearing elsewhere herein.

### TERMS OF THE OFFERING

The Offering. The Partnership is offering a total of 100 Units for sale at a price of $20,000 per Unit, payable in cash on or prior to the Closing Date. The General Partners, in their discretion, may also permit the purchase of fractional Units.

Subscription Period and Procedures. The Offering will expire on April 15, 1993 (the "Closing Date"). If greater than fifty percent (50%) of the Units have been sold by the Partnership on or before April 15, 1993, then the General Partners may, at their sole election, make a loan to the Partnership in an amount equal to the capital otherwise to be raised by the sale of Units or the General Partners may, at their sole discretion, extend the Closing Date.

Subscriptions are subject to acceptance by the General Partners and may be rejected by the General Partners in their sole discretion. Pending the sale of all of the Units, cash funds paid by subscribers will be deposited by Bathgate, Wegener, Dugan & Wolf, P.C., Lakewood, New Jersey in a non-interest bearing escrow account to be maintained at Chemical Bank New Jersey, N.A., 1040 Route 70, Brick, New Jersey or in accordance with such other directions as may be given by the General Partner(s).

- 13 -

In the event that this Offering is not consummated, the proceeds of the Offering will be promptly and fully returned to the Investors. Promptly after the sale of the Units, any subscriptions not accepted by the Partnership will be returned. In the event that the Offering is terminated and the transactions contemplated are not consummated, all payments will be returned without deduction for expenses and without any interest thereon, and all subscriptions will be cancelled.

## INVESTOR SUITABILITY

Investment in the Units involves a high degree of risk and is suitable only for persons of substantial financial means who have no need for liquidity in this investment. A public market for the Units will be restricted and may result in substantial adverse tax consequences to a seller of a Unit.

This Offering is intended to be made as a private placement Offering, exempt from registration (i) under the Act, pursuant to Sections 3(b) and/or 4(2) of the Act and Regulation D promulgated thereunder ("Regulation D"), and (ii) under the securities laws of the States of New Jersey, New York and Florida. These exemptions from registration require, in part, that the Units may not be purchased by more than twenty-five (25) non-accredited investors. In addition, the General Partners are requiring that all Investors have such knowledge and experience in financial and business matters so that they are capable of evaluating the merits and risks of the prospective investment.

The General Partners are offering the Units to persons who possess certain characteristics suggesting financial sophistication and strength and who meet the definition of an "Accredited Investor" contained in Regulation D. The General Partners will require each prospective Investor to provide certain written information concerning the prospective Investor's income, net worth and experience in financial and business matters, and they may utilize such information to determine whether a prospective Investor is eligible to purchase an Unit.

Investors also will be required to meet any suitability standards imposed by the states or other jurisdictions in which the Units are offered and sold. Such jurisdictions may impose standards stricter than those set forth above.

Notwithstanding that a prospective Investor is an Accredited Investor, or that such Investor is willing to represent that he as sufficient knowledge and experience to capably evaluate the

- 14 -

merits and risks of the prospective investment, the General Partners have the absolute right to refuse to sell Units to any prospective Investor.

## SOURCES AND USES OF PROCEEDS

Below is a summary of the expected sources of funds and uses of funds required to close the sale of the Units and the John Hancock Mortgage. See "THE PARTNERSHIP" and "PLAN OF FINANCING' for descriptions of these transactions.

Please note that this summary reflects estimates based on tentative attorney closing adjustments. If the amounts change, the General Partners may be required to contribute more or less than the amount shown below under "SOURCES." Please further note that there also may be additional capital calls on the Limited Partners pursuant to the Partnership Agreement if the amounts allocated under "OTHER COSTS" is exceeded. See "THE CERTIFICATE AND AGREEMENT OF LIMITED PARTNERSHIP OF HARBOR INN OF CS ASSOCIATES, LTD., a Florida Limited Partnership".

SOURCES:

Permanent Mortgage
(Proposed John Hancock Mortgage) ...... $ 10,950,000.00

Contribution of General Partner ........... $           1.00

Units (100 Units at $20,000 each) ......... $  2,000,000.00

TOTAL SOURCES............................. $ 12,950,001.00

USES:

```
EFFECTIVE PURCHASE PRICE (includes
additional interest, etc. to
John Hancock) ............................ $ 12,850,000.00

MODIFICATION OF EXISTING MORTGAGE
   AND ACQUISITION OF PROJECT
      First Mortgage to John Hancock ....... $ 10,950,000.00

CASH FOR DOWN PAYMENT,
John Hancock and some costs ............... $  1,900,000.00

CLOSING COSTS AND WORKING CAPITAL ......... $    100,000.00

TOTAL CASH NEEDED                           $  2,000,000.00
```

## RISK FACTORS

The purchase of the Units offered hereby involves a substantial degree of risk and is suitable only for persons of adequate means who have no need for liquidity in this investment. In addition to the factors set forth elsewhere in this Memorandum, prospective purchasers of the Units should specifically consider the following risks before making a decision to purchase one or more Units:

Factors Affecting Operations and Financial Forecasts. The forecasts of the contemplated operating results of the Partnership, reflected in the FORECAST FINANCIAL STATEMENTS attached hereto as Exhibit "E" are based on many assumptions concerning facts and events relating to the Project over which the Partnership will have little or no control. The projected operating expenses, as reflected in the FORECAST FINANCIAL STATEMENTS, have been based in part upon actual operating information of the Project and in part upon certain assumptions and Project operating results. The forecasted tax benefits described in the FORECAST FINANCIAL STATEMENTS are also based on interpretations of current laws and there is no assurance that such laws will not be modified, either prospectively or retroactively, or that such interpretations will be adopted by the IRS. NO REPRESENTATION OR WARRANTY IS OR CAN BE MADE AS TO FUTURE OPERATIONS OR THE AMOUNT OF ANY FUTURE INCOME OR LOSS OF THE PARTNERSHIP.

Return on Investment. No assurances can be given that an Investor will realize any return on his investment. For this reason, each prospective Investor should read this Memorandum and

## FEES AND COMPENSATION ARRANGEMENTS

The following information describes the fees and other forms of compensation to be paid by the Partnership to the General Partners or their affiliates out of the proceeds of the offering and which may be paid in the future.  Such fees and compensation will be determined by related parties and will not be the result of arms'-length negotiations.

Offering and Organization Stage:

At the Closing, under the terms of the Partnership Agreement and the Management Agreement, a closing fee of $5,000.00 will be paid to M.L. Property Management, Inc., the Property Manager, and a fee of $63,250.00 will be paid to M.L. Property Management, Inc. for services rendered in connection with the acquisition.

M. L. Property Management, Inc. and CDS Corporation have a one (1%) percent Partnership interest.  However, due to the fact that all OTHER COSTS, as specified in SOURCES AND USES OF PROCEEDS herein, are being paid by contributions of the Investors, and in consideration for incurring potential liability as General Partners, M. L. Property Management, Inc. and CDS Corporation are contributing 0% of the capital contributions necessary for the closing.

Operational Stage:

During the course of the Partnership's operations, the Partnership will pay the General Partners amounts to be determined as follows:

The General Partners owning 1% of the Partnership will receive 1% of all Cash Flow of the Partnership.

The Partnership will enter into a Project Management Agreement with M.L. Property Management, Inc., one of the General Partner(s), wherein the Partnership will pay a fee equal to five percent (5%) of the gross receipts generated by the Project for management services.  See "THE MANAGEMENT AGREEMENT."

Refinancing, Sale or Dissolution Stage:

Upon the sale or refinancing of the Project, the General Partners owning 1% of the Partnership will receive 1% of all Capital Items.

## THE MANAGEMENT AGREEMENT

M.L. Property Management, Inc., whose principal shareholders are Murray Liebowitz and Sheldon Liebowitz, shall be sole management agent for the term of ownership of the Project by the Partners subject to the terms and conditions of the Mangement Agreement.   Pursuant to the Management Agreement, the Management Agent shall receive a commission equal to 5% of gross receipts. This fee is paid by the tenants of the Project as part of the costs of operation included in their rent.   A copy of the Management Agreement is annexed hereto as Exhibit "D".

## CONFLICTS OF INTEREST

The Partnership is subject to various conflicts of interest arising out of its relationships with the General Partners and their Affiliates, including conflicts related to the acquisition of the Project, development and operation of the Project, and arrangements pursuant to which the General Partners or entities owned or controlled by the General Partners will derive income from the operations of the Project.   See "FEES AND COMPENSATION ARRANGEMENTS."   Because the Partnership will be managed by the General Partners, those conflicts will not be resolved through arm's-length negotiations. These conflicts include, but are not limited to, to the following:

Management Agreement.   The Partnership will enter into a Project Management Agreement with M.L. Property Management, Inc., an Affiliate of Murray Liebowitz and Sheldon Liebowitz, two of the Limited Partners, under which the Management Agent will receive a fee equal to five percent (5%) of the gross receipts generated by the Project.   See "THE MANAGEMENT AGREEMENT."

Related Party Transactions.   Under the terms of the proposed Partnership Agreement, the General Partners are expressly authorized to deal with the General Partners or its Affiliates in connection with real estate brokerage commission agreements, leases, property operation fees, mortgage brokerage fees and construction contracts.   The proposed Partnership Agreement provided, however, that unless such agreements are specifically authorized by the Partnership Agreement all such agreements are to be on terms not less favorable to the Partnership than those available from unaffiliated parties.

Interests in Other Partnerships.   The General Partners and its Affiliates are general partners in other partnerships in and outside the State of Florida.   It is expected that the General

Professional   Representation.      Robert   Krim,   a   public
accountant,  represents  and  advises  the  General  Partners  in
connection with the Partnership and in other capacities and it is
anticipated  that  such  dual  representation  may  continue  in  the
future.   Should any dispute arise between the Partnership and the
General Partners, the General Partners and/or the Partnership may
be  required  to  retain  separate  representation  for  such  matters.
Counsel  to  the  General  Partners  represents  the  General  Partners
in  its  individual  capacities  and  in  their  capacities  as  General
Partners, and it is anticipated that such dual representation may
continue  in  the  future.    However,  should  any  dispute  arise
between  the  Partnership  and  the  General  Partners,  the  General
Partners  and/or  the  Partnership  may  be  required  to  retain
separate counsel for such matters.


## THE GENERAL PARTNERS

The following information is based upon data supplied by the
General Partners.  While the Partnership has no reason to believe
that the information is not correct in any material respect, it
has not conducted or arranged for any independent investigation
and  can  make  no  representation,  warranty  or  guarantee  to  that
effect.  (See "CONFLICTS OF INTERESTS").

M. L. PROPERTY MANAGEMENT, INC. is a Florida corporation,
incorporated in 1978.   M.L. Property Management, Inc. is owned
51%  by  Murray  Liebowitz  and  49%  by  Sheldon  Liebowitz,  Mr.
Liebowitz's son.   Pursuant to the terms of an existing Buy-Sell
Agreement between Murray Liebowitz and Sheldon Liebowitz, Sheldon
Liebowitz can acquire Murray Liebowitz's 51% stock interest in
the Management Company upon the death of Murray Liebowitz.

Since its inception in 1978, the Management Company has been
a  general  partner  and  managing  agent  of  garden-type  apartment
complexes.   Some of the limited and general partnerships in which
Mr.  Liebowitz  and  the  Management  Company  have  been  actively
involved are as follows:

Crossroads Manor Apartments, a 264 unit apartment complex in
Lakewood, New Jersey.  Mr. Liebowitz has been a 99% owner and the
general partner since 1967.

Hialeah Miami Lakes Apartments, a 288 unit apartment complex
located in Hialeah, Florida.   Since 1979, Mr. Liebowitz and the
Management Company have been general partners and the Management
Company has been the managing agent.

- 25 -

Lake Villa Apartments, a 152 Unit Apartment complex located in Hallandale, Florida.   Since 1980, Mr. Liebowitz and the Management Company have been the general partners and the Management Company has been the managing agent.

Market Square Shopping Center is a 125,000 square foot community strip shopping center located in Lakeland, Florida. This property was acquired in 1985 by a limited partnership in which Murray Liebowitz is the general partner, and M.L. Property Management, Inc. is the Managing Agent.

CDS CORPORATION is a Florida corporation, incorporated in 1993. CDS Corporation is owned by Paul Marcus.

### THE PARTNERSHIP AGREEMENT

The Partnership Agreement will be formed with the Sale of the Limited Partnership interests under this Memorandum.   The Certificate and Agreement of Limited Partnership will be filed with the Secretary of State of the State of Florida on or before the Closing Date and is included in its entirety at Exhibit "A".

### Highlights of the Partnership Agreement

The business of the Partnership, and the respective rights and obligations of the Partners, will be governed by the proposed Partnership Agreement, which is appended to this Memorandum as Exhibit "A".   Investors should review the proposed Partnership Agreement.

The following information highlights certain portions of the Partnership Agreement.   It does not purport to be a summary of all material portions of the Partnership Agreement, and is qualified in its entirety by reference to the complete Partnership Agreement.

A. NATURE OF THE PARTNERSHIP.

Harbor Inn of CS Associates, Ltd. will be a Florida Limited Partnership.   The General Partners will be M.L. Property Management, Inc. and CDS Corporation.   There are certain conflicts of interest between the Partnership and the General Partners.  See "CONFLICTS OF INTEREST".

pertaining to the Property, and (xii) execute and deliver the
John Hancock Mortgage and all notes, certificates and agreements
necessary or convenient in connection therewith. However, General
Partners shall not be empowered without the consent of the
Limited Partners owning at least two-thirds (2/3) of the Units in
the Partnership to (i) do any act in contravention of the
Partnership Agreement, (ii) confess a judgment against the
Partnership, (iii) possess Partnership property or assign any
rights in specific Partnership property for other than a
Partnership purpose, (iv) admit a person as a General Partner
into the Partnership, (v) change or reorganize the Partnership
into any other legal form, (vi) require the Limited Partners to
make any contribution to the capital of the Partnership which is
not provided for within the Partnership Agreement, (vii) utilize
the proceeds to be received by the Partnership for purposes other
than as set forth under the Sources and Uses of Proceeds in this
Memorandum, (viii) do any act that would make it impossible to
carry on the ordinary business of the Partnership, (ix) relieve
the General Partners of any liability under this Agreement, and
(x) admit additional or substitute Limited partners except as
provided in the Limited Partnership Agreement.  The sale or
disposition of all or substantially all of the Partnership's
assets shall require the approval of partners owning at least
two-third (2/3) of the total Partnership Interests.

E.   TRANSFERS OF PARTNERS INTERESTS.

     A General Partner shall not transfer his interest in the
Partnership (except to an Affiliate) unless he dies, is declared
incompetent, is insolvent, is bankrupt or he retires and no such
person shall become a substitute General Partner without the
written consent of the Limited Partners owning a majority of the
Units in the Partnership.  A General Partner shall also not be
relieved of any liability within the Partnership unless it
receive the written consent of the Limited Partners owning at
least a majority of the Units of the Partnership.

     A Limited Partner shall not transfer any part or all of his
Units unless he dies, is declared incompetent, is insolvent, is
bankrupt or he receives the consent of the General Partners to
transfer his interest in accordance with Sections 9, 11 of the
Partnership Agreement and subject to Section 7 and its provisions
for the loss and/or gain of Partnership Interest based on
additional capital contributions of Partners.

     No transfer shall be permitted if in the reasonable opinion
of counsel to the Partnership, the Partnership's continued tax
status as a Partnership for federal income tax purposes would be
jeopardized by such a transfer.  No transfer shall be permitted

- 29 -

## THE PROJECT

The Project, Harbor Inn Apartments, is an apartment complex on property consisting of approximately 17.1 acres, located at Harbor Inn, 801 Harbor Drive, Coral Springs, Broward County, Florida (the "Property"), on the northwest corner of 104th Way and Atlantic Boulevard in Coral Springs, Florida. The property has been developed into 32 apartment buildings containing 310 apartment units with 150 one bedroom units, 160 two bedroom units, 548 parking spaces, a clubhouse, four laundry buildings, two swimming pools and tennis courts and all fixtures, appliances, apparatus, equipment, furnishings, heating and air-conditioning equipment, machinery and articles of personal property and replacements thereof, including without limitation, all sewage treatment facilities and fresh water systems, and all water pumps, filters, motors, generators, lift stations, lines and accessories thereto, and all furniture and recreational equipment located in or used in conjunction with the recreational facilities, and all refrigerators, ranges, microwave ovens, dishwashers, disposals, washers and dryers (other than those owned by tenants of apartment units located on said real property) (the "Project"). This offering involves the sale of limited partnership interests in the Partnership for the purpose of raising funds to pay a portion of the Partnership's costs of acquiring the Property and costs of operating the Project.

The Project is in the heart of Coral Springs and in the vicinity of eleven (11) of its residential developments, which include single family homes, townhouses, villas and condominiums. The area to be served by the Project is highly developed with additional growth potential. The surrounding residential area includes nearly 12,000 households of approximately 30,000 residents. The majority of the single family homes in the Project's neighborhoods are priced in the $100,000 to $300,000 range. Median income levels are fairly high and expected to increase in the future. The area is stable and is typically composed of upper middle class, or above, residents. The Project is in a visible location along a well traveled route.

Coral Springs, Florida, is the third largest city in Broward County and at the geographic center of Florida's "Gold Coast," along its southern Atlantic shore line. This northwest Broward County community consists of 22.5 square miles populated by 83,000 residents and is a steadily developing family oriented city which is residential in character. More than three quarters of its population is in the 0-to-17 or the 25-to-64 age bracket. This family dominated community enjoys the highest median income of the 20 lowest crime rate of Florida's 20 largest cities. The average family income is $41,300 per year with approximately 40%

of the families enjoying income levels in excess of $43,680 per
year. Over 32% of the City's household incomes is in excess of
$58,240 per year.

Coral Springs' economic environment supports over 1 million
square feet of office space and nearly 3 million square feet of
retail shopping centers. In addition, industry is served by
Coral Springs' Park of Industry, which contains 12 million square
feet of space and nearly 200 business on 640 acres. Coral
Springs has developed a multifaceted market which provides
employment for over 21,000 persons in a wide range of categories.

The community atmosphere of Coral Springs benefits from 2
major shopping malls and extensive recreational facilities as
well as a host of hotels, hospitals and financial institutions.
Coral Springs residents also enjoy highly acclaimed educational
facilities, with its local-system students distinguishing
themselves at the county, state and national levels. In
addition, there are 17 institutions of higher learning within
commuting distance of the City.

An important factor in Coral Springs' continued growth is
the convenient access to outside centers through its network of
Federal, State and County roadways. In particular, the Sawgrass
Expressway, running along the western perimeter of the City and
with 4 interchanges into the City, links Coral Springs to I-95,
the Florida Turnpike, I-75, I-595 and Alligator Alley. Coral
Springs is also near airport facilities, water ports and railway
lines.

The City, located on the southern east coast, is ten (10)
miles northwest of Fort Lauderdale and lies approximately
equidistant between Palm Beach to the north and Miami to the
south. It is essentially a suburban community whose residents
are owners or employees of businesses with offices in the City
and nearby communities, with most residents employed in the Fort
Lauderdale area. The City economy is directly related to that of
Broward County and the southern Florida region. The County,
which has been one of the nation's fastest growing counties since
the 1960's, enjoys a diversified and expanding economy balanced
between high-technology, manufacturing, international and
domestic tourism, residential and commercial construction, and
up-scale retail trade. The three (3) major industries of the
City of Coral Springs are construction, real estate and retail
sales.

The Project is centrally located in a residential area of a
community enjoying a favorable standard of living and possessing
well-educated, trained residents and which places an emphasis on

## Legal Representation:

Lawrence E. Bathgate, II, Esquire (the "Counsel") (Assisted by the law firm of Alan Werksman, Esquire) representing the General Partners in connection with the preparation of certain documents relating to the Units described in this Memorandum, does not in any way represent the legal, tax or other interests of the prospective Limited Partners or the Partnership. The terms and provisions between the General Partners and the Limited Partners were not reached in arm's-length negotiations. Thus it is likely that such terms and conditions are not as favorable to the Limited Partners as they might have been had they had been reach in arm's length negotiations between the General Partners and a representative of the Limited Partners. No Limited Partners should impute or imply any duty on the Counsel at any time, present or future, to advise or inform the Limited Partners with respect to any information received or obtained by the Counsel at any time relating to the Partnership.

## Accountant:

Robert Krim, Public Accountant, has acted and it is anticipated will continue to act as accountant to the Partnership (the "Accountant").

## Independent Counsel Recommended for Investors:

Investors should not construe the contents of this Memorandum or any written or oral communications from the Partnership, the General Partners, or its employees, agents or Affiliates as tax, legal or accounting advice. Investors are encouraged to consult their own independent legal counsel in connection with their rights and obligations relating to an investment in the Partnership.

## Captions for Convenience Only:

Captions are inserted in this Memorandum solely for organizational convenience and such captions may not necessarily indicate all the information which may be contained under a particular caption.

## Priority of Sections Not Material:

The order in which information appears in the Memorandum does not indicate any priority or materiality of importance with respect to the matters discussed. All material appearing in this Memorandum should be carefully considered by prospective Investors.

EXHIBIT "A"

CERTIFICATE AND AGREEMENT OF LIMITED PARTNERSHIP OF HARBOR INN OF
CS ASSOCIATES, LTD.


SEE ATTACHED

EXHIBIT "B"

PURCHASE AND SALE AGREEMENT


SEE ATTACHED

EXHIBIT "C"

JOHN HANCOCK MORTGAGE APPLICATION


SEE ATTACHED

EXHIBIT "D"

PROPERTY MANAGEMENT AGREEMENT
AND COMMITMENT

SEE ATTACHED

- 69 -

EXHIBIT "E"

FORECAST FINANCIAL STATEMENTS

SEE ATTACHED

1

MEMO NO.

Prepared for the Sole Use of

PAUL MARCUS

NAME

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

PARK PLAZA ASSOCIATES, LTD.

(A Florida Limited Partnership)

$2,178,000

99 Units of Limited Partnership Interests

$22,000 Per Unit

**Minimum of One  (1) Unit ($22,000.00)**

GENERAL PARTNER

M.L. PROPERTY MANAGEMENT, INC.
C/O Murray Liebowitz
2600 E. Commercial Boulevard
Suite 213, Ft. Lauderdale, Florida 33308

THE SECURITIES DESCRIBED IN THIS MEMORANDUM HAVE NOT BEEN FILED, REGISTERED, APPROVED, DISAPPROVED OR QUALIFIED WITH UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR WITH THE AGENCY OR REGULATORY AUTHORITY REGULATING THE SALE OF SECURITIES OF ANY STATE; NOR HAS ANY OFFICIAL CHARGED WITH THE ADMINISTRATION OF FEDERAL OR ANY OTHER JURISDICTION'S SECURITIES LAWS REVIEWED THIS MEMORANDUM OR PASSED ON OR ENDORSED THE MERITS OF THE INVESTMENT DESCRIBED IN THIS MEMORANDUM OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**FOR FLORIDA RESIDENTS:**  THE UNITS REFERRED TO IN THIS OFFERING MEMORANDUM WILL BE SOLD TO, AND ACQUIRED BY, THE HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061 OF THE FLORIDA SECURITIES ACT.  THE UNITS HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA.  EACH OFFEREE WHO IS A FLORIDA RESIDENT SHOULD BE AWARE THAT SECTION 517.061(12)(a)(5) OF THE FLORIDA SECURITIES ACT PROVIDES, IN RELEVANT PART, AS FOLLOWS: "...ANY SALE MADE PURSUANT TO THIS SUBSECTION...SHALL BE VOIDABLE

ATTACHMENT / EXHIBIT 

BY THE PURCHASER... WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER, OR AN ESCROW AGENT..."EACH PERSON ENTITLED TO EXERCISE THE RIGHT TO WITHDRAW GRANTED BY SECTION 517.061(12)(a)(5) AND WHO WISHES TO EXERCISE SUCH RIGHT, MUST, WITHIN THREE (3) DAYS AFTER THE TENDER OF THE FIRST INSTALLMENT OF THE CAPITAL CONTRIBUTION TO THE PLACING BROKER, CAUSE A WRITTEN NOTICE OR TELEGRAM TO BE SENT TO THE PLACING BROKER. SUCH LETTER OR TELEGRAM MUST BE SENT AND POSTMARKED ON OR PRIOR TO THE AFOREMENTIONED THIRD DAY.  IF AN INVESTOR CHOOSES TO WITHDRAW BY LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED.  AN INVESTOR MAKING AN ORAL REQUEST FOR WITHDRAWAL MUST ASK FOR WRITTEN CONFIRMATION THAT THE REQUEST HAS BEEN RECEIVED.

FOR NEW JERSEY RESIDENTS:  THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING.  ANY FILING OF THE WITHIN OFFERING WITH THE BUREAU OF SECURITIES DOES NOT CONSTITUTE APPROVAL OF THE ISSUE OR THE SALE THEREOF BY THE BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEW JERSEY.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

FOR NEW YORK RESIDENTS:  THIS PRIVATE PLACEMENT MEMORANDUM HAS NOT BEEN FILED OR REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PRIOR TO ITS ISSUANCE AND USE.  THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THE INTERESTS ARE BEING OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT FOR NON-PUBLIC OFFERINGS.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM, OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS FROM THE GENERAL PARTNERS, OR FROM THE PLACEMENT AGENT OR ANY PARTICIPATING BROKER ACTING ON THEIR BEHALF, AS LEGAL OR TAX ADVICE.  INVESTORS ARE INVITED TO DISCUSS ALL ASPECTS OF THE TRANSACTION AND MATTERS DESCRIBED HEREIN WITH THE GENERAL PARTNERS, BUT EACH INVESTOR MUST RELY UPON HIS OWN REPRESENTATIVES AND ADVISORS (INCLUDING HIS OWN LEGAL COUNSEL AND ACCOUNTANT) AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING HIS INVESTMENT.

THE GENERAL PARTNER RESERVES THE RIGHT TO WITHDRAW THIS OFFERING AT ANY TIME PRIOR TO THE ADMISSION OF LIMITED PARTNERS WHO SUBSCRIBED FOR 99 UNITS.  THIS OFFERING WILL TERMINATE ON AUGUST 11, 1993, UNLESS SOONER TERMINATED (OR EXTENDED) IN THE DISCRETION OF THE GENERAL PARTNER.

- 2 -

IN THE EVENT THAT THE OFFERING IS TERMINATED, AND THE TRANSACTIONS CONTEMPLATED ARE NOT CONSUMMATED, ALL PAYMENTS WILL BE RETURNED WITHOUT DEDUCTION FOR EXPENSES AND WITHOUT ANY INTEREST THEREON, AND ALL SUBSCRIPTIONS WILL BE CANCELLED.

ALL PROCEEDS OF THE OFFERING WILL BE HELD IN TRUST BY THE PARTNERSHIP FOR THE BENEFIT OF THE PURCHASERS OF INTERESTS TO BE USED ONLY FOR THE PURPOSES SET FORTH IN THE USE OF PROCEEDS SECTION.

THE GENERAL PARTNER HAS AGREED TO MAKE AVAILABLE, PRIOR TO THE CONSUMMATION OF THE TRANSACTION CONTEMPLATED HEREIN, TO EACH PROSPECTIVE PURCHASER OF UNITS OR TO HIS REPRESENTATIVE(S) OR BOTH, THE OPPORTUNITY TO ASK QUESTIONS OF, AND RECEIVE ANSWERS FROM, THE GENERAL PARTNER OR ANY PERSON ACTING ON ITS BEHALF CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING, AND TO OBTAIN ANY ADDITIONAL INFORMATION, TO THE EXTENT THAT THE GENERAL PARTNER POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE, NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION SET FORTH HEREIN.

INVESTMENT IN THE INTERESTS MAY NOT BE SUITABLE FOR INVESTORS WHO DO NOT MEET CERTAIN NET WORTH AND OTHER REQUIREMENTS, OR WHO CANNOT AFFORD A NON-LIQUID SPECULATIVE INVESTMENT. SEE "RISK FACTORS," "FEDERAL INCOME TAX CONSEQUENCES," "INVESTOR SUITABILITY" AND "RESTRICTIONS ON TRANSFER."

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION TO ANYONE IN ANY STATE OR IN ANY OTHER JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED. IN ADDITION, THIS MEMORANDUM CONSTITUTES AN OFFER ONLY IF A NAME AND MEMORANDUM IDENTIFICATION NUMBER APPEAR IN THE APPROPRIATE SPACE PROVIDED ON THE COVER PAGE. REFERENCE SHOULD BE MADE TO THE CERTIFICATE AND AGREEMENT OF LIMITED PARTNERSHIP, SUPPORTING DOCUMENTS AND OTHER INFORMATION FURNISHED HEREWITH FOR COMPLETE INFORMATION CONCERNING THE RIGHTS AND OBLIGATIONS OF THE PARTIES THERETO. CERTAIN PROVISIONS OF SUCH AGREEMENTS AND DOCUMENTS ARE SUMMARIZED IN THIS MEMORANDUM, BUT IT SHOULD NOT BE ASSUMED THAT THE SUMMARIES ARE COMPLETE.

THE FOREGOING FINANCIAL STATEMENTS FURNISHED HEREWITH HAVE BEEN PREPARED ON AN INCOME TAX BASIS AND ON THE BASIS OF ASSUMPTIONS AND HYPOTHESES STATED THEREIN. FUTURE OPERATING RESULTS ARE IMPOSSIBLE TO PREDICT AND NO REPRESENTATION OF ANY KIND IS MADE RESPECTING THE FUTURE ACCURACY OR COMPLETENESS OF THESE PROJECTIONS.

Dated as of July 19,1993

## INDEX AND TABLE OF CONTENTS

                                                          PAGE

I.   OFFERING CIRCULAR

     Information Regarding this Memorandum ...........   7
     Summary of the Offering .........................   8
     Terms of the Offering ...........................  12
     Investor Suitability ............................  13
     Sources and Uses of Proceeds ....................  13
     Risk Factors ....................................  15
     Fees and Compensation Arrangements ..............  21
     The Management Agreement ........................  22
     Conflicts of Interest ...........................  22
     The General Partner .............................  24
     The Partnership Agreement .......................  25
     Fiduciary Responsibilities of the
          General Partner ............................  30
     The Project .....................................  30
     Plan of Financing ...............................  32
     State and Local Taxes ...........................  33
     Federal Income Tax Consequences .................  34
     Restrictions on Transfer ........................  59
     Certain Other Information .......................  60
     Absence of Material Litigation ..................  62
     Glossary of Terms ...............................  62

II.  EXHIBITS

     A.   Amended and Restated Certificate and
          Agreement of Limited Partnership
     B.   Purchase and Sale Contract
     C.   Intercontinental Bank Mortgage Application
     D.   Management Agreement
     E.   Forecast Financial Statements

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

---

### PARK PLAZA ASSOCIATES, LTD.

#### $2,178,000 of Limited Partnership Interests

#### $20,000 per Unit

PARK PLAZA ASSOCIATES, LTD. is a Florida limited partnership (the "Partnership") formed for the purpose of purchasing property and operating, leasing, managing, improving, holding, selling and otherwise dealing with, for investment purposes, an apartment building complex with related amenities and facilities thereon and to otherwise own, operate or lease the complex presently known as Candlewood Square Apartments located on approximately 10.436± acres. The Partnership property, known as Candlewood Square Apartments, 8140 Southwest 22nd Street, North Lauderdale, Broward County, Florida (the "Property") has been developed into six 3-story, elevator and stair accessed apartment buildings containing 252 rentable garden apartment units with 72 1 bedroom/1.5 baths, 108 2 bedroom/2 baths, and 72 3 bedroom/2 baths, patios and balconies, 402 asphalt paved, open parking spaces, a rental office building with maintenance shop and restrooms, one swimming pool and pool area, one basketball court, tennis courts, a volleyball court, a kiddie playground, shuffleboard courts, laundry rooms on each floor of the apartment buildings, and all fixtures, appliances, apparatus, equipment, furnishings, wall-to-wall carpeting, electric water heaters in each unit, central air-conditioning equipment with individual units, machinery and articles of personal property and replacements thereof, including without limitation, all sewage treatment facilities and fresh water systems, and all water pumps, filters, motors, generators, lift stations, lines and accessories thereto, and all furniture and recreational equipment located in or used in conjunction with the recreational facilities, and all refrigerators/freezers, ranges/ovens, dishwashers, garbage disposals, washers and dryers located in laundry rooms on each floor of the apartment buildings located on said real property (the "Project"). The property has a combined gross building area estimated at 273,191± square feet, and a net rentable area estimated at 218,700± square feet in 252 units. The property is zoned by the City of North Lauderdale as "RM-16", Medium Density District with a maximum permitted density of sixteen units per acre. The project possesses a density of 24 units per gross acre which, according to Mr. Richard Sala of the North Lauderdale Zoning Department, was grandfathered into the most recent land use plan. This offering involves the sale of

- 5 -

limited partnership interests in the Partnership for the purpose of raising funds to pay a portion of the Partnership's costs of acquiring the Property and costs of operating the Project.

The Partnership is offering a total of 99 limited partnership units (the "Units") at a price of $22,000 per Unit. The per Unit price of $22,000 shall be payable by check upon subscription. It should be noted that 1 Unit, in addition to the 99 Units, shall be purchased by the General Partner for the consideration of $22,000.00. The General Partner, in its discretion, may allow the purchase of fractional Units, in which case the percentage Interest of the Partner will be adjusted accordingly.

M.L. Property Management, Inc., the General Partner, will act as placement agent and conduct the Offering of the Units as the representative of the Partnership. Until consummation of the Offering, subscription payments received will be deposited by Bathgate, Wegener, Dugan & Wolf, P.C., Lakewood, New Jersey, in a non-interest bearing escrow account maintained at Chemical Bank New Jersey, N.A., 1040 Route 70, Brick, New Jersey or in accordance with such other directions as may be given by the General Partner. The Offering will terminate on the earliest of (i) the date the General Partner may, in its sole discretion, determine, (ii) the date on which all the Units have been sold, or (iii) August 11, 1993. If greater than fifty (50%) percent of the Units have been sold by the Partnership on or before August 11, 1993, then the General Partner may, at its sole election, extend the subscription period or make a loan to the Partnership in an amount equal to the capital otherwise to be raised by the sale of Units, and if such a loan is made and all of the Units have not been sold by August 30, 1993, then the General Partner may, but is not required to, purchase such Units. In the event that this Offering is not consummated, the proceeds of the Offering will be promptly and fully returned to the Investors. Promptly after the sale of the Units, any subscriptions not accepted by the Partnership will be returned.

## INFORMATION REGARDING THIS MEMORANDUM

### No Offer or Invitation:

This Memorandum has been prepared solely for informational purposes and is not an offer or an invitation to become a Limited Partner. Such an offer may be made only by the General Partner, who reserves the right to accept or reject any proposals of investment. Since this Offering is intended to qualify as a private placement, exempt from registration under the Securities Act of 1933, as amended, and other applicable securities laws, and since there will be no market for, and therefore limited transferability of, the Units, the General Partner, in its sole discretion, will accept subscriptions only from persons meeting certain suitability requirements. See "INVESTOR SUITABILITY."

### Sources of Information:

This Memorandum has been prepared from sources deemed reliable, but no representation or warranty is made as to its accuracy or completeness. The obligations of the parties to this transaction will be set forth in and governed by the documents referred to in this Memorandum.

### Authorized Statements:

No person is authorized to give any information or to make any statement or any representation or warranty not contained in this Memorandum. Any such information must not be relied upon as having been authorized by the Partnership or the General Partner or any employee, agent or Affiliate of the General Partner.

### Supplements to Memorandum:

Neither the delivery of this Memorandum nor any sales of Units shall, under any circumstances, create any implication that there has been no change in the matters discussed in this Memorandum since the date hereof. However, in the event that the General Partner becomes aware of any material changes occurring prior to the completion of the Offering described in this Memorandum, this Memorandum will be amended or supplemented accordingly.

### Memorandum Not Legal Advice:

Prospective Investors should not construe the contents of this Memorandum or any prior or subsequent communication from the General Partner, as legal or tax advice. Each Investor must rely solely upon his own representatives (including his legal counsel and accountant) as to legal, tax and related matters concerning a prospective investment in the Partnership.

Confidential Memorandum:

This Memorandum has been prepared solely for the information of persons and entities interested in the private placement of the Interests offered hereunder and may neither be reproduced nor used for any other purpose. Any reproduction or distribution of this Memorandum, in whole or in part, without the prior written consent of the General Partner, is prohibited.

Miscellaneous:

Certain capitalized terms used in this Memorandum are defined in "GLOSSARY OF TERMS." Cross references refer to section headings contained in this Memorandum and are referenced in the Table of Contents on page 5 of this Memorandum. The descriptions in this Memorandum of various agreements, documents, statutes, regulations and proposed legislation are not designed to be complete and are, therefor, qualified in their entirety by reference to the respective agreement, document, statute, regulation or proposed legislation described in the summaries.

### SUMMARY OF THE OFFERING

#### INTRODUCTION

This Offering relates to a limited partnership whose purpose is to acquire, own and operate an apartment complex with amenities and related facilities located in North Lauderdale, Florida. Several transactions are occurring concurrently with this Offering. The Offering under this Memorandum will result in the filing of a Limited Partnership Agreement to form a Florida limited partnership to acquire, own and operate a 252 unit apartment complex at 8140 Southwest 22nd Street, North Lauderdale, Florida. See, the proposed form of limited partnership agreement, "THE AMENDED AND RESTATED CERTIFICATE AND AGREEMENT OF LIMITED PARTNERSHIP OF PARK PLAZA ASSOCIATES, LTD., attached hereto as Exhibit "A". The acquisition of the subject Property by the limited partnership is pursuant to a PURCHASE AND SALE CONTRACT, attached hereto as Exhibit "B". A mortgage is expected to be obtained in connection with the acquisition of the Property by PARK PLAZA ASSOCIATES, LTD., and is proposed to be similar in terms and conditions to the proposed Intercontinental Bank Mortgage referenced in the within Private Placement Memorandum. The mortgage closing shall occur on the Closing Date. See the PROPOSED INTERCONTINENTAL BANK MORTGAGE DATA, attached hereto as Exhibit "C". The subject Property will be managed pursuant to a Management Agreement. See, PROPERTY MANAGEMENT AGREEMENT, attached hereto as Exhibit "D".

- 8 -

This Offering is being made to a few potential investors, all of which have had past business or personal or both relations with the General Partner or its principals. Potential Limited Partners should note that the proposed Limited Partnership Agreement for the Partnership permits the General Partner to call for additional funds from the Limited Partner, or the prospect of the subsequent dilution of a Limited Partner's interest. See "THE PARTNERSHIP AGREEMENT."

Also closing concurrently with the Offering under this Memorandum is a proposed mortgage (the "PROPOSED INTERCONTINENTAL MORTGAGE DATA"). This proposed Mortgage or one similar in amount and terms, together with the General and Limited Partner contributions, will be used to acquire the Project. See, "PLAN OF FINANCING."

The successful closing of each of these transactions is a condition of closing of the others.

### THE OFFERING

The following is a brief summary of certain information contained in this Memorandum and is qualified in its entirety by the information contained elsewhere in this Memorandum. Investors are urged to carefully review this Memorandum and the Exhibits hereto in their entirety prior to making an investment decision.

The Partnership. Park Plaza Associates Ltd. is a Florida limited partnership formed for the purpose of acquiring, improving, leasing and managing the 252 unit apartment complex located in North Lauderdale, Florida. A copy of the proposed form of the Amended and Restated Certificate and Agreement of Limited Partnership of Park Plaza Associates, Ltd., a Florida Limited Partnership (the "Partnership Agreement") is attached as Exhibit "A" to this Memorandum.

Business of the Partnership. The business of the Partnership is the ownership, operation, leasing and management sale or refinancing of the Project, a 252 apartment unit complex (the "Project"), known as Candlewood Square Apartments, located at 8140 Southwest 22nd Street, in the City of North Lauderdale, Broward County, Florida. See "THE PROJECT."

The General Partner. The name and business address and telephone number of the General Partner of the Partnership is as follows:

M.L.  Property Management, Inc.
C/O Murray Liebowitz, President
2600 E. Commercial Boulevard
Suite 213
Ft. Lauderdale, Florida 33308
(305) 491-4511

Capital Contributions of Limited Partners.  Each Limited
Partner shall pay $22,000 per Unit as a capital contribution of
the Partnership.  The per Unit price of $22,000 shall be payable
by check upon subscription.  The General Partner, in its
discretion, may allow the purchase of fractional Units, in which
case the percentage Interest of the purchase price will be
adjusted accordingly.  See "TERMS OF THE OFFERING."

Partnership Agreement.  The proposed form of the Partnership
Agreement is set forth in Exhibit "A" appended to this
Memorandum.  Various references herein to the Partnership
Agreement do not purport to be complete descriptions of the
provisions of the Partnership Agreement.  Prospective Investors
are advised to read the entire Partnership Agreement.

Partnership Objectives.  The General Partner anticipates
that, given the characteristics of the Project, the nature of the
investment, and the structure of the Offering, the principal
investment objectives of the Partnership will be such as to allow
an investor to realize the following potential benefits:

(a) preservation and protection of invested capital
through ownership of real property;

(b) distribution to the Limited Partners of Cash Flow to
the extent available;

(c) tax benefits through cost recovery and interest
deductions allowing the deferral of taxation on Cash Flow;
and

(d) long-term capital appreciation through potential
increases in the value of the Project.

There is no assurance that the Partnership will be
successful in attaining any of these objectives, or that a
Limited Partner will realize these or any other benefits.

The Partnership intends to hold the Project indefinitely as
an investment.  In determining an appropriate time to sell the
Project, or any part thereof, the General Partner will consider

- 10 -

factors such as any current cash flow and cash distribution to
Partners, potential capital appreciation that may be realized
from a sale, and the maturity date of the mortgage on the
Project.  See "PLAN OF FINANCING."

   Any net proceeds from the sale or refinancing of the assets
of the Partnership will be distributed to the Partners as
provided in the Partnership Agreement and will not be reinvested.

   <u>Management of the Partnership</u>.   The management of the
Partnership will be the responsibility of the General Partner.
The Partnership Agreement authorizes the General Partner to
undertake various obligations and perform certain tasks on behalf
of the Partnership.   Pursuant to the terms of the Management
Agreement, M.L. Property Management, Inc., the General Partner,
will act as the Management Company for the Partnership.   Pursuant
to the Management Agreement, the Management Company will receive
an initial set up fee of five thousand dollars ($5,000.00) plus a
continuing fee of 5% of the gross receipts, as defined in the
Management Agreement of the Project, which is included in the
amounts paid by the Project tenants.   See "THE MANAGEMENT
AGREEMENT," "FEES AND COMPENSATION ARRANGEMENTS," "THE AMENDED
AND RESTATED CERTIFICATE AND AGREEMENT OF LIMITED PARTNERSHIP OF
PARK PLAZA ASSOCIATES, LTD., a Florida Limited Partnership" and
the Management Agreement attached hereto as Exhibit "D".

   <u>Certain Risk Factors</u>.   The Partnership will face all of the
risks involved in operating an apartment complex.   The
Partnership is leveraged.   The Limited Partners will have no
voice in the operations of the Partnership and the General
Partner has conflicts of interests with the interests of the
Limited Partners.   The Units are not freely transferable and no
public market in the Units is expected to develop.   The proposed
Intercontinental Bank Mortgage is for $2,500,000.00 in the form
of a one (1) year ARM based on a fifteen (15) term with a 3
(three) year balloon with the option to renew the loan at
maturity for an additional three (3) years, subject to
satisfactory performance, terms and conditions to be negotiated.
See "RISK FACTORS" and "CONFLICTS OF INTERESTS."

   <u>Tax Aspects of the Partnership</u>.   The Partnership has not
sought a ruling from the IRS with respect to its tax
classification as a partnership.  With respect to its depreciable
real property, the Partnership expects to utilize a straight line
method over a 27.5 year recovery period.   With respect to its
personal property, depreciation will be based on the modified
accelerated cost recovery system.   See the "FORECAST FINANCIAL

- 11 -

STATEMENTS" attached hereto as Exhibit "E". The Partnership will use the accrual method of accounting for both financial accounting and tax purposes.

Information concerning the federal income tax consequences of an investment in the Partnership is more fully set forth under "FEDERAL INCOME TAX CONSEQUENCES" below. Prospective Investors are urged to carefully review the material contained therein and to seek the advice of their independent tax counsel prior to investing in the Partnership.

Glossary. Certain terms used in this Memorandum are defined in the "GLOSSARY OF TERMS" appearing elsewhere herein.

### TERMS OF THE OFFERING

The Offering. The Partnership is offering a total of 99 Units for sale at a price of $22,000 per Unit, payable in cash on or prior to the Closing Date. The General Partner, in its discretion, may also permit the purchase of fractional Units.

Subscription Period and Procedures. The Offering will expire on August 11, 1993 (the "Closing Date"). If greater than fifty percent (50%) of the Units have been sold by the Partnership on or before August 11, 1993, then the General Partner may, at its sole election, make a loan to the Partnership in an amount equal to the capital otherwise to be raised by the sale of Units or the General Partner may, at its sole discretion, extend the Closing Date.

Subscriptions are subject to acceptance by the General Partner and may be rejected by the General Partner in its sole discretion. Pending the sale of all of the Units, cash funds paid by subscribers will be deposited by Bathgate, Wegener, Dugan & Wolf, P.C., Lakewood, New Jersey in a non-interest bearing escrow account to be maintained at Chemical Bank New Jersey, N.A., 1040 Route 70, Brick, New Jersey or in accordance with such other directions as may be given by the General Partner.

In the event that this Offering is not consummated, the proceeds of the Offering will be promptly and fully returned to the Investors. Promptly after the sale of the Units, any subscriptions not accepted by the Partnership will be returned. In the event that the Offering is terminated and the transactions contemplated are not consummated, all payments will be returned without deduction for expenses and without any interest thereon, and all subscriptions will be cancelled.

- 12 -

## INVESTOR SUITABILITY

Investment in the Units involves a high degree of risk and is suitable only for persons of substantial financial means who have no need for liquidity in this investment.  A public market for the Units will be restricted and may result in substantial adverse tax consequences to a seller of a Unit.

This Offering is intended to be made as a private placement Offering, exempt from registration (i) under the Act, pursuant to Sections 3(b) and/or 4(2) of the Act and Regulation D promulgated thereunder ("Regulation D"), and (ii) under the securities laws of the States of New Jersey, New York and Florida.   These exemptions from registration require, in part, that the Units may not be purchased by more than twenty-five (25) non-accredited investors.   In addition, the General Partner is requiring that all Investors have such knowledge and experience in financial and business matters so that they are capable of evaluating the merits and risks of the prospective investment.

The General Partner is offering the Units to persons who possess   certain    characteristics    suggesting    financial sophistication and strength and who meet the definition of an "Accredited Investor" contained in Regulation D.   The General Partner will require each prospective Investor to provide certain written information concerning the prospective Investor's income, net worth and experience in financial and business matters, and they may utilize such information to determine whether a prospective Investor is eligible to purchase an Unit.

Investors also will be required to meet any suitability standards imposed by the states or other jurisdictions in which the Units are offered and sold.   Such jurisdictions may impose standards stricter than those set forth above.

Notwithstanding that a prospective Investor is an Accredited Investor, or that such Investor is willing to represent that he has sufficient knowledge and experience to capably evaluate the merits and risks of the prospective investment, the General Partner has the absolute right to refuse to sell Units to any prospective Investor.


## SOURCES AND USES OF PROCEEDS

Below is a summary of the expected sources of funds and uses of funds required to close the sale of the Units and the proposed Intercontinental Bank Mortgage. See "THE PARTNERSHIP" and "PLAN OF FINANCING" for descriptions of these transactions.

- 13 -

Please note that this summary reflects estimates based on tentative attorney closing adjustments.  If the amounts change, the General Partner may be required to contribute more or less than the amount shown below under "SOURCES".  Please further note that there also may be additional capital calls on the Limited Partners pursuant to the Partnership Agreement if the amounts allocated under "OTHER COSTS" is exceeded.  See "THE AMENDED AND RESTATED CERTIFICATE AND AGREEMENT OF LIMITED PARTNERSHIP OF PARK PLAZA ASSOCIATES, LTD., a Florida Limited Partnership".

SOURCES:

Permanent Mortgage
    (Proposed Intercontinental Bank) ...... $  2,500,000.00

Units (Total of 100 Units at $22,000 each... $  2,200,000.00
    (1 Unit at $22,000
    of General Partner – $  22,000.00
    (99 Units at $22,000 each
    of Limited Partners – $2,178,000.00

TOTAL SOURCES............................. $  4,700,000.00

USES:

PURCHASE PRICE......... $  4,000,000.00

MORTGAGE  AND ACQUISITION OF PROJECT
Proposed First Mortgage Intercontinental Bank$  2,500,000.00

CASH FOR BALANCE OF PURCHASE PRICE......... $  1,500,000.00

CLOSING COSTS (APPROX.).................... $    154,000.00

WORKING CAPITAL-FIX UP COSTS SCHED A APPROX. $    500,000.00

WORKING CAPITAL-FIX UP COSTS SCHED B APPROX. $    170,000.00

TOTAL CASH NEEDED                           $ 4,824,000.00

It should be noted that the TOTAL CASH NEEDED as shown in the USES section above is $124,000.00 over the amount shown in the TOTAL SOURCES section.  The numbers in the WORKING CAPITAL column are shown as appoximate numbers estimated as costs for

- 14 -

necessary repairs and/or improvements.  These numbers were based on the estimates which were previously distributed to the partners by M.L. Property Management, Inc. by cover letter dated June 7, 1993, a copy of which is attached hereto as part of Exhibit E.  The actual costs listed in the schedules might be higher or lower than these estimates.  It must be stressed that these estimates may not include all repairs and/or improvements which may be necessary and/or desirable.  It is highly likely that additional cost items may be identified after the closing of title.  The actual fix up costs, etc., may be higher than the estimates set forth within this document and the total fix up costs may be further increased by additional repair/improvement items not identified at this time and not included in the estimated working capital fix up costs.  In the event the actual fix up costs are higher than originally estimated due to fix up costs that are higher than those estimated herein and due to additional costs for other fix up repairs and improvements not even estimated to date, then, in that event, it is the intent of the partnership to first use available cash flow for the necessary funds, however, a call for additional funds from the partners may be necessary.

## RISK FACTORS

The purchase of the Units offered hereby involves a substantial degree of risk and is suitable only for persons of adequate means who have no need for liquidity in this investment.  In addition to the factors set forth elsewhere in this Memorandum, prospective purchasers of the Units should specifically consider the following risks before making a decision to purchase one or more Units:

Factors Affecting Operations and Financial Forecasts.  The forecasts of the contemplated operating results of the Partnership, reflected in the FORECAST FINANCIAL STATEMENTS attached hereto as Exhibit "E" are based on many assumptions concerning facts and events relating to the Project over which the Partnership will have little or no control.  The projected operating expenses, as reflected in the FORECAST FINANCIAL STATEMENTS, have been based in part upon actual operating information of the Project and in part upon certain assumptions and Project operating results.  The forecasted tax benefits described in the FORECAST FINANCIAL STATEMENTS are also based on interpretations of current laws and there is no assurance that such laws will not be modified, either prospectively or retroactively, or that such interpretations will be adopted by the IRS.  NO REPRESENTATION OR WARRANTY IS OR CAN BE MADE AS TO FUTURE OPERATIONS OR THE AMOUNT OF ANY FUTURE INCOME OR LOSS OF THE PARTNERSHIP.

- 15 -

<u>Return on Investment</u>.    No assurances can be given that an Investor will realize any return on his investment.    For this reason, each prospective Investor should read this Memorandum and all exhibits carefully and should consult with his own personal attorney, accountant, or business advisor prior to making any investment decision.

<u>Balloon Payment on Mortgages</u>.    As described below, the Project is currently proposed to be encumbered by a mortgage upon acquisition.    The mortgage will have a balloon payment.    In the event that the Project is not sold or the mortgage is not refinanced prior to the balloon payment date, or in the event of an earlier default, the lenders will have the right to foreclose and force a sale of the Project.    In such event, the Limited Partners may lose their invested capital and may be requested to recapture a portion of any tax benefits previously realized by them.

        (a)  <u>Proposed Intercontinental Bank Mortgage</u>.    The Partnership expects to enter into a first lien permanent mortgage with Intercontinental Bank. (See the "PROPOSED INTERCONTINENTAL BANK DATA" attached as Exhibit "C").    The proposed Intercontinental Bank Mortgage is a one (1) year ARM priced at 375 basis points over the one (1) year Treasury Index, based on a fifteen (15) year amortization with a three (3) year balloon, expected to be payable in thirty five (35) equal and consecutive payments commencing on the last day of the first (1st) month following the Closing Date on the property with the entire principal balance outstanding, together with all accrued and unpaid interest thereon, being due and payable in full on the last day of the thirty sixth (36th) month following the Closing Date.    It is not expected that the Partnership will have available to it sufficient funds from operations to meet the balloon payment due on the proposed Intercontinental Bank Mortgage at its maturity in three years. The General Partner anticipates refinancing the reduced balance on the proposed Intercontinental Bank Mortgage when it comes due in three years, however, the Bank offers an option to renew the balance owed on the mortgage for an additional three years subject to the payment of one point plus costs.

        The Partnership has obtained data concerning the proposed Intercontinental Bank Mortgage. (See the "PROPOSED INTERCONTINENTAL BANK MORTGAGE DATA" annexed as Exhibit "C"). There can be no assurance that the Intercontinental Bank Mortgage will be closed.    If the Intercontinental Bank Mortgage does not close, the portion of the sale price due at closing in the amount of $2,500,000.00 which was the subject of the mortgage application must be paid from alternative sources.

- 16 -

## Offering and Organization Stage:

At the Closing, under the terms of the Partnership Agreement and the Management Agreement, a set-up fee of $5,000.00 will be paid to M.L. Property Management, Inc., the Property Manager, and S.L. Realty, an affiliate of M.L. Property Management, Inc., will receive a fee of $40,000.00 reflected at closing in a credit from Westinghouse. The $40,000.00 will be applied toward the puchase of the limited partnership interests of Murray Liebowitz and Sheldon Liebowitz with $20,000.00 being applied respectively to the purchase by each of these two limited partners of limited partnership interests.

M. L. Property Management, Inc. has a one (1%) percent Partnership interest in consideration for payment of $22,000.00.

## Operational Stage:

During the course of the Partnership's operations, the Partnership will pay the General Partner amounts to be determined as follows:

The General Partner owning 1% of the Partnership will receive 1% of all Cash Flow of the Partnership.

The Partnership will enter into a Project Management Agreement with M.L. Property Management, Inc., the General Partner, wherein the Partnership will pay a fee equal to five percent (5%) of the gross receipts generated by the Project for management services.  See "THE MANAGEMENT AGREEMENT."

## Refinancing, Sale or Dissolution Stage:

Upon the sale or refinancing of the Project, the General Partner owning 1% of the Partnership will receive 1% of all Capital Items.

### THE MANAGEMENT AGREEMENT

M.L. Property Management, Inc., whose principal shareholders are Murray Liebowitz and Sheldon Liebowitz, shall be sole management agent for the term of ownership of the Project by the Partners subject to the terms and conditions of the Mangement Agreement.  Pursuant to the Management Agreement, the Management Agent shall receive a commission equal to 5% of gross receipts. This fee is paid by the tenants of the Project as part of the costs of operation included in their rent.  A copy of the MANAGEMENT AGREEMENT is annexed hereto as Exhibit "D".

- 22 -

between the Partnership and the General Partner, the General Partner and/or the Partnership may be required to retain separate counsel for such matters.

## THE GENERAL PARTNER

The following information is based upon data supplied by the General Partner. While the Partnership has no reason to believe that the information is not correct in any material respect, it has not conducted or arranged for any independent investigation and can make no representation, warranty or guarantee to that effect. (See "CONFLICTS OF INTERESTS").

M. L. PROPERTY MANAGEMENT, INC. is a Florida corporation, incorporated in 1978. M.L. Property Management, Inc. is owned 51% by Murray Liebowitz and 49% by Sheldon Liebowitz, Mr. Liebowitz's son. Pursuant to the terms of an existing Buy-Sell Agreement between Murray Liebowitz and Sheldon Liebowitz, Sheldon Liebowitz can acquire Murray Liebowitz's 51% stock interest in the Management Company upon the death of Murray Liebowitz.

Since its inception in 1978, the Management Company has been a general partner and managing agent of garden-type apartment complexes. Some of the limited and general partnerships in which Mr. Liebowitz and the Management Company have been actively involved are as follows:

Crossroads Manor Apartments, a 264 unit apartment complex in Lakewood, New Jersey. Mr. Liebowitz has been a 99% owner and the general partner since 1967.

Hialeah Miami Lakes Apartments, a 288 unit apartment complex located in Hialeah, Florida. Since 1979, Mr. Liebowitz and the Management Company have been general partners and the Management Company has been the managing agent.

Lake Villa Apartments, a 152 Unit Apartment complex located in Hallandale, Florida. Since 1980, Mr. Liebowitz and the Management Company have been the general partners and the Management Company has been the managing agent.

Market Square Shopping Center is a 125,000 square foot community strip shopping center located in Lakeland, Florida. This property was acquired in 1985 by a limited partnership in which Murray Liebowitz is the general partner, and M.L. Property Management, Inc. is the Managing Agent.

Harbor Inn of CS Associates, Ltd. is a 310 Unit Apartment complex located in Coral Springs, Florida. This property was acquired in March, 1993, by a limited partnership in which M.L. Property Management, Inc. is one of the general partners, and M.L. Property Management, Inc. is the Managing Agent.

## THE PARTNERSHIP AGREEMENT

The Partnership Agreement will be formed with the Sale of the Limited Partnership interests under this Memorandum. The Certificate and Agreement of Limited Partnership will be filed with the Secretary of State of the State of Florida on or before the Closing Date and is included in its entirety at Exhibit "A".

### Highlights of the Partnership Agreement

The business of the Partnership, and the respective rights and obligations of the Partners, will be governed by the proposed Partnership Agreement, which is appended to this Memorandum as Exhibit "A". Investors should review the proposed Partnership Agreement.

The following information highlights certain portions of the Partnership Agreement. It does not purport to be a summary of all material portions of the Partnership Agreement, and is qualified in its entirety by reference to the complete Partnership Agreement.

A. NATURE OF THE PARTNERSHIP.

Park Plaza Associates, Ltd. will be a Florida Limited Partnership. The General Partner will be M.L. Property Management, Inc.. There are certain conflicts of interest between the Partnership and the General Partner. See "CONFLICTS OF INTEREST".

B. CAPITAL CONTRIBUTIONS.

Each Investor desiring to be a Limited Partner shall contribute $22,000 per Unit as his initial capital contribution. There will be ninety-nine (99) Units sold through this Offering. The General Partner will acquire one Unit of $22,000 as its initial capital contribution.

If in the judgment of the General Partner, additional funds are required by The Partnership for the operation, management, maintenance, preservation or co-operation of the Property, such

2600 E. Commercial Boulevard
Suite 213
Ft. Lauderdale, Florida  33308

The General Partner is available to respond to any questions and inquiries relating to this Offering and to the backgrounds and prior experience of the General Partner.  The General Partner will make available to prospective Investors and their attorneys, accountants and purchaser representatives, upon their request, any additional information which may be reasonably requested by such persons to support or verify the information contained herein.  All requested information to assist prospective Investors in making an informed investment decision will be provided to the extent that the General Partner or the Partnership possesses such information or can acquire it without unreasonable effort or expense.  Should any prospective Investor desire to visit the site of the Project, the General Partner will, upon request, make arrangements for a representative to be available at the site to answer questions.

Legal Representation:

     Bathgate, Wegener, Dugan $ Wolf, P.C. (the "Counsel") (Assisted by the law firm of Alan Werksman, Esquire in the preparation of an opinion letter, if required) representing the General Partner in connection with the preparation of certain documents relating to the Units described in this Memorandum, does not in any way represent the legal, tax or other interests of the prospective Limited Partners or the Partnership.  The terms and provisions between the General Partner and the Limited Partners were not reached in arm's-length negotiations.  Thus it is likely that such terms and conditions are not as favorable to the Limited Partners as they might have been had they had been reach in arm's length negotiations between the General Partner and a representative of the Limited Partners.  No Limited Partners should impute or imply any duty on the Counsel at any time, present or future, to advise or inform the Limited Partners with respect to any information received or obtained by the Counsel at any time relating to the Partnership.

Accountant:

     Robert Krim, Public Accountant, has acted and it is anticipated will continue to act as accountant to the Partnership (the "Accountant").

- 61 -

## EXHIBIT "A"

## AMENDED AND RESTATED CERTIFICATE AND AGREEMENT
## OF LIMITED PARTNERSHIP OF PARK PLAZA ASSOCIATES, LTD.


SEE ATTACHED

EXHIBIT "B"

PURCHASE AND SALE AGREEMENT

SEE ATTACHED

**EXHIBIT "C"**

**PROPOSED INTERCONTINENTAL BANK MORTGAGE DATA**

SEE ATTACHED

EXHIBIT "D"

PROPERTY MANAGEMENT AGREEMENT


SEE ATTACHED

EXHIBIT "E"

FORECAST FINANCIAL STATEMENTS

SEE ATTACHED

AMENDED AND RESTATED CERTIFICATE AND

AGREEMENT OF LIMITED PARTNERSHIP

OF

HARBOR INN OF CS ASSOCIATES, LTD.
A Florida Limited Partnership

THIS AMENDED AND RESTATED CERTIFICATE AND AGREEMENT OF LIMITED PARTNERSHIP ("Agreement"), dated as of March 31, 1993 by and among M.L. Property Management, Inc., a Florida corporation, as Original General Partner (the "Original General Partner"), and M.L. Property Management, Inc., a Florida corporation, and CDS Industries, Inc., a Florida corporation, both of 2600 E. Commercial Boulevard, Suite 213, Fort Lauderdale, Florida 33308, hereinafter referred to by name or as a General Partner and collectively as the General Partners (the "General Partners") and Murray Liebowitz and Sheldon Liebowitz, as the Original Limited Partners (the "Original Limited Partners"), and each of the individuals, partnership, corporations, trusts, estates and other entities listed on Exhibit "Al" annexed hereto who execute Counterpart Signature Pages of this Agreement (collectively and together with any individual, partnershp, corporation, trust, estate or other entity hereafter admitted as Limited Partners, referred to as the "Limited Partners", and, individually, as a "Limited Partner").  The General Partners and the Limited Partners are herein sometimes referred to individually as a "Partner" and collectively as the "Partners".

-1-

ATTACHMENT / EXHIBIT D

## W I T N E S S E T H:

**WHEREAS,** Harbor Inn of CS Associates, Ltd., a Florida Limited Partnership, (the "Partnership") was created pursuant to a Certificate and Agreement of Limited Partnership dated March 24, 1993 and filed with the Office of the Secretary of State, of the State of Florida on March 29, 1993 (said Certificate and Agreement of Limited Partnership dated March 24, 1993 is sometimes referred to herein as the "Original Partnership Agreement");

**WHEREAS,** the Partnership is presently in existence as a Limited partnership under the Revised Uniform Limited Partnership Act of the State of Florida; and

**WHEREAS,** the Original General Partner desires to transfer one-half (1/2%) percent of the Original General Partner's one (1%) percent interest to M.L. Property Management, Inc., a Florida corporation, and to transfer one-half (1/2%) percent interest of the Original General Partner's one (1%) percent interest to CDS Industries, Inc., a Florida corporation, as set forth on Exhibit "A1" annexed hereto and incorporated herein; and,

**WHEREAS,** the Original Limited Partners desire to transfer their interests as Original Limited Partners and have these interests reallocated to the Limited Partners in accordance with the Limited Partners percentage interests set forth on Exhibit "A1", annexed hereto and incorporated herein; and

**WHEREAS,** the parties hereto desire to amend, restate and supersede in its entirety the Original Partnership Agreement and to enter into this Agreement for the purpose of (i) admitting the General Partners and transferring and reallocating the General Partners' interests by and between M.L. Property Management, Inc., a Florida corporation, and CDS Industries, Inc., a Florida corporation, as set forth on Exhibit "Al" annexed hereto and incorporated herein, (ii) admitting the Limited Partners and transferring and reallocating the Limited Partners' interest by and among the Limited Partners, as set forth in Exhibit "Al" annexed hereto and incorporated herein, and (iii) amending, restating and superseding in its entirety the Original Partnership Agreement as hereinafter set forth;

**NOW, THEREFORE,** the Original General Partner, the General Partners, the Original Limited Partners and the Limited Partners hereby SIGN AND SWEAR TO this Agreement and agree as follows:

## SECTION 1

### THE PARTNERSHIP

1.1   <u>Continuation of Partnership.</u>   The parties hereby continue the Partnership as a Limited Partnership pursuant to the provisions of the Revised Uniform Limited Partnership Act of the State of Florida and in accordance with the transfer and reallocation of interests as set forth on Exhibit Al attached hereto and incorporated by reference herein.

1.2   <u>Partnership Name.</u>   The name of the Partnership shall be Harbor Inn of CS Associates, Ltd., A Florida Limited Partnership, and all business of the Partnership shall be conducted in such

-3-

name.    The  General  Partners  may  change  the  name  of  the partnership or adopt such trade or fictitious names as they may determine to be appropriate upon ten (10) Business Days notice to the Limited Partners.

    1.3   **Purpose.**   The  sole  purpose  and  business  of  the Partnership shall be to acquire, own, improve, lease, manage, operate,  hold,  mortgage,  sell  and  otherwise  deal  with  the Property for investment, or any part thereof, and to conduct such other activities as may be necessary or appropriate to promote the business of the Partnership as set forth above, it being agreed that each of the foregoing is an ordinary part of the Partnership's business.  The Partnership shall not engage in any other business without the prior consent of the Partners owning at least two-thirds (2/3rds) of the Interests in the Partnership.

    1.4   **Principal Place of Business.**   The principal place of business of the Partnership shall be at 2600 E. Commercial Blvd., Suite 213, Fort Lauderdale,  Florida  33308, or at such other location  as  the  General  Partners,  in  their  discretion,  may determine.

    1.5   **Term.**  The term of the Partnership shall commence upon recordation of the Certificate of Limited Partnership by the General Partners in the manner provided by the Act, which filing and recordation shall occur as promptly as possible following the execution and delivery of this Agreement, and the Partnership shall continue until the winding up and liquidation of the Partnership and its business is completed following a Liquidating Event, as provided in Section 10 hereof.

-4-

1.6   **Filings.**   (a) The General Partners shall cause to be filed, with the Secretary of the State of Florida, and elsewhere as may be required by law, the original and any amended Certificates and other documents, and shall take any and all other actions as may be reasonably necessary to perfect and maintain the status of the Partnership as a limited partnership in accordance with the Act.

(b)   The name and address of the Agent for service of process on the Partnership shall be Sheldon Liebowitz or any successor as appointed by the General Partners in their sole discretion in accordance with the Act. The registered Office for Service of Process of the Partnership in the State of Florida is located at 2600 E. Commercial Blvd., Suite 213, Fort Lauderdale, Florida 33308.

(c)   Upon the dissolution of the Partnership, the General Partners (or, in the event there is no remaining General Partner, any Person elected pursuant to Section 10 hereof) shall promptly execute and cause to be filed certificates of dissolution in accordance with the Act and the laws of any other states or jurisdictions in which the Partnership has filed certificates.

1.7   **Title to Property.**   All real and personal property owned by the Partnership shall be owned by the Partnership as an entity and no Partner shall have any ownership interest in such property in its individual name or right, and each Partner's interest in the Partnership shall be personal property for all

purposes.  Except as otherwise provided in this Agreement, the Partnership shall hold all of its real and personal property in the name of the Partnership and not in the name of any Partner.

1.8  **Tax Matters Partner.**  Murray Liebowitz shall be the tax matters partner, pursuant to Code Sections 6221 through 6231.

1.9  **Independent Activities.**  (a)  The General Partners and any of their Affiliates shall be required to devote only such time to the affairs of the Partnership as such General Partners determine in their sole discretion may be necessary to manage and operate the Partnership, and each such Person, to the extent not otherwise directed by such General Partners, shall be free to serve any other Person or enterprise in any capacity that it may deem appropriate in its discretion.

(b)  Insofar as permitted by applicable law, the General Partners (acting on their own behalf) and each Limited Partner (acting on its own behalf) may, notwithstanding this Agreement, engage in whatever activities they choose, whether the same are competitive with the Partnership or otherwise, without having or incurring any obligation to offer any interest in such activities to the Partnership or any Partner and neither this Agreement nor any activity undertaken pursuant hereto shall prevent any Partner from engaging in such activities, or require any Partner to permit the Partnership or any Partner to participate in any such activities, and as a material part of the consideration for the execution of this Agreement by each Partner, each Partner hereby waives, relinquishes, and renounces any such right or claim of participation.  Anything contained

-6-

herein to the contrary notwithstanding, the General Partners hereby agree not to compete, directly or indirectly, with the Partnership within a one (1) mile radius from the Property in renting, owning or managing any multi-family dwellings.

(c)   To the extent permitted by applicable law and except as otherwise provided in this Agreement, each General Partner, when acting on behalf of the Partnership, is hereby authorized to purchase property from, sell property to, or otherwise deal with any Partner, acting on its own behalf, or any Affiliate of any Partner, provided that any such purchase, sale, or other transaction shall be made on terms and conditions which are no less favorable to the Partnership than if the sale, purchase, or other transaction had been entered into with an independent third party.

1.10 **Voting of the Partners.**  Except as otherwise expressly provided herein to the contrary any vote, approval, consent, authorization or other action required to be taken or made by the (i) General Partners shall be made by a vote of the General Partners, and (ii) Limited Partners shall be made by a vote of the Limited Partners owning at least two-thirds (2/3) of the Interests in the Partnership.

1.11 **Payments of Individual Obligations.**  The Partnership's credit and assets shall be used solely for the benefit of the Partnership, and no asset of the Partnership shall be transferred or encumbered for or in payment of any individual obligation of any Partner.

-7-

**1.12 Definitions.** Capitalized words and phrases used in this Agreement shall have the following meanings:

(a) "Act" means the Florida Uniform Limited Partnership Act.

(b) "Adjusted Capital Account Deficit" means with respect to any Interest Holder, the deficit balance, if any, in such Interest Holder's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(i) Credit to such Capital Account any amounts which such Interest Holder is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii) Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

(c) "Adjusted Capital Contribution" means, as of any day, an Interest Holder's Capital Contributions adjusted as follows:

(i) Increased by the amount of any Partnership liabilities which, in connection with distributions pursuant to Sections 5.1(b),(c) and 5.2 hereof, are assumed by such Interest Holder or are secured by any Partnership Property distributed to such Interest Holder;

(ii) Increased by any amounts actually paid by such Interest Holder to any Partnership lender pursuant to the terms of any Assumption Agreement; and

(iii) Reduced by the amount of cash and the Gross Asset Value of any Partnership Property distributed to such Interest Holder pursuant to Sections 5.1 and 5.2 hereof and the amount of any liabilities of such Interest Holder assumed by the Partnership or which are secured by any property contributed by such Interest Holder to the Partnership.

(d) "Affiliate" means any member of the immediate family of a General Partner (or shareholder of a corporate general partner), any person, firm or entity which, directly or indirectly, controls, is controlled by or is under common control with a General Partner, or any member of his immediate family; or any person, firm or entity which is associated with a General Partner, or any member of his immediate family in a joint venture, partnership or other form of business association. In this definition the term "Control" shall mean the ownership of ten (10%) percent or more of the beneficial interest in the firm or entity referred to, and the term "immediate family" shall mean the spouse, ancestors, lineal descendants, brothers and sisters of the person in question, including those adopted.

(e) "Agreement" or "Partnership Agreement" means this Agreement as amended from time to time. Words such as "herein", "hereinafter", "hereof", "hereto", and "hereunder", refer to this Agreement as a whole, unless the context otherwise requires.

-9-

(f) "Aggregate Capital Contribution" means all contributions made to the capital of the Partnership by a Partner pursuant to Sections 2 and 7 hereof.

(g) "Bankruptcy" means, with respect to any Person, a "Voluntary Bankruptcy" or an "Involuntary Bankruptcy". A "Voluntary Bankruptcy" means, with respect to any Person, the inability of such Person generally to pay its debts as such debts become due, or an admission in writing by such Person of its inability to pay its debts generally or a general assignment by such Person for the benefit of creditors; the filing of any petition or answer by such Person seeking to adjudicate it a bankrupt or insolvent, or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of such Person or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian, or other similar official for such Person or for any substantial part of its property; or corporate action taken by such Person to authorize any of the actions set forth above. An "Involuntary Bankruptcy" means, with respect to any Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization of any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or other similar relief under any present or future bankruptcy, insolvency, or similar statute, law, or regulation, or the filing

-10-

of any such petition against such Person which petition shall not be dismissed within ninety (90) days, or, without the consent or acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver, or liquidator of such Person or of all or any substantial part of the property of such Person which order shall not be dismissed within sixty (60) days.

(h) "Business Day" means a day of the year on which banks are not required or authorized to close in the State of Florida.

(i) "Capital Account" means, with respect to any Partner, the Capital Account maintained for such Person in accordance with the following provisions:

(i) To each Person's Capital Account there shall be credited such Person's Capital Contributions, such Person's distributive share of Profits and any items in the nature of income or gain that are specially allocated pursuant to Sections 4.4 or 4.6 hereof, and the amount of any Partnership liabilities assumed by such Person or secured by any Partnership Property distributed to such Person.

(ii) To each Person's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Partnership Property distributed to such Person pursuant to any provision of this Agreement, such Person's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Sections 4.4 or 4.6 hereof, Partnership or which are secured by any property contributed by such Person to the Partnership.

-11-

(iii) In the event all or a portion of an interest in the Partnership is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(iv) In determining the amount of any liability for purposes of Sections 1.12(c)(i), 1.10(c)(iii), and Sections 1.12(i)i and 1.12(i)ii hereof, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations.  In the event the General Partners shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Partnership, General Partners or Interest Holders), are computed in order to comply with such Regulations, the General Partners may make such modifications provided that they are not likely to have a material effect on the amounts distributable to any Partner pursuant to Section 10 hereof upon the dissolution of the Partnership.  The General Partners also

-12-

shall make any appropriate modifications in the event unanticipated events might otherwise cause the Agreement not to comply with Regulations Section 1.704-1(b).

(j) "Capital Contributions" means, with respect to any Interest, the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Partnership with respect to the interest in the Partnership held by such Person. The principal amount of a promissory note which is not readily traded on an established securities market and which is contributed to the Partnership by the maker of the note (or a Person related to the maker of the note within the meaning of Regulations Section 1.704-1(b)(2)(ii)(c) shall not be included in the Capital Account of any Person until the Partnership makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Regulations Section 1.704-1(b)(2)(iv)(d)(2).

(k) "Capital Items": The net proceeds (Less any expenses incurred in connection with the receipt or collection of any such proceeds, which are not applied to set aside for the reduction of Partnership liabilities or the repair, restoration or improvement of Partnership assets, and after retirement of applicable debt or any portion thereof) received by the Partnership upon the occurrence of any of the following events, provided that no such event causes or results in the dissolution of the Partnership: (i) any sale of all or part of the capital assets of the Partnership, (ii) any insurance payments (other than under policies commonly referred to as rent insurance) or damage

-13-

recoveries paid to the Partnership in respect of its assets; (iii) any award or payment made by any governmental authority in connection with the exercise of any right of eminent domain, condemnation or similar right or power; (iv) any refinancing of the Partnership's loans.

(1) "<u>Cash Flow</u>": The excess of cash revenue from Partnership operations over cash disbursements, without deduction for depreciation or cost recovery, and a reasonable allowance for cash reserves for repairs, replacement, contingencies and anticipated obligations (including debt service, capital improvements and replacements) as determined by the General Partners. Cash Flow shall not include Capital Items. For this purpose, revenue from Partnership operations shall not include: capital contributions from the Partners, deposits until the same are forfeited by the persons making such deposits, advance rentals until such time as they are earned by the Partnership, insurance loss proceeds (except for any proceeds of rent interruption insurance), any award or payment made by any governmental authority in connection with the exercise of any right of eminent domain, condemnation or similar right or power, or any proceeds from the sale, exchange, or refinancing of the Property.

(m) "<u>Certificate</u>" means the certificate of limited partnership filed with the Secretary of State to reflect the provisions of this Agreement.

(n) "<u>Closing Date</u>" means    the Closing Date as may be specified in a legal agreement of which the Partnership is a party.

(o) "<u>Code</u>" or "<u>IRC</u>" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

(p) "<u>Depreciation</u>" means, for each fiscal year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such year or other period, except that, if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such fiscal year or other period bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such fiscal year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Partners.

(q) "<u>Distributions</u>" means any cash or property distributed to any Interest Holders arising from their interests in the Partnership, other than payments to an Interest Holder for services or as repayment of loans or advances.

-15-

(r) "<u>General Partner(s)</u>" means the General Partners of the Partnership, and means any Person, corporation, and/or any other Sub S corporation who at the time of reference has been admitted as a General Partner or a successor to a General Partner, or an additional General Partner.

(s) "<u>General Partnership Interest</u>" means the general partnership ownership interest of the General Partners in the Partnership, including the rights of the General Partners to any and all benefits to which he may be entitled pursuant to this Agreement, together with the obligations of the General Partners to comply with all the terms and provisions of this Agreement.

(t) "<u>Gross Asset Value</u>" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i) The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset, as determined by the contributing Partner and the General Partners, provided that, if the contributing Partner is a General Partners, the determination of the fair market value of a contributed asset shall require the consent of a majority of the Limited Partners;

(ii) The Gross Asset Values of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partners, as of the following times:

-16-

(a) the acquisition of an additional interest in the Partnership (other than pursuant to Sections 5.1 or 5.2 hereof) by any new or existing Partner in exchange for more than a de minimus Capital Contribution;

(b) the distribution by the Partnership to an Interest Holder of more than a de minimus amount of Partnership Property as consideration for an interest in the Partnership; and

(c) the liquidation of the Partnership within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the General Partners reasonably determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the General Partners and Interest Holders in the Partnership.;

(iii) The Gross Asset Value of any Partnership asset distribution to any General Partners or Interest Holder shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the distributee and the General Partners, provided that, if the distributee is a General Partner, the determination of the fair market value of the distributed asset shall require the consent of a majority of the Limited Partners; and

(iv) The Gross Asset Value of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Sections 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant

to Regulations Section 1.704-1(b)(2)(iv)(m) and Section 2.3(f) hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this Section 1.12(t)(iv) to the extent the General Partner determines that an adjustment pursuant to Section 1.12(t)(ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.12(t)(iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Sections 1.12(t)(i), 1.12(t)(ii), or 1.12(t)(iii) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

(u) "<u>Interest</u>" means a percentage ownership interest in the Partnership, in accordance with the percentage Capital Contribution made by a Partner pursuant to Exhibit A hereof together with any additional contribution subsequently made pursuant to Section 7 herein and as contemplated by this Agreement, including the right of any such Partner to any and all benefits to which the holder of such interest may be entitled pursuant to this Agreement, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement.

(v) "<u>Interest Holder</u>" means any Person who holds an Interest. "Interest Holders" means all such Persons.

(w) "<u>Limited Partners</u>" means the limited partners whose names are set forth on Exhibit "Al" attached to this Agreement, and such other persons as are admitted to the Partnership as substitute or additional Partners and are named as Limited Partners in any amended Certificate of the Partnership. Further, it includes the General Partners in their capacity as a holder of a Limited Partnership Interest, where no distinction is required by the context in which the term is used herein. Reference to a "Limited Partner" shall be to any one of the Limited Partners.

(x) "<u>Management Agreement</u>" means that certain Management Agreement, dated as of the Closing Date, between the Partnership and M.L. Property Management, Inc., pertaining to the operation and management of the Property.

(y) "<u>Memorandum</u>" means that certain Confidential Private Placement Memorandum dated as of March 1, 1993, including all amendments or supplements thereto relating to the sale of Units of limited partnership of the Partnership.

(z) "<u>Net Cash From Operations</u>" means the gross cash proceeds from Partnership operations (including sales and dispositions of Property in the ordinary course of business) less the portion thereof used to pay all cash expenditures incurred incident to the normal operation of partnership business including those expenses of the General Partners reimbursed by the Partnership pursuant to the terms hereof, or to establish reserves for all Partnership expenses, debt payments, capital improvements, replacements, and contingencies, all deemed by the General Partners in their sole and absolute discretion to be

-19-

reasonably necessary for proper operation of the Partnership's business. "Net Cash From Operations" shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowances, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this Section 1.12(z) and Section 1.12(aa) hereof.

(aa) "<u>Net Cash From Sales or Refinancings</u>" means the net cash proceeds from all sales and other dispositions (other than in the ordinary course of business) and all refinancings of Partnership Property, less any portion thereof used to establish reserves, all as determined by the General Partners. "Net Cash From Sales or Refinancings" shall include all principal and interest payments with respect to any note or other obligation received by the Partnership in connection with sales and other dispositions (other than in the ordinary course of business) of Partnership Property.

(bb) "<u>Nonrecourse Deductions</u>" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations.

(cc) "<u>Nonrecourse Liability</u>" has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

(dd) "<u>Partner Nonrecourse Debt</u>" has the meaning set forth in Section 1.704-2(b)(4) of the Regulations.

(ee) "<u>Partner Nonrecourse Debt Minimum Gain</u>" means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimus Gain that would result if such Partner

-20-

Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Regulations.

(ff) "Partner Nonrecourse Deductions" has the meaning set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Regulations.

(gg) "Partners" means all General Partners and all Limited Partners, where no distinction is required by the context in which the term is used herein. "Partner" means any one of the Partners.

(hh) "Partnership" means the partnership formed pursuant to this Agreement and the partnership continuing the business of this Partnership in the event of dissolution as herein provided.

(ii) "Partnership Minimum Gain" has the meaning set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

(jj) "Partnership Property" means all real and personal property acquired by the Partnership and any improvements thereto, and shall include both tangible and intangible property.

(kk) "Person" means a any individual, trust, estate, partnership, association, company, corporation or other entity.

(ll) "Prime Rate" means the prime lending rate of interest established from time to time by Chemical Bank, New York, N.Y.

(mm) "Priority Return" means a sum equivalent to fifteen percent (15%) per annum, determined on the basis of a year of 365 or 366 days, as the case may be, for the actual number of days in the period for which the Priority Return is being determined, cumulative but not compounded, of the average daily balance of

-21-

the aggregate Capital Contributions of the Interest Holders from time to time during the period to which the Priority Return relates, commencing on the first date any money is paid that relates to the Priority Return.

(nn) "Profits and Losses" means, for each fiscal year or other period, an amount equal to the Partnership's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(i) Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.12(nn) shall be added to such taxable income or loss;

(ii) Any expenditures of the Partnership described in Section 705(a)(2)(B) of the Code or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.12(nn), shall be subtracted from such taxable income or loss;

(iii) In the event the Gross Asset Value of any Partnership asset is adjusted pursuant to Sections 1.12(t)(ii) or 1.12(t)(iii) hereof, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such assets for purposes of computing Profits or Losses;

(iv) Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(v) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period, computed in accordance with Section 1.12(p) hereof;

(vi) To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) or Section 743(b) of the Code is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in complete liquidation of a Partner's or Holder's Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

(vii) Notwithstanding any other provision of this Section 1.12(nn), any items that are specially allocated pursuant to Sections 4.4 and 4.6 (Special Allocations and Curative Allocations) hereof shall not be taken into account in computing Profits or Loses.

The amounts of the items of Partnership income, gain, loss, or deduction available to be specially allocated pursuant to Sections 4.4 and 4.6 (Special Allocations and Curative Allocations) hereof shall be determined by applying rules analogous to those set forth in Sections 1.12(nn)i through vi above.

(oo) "Property" means that certain land and building located at Harbor Inn, 801 Harbor Drive, Coral Springs, Florida.

(pp) "Regulations" means the Income Tax Regulations promulgated under the Code as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

(qq) "Section" means the designated Section of this Agreement if no reference is specified; otherwise, the designated Section of the specified statute or regulation or the comparable provision of any successor statute or regulation.

(rr) "Substitute Partner" means a Partner, other than the existing General Partners and the existing Limited Partners listed on Exhibit "Al", who is subsequently admitted to the Partnership pursuant to the provisions of Sections 9 and 11 herein, and possesses all rights and obligations granted to (and imposed upon) General Partners or Limited Partners, as the case may be, pursuant to this Agreement.

(ss) "Transfer" means the mortgage, pledge, hypothecation, transfer, sale, assignment or other disposition of any part of all of any Interest in the Partnership, whether voluntarily, by operation of law or otherwise.

-24-

(tt)   "Uniform Act" means the Florida Revised Uniform Limited Partnership Law, as amended from time to time.

(uu)   "Unit" means a percentage ownership interest in the partnership representing a capital contribution of $20,000.00 to the Partnership.

(vv)   "Unit Holder" means any person who holds a Unit. "Unit Holders" means all such persons.

(ww) "Unreturned Capital of the Partners" means as at any given time, an amount equal to the excess, if any, of (i) the aggregate capital contributions theretofore made by the Partners to the Partnership pursuant to Section 5.1 and 10, computed without interest thereon, over (ii) all amounts theretofore distributed or distributable to the Partners pursuant to Section 8, but in no event less than zero.

## SECTION 2

### CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

2.1   **General Partners.**   The names, addresses, and Capital Contributions of each General Partner are set forth on Exhibit Al attached hereto.

2.2   **Limited Partners.**   The names, addresses, Capital Contributions, and Interests of the Limited Partners are as provided herein as of the date of this Agreement as set forth on Exhibit Al attached hereto.

2.3   **Capital Accounts.**   Each Partner shall have a Capital Account equal to the amount of his capital contribution to the Partnership made on or before the execution of this Agreement

pursuant to Exhibit Al and any additional capital contributions pursuant to Section 7 and as contemplated in accordance with the provisions of this Agreement, and such Capital Account shall be credited with the cash and the fair market value of the property contributed to the Partnership (net of liabilities assumed by the Partnership and liabilities to which such contributed property is subject), and his distributive share of Partnership income (including income exempt from tax) and gain (or items thereof). Each Partner's Capital Account shall be debited with the cash and the Partnership's fair market value of property distributed to him (net of liabilities assumed by such Partner and liabilities to which such distributed property is subject), his distributive share of the Partnership losses and deductions (or items thereof) and his distributive share of expenditures of the Partnership described in Code Section 705(a) (2)(B) or otherwise required to be treated as expenditures described in Section 705(a) (2)(B). The amount of income and gain credited to each Partner's Capital Account shall be the amount of profits allocated to each Partner in accordance with the provisions of Sections 4 and 7 hereof. The amount of losses and deductions debited to each Partner's Capital Account shall be the amount of loss allocated to each Partner in accordance with the provisions of Sections 4 and 7 hereof.  If there is any question with respect to a Partner's Capital Account (including but not limited to, whether such Capital Account is being maintained in a manner consistent with the Code), it shall be resolved by the General Partners in their

reasonably exercised discretion, applying principles consistent with this Agreement, the Uniform Act and applicable provisions of the Code and the Regulations thereof.

2.4   **Determination of Balance in Capital Accounts.**   Except as otherwise provided in this Agreement, whenever it is necessary to determine the Capital Account of any Partner for purposes of Section 7 or 8, the Capital Account of the Partner shall be determined after giving effect to all allocations provided for herein for the current year in respect of transactions effected prior to the date as of which such determination is to be made.

2.5   **Withdrawal of Capital.**   Except as specifically provided in this Agreement, no Partner shall be entitled to withdraw any part of his Capital Account or to receive any distribution from the Partnership, and no Partner shall be entitled or required to make any additional capital contribution to the Partnership except as specifically provided herein.

2.6   **Capital Accounts of New Partners.**   Each Limited Partner, including any additional, new, or Substitute Limited Partner, who shall receive any Interest in the Partnership or whose Interest in the Partnership shall be increased by means of a Transfer to him of all or part of the Interest of another Partner in accordance with Sections 7 and 9 and as contemplated by this Agreement, shall have a Capital Account which reflects such Transfer.

2.7   **Allocation Among Partners.**   Whenever amounts are allocated or distributed to the Partners, the total amount allocated or distributed to all the Limited Partners shall be

ninety nine (99%) percent.  Such amount shall be allocated or distributed among the Limited Partners in the proportion that the Interest each owns bears to the aggregate Interest of all the Limited Partners at the time of such allocation or distribution. Whenever amounts are allocated or distributed to the Partners, such amounts shall be allocated or distributed to the General Partners in accordance with their Partnership interests which are hereby reallocated effective as of the date of this Agreement as follows:

M.L. Property Management, Inc. . .One-Half(1/2%)Percent

CDS Industries, Inc. . . .. . . . One-Half(1/2%)Percent

In the event of Transfers or dilutions in accordance with Section 7.2 et. seq. of any Partnership Interests, the provisions and allocations in this Section 2.7 shall be subject to such adjustments as are provided therein.

2.8  **Partner's Loans.**  Loans by any Partner to the Partnership shall not be considered contributions to the capital of the Partnership.

2.9  **Liability of Limited Partner.**  A Limited Partner shall not be bound by, or personally liable for, any of the debts, contracts, liabilities or other obligations of the Partnership or the General Partners, and the liability of each Limited Partner shall be limited solely to the amount of his contribution to the capital of the Partnership required by the provisions of Sections 2.2, 7 and 10.  No Partner with a negative balance in his Capital Account shall have any obligation to the Partnership or the other Partners to restore such negative balance.  Notwithstanding any

-28-

or the foregoing provisions to the contrary, to the extent required by applicable law, a Partner receiving a distribution in part of full return of his capital contribution shall be liable to the Partnership for any sum, not in excess of such amount returned plus interest, necessary to discharge the liabilities of the Partnership to creditors who extended credit or whose claims arose before such distribution, excluding liabilities of the Partnership represented by debt, the repayment of which is secured solely by the Property.

2.10 **Interest on Capital Contributions.** No interest shall be paid on any capital contributed to the Partnership, except as may be otherwise provided in this Agreement.

### SECTION 3

### CONTROL AND MANAGEMENT

3.1 **General.** Except as specifically limited herein, the General Partners shall have full, exclusive and completed discretion in the management and control of the Partnership for accomplishing the purposes set forth in Section 1.3. The General Partners agree to manage and control the affairs of the Partnership to the best of its ability, and to conduct the operations contemplated under this Agreement in a careful and prudent manner and in accordance with good industry practice.

The General Partners shall have full power and authority to execute all documents and take all other actions on behalf of the Partnership.

3.2   <u>Powers of the General Partners.</u>   Subject to any limitation expressly set forth in this Agreement, the General Partners shall perform or cause to be performed, at the Partnership's expense and in his name, the coordination of all management and operational functions relating to the Property so that the Property is operated in a first-class manner.   Without limiting the generality of the foregoing, the General Partners (subject to the provisions of Section 3.3) are expressly authorized on behalf of the Partnership to:

(a)   operate any business normal or customary for the owner of a project similar to the Property;

(b)   borrow money on behalf of the Partnership on a secured or unsecured basis, or refinance or modify any loan to the Partnership which affects the assets of the Partnership;

(c)   perform any and all acts necessary or appropriate to the acquisition and operation of the Property, including, but not limited to, making applications for rezoning or objections to rezoning of other property, and commencing, defending, and/or settling litigation regard the Partnership, the Property or any aspect thereof;

(d)   procure and maintain with responsible companies such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partners;

(e)   take and hold all property of the Partnership, real, personal and mixed, in the Partnership name, or in the name of a nominee of the Partnership solely for the purpose of placing a deed of trust or mortgage on the Property or closing a loan relating to the Property;

(f)   execute and deliver on behalf of and in the name of the Partnership, or in the name of a nominee of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale, financing statements, security agreements, easements, assignments and any and all other instruments necessary or incidental to the conduct of the Partnership's business and the financing thereof;

(g)   bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of, or against, the Partnership;

(h)   establish reasonable reserve funds from income derived from the Partnerships' operations to provide for future contingencies;

(i)   loan funds to the Partnership, directly or through an affiliate, and to charge interest therefor;

(j)   coordinate all accounting and clerical functions of the Partnership and employ such accountants, lawyers, managers, agents and other management or service personnel as may from time to time be required to carry on the business of the Partnership;

(k)   enter into the Management Agreement, as provided at Paragraph 6.1, et seq., of the within Partnership Agreement, or any subsequent leases or use agreements pertaining to the Property;

(l)   negotiate, execute, deliver and perform any and all mortgages, financing, notes, letters of credit, insurance, certificates and/or agreements including the John Hancock Mortgage (as defined in the Memorandum), and any and all amendments, modifications, addendums, renewals, etc., related thereto and necessary or convenient in connection therewith; and,

(m)   designate, in writing, representatives with authority to approve/disapprove, consent to or act on behalf of the Partnership in connection with the performance of the within Agreement, the Management Agreement and any and all other instruments or documents necessary or convenient therewith.

3.3   <u>Limitations on Power of the General Partner.</u> Notwithstanding the generality of the foregoing, the General Partner shall not be empowered without the consent of the Limited Partner owning at least two-thirds (2/3rds) of the Interest in the Partnership (allocated pursuant to Section 2.7 of this Agreement) to:

(a)   do any act in contravention of this Agreement;

(b)   do any act that would make it impossible to carry on the ordinary business of the Partnership;

(c)   confess a judgment against the Partnership

-32-

(d)   possess Partnership property or assign any rights in specific Partnership property for other than a Partnership purpose;

(e)   admit a person as a General Partner into the Partnership;

(f)   change or reorganize the Partnership into any other legal form;

(g)   require the Limited Partners to make any contribution to the capital of the Partnership not provided for in Sections 2, 7 or Section 10 of this Agreement;

(h)   utilize the proceeds to be received by the Partnership pursuant to Section 5.1 for purposes other than as set forth under the caption "Sources and Uses of Proceeds" in the Memorandum;

(i)   relieve the General Partners of any liability under this Agreement due to their assignment of interest in the Partnership; or

(j)   admit additional or Substitute Limited Partners, except as provided in Sections 9 and 11 of this Agreement.

3.4   **No Management Powers by Limited Partners.**   The Limited Partners shall take no part in the conduct or control of the Partnership business and shall have no right or authority to act for or to bind the Partnership. The exercise of any of the rights and powers of a Limited Partner pursuant to the terms of this Agreement shall not be deemed as taking part in the day-to-day affairs of the Partnership or the exercise of control over Partnership affairs.

3.5  <u>Liability of General Partners.</u>  The General Partners shall not be personally liable for the return of any portion of the Aggregate Capital Contributions of the Limited Partners.

3.6  <u>Right to Engage in Other Ventures.</u>  Any Partner may engage in or possess an interest in another business ventures of any nature or description independently or with others including, but not limited to, real estate business in all its phases, which shall include, without limitation, the ownership, operation, management, syndication and development of real property, and neither the Partnership nor any Partner shall have any rights in or to such independent ventures or the income or profits derived therefrom by virtue of this Agreement.

3.7  <u>Limitation on Obligations of the General Partners.</u>  The General Partners shall not be required to devote all of its time or business efforts to the affairs of the Partnership, but shall devote such of its time and attention as is reasonably advisable and necessary to manage the affairs of the Partnership.  Except as otherwise specifically set forth below, the General Partners shall not be liable to the Limited Partners because any taxing authorities disallow or adjust any deductions or credits in the Partnership's income tax returns.

3.8  <u>Indemnification of General Partners and Partnership.</u>  The General Partners shall not be liable, responsible or accountable in damages or otherwise to any other Partner for any act performed or failure to act by them in good faith and within the scope of this Agreement, unless such act or failure to act is attributable to gross negligence, malfeasance or fraud.  The

-34-

Partnership (but no Partner individually) shall indemnify and hold harmless the General Partners for any loss, damage, liability, cost or expense (including reasonable attorney's fees) arising out of any act or failure to act by the General Partners if such act or failure to act is in good faith within the scope of this Agreement and is not attributable to gross negligence, malfeasance or fraud. The General Partners shall indemnify and hold harmless the Partnership and the Partners for any loss, damage, liability, cost or expense (including reasonable attorney's fees) arising out of any act or failure to act by such General Partner, where such act or failure to act is attributable to gross negligence, malfeasance or fraud.

3.9   **Dealings with the General Partners and Affiliates.** Provided the General Partners shall have the Owner's written approval, the Partnership is authorized to enter into business agreements, contracts, and other transactions with the General Partners or any Affiliates of the General Partners or the Affiliates of the shareholders of the General Partners ("Affiliates of General Partners"), and is authorized to pay fees, commissions or other consideration to the General Partners or Affiliates of the General Partners, including without limitation, real estate brokerage commissions, insurance premiums, rental property management fees, consulting fees, leasing commissions and mortgage brokerage fees. Unless such transactions are expressly authorized herein, any such transactions between the Partnership and a General Partner or

-35-

Affiliates of a General Partner shall be on terms not less favorable to the Partnership than those available from non-affiliated parties.

## SECTION 4

### ALLOCATIONS OF INCOME, NET LOSSES AND CREDITS

4.1  <u>Allocation of Profits and Losses.</u>  All profits, gains, losses, credits and deductions of the Partnership, as determined for federal income tax purposes, shall be allocated in the following order of priority (and for these purposes only, the calculations under this Section and under Section 4.2 shall treat and refer to the Limited Partners as one class and the General Partner as another class, but any gain or loss allocated to the Limited Partners or the General Partners, as a group, shall be allocated among the Limited Partners and the General Partners as prescribed in Section 2.7) (unless otherwise provided herein).

(a)  <u>Allocation of Profits and Gains.</u>  Profits of the Partnership, as determined for federal income tax purposes, and gains of the Partnership shall be allocated ninety nine (99%) percent to the Limited Partners and one (1%) percent to the General Partners.

(b)  <u>Allocation of Losses.</u>  Losses and tax credits of the Partnership, as determined for federal income tax purposes, shall be allocated ninety nine (99%) percent to the Limited Partners and one (1%) percent to the General Partners.

4.2  __Dissolution and Winding Up.__  All profits and net losses of the Partnership, as determined for federal income tax purposes, in connection with a sale of substantially all of the assets of the Partnership and/or the dissolution and winding up of the Partnership, shall be allocated in the manner provided in Sections 4.1 and 5.1.

4.3  __Distributive Share; Charges and Credits to Capital Accounts.__  For purposes of Subchapter K of the Code, the distributive shares for any fiscal year of the Partners in each item of Partnership taxable income, gain, loss, deduction or credit shall be in the same proportions as their respective shares of items allocated under Paragraphs 4.1 and 4.2 (except as may be otherwise provided in the within Agreement). All profits, losses and distributions shared by the Partners shall be credited or charged, as the case may be, to their Capital Accounts, and allocated between or among the members of each class of Partners in accordance with their respective sharing ratios within such class; provided, that, upon a sale pursuant to the liquidation of the Partnership, profits and losses shall be allocated in a manner that will first equalize to the extent possible the Capital Accounts of all Partners and then in accordance with their respective sharing ratios. Each Partner shall share in profits, losses and cash contributions from the first day of the calendar month during which said Partner was admitted to the Partnership, if he is admitted on or after the first day of such month and on or before the fifteenth day thereof, and he shall share in profits, losses and cash distributions from the

-37-

sixteenth day of the calendar month during which he was admitted to the Partnership, if he is admitted on or after the sixteenth day of such month and on or before the 1st day of such month. For such purposes and to the extent permitted by the Uniform Act, the date of admission to the Partnership of a Partner shall be the date of his execution of this Agreement, if his subscription for an Interest is accepted by the General Partners.

**4.4 Special Allocations.** The following special allocations shall be made in the following order:

(a) **Minimum Gain Chargeback.** Except as otherwise provided in Section 1.704-2(f) of the Regulations, notwithstanding any other provision of this Section 4, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, each General Partner and Interest Holder shall be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Person's share of the net decrease in Partnership Minimum pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each General Partner and Interest Holder pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations. This Section 4.4(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

the purpose of this Minimum Gain calculation and for purposes of the preceding paragraph, there will be excluded from the Partner's deficient balance in his Capital Account (i) any amount the Partner is obligated to restore to his Capital Account and (ii) any addition to his Capital Account represented by the Partner's share of Minimum Gain. In addition, for the purpose of calculating the amount of Minimum Gain, each Partner's Capital Account will be reduced for items described in Treas. Reg. Section 1.704-1(b) (2) (ii) (D) (4), (5) and (6).

Notwithstanding anything to the contrary contained elsewhere in this Agreement, if any gain arises from the sale or other disposition of any Partnership asset which shall be treated as income under the depreciation or investment credit recapture provisions of the Code, then the full extent of such gain shall be allocated to the Partners on the basis that the Partnership deductions for depreciation or investment credit giving rise to such recapture where actually allocated. In the event that subsequently enacted provisions of or relating to the Code result in other recapture income to the Partnership, no allocation of such recapture income shall be made to any Partner who has not received the benefit of those items giving rise to such other recapture income.

## SECTION 5

### DISTRIBUTIONS

5.1 (a) <u>Cash Flow Distributions.</u> After providing for the satisfaction of the current debts and obligations of the Partnership, including any priority return and making any

-47-

provision for reasonable amounts for replacements and reserves, the General Partners shall, after the end of each fiscal quarter of the Partnership, make distributions of Cash Flow from operations to the Partners out of the Partnership funds, to the extent available, which shall be allocated ninety nine (99%) percent to the Limited Partners and one (1%) percent to the General Partners, in accordance with the provisions of this Agreement.

(b) **Proceeds from Refinancing, Sale or Other Disposition of the Property.** Distribution of Capital Items (other than any sale or other disposition of substantially all of the assets of the Partnership) shall be made as expeditiously as possible, in the following order of priority:

(i) first, to repay any New Additional Partner or Existing Partner who has contributed Excess Additional Capital, all moneys, plus accrued interest that may then be due thereon; and

(ii) then ninety nine (99%) percent to the Limited Partners and one (1%) percent to the General Partners to the extent necessary to reduce the Unreturned Capital of the Partners to zero; and

(iii) the balance, ninety nine (99%) percent to the Limited Partners and one (1%) percent to the General Partners is accordance with their then respective percentage interest in the Partnership.

-48-

5.3   **Rights of Partners to Property.**   No Partner shall be entitled to demand and receive property other than cash in return for his capital contributions to the Partnership, and, to the maximum extent permissible under applicable law, each Partner hereby waives all right to partition the Property.

5.4   **Priorities of Limited Partners.**   No Limited Partner shall have any priority over any other Limited Partner as to the return of his contributions to the capital of the Partnership or as to compensation by way of income, except as may be otherwise provided in this Agreement.

### SECTION 6

**CERTAIN MATTERS RELATING TO MANAGEMENT
OF THE PARTNERSHIP; PARTNERSHIP EXPENSES;
REPLACEMENT RESERVE ACCOUNT**

6.1   **Property Management.**   M.L. Property Management, Inc., an entity controlled by Murray Liebowitz, shall enter into a Management Agreement (a copy of which is appended to the Memorandum as Exhibit "B"), wherein M.L. Property Management, Inc. shall receive a management fee equal to five (5%) percent of the gross receipts from the ownership and operation of the Property actually received by the Partnership, as more fully provided for in the Management Agreement.   M.L. Property Management, Inc. shall act as managing agent of the Property pursuant to the Property Management Agreement, and in such capacity shall perform on behalf of the Partnership all services customarily performed by a property management company, in accordance with sound management practices.

-51-

6.2   <u>Partnership Expenses.</u>   Except as herein otherwise provided, the Partnership shall be responsible for paying all direct costs and expenses of holding, owning, developing and operating the Property, including, without limitation, debt service; compensation of M.L. Property Management, Inc., as managing agent; cost of utilities, supplies, insurance premiums, taxes, advertising expenses, bookkeeping and accounting directly related to the Property; legal expenses; office supplies; and all other fees, costs and expenses directly attributable to the operation of the Property and the Partnership.   In the event any such costs and expenses are or have been advanced by a Partner on behalf of the Partnership, then except as expressly provided herein to the contrary, such Partner shall be entitled to be reimbursed for such payment pursuant to Section 7.1 of this Agreement, so long as payment is reasonably necessary for Partnership business and is reasonable in amount.

6.3   <u>Replacement Reserve Account.</u>   The General Partners may establish a replacement reserve account (the "Replacement Reserve Account") and may deposit therein from time to time such amounts from revenues from operations before any other distributions under Section 5 as they shall determine in their sole discretion to be appropriate   The Replacement Reserve Account may be charged with any expenditures for the acquisition, repair or construction of items which are treated as capital expenditures (as opposed to expense deductions) under generally accepted accounting principles.   Nothing contained in this Section 6.3 shall in any way limit or restrict the right of the General Partners to use

-52-

（置き换え）

other assets of the Partnership (other than deposits to the Replacement Reserve Account) for the acquisition, repair, or construction of items which are treated as capital expenditures under generally accepted accounting principles.

## SECTION 7

### LOANS AND ADDITIONAL CAPITAL CONTRIBUTIONS TO THE PARTNERSHIP

7.1 <u>Optional Loans.</u> From time to time any Partner may make optional loans to the Partnership or advance money on its behalf. Such loans or advances shall bear interest at the Prime Rate, and shall be payable as determined by the General Partners. The amount of any such loan or advance, and interest thereon, shall be deemed an obligation of indebtedness from the Partnership to the Partner making such loans or advances.

7.2 <u>Additional Capital Contributions</u> No Partner shall be required to make any additional capital contribution, except as may be set forth in paragraph 7.2.2.

7.2.1. <u>Call for Funds.</u> The Partners recognize that the income produced by the Partnership activities in the operation of the Property may be insufficient for the proper maintenance and operation of the Property. If, in the judgment of the General Partners, additional funds are required by the Partnership for the construction, completion, maintenance, preservation or operation of the Property, such additional funds shall be called for by the General Partner on written notice to the Partners specifying the amounts and purposes of any such additional contributions. Such funds may be contributed by the

7.2.5 <u>Additional Partners</u>. In the event that the Existing Partners of the Partnership, at any time, fail or refuse to make required or needed additional Capital Contributions, then, and in that event the General Partners, in their sole discretion, shall have the right to admit to the Partnership New Additional Partners. The New Additional Partners shall be bound by and have the benefit of the within Agreement and any new capital contributed by any New Additional Partner shall be specifically entitled to the dilution privileges and priority privileges as provided by the within Agreement, including but not limited to, the provisions of Sections 7.2.3 <u>et seq</u>.

7.2.6 <u>New Partners</u>. New Partners shall only be permitted to gain admission to the Partnership by the vote of two-thirds (2/3rds) of the Partnership Interest of the Contributing Partners only. Non-Contributing Partners shall not be permitted to vote on the admission to the Partnership of New Partners. For purposes of this Subsection 7.2.6 as it relates to voting on the admission of New Partners to the Partnership, Contributing Partners permitted to vote shall be those Partners contributing to the specific request for Additional Capital Contribution which gave rise to the need for New Partners.

7.2.7 <u>Miscellaneous</u>. In the event that the amount of additional capital contribution collected by the General Partners from any Partner is not in equal proportion to the Partner(s) percentage of the total original capital contribution of said Partner(s), then, in that event, except as otherwise provided in Section 10 hereof (Dissolution and Winding Up), net cash from

-58-

not provide the full purchase money due from him is added to the list of Partners voting in favor of the Sale ("Selling Partners").

(c)   Subsections 8.1 and 8.2(a) and 8.2(b) shall be subject to and conditioned upon the approval of any lender holding a Mortgage or other encumbrance, a lien against the subject Property subject to the Sale contemplated by this Section 8 of this Agreement, together with any and all other approvals as may be required by any other written contract or agreement which is binding upon the Partnership (and which prohibits a prepayment of any mortgage or other lien or encumbrance against the Property).

8.3   **Response to Notice of Sale.**   Written response by the Limited Partner(s) to any notice of sale from the General Partners to the Limited Partner(s) shall be sent to the General Partners within ten (10) business days of receipt of the notice by the Limited Partner(s) and any failure to respond in writing within ten (10) business days from receipt of such notice shall be deemed an approval of sale by the said Limited Partner(s).

## SECTION 9

### TRANSFER OF INTEREST OF PARTNERS
### OR ADMISSION OF OTHER PARTNERS

9.1   **Method of Transfer.**   No transfer of all or part of a Partner's Unit(s) or interest in the Partnership may be effected except as permitted in this Section 9, and then only if a counterpart of the instrument of Transfer, executed and

-65-

Case 0:03-cv-60741-WPD   Document 2   Entered on FLSD Docket 04/22/2003   Page 123 of 333

acknowledged by the parties thereof, is delivered to the Partnership. A permitted Transfer shall be effective as of the date specified in the instrument related thereto.

9.2 <u>Transfers by Partners.</u> (a) Except as provided in Section 10 and this Section 9, the General Partners shall not Transfer any part or all of their Partnership interest, and no Limited Partner shall Transfer any part or all of his Interest, except as hereinafter provided, and then only if the transferee is either a citizen or resident of the United States. The foregoing prohibitions shall not apply to the following:

<u>As to the General Partners</u>

(i) any transfer by a General Partner to an Affiliate or a transfer by a General Partner on account of bankruptcy or dissolution of such General Partner or any pledge of its Partnership interest by the General Partner to secure a loan to the General Partner or guaranteed by the General Partner; provided, however, that (a) without the written consent of the Limited Partners owning a majority of the Interest in the Partnership, no such person shall become a Substitute General Partner of the Partnership, and (b) without the written consent of the Limited Partners owning at least a majority of the Units of the Partnership, which consent shall not be unreasonably withheld, no assignment by a General Partner of its interest as a General Partner shall relieve such Partner of any liability hereunder.

-66-

<u>As to the Limited Partner</u>

(ii)  any transfer of the Partnership interest of a deceased, incompetent, insolvent, bankrupt or dissolved Limited Partner to his executors, administrators or legal representatives or by any of such persons to accomplish any Transfer described under Subsection (b) above (as used in this Section 9, "transferee" shall include such persons); provided, however, that (i)  the effectiveness of any of the aforesaid transactions may be conditions, in the discretion of the General Partner, upon receipt by the Partnership of a legal opinion (the cost of which shall be borne by the transferor), satisfactory in form and substance to the General Partner, to the effect that such transaction will not violate the Act or any other applicable securities laws, (ii) no Transfer shall be permitted if, in the reasonable opinion of counsel to the Partnership (which may be secured by the General Partner, in its discretion, at the expense of the Partnership), the Partnership's continued tax status as a partnership for federal income tax purposes would be jeopardized by such a Transfer, (iii) no Transfer shall be permitted without the consent of the General Partner if the Transfer would result in the "termination" of the Partnership pursuant to Section 708 of the Code.

9.3    <u>Rights of Transferee.</u>    No transferee of the Partnership interest of a Partner shall have the right to become a Substitute Partner, unless:

(a)  his transferor has stated such intention in the instrument of assignment;

-67-

(b)    the   transferee   has   executed   an   instrument reasonably satisfactory to the General Partners accepting and adopting the terms and provisions of this Agreement;

(c)    the   transferor   or   transferee   has   paid   any reasonable  expenses  in  connection  with  the  admission  of  the transferee as a Substitute Partner; and

(d)   in the case of an assignee or transferee who is not otherwise a Partner, the General Partners (in their sole, absolute  and  unfettered  discretion)  consent  to  such  person becoming  a  Substitute  Partner,  which  said  consent  shall  not  be unreasonably withheld.

9.4  **Section 754 Election.**  In the event of a Transfer of all or part of the Partnership interest of a Limited Partner in the  Partnership,  and  at  the  request  of  the  transferee,  the Partnership may elect (in the General Partners' sole discretion) pursuant  to  Section  754  of  the  Code,  or  the  corresponding provision  of  subsequent  law,  to  adjust  the  basis  of  the Partnership's assets as provided by Section 734 and 743 of the Code.

9.5    **Profit/Loss  Allocations  Upon  Transfer.**    Unless otherwise agreed between the transferor and the transferee and permitted under applicable law, upon the Transfer of all or any part  of  the  Interest  of  a  Limited  Partner  as  hereinabove provided, the net profits, net losses, net gains and credits attributable to the Interest so transferred shall be allocated between the transferor and the transferee as of the date set forth in the instrument of transfer, and such allocation shall be

-68-

based upon the number of days during the applicable fiscal year of the Partnership that the Interest so transferred was held by each of the transferor and transferee, without regard to the results of the Partnership activities during the period in which each was the holder. Distributions shall be made to the holder of record of the Partnership interest on the date of distribution.

<div align="center">

**SECTION 10**

**DISSOLUTION AND TERMINATION**

</div>

10.1   <u>Events of Dissolution.</u>   Except as provided in Section 10.2, the Partnership shall be dissolved and its business wound up upon the earliest to occur of:

(a)   December 31, 2030;

(b)   with the prior written consent of the Limited Partners owning two-thirds (2/3rds) of the Interest, determining that the Partnership should be dissolved;

(c)   the Partnership becoming insolvent or bankrupt;

(d)   the insolvency, bankruptcy or dissolution of the General Partner; or

(e)   the sale or disposition of all or substantially all of the Partnership's assets, unless the Partnership as a part of the consideration for any such sale or other disposition acquires a note, in which case the Partnership shall be dissolved following the sale by it of its entire interest in such note, or the full collection of the balance thereof.

<div align="center">

-69-

</div>

For the purposes of this Agreement, a bankruptcy or an entity shall be deemed to occur when such entity files a petition in bankruptcy, or voluntarily takes advantage of any bankruptcy, or insolvency law, or is adjudicated a bankrupt, or if a petition or answer is filed proposing the adjudication of such entity as a bankrupt and such entity either consents to the filing thereof or such petition or answer is not discharged or denied prior to the expiration of sixty (60) days from the date of such filing; and the insolvency of an entity shall be deemed to occur when the assets of such entity are sufficient to pay its liabilities and it shall so admit in writing.

10.2 __Continuation of Partnership.__ The General Partners agree to serve as general partner of the Partnership until the Partnership is terminated. Upon the occurrence of any event set forth in Section 10.1(d) with respect to the General Partner(s), the business of the Partnership shall be continued on the terms and conditions of this Agreement is, within ninety (90) days after such event, Limited Partners owning in the aggregate at least two-thirds (2/3rds) of the Interest in the Partnership shall elect in writing that the business of the Partnership should be continued and shall designate one or more persons to be substituted as General Partner(s). In the event that the Limited Partners elect so to continue the Partnership with a new General Partner(s), such new General Partner(s) shall succeed to all of the powers, privileges and obligations of the General Partner, and the interest in the Partnership of any person or entity no

-70-

⏜

**11.2    Insanity.**    In the event of the incompetency or insanity of a Limited Partner, the guardian or other legal representative of the insane or incompetent Limited Partner shall succeed to the rights of such Limited Partner to receive allocations and distributions hereunder, and may be admitted into the Partnership as a Limited Partner in the place and stead of the insane or incompetent Limited Partner in accordance with Section 9.    Any Transfer by such guardian or other legal representative of all or any part of the Partnership interest of the insane or incompetent Limited Partner shall be governed by the provisions of Section 9.

<div align="center">

**SECTION 12**

**ACCOUNTING**

</div>

**12.1    Fiscal Year.**    The fiscal year of the Partnership shall be the calendar year.

**12.2    Books, Records and Accounting Method.**    The General Partners shall keep, or cause to be kept, full and accurate records of all transactions of the Partnership in accordance with the principles and practices generally accepted for the accrual method of accounting (the Partnership may adopt the cash method of accounting at any time upon the written determination to do so by the General Partners).

**12.3    Location of Books and Records.**    Unless otherwise changed by the General Partners, all such books of account shall, at all times, be maintained in the principal place of business of the Partnership.    Such principal office shall be open during reasonable business hours for the reasonable inspection and

<div align="center">

-72-

</div>

examination by the Limited Partners and their authorized representatives of such books of account, which parties shall have the right to make copies thereof.

12.4  **Federal Tax Returns.**  The General Partners shall prepare, or cause to be prepared, a federal information tax return in compliance with the Code, and any required state and local tax returns for the Partnership for each tax year of the Partnership; and, in connection therewith, shall made any available or necessary elections, including elections with respect to the useful lives of the properties of the Partnership and the rates of depreciation on such properties.

## SECTION 13

### REPORTS AND STATEMENTS

13.1  **Tax Return Information.**  By the tenth (10th) day of April of the fiscal year of the Partnership, the General Partners, at the expense of the Partnership, shall cause to be delivered to the Limited Partners such information as shall be necessary (including a statement for that year of the Limited Partner's share of net income, net gains, net losses and other items of the Partnership) for the preparation by the Limited Partners of their federal, state and local income and other tax returns.

13.2  **Financial Statements.**  Within one hundred (100) days after the end of each fiscal year of the Partnership, the General Partners shall cause to be delivered to the Limited Partners a financial statement of the Partnership for such fiscal year, prepared at the expense of the Partnership, prepared by an

-73-

independent certified public accountant, which financial statement shall set forth, as of the end of and for such fiscal year, the following:

(a) a profit and loss statement and a balance sheet of the Partnership;

(b) the balance in the capital account of each Partner; and

(c) such other information as, in the judgment of the General Partners, shall be reasonably necessary for the Partners to be advised of the financial status and results of operations of the Partnership.

### SECTION 14

### BANK ACCOUNTS

14.1   **General.**   The General Partners shall open and maintain (in the name of the Partnership) a bank account or accounts in a bank or savings and loan association, the deposits of which are insured by an agency of the United States government, in which shall be deposited all funds of the Partnership.   Withdrawals from such account or accounts shall be made upon the signature or signatures of such person or persons as the General Partners shall designate.   There shall be no commingling of the assets of the Partnership with the assets of any other entity or person.

### SECTION 15

### POWER OF ATTORNEY

15.1   **General.**   The Limited Partners give to the General Partners, the power of attorney contained in this Section and constitute and appoint the General Partners, with full power of

-74-

the obligations of the General Partners; (ii) affect the rights or restrictions regarding the assignability of the Unit(s); (iii) modify the terms of the Partnership; (iv) amend this Section 15; or (v) reduce the rights or interests or enlarge the obligations of the Limited Partners.  The General Partners shall promptly notify the Limited Partners of any documents or amendments affecting them executed pursuant to this Section 15.

### SECTION 16

### NOTICES

16.1  <u>General.</u>  Whenever any notice is required or permitted to be given under any provision of this Agreement, such notice shall be in writing, signed by or on behalf of the person giving the notice, and shall be deemed to have been given on the earlier to occur of (i) actual delivery or (ii) when mailed by certified mail, postage prepaid, return receipt requested, addressed to the person or persons to whom such notice is to be given as follows (or at such other address as shall be stated in a notice similarly given):

(a) such notice shall be given to the General Partners, at the principal place of business of the Partners;

(b) if the Limited Partners, such notice shall be given to the Limited Partners at their respective addresses indicated on Schedule "Al" attached hereto;

(c) a copy of such notice shall be given to the Counsel for the Partnership, Lawrence E. Bathgate II, Esquire, Bathgate, Wegener, Dugan & Wolf, P.C., One Airport Road, Lakewood, New Jersey  08701;

-77-

)

(d)    a copy of such Notice shall be given to the Accountant for the Partnership, Robert Krim, Cranberry Commons, Building C, 446 State Highway #35, Eatontown, New Jersey  07724; and

(e)  whenever any written notice is given in accordance with this Section 16.1 to a Limited Partner, the failure of any Limited Partner to respond to said Notice in writing within ten (10) business days of receipt of said Notice shall be deemed an approval and consent of said Limited Partner to the proposal set forth in said Notice.  The only action which shall be deemed a disapproval or a vote in opposition by the Limited Partner to any contemplated action by the Partnership and/or the General Partners shall be a written response expressly stating such disapproval or opposition from the Limited Partner to the General Partners within ten (10) business days of the receipt of the Notice.

## SECTION 17

### BINDING EFFECT

17.1  **General.**  Except as herein otherwise provided to the contrary, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their heirs, personal representatives, successors and assigns.

## SECTION 18

### AMENDMENTS

18.1  **General.**  No amendment, modification or waiver of this Agreement, or any part hereof, shall be valid or effective unless in writing and signed by the General Partners and by the Limited

-78-

)

Partners owning in the aggregate at least two-thirds (2/3) of the Interest of the Partnership; and no waiver of any breach or condition of this Agreement shall be deemed to be a waiver of any other condition or subsequent breach, whether of like or different nature. Notwithstanding the above, this Agreement may be amended without the prior agreement of the Limited Partners whenever required by law or by this Agreement or necessary to effect changes of a ministerial nature which do not adversely affect the rights or increase the obligations of the Limited Partners, including, without limitation, changes in Partners or their addresses, the admission of Limited Partners and the addition of Substitute Limited or New Additional Partners.

### SECTION 19

### APPLICABLE LAWS

19.1   **General.**   This Agreement shall be governed by and construed in accordance with the laws of the State of Florida.

### SECTION 20

### COUNTERPARTS

20.1   **General.**   This Agreement may be executed in several counterparts, and all such counterparts, so executed, taken together shall constitute one agreement, binding on all the parties hereto, notwithstanding that all the parties are not signatory to the original or the same counterpart.

## SECTION 21

### MISCELLANEOUS

21.1  **Severability.**  Each provision hereof is intended to be severable and the invalidity or illegality of any portion of this Agreement shall not affect the validity or legality of the remainder hereof.

21.2  **Captions.**  Section and Subsection captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or extend or describe the scope of this Agreement or the intent of any provision hereof.

21.3  **Person and Gender.**  The masculine gender shall include the feminine and neuter genders, and the singular shall include the plural.

21.4  **Miscellaneous.**  The General Partners are authorized to perform the ministerial duty of qualifying this Partnership under the laws of any state in which it is necessary to file documents or instruments of qualification.  A Partnership office or principal place of business in any state may be designated from time to time by the General Partners.

)

IN WITNESS WHEREOF, the parties hereto have subscribed and sworn to this Certificate and Agreement of Limited Partnership as of the day and year first above written.

HARBOR INN OF CS ASSOCIATES, LTD.

GENERAL PARTNERS
ATTEST:                           M.L. PROPERTY MANAGEMENT, INC.

                                  By: _____
SHELDON LIEBOWITZ, Secty.             MURRAY LIEBOWITZ, PRESIDENT

ATTEST:                           CDS INDUSTRIES, INC.

                                  By: _____
PAUL MARCUS, Secretary                PAUL MARCUS, PRESIDENT

WITNESS:                          LIMITED PARTNERS

                                  _____
                                  PAUL MARCUS

                                  _____
                                  DANI SIEGEL

                                  _____
                                  ADRIAN VAN ZON

                                  _____
                                  GLEN PARKER

                                  _____
                                  NORMAN FOSBACK

                                  _____
                                  MURRAY LIEBOWITZ

                                  _____
                                  SHELDON LIEBOWITZ

                                  _____
                                  JERRY HOFFMAN, TRUSTEE FOR
                                  JOAN OSIAS HOFFMAN TRUST UNDER DATE 5/15/84

                                  _____
                                  JOAN HOFFMAN, TRUSTEE FOR
                                  JOAN OSIAS HOFFMAN TRUST UNDER DATE 5/15/84

-81-

COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE
AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private
Placement Memorandum relating to the placement of units in Harbor
Inn of CS Associates, Ltd. (the "Partnership"), hereby agrees to
become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of
the Amended and Restated Certificate and Agreement of Limited
Partnership of Harbor Inn of CS Associates, Ltd.

DATE: 3/29/93

_____
(signature)

MAILING ADDRESS:

6-BAYBERRY DR.
SADDLE RIVER N-J

PAUL MARCUS
(Please Print Name)

STATE OF        )

COUNTY OF       )

I HEREBY CERTIFY that on this day, before me an officer
duly authorized in the State aforesaid and in the County aforesaid,
to take acknowledgments, personally appeared PAUL MARCUS to me
known to be the person described in and who executed the foregoing
instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State
last aforesaid this 29th day of March, 1993.

_____
Notary Public
My Commission Expires:
JAMES K. BARRY
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES DEC. 13, 1993

CSP-27

COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE
AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private placement Memorandum relating to the placement of units in Harbor Inn of CS Associates, Ltd. (the "Partnership"), hereby agrees to become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of the Amended and Restated Certificate and Agreement of Limited Partnership of Harbor Inn of CS Associates, Ltd.

DATE: ___March 26, 1993___

_____
(signature)

MAILING ADDRESS:

_____

_____

DANI SIEGEL
_____
(Please Print Name)

STATE OF _NEW YORK_ )

COUNTY OF _NEW YORK_ )

I HEREBY CERTIFY that on this day, before me an officer duly authorized in the State aforesaid and in the County aforesaid, to take acknowledgments, personally appeared _DANI SIEGEL_ to me known to be the person described in and who executed the foregoing instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State last aforesaid this _26TH_ day of ___MARCH___, 1993.

_____
Notary Public
My Commission Expires:

DAVID J. SOCCI
Notary Public, State of New York
No. 43-4741386
Qualified Richmond County
Commission Expires _8/31/93_

CSP-27

COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE
AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private
Placement Memorandum relating to the placement of units in Harbor
Inn of CS Associates, Ltd. (the "Partnership"), hereby agrees to
become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of
the Amended and Restated Certificate and Agreement of Limited
Partnership of Harbor Inn of CS Associates, Ltd.

DATE: _____3/29/93_____     _____
                                  (signature)

MAILING ADDRESS:

_998 Spinnaker Reh Dr._   _A. Van Zon_
_Ponte Vedra Bch, FL_        (Please Print Name)
         _32082_

STATE OF _New York_,

COUNTY OF _Queens_,

I HEREBY CERTIFY that on this day, before me an officer
duly authorized in the State aforesaid and in the County aforesaid,
to take acknowledgments, personally appeared _Adrian van Zon_ to me
known to be the person described in and who executed the foregoing
instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State
last aforesaid this _29th_ day of _March_, 1993.

ALTHEA HENRY
Notary Public, State of New York
No.41-4758409
Qualified in Queens County
Commission Expires March 30, 1993

_____
Notary Public
My Commission Expires:

CSP-28

COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE
AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private Placement Memorandum relating to the placement of units in Harbor Inn of CS Associates, Ltd. (the "Partnership"), hereby agrees to become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of the Amended and Restated Certificate and Agreement of Limited Partnership of Harbor Inn of CS Associates, Ltd.

DATE: _3/25/93_   _____
                   (signature)

MAILING ADDRESS:
_2855 NE 25 Ct._            _Glen King Parker_
_Ft. Lauderdale FL 33305_     (Please Print Name)

STATE OF _Florida_  )
                    )
COUNTY OF _Broward_ )

I HEREBY CERTIFY that on this day, before me an officer duly authorized in the State aforesaid and in the County aforesaid, to take acknowledgments, personally appeared _Glen King Parker_ to me known to be the person described in and who executed the foregoing instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State last aforesaid this _25_ day of _March_, 1993.

_____
Notary Public
My Commission Expires:

NOTARY PUBLIC STATE OF FLORIDA
MY COMMISSION EXP. OCT. 25, 1995
BONDED THRU GENERAL INS. UND.

CSP-27

COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private Placement Memorandum relating to the placement of units in Harbor Inn of CS Associates, Ltd. (the "Partnership"), hereby agrees to become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of the Amended and Restated Certificate and Agreement of Limited Partnership of Harbor Inn of CS Associates, Ltd.

DATE: _3/25/93_                     _Norman G Fosback_
                                    (Signature)

MAILING ADDRESS:

_2600 N. E. 30th Ave._              _Norman G. Fosback_
_Ft. Laud., FL 33306_               (Please Print Name)

STATE OF _Florida_ )

COUNTY OF _Broward_ )

I HEREBY CERTIFY that on this day, before me an officer duly authorized in the State aforesaid and in the County aforesaid, to take acknowledgments, personally appeared _Norman G. Fosback_ to me known to be the person described in and who executed the foregoing instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State last aforesaid this _25_ day of _March_ , 1993.

_Joan M. Appel_
Notary Public
My Commission Expires:

NOTARY PUBLIC STATE OF FLORIDA
MY COMMISSION EXP. OCT. 25, 1995
BONDED THRU GENERAL INS. UND.

CSP-27

## COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE
### AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private Placement Memorandum relating to the placement of units in Harbor Inn of CS Associates, Ltd. (the "Partnership"), hereby agrees to become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of the Amended and Restated Certificate and Agreement of Limited Partnership of Harbor Inn of CS Associates, Ltd.

DATE: 3/29/93

_____
(signature)

MAILING ADDRESS:

_____

Murry Liebowitz
(Please Print Name)

STATE OF Florida )
COUNTY OF Broward )

I HEREBY CERTIFY that on this day, before me an officer duly authorized in the State aforesaid and in the County aforesaid, to take acknowledgments, personally appeared Murry Liebowitz to me known to be the person described in and who executed the foregoing instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State last aforesaid this 29th day of March, 1993.

Margaret R. Smith
Notary Public
My Commission Expires

COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE
AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private Placement Memorandum relating to the placement of units in Harbor Inn of CS Associates, Ltd. (the "Partnership"), hereby agrees to become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of the Amended and Restated Certificate and Agreement of Limited Partnership of Harbor Inn of CS Associates, Ltd.

DATE: 3/29/93

_____
(signature)

MAILING ADDRESS:

_____       Shelden Liebowitz
_____       (Please Print Name)

STATE OF Florida )
COUNTY OF Broward )

I HEREBY CERTIFY that on this day, before me an officer duly authorized in the State aforesaid and in the County aforesaid, to take acknowledgments, personally appeared Shelden Liebowitz to me known to be the person described in and who executed the foregoing instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State last aforesaid this 29th day of March , 1993.

Margaret R. Smith
Notary Public
My Commission Expires:

CSP-29

COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE
AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private
Placement Memorandum relating to the placement of units in Harbor
Inn of CS Associates, Ltd. (the "Partnership"), hereby agrees to
become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of
the Amended and Restated Certificate and Agreement of Limited
Partnership of Harbor Inn of CS Associates, Ltd.

DATE: 3/29/93

(signature)

MAILING ADDRESS:

10 Compass Lane

Fort Lauderdale, Florida 33308

Jerome J. Hoffman, M.D.
(Please Print Name)

STATE OF Florida )

COUNTY OF Broward )

I HEREBY CERTIFY that on this day, before me an officer
duly authorized in the State aforesaid and in the County aforesaid,
to take acknowledgments, personally appeared Jerome J. Hoffman to me
known to be the person described in and who executed the foregoing
instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State
last aforesaid this 26th day of March , 1993.

Margaret R. Smith
Notary Public
My Commission Expires:

CSP-29

COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE
AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private
Placement Memorandum relating to the placement of units in Harbor
Inn of CS Associates, Ltd. (the "Partnership"), hereby agrees to
become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of
the Amended and Restated Certificate and Agreement of Limited
Partnership of Harbor Inn of CS Associates, Ltd.

DATE: 3/29/93

_____
(signature)

MAILING ADDRESS:

10 Compass Lane

Ft Lauderdale, Fl. 33308

Joan O. Hoffman
(Please Print Name)

STATE OF Florida )

COUNTY OF Broward )

I HEREBY CERTIFY that on this day, before me an officer
duly authorized in the State aforesaid and in the County aforesaid,
to take acknowledgments, personally appeared Joan Hoffman to me
known to be the person described in and who executed the foregoing
instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State
last aforesaid this 26th day of March , 1993.

_____
Notary Public
My Commission Expires

CSP-29

EXHIBIT Al
Page 1 of 2


General Partners


|  | Unit(s) | %Interests–CapitalContribution (Amount ofCash/Agreed Value) |
|---|---|---|
| M.L.Property Management,Inc.<br>c/o Murray Liebowitz<br>2600 E. Commercial Boulevard<br>Suite 213<br>Ft. Lauderdale, Florida 33308 | 1/2 | 1/2%(.5%)    $         0*<br>No initial capital<br>contribution but<br>required to pay any<br>additional contribution |
| CDS Industries, Inc.<br>c/o Paul Marcus<br>2600 E. Commercial Boulevard<br>Suite 213<br>Ft. Lauderdale, Florida 33308 | 1/2 | 1/2%(.5%)    $         0*<br>No initial capital<br>contribution but<br>required to pay any<br>additional contribution |

*The initial capital contribution waiver is in consideration for agreement to serve as general partners and incur liability related thereto.


Limited Partners


|  | Unit(s) | %Interests–CapitalContribution** (Amount of Cash/Agreed Value) | |
|---|---|---|---|
| Paul Marcus<br>864 East 25th Street<br>Paterson, NJ  07513 | 45 | 44.55% | $  900,000.00 |
| Dani Siegel<br>Genetra Affiliates, Inc.<br>29 W. 56th Street<br>New York, NJ  10019 | 20 | 19.80% | 400,000.00 |

EXHIBIT A1
Page 2 Of 2

## Limited Partners cont'd.

| | Unit(s) | %Interests-CapitalContribution** (Amount of Cash/Agreed Value) | |
|---|---|---|---|
| Adrian Van Zon<br>Van Zon International<br>555 West 57th Street<br>New York, New York  10019 | 10 | 9.90% | 200,000.00 |
| Glen Parker<br>The Institute for<br>Economic Research<br>3471 N. Federal Highway<br>Ft. Lauderdale, FL  33306 | 5 | 4.95% | 100,000.00 |
| Norman Fosback<br>2600 N.E. 39th Avenue<br>Ft. Lauderdale, FL  33306 | 5 | 4.95% | 100,000.00 |
| Murray Liebowitz<br>c/oM.L.Property Management,Inc.<br>2600 E. Commercial Boulevard<br>Suite 213<br>Ft. Lauderdale, FL  33308 | 5 | 4.95% | 100,000.00 |
| Sheldon Liebowitz<br>c/oM.L.Property Management,Inc.<br>2600 E. Commercial Boulevard<br>Suite 213<br>Ft. Lauderdale, Florida 33308 | 5 | 4.95% | 100,000.00 |
| Drs. Jerry and Joan Hoffman***<br>***Trustees for<br>Joan Osias Hoffman Trust<br>dated May 15, 1984<br>10 Compass Lane<br>Ft. Lauderdale, FL  33308 | 5 | 4.95% | 100,000.00 |
| Total: | 101 | 100% | $2,000,000.00 |

**Limited Partners representing 99% of the capital interest contributed 100% of the initial capital contribution of $2,000,000.00.

AMENDED AND RESTATED CERTIFICATE AND

AGREEMENT OF LIMITED PARTNERSHIP

OF

PARK PLAZA ASSOCIATES, LTD.
A Florida Limited Partnership

DATED: August __, 1993

Record and Return To:

LAWRENCE E. BATHGATE, II, ESQUIRE
Bathgate, Wegener, Dugan & Wolf, P.C.
One Airport Road
P.O. Box 2043
Lakewood, NJ  08701
(908) 363-0666

DOCUMENT PREPARED BY:
            LAWRENCE E. BATHGATE, II, ESQUIRE

ATTACHMENT / EXHIBIT  E

# INDEX

| SECTION | TOPIC | PAGE |
|---|---|---|
| 1 | THE PARTNERSHIP | |
| 1.1 | Continuation of Partnership | 3 |
| 1.2 | Partnership Name | 3 |
| 1.3 | Purpose | 3 |
| 1.4 | Principal Place of Business | 4 |
| 1.5 | Term | 4 |
| 1.6 | Filings | 4 |
| 1.7 | Title to Property | 5 |
| 1.8 | Tax Matters Partner | 5 |
| 1.9 | Independent Activities | 5 |
| 1.10 | Voting of the Partners | 6 |
| 1.11 | Payments of Individual Obligations | 6 |
| 1.12 | Definitions | 6 |
| 2 | CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS | |
| 2.1 | General Partners | 24 |
| 2.2 | Limited Partners | 24 |
| 2.3 | Capital Accounts | 24 |
| 2.4 | Determination of Balance in Capital Accounts | 26 |
| 2.5 | Withdrawal of Capital | 26 |
| 2.6 | Capital Accounts of New Partners | 26 |
| 2.7 | Allocation Among Partners | 27 |
| 2.8 | Partner's Loans | 27 |
| 2.9 | Liability of Limited Partner | 27 |
| 2.10 | Interest on Capital Contributions | 28 |
| 3 | CONTROL AND MANAGEMENT | |
| 3.1 | General | 28 |
| 3.2 | Powers of the General Partner | 29 |
| 3.3 | Limitation on Powers of the General Partner | 31 |
| 3.4 | No Management Powers by Limited Partners | 32 |
| 3.5 | Liability of General Partner | 33 |
| 3.6 | Right to Engage in Other Ventures | 33 |
| 3.7 | Limitation on Obligations of the General Partner | 33 |
| 3.8 | Indemnification of General Partner and Partnership | 33 |
| 3.9 | Dealings with the General Partner and Affiliates | 34 |
| 4 | ALLOCATIONS OF INCOME, NET LOSSES AND CREDITS | |
| 4.1 | Allocation of Profits and Losses | 35 |
| 4.2 | Dissolution and Winding Up | 35 |
| 4.3 | Distributive Share; Charges and Credits to Capital Accounts | 36 |
| 4.4 | Special Allocations | 37 |
| 4.5 | Qualified Income Offset, Minimum Gain, Recapture of Special Allocations | 41 |
| 4.6 | Curative Allocations | 42 |
| 4.7 | Other Allocation Rules | 43 |
| 4.8 | Tax Allocations: Code Section 704(c) | 44 |
| 4.9 | Miscellaneous | 45 |

i

| | | |
|---|---|---|
| 5 | DISTRIBUTIONS | |
| 5.1(a) | Cash Flow Distributions | 46 |
| 5.1(b) | Proceeds from Refinancing, Sale or Other Disposition of the Property | 47 |
| 5.1(c) | Proceeds Available Upon Dissolution | 47 |
| 5.2 | Distribution in Kind | 49 |
| 5.3 | Rights of Partners to Property | 49 |
| 5.4 | Priorities of Limited Partners | 50 |
| 6 | CERTAIN MATTERS RELATING TO MANAGEMENT OF THE PARTNERSHIP; PARTNERSHIP EXPENSES; REPLACEMENT RESERVE ACCOUNT | |
| 6.1 | Property Management | 50 |
| 6.2 | Partnership Expenses | 50 |
| 6.3 | Replacement Reserve Account | 51 |
| 7 | LOANS AND ADDITIONAL CAPITAL CONTRIBUTIONS TO THE PARTNERSHIP | |
| 7.1 | Optional Loans | 52 |
| 7.2 | Additional Capital Contributions | 52 |
| 7.2.1 | Call for Funds | 52 |
| 7.2.2 | Contributions by Partners | 53 |
| 7.2.3 | Contributions for Non-Contributing Partners | 55 |
| 7.2.4 | Loss of Partnership Interest by Non-Contributing Partner | 56 |
| 7.2.5 | Additional Partners | 56 |
| 7.2.6 | New Partners | 57 |
| 7.2.7 | Miscellaneous | 57 |
| 7.2.8 | Transferee Partners | 59 |
| 8 | SALE OF THE PROPERTY | |
| 8.1 | General | 59 |
| 8.2 | Sale Based on Votes of Partners Owning One-Half or More but Less than Two-Thirds of Total Partnership Interest | 59 |
| 8.3 | Response to Notice of Sale | 64 |
| 9 | TRANSFER OF INTEREST OF PARTNERS OR ADMISSION OF OTHER PARTNERS | |
| 9.1 | Method of Transfer | 64 |
| 9.2 | Transfers by Partners | 64 |
| 9.3 | Rights of Transferee | 66 |
| 9.4 | Section 754 Election | 67 |
| 9.5 | Profit/Loss Allocations Upon Transfer | 67 |
| 10 | DISSOLUTION AND TERMINATION | |
| 10.1 | Events of Dissolution | 68 |
| 10.2 | Continuation of Partnership | 69 |
| 10.3 | Obligations Survive Dissolution | 69 |
| 10.4 | Distributions Upon Dissolution | 70 |
| 11 | DEATH OR INSANITY OF A LIMITED PARTNER | |
| 11.1 | Death | 70 |
| 11.2 | Insanity | 70 |
| 12 | ACCOUNTING | |
| 12.1 | Fiscal Year | 71 |
| 12.2 | Books, Records and Accounting Method | 71 |
| 12.3 | Location of Books and Records | 71 |
| 12.4 | Federal Tax Returns | 71 |

```
13          REPORTS AND STATEMENTS
13.1            Tax Return Information.........................72
13.2            Financial Statements...........................72
14          BANK ACCOUNTS
14.1            General........................................73
15          POWER OF ATTORNEY
15.1            General........................................73
15.2            A Special Power; Manner of Exercise; Survival..74
15.3            Limitations....................................75
16          NOTICES
16.1            General........................................76
17          BINDING EFFECT
17.1            General........................................77
18          AMENDMENTS
18.1            General........................................77
19          APPLICABLE LAWS
19.1            General........................................78
20          COUNTERPARTS
20.1            General........................................78
21          MISCELLANEOUS
21.1            Severability...................................78
21.2            Captions.......................................78
21.3            Person and Gender..............................79
21.4            Miscellaneous..................................79
EXHIBIT A LIST OF PARTNERS.....................................81
EXHIBIT B MANAGEMENT AGREEMENT.................................83
```

AMENDED AND RESTATED CERTIFICATE AND

AGREEMENT OF LIMITED PARTNERSHIP

OF

PARK PLAZA ASSOCIATES, LTD.
A Florida Limited Partnership

THIS AMENDED AND RESTATED CERTIFICATE AND AGREEMENT OF LIMITED PARTNERSHIP ("Agreement"), dated as of August __, 1993 by and among M.L. Property Management, Inc., a Florida corporation, as General Partner (the "General Partner"), and Murray Liebowitz and Sheldon Liebowitz, as the Original Limited Partners (the "Original Limited Partners"), and each of the individuals, partnership, corporations, trusts, estates and other entities listed on Exhibit "A1" annexed hereto who execute Counterpart Signature Pages of this Agreement (collectively and together with any individual, partnershp, corporation, trust, estate or other entity hereafter admitted as Limited Partners, referred to as the "Limited Partners", and, individually, as a "Limited Partner"). The General Partner and the Limited Partners are herein sometimes referred to individually as a "Partner" and collectively as the "Partners".


W I T N E S S E T H:


WHEREAS, Park Plaza Associates, Ltd., a Florida Limited Partnership, (the "Partnership") was created pursuant to a Certificate and Agreement of Limited Partnership dated July 19,

-1-

1993 and filed with the Office of the Secretary of State of the State of Florida on July 20, 1993 (said Certificate and Agreement of Limited Partnership dated July 19, 1993 is sometimes referred to herein as the "Original Partnership Agreement");

**WHEREAS,** the Partnership is presently in existence as a limited partnership under the Revised Uniform Limited Partnership Act of the State of Florida; and

**WHEREAS,** the Original Limited Partners desire to transfer their interests as Original Limited Partners and have these interests reallocated to the Limited Partners in accordance with the Limited Partners percentage interests set forth on Exhibit "A1", annexed hereto and incorporated herein; and

**WHEREAS,** the parties hereto desire to amend, restate and supersede in its entirety the Original Partnership Agreement and to enter into this Agreement for the purpose of (i) admitting the Limited Partners and transferring and reallocating the Limited Partners' interest by and among the Limited Partners, as set forth in Exhibit "A1" annexed hereto and incorporated herein, and (ii) amending, restating and superseding in its entirety the Original Partnership Agreement as hereinafter set forth;

**NOW, THEREFORE,** the General Partner, the Original Limited Partners and the Limited Partners hereby SIGN AND SWEAR TO this Agreement and agree as follows:

## SECTION 1

## THE PARTNERSHIP

1.1     <u>Continuation of Partnership.</u>   The parties hereby continue the Partnership as a Limited Partnership pursuant to the provisions of the Revised Uniform Limited Partnership Act of the State of Florida and in accordance with the transfer and reallocation of interests as set forth on Exhibit "A1" attached hereto and incorporated by reference herein.

1.2   <u>Partnership Name.</u>   The name of the Partnership shall be Park Plaza Associates, Ltd., A Florida Limited Partnership, and all business of the Partnership shall be conducted in such name. The General Partner may change the name of the Partnership or adopt such trade or fictitious names as they may determine to be appropriate upon ten (10) Business Days notice to the Limited Partners.

1.3   <u>Purpose.</u>   The sole purpose and business of the Partnership shall be to acquire, own, improve, lease, manage, operate, hold, mortgage, sell and otherwise deal with the Property for investment, or any part thereof, and to conduct such other activities as may be necessary or appropriate to promote the business of the Partnership as set forth above, it being agreed that each of the foregoing is an ordinary part of the Partnership's business.   The Partnership shall not engage in any other business without the prior consent of the Partners owning at least two-thirds (2/3rds) of the Interests in the Partnership.

**1.4   Principal Place of Business.**   The principal place of business of the Partnership shall be at 2600 E. Commercial Blvd., Suite 213, Fort Lauderdale, Florida 33308, or at such other location as the General Partner, in its discretion, may determine.

**1.5   Term.**   The term of the Partnership shall commence upon recordation of the Certificate of Limited Partnership by the General Partner in the manner provided by the Act, which filing and recordation shall occur as promptly as possible following the execution and delivery of this Agreement, and the Partnership shall continue until the winding up and liquidation of the Partnership and its business is completed following a Liquidating Event, as provided in Section 10 hereof.

**1.6   Filings.**   (a) The General Partner shall cause to be filed, with the Secretary of the State of Florida, and elsewhere as may be required by law, the original and any amended Certificates and other documents, and shall take any and all other actions as may be reasonably necessary to perfect and maintain the status of the Partnership as a limited partnership in accordance with the Act.

(b)   The name and address of the Agent for service of process on the Partnership shall be Sheldon Liebowitz or any successor as appointed by the General Partner in its sole discretion in accordance with the Act. The registered Office for Service of Process of the Partnership in the State of Florida is located at 2600 E. Commercial Blvd., Suite 213, Fort Lauderdale, Florida 33308.

-4-

(c)   Upon the dissolution of the Partnership, the General Partner (or, in the event there is no remaining General Partner, any Person elected pursuant to Section 10 hereof) shall promptly execute and cause to be filed certificates of dissolution in accordance with the Act and the laws of any other states or jurisdictions in which the Partnership has filed certificates.

1.7   **Title to Property.**   All real and personal property owned by the Partnership shall be owned by the Partnership as an entity and no Partner shall have any ownership interest in such property in its individual name or right, and each Partner's interest in the Partnership shall be personal property for all purposes.   Except as otherwise provided in this Agreement, the Partnership shall hold all of its real and personal property in the name of the Partnership and not in the name of any Partner.

1.8   **Tax Matters Partner.**   Murray Liebowitz shall be the tax matters partner, pursuant to Code Sections 6221 through 6231.

1.9   **Independent Activities.**   (a)   The General Partner and any of their Affiliates shall be required to devote only such time to the affairs of the Partnership as such General Partner determines in its sole discretion may be necessary to manage and operate the Partnership, and each such Person, to the extent not otherwise directed by such General Partner, shall be free to serve any other Person or enterprise in any capacity that it may deem appropriate in its discretion.

-5-

(b)    Insofar as permitted by applicable law, the General Partner (acting on its own behalf) and each Limited Partner (acting on its own behalf) may, notwithstanding this Agreement, engage in whatever activities they choose, whether the same are competitive with the Partnership or otherwise, without having or incurring any obligation to offer any interest in such activities to the Partnership or any Partner and neither this Agreement nor any activity undertaken pursuant hereto shall prevent any Partner from engaging in such activities, or require any Partner to permit the Partnership or any Partner to participate in any such activities, and as a material part of the consideration for the execution of this Agreement by each Partner, each Partner hereby waives, relinquishes, and renounces any such right or claim of participation.    Anything contained herein to the contrary notwithstanding, the General Partner hereby agrees not to compete, directly or indirectly, with the Partnership within a one (1) mile radius from the Property in renting, owning or managing any multi-family dwellings.

(c)    To the extent permitted by applicable law and except as otherwise provided in this Agreement, each General Partner, when acting on behalf of the Partnership, is hereby authorized to purchase property from, sell property to, or otherwise deal with any Partner, acting on its own behalf, or any Affiliate of any Partner, provided that any such purchase, sale, or other transaction shall be made on terms and conditions which

-6-

are no less favorable to the Partnership than if the sale, purchase, or other transaction had been entered into with an independent third party.

1.10 **Voting of the Partners.** Except as otherwise expressly provided herein to the contrary any vote, approval, consent, authorization or other action required to be taken or made by the (i) General Partner shall be made by a vote of the General Partner, and (ii) Limited Partners shall be made by a vote of the Limited Partners owning at least two-thirds (2/3) of the Interests in the Partnership.

1.11 **Payments of Individual Obligations.** The Partnership's credit and assets shall be used solely for the benefit of the Partnership, and no asset of the Partnership shall be transferred or encumbered for or in payment of any individual obligation of any Partner.

1.12 **Definitions.** Capitalized words and phrases used in this Agreement shall have the following  meanings:

(a) Act" means the Florida Uniform Limited Partnership Act.

(b) "Adjusted Capital Account Deficit" means with respect to any Interest Holder, the deficit balance, if any, in such Interest Holder's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(i) Credit to such Capital Account any amounts which such Interest Holder is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

-7-

(ii) Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

(c) "Adjusted Capital Contribution" means, as of any day, an Interest Holder's Capital Contributions adjusted as follows:

(i) Increased by the amount of any Partnership liabilities which, in connection with distributions pursuant to Sections 5.1(b),(c) and 5.2 hereof, are assumed by such Interest Holder or are secured by any Partnership Property distributed to such Interest Holder;

(ii) Increased by any amounts actually paid by such Interest Holder to any Partnership lender pursuant to the terms of any Assumption Agreement; and

(iii) Reduced by the amount of cash and the Gross Asset Value of any Partnership Property distributed to such Interest Holder pursuant to Sections 5.1 and 5.2 hereof and the amount of any liabilities of such Interest Holder assumed by the Partnership or which are secured by any property contributed by such Interest Holder to the Partnership.

(d) "Affiliate" means any member of the immediate family of a General Partner (or shareholder of a corporate general partner), any person, firm or entity which, directly or indirectly, controls, is controlled by or is under common control

-8-

with a General Partner, or any member  of his immediate family;
or any person, firm or entity which is associated with a General
Partner, or any member of his immediate family in a joint
venture, partnership or other form of business association.   In
this definition the term "Control" shall mean the ownership of
ten (10%) percent or more of the beneficial interest in the firm
or entity referred to, and the term "immediate family" shall mean
the spouse, ancestors, lineal descendants, brothers and sisters
of the person in question, including those adopted.

(e)  "Agreement"  or  "Partnership Agreement"  means  this
Agreement as amended from time to time.   Words such as "herein",
"hereinafter", "hereof", "hereto", and "hereunder", refer to this
Agreement as a whole, unless the context otherwise requires.

(f)  "Aggregate Capital Contribution" means all contributions
made to the capital of the Partnership by a Partner pursuant to
Sections 2 and 7 hereof.

(g)  "Bankruptcy" means, with respect to any Person, a
"Voluntary Bankruptcy" or an "Involuntary Bankruptcy".   A
"Voluntary Bankruptcy" means, with respect to any Person, the
inability of such Person generally to pay its debts as such debts
become due, or an admission in writing by such Person of its
inability to pay its debts generally or a general assignment by
such Person for the benefit of creditors; the filing of any
petition or answer by such Person seeking to adjudicate it a
bankrupt or insolvent, or seeking for itself any liquidation,
winding up, reorganization, arrangement, adjustment, protection,
relief, or composition of such Person or its debts under any law

-9-

relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian, or other similar official for such Person or for any substantial part of its property; or corporate action taken by such Person to authorize any of the actions set forth above.   An "Involuntary Bankruptcy" means, with respect to any Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization of any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or other similar relief under any present or future bankruptcy, insolvency, or similar statute, law, or regulation, or the filing of any such petition against such Person which petition shall not be dismissed within ninety (90) days, or, without the consent or acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver, or liquidator of such Person or of all or any substantial part of the property of such Person which order shall not be dismissed within sixty (60) days.

(h) "Business Day" means a day of the year on which banks are not required or authorized to close in the State of Florida.

(i) "Capital Account" means, with respect to any Partner, the Capital Account maintained for such Person in accordance with the following provisions:

(i) To each Person's Capital Account there shall be credited such Person's Capital Contributions, such Person's distributive share of Profits and any items in the nature of

income or gain that are specially allocated pursuant to Sections 4.4 or 4.6 hereof, and the amount of any Partnership liabilities assumed by such Person or secured by any Partnership Property distributed to such Person.

(ii) To each Person's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Partnership Property distributed to such Person pursuant to any provision of this Agreement, such Person's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Sections 4.4 or 4.6 hereof, Partnership or which are secured by any property contributed by such Person to the Partnership.

(iii) In the event all or a portion of an interest in the Partnership is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(iv) In determining the amount of any liability for purposes of Sections 1.12(c)(i), 1.10(c)(iii), and Sections 1.12(i)i and 1.12(i)ii hereof, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations.  In the event the General Partner shall determine

-11-

that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Partnership, General Partner or Interest Holders), are computed in order to comply with such Regulations, the General Partner may make such modifications provided that they are not likely to have a material effect on the amounts distributable to any Partner pursuant to Section 10 hereof upon the dissolution of the Partnership. The General Partner also shall make any appropriate modifications in the event unanticipated events might otherwise cause the Agreement not to comply with Regulations Section 1.704-1(b).

(j) "Capital Contributions" means, with respect to any Interest, the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Partnership with respect to the interest in the Partnership held by such Person. The principal amount of a promissory note which is not readily traded on an established securities market and which is contributed to the Partnership by the maker of the note (or a Person related to the maker of the note within the meaning of Regulations Section 1.704-1(b)(2)(ii)(c) shall not be included in the Capital Account of any Person until the Partnership makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Regulations Section 1.704-1(b)(2)(iv)(d)(2).

(k) "Capital Items"   The net proceeds (Less any expenses incurred in connection with the receipt or collection of any such proceeds, which are not applied to set aside for the reduction of Partnership liabilities or the repair, restoration or improvement of Partnership assets, and after retirement of applicable debt or any portion thereof) received by the Partnership upon the occurrence of any of the following events, provided that no such event causes or results in the dissolution of the Partnership: (i) any sale of all or part of the capital assets of the Partnership, (ii) any insurance payments (other than under policies commonly referred to as rent insurance) or damage recoveries paid to the Partnership in respect of its assets; (iii) any award or payment made by any governmental authority in connection with the exercise of any right of eminent domain, condemnation or similar right or power; (iv) any refinancing of the Partnership's loans.

(l) "Cash Flow":   The excess of cash revenue from Partnership operations over cash disbursements, without deduction for depreciation or cost recovery, and a reasonable allowance for cash reserves for repairs, replacement, contingencies and anticipated obligations (including debt service, capital improvements and replacements) as determined by the General Partners.  Cash Flow shall not include Capital Items.  For this purpose, revenue from Partnership operations shall not include: capital contributions from the Partners, deposits until the same are forfeited by the persons making such deposits, advance rentals until such time as they are earned by the Partnership,

-13-

insurance loss proceeds (except for any proceeds of rent interruption insurance), any award or payment made by any governmental authority in connection with the exercise of any right of eminent domain, condemnation or similar right or power, or any proceeds from the sale, exchange, or refinancing of the Property.

(m) "Certificate" means the certificate of limited partnership filed with the Secretary of State to reflect the provisions of this Agreement.

(n) "Closing Date" means the Closing Date as may be specified in a legal agreement of which the Partnership is a party.

(o) "Code" or "IRC" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

(p) "Depreciation" means, for each fiscal year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such year or other period, except that, if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such fiscal year or other period bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of

-14-

such fiscal year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Partner.

(q) "Distributions" means any cash or property distributed to any Interest Holders arising from their interests in the Partnership, other than payments to an Interest Holder for services or as repayment of loans or advances.

(r) "General Partner(s)" means the General Partner(s) of the Partnership, and means any Person, corporation, and/or any other Sub S corporation who at the time of reference has been admitted as a General Partner or a successor to a General Partner, or an additional General Partner.

(s) "General Partnership Interest" means the general partnership ownership interest of the General Partner(s) in the Partnership, including the rights of the General Partner(s) to any and all benefits to which he may be entitled pursuant to this Agreement, together with the obligations of the General Partner(s) to comply with all the terms and provisions of this Agreement.

(t) "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i) The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset, as determined by the contributing Partner and the General Partner, provided that, if

the contributing Partner is a General Partner, the determination of the fair market value of a contributed asset shall require the consent of a majority of the Limited Partners;

(ii) The Gross Asset Values of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partner, as of the following times:

(a) the acquisition of an additional interest in the Partnership (other than pursuant to Sections 5.1 or 5.2 hereof) by any new or existing Partner in exchange for more than a de minimus Capital Contribution;

(b) the distribution by the Partnership to an Interest Holder of more than a de minimus amount of Partnership Property as consideration for an interest in the Partnership; and

(c) the liquidation of the Partnership within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the General Partner reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the General Partner and Interest Holders in the Partnership.;

(iii) The Gross Asset Value of any Partnership asset distribution to any General Partner or Interest Holder shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the distributee and the General Partner, provided that, if the distributee is a General

-16-

Partner, the determination of the fair market value of the distributed asset shall require the consent of a majority of the Limited Partners; and

(iv) The Gross Asset Value of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Sections 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and Section 2.3(f) hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this Section 1.12(t)(iv) to the extent the General Partner determines that an adjustment pursuant to Section 1.12(t)(ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.12(t)(iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Sections 1.12(t)(i), 1.12(t)(ii), or 1.12(t)(iii) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

(u) "Interest" means a percentage ownership interest in the Partnership, in accordance with the percentage Capital Contribution made by a Partner pursuant to Exhibit A hereof together with any additional contribution subsequently made pursuant to Section 7 herein and as contemplated by this Agreement, including the right of any such Partner to any and all

-17-

benefits to which the holder of such interest may be entitled pursuant to this Agreement, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement.

(v)  "Interest Holder" means any Person who holds an Interest.  "Interest Holders" means all such Persons.

(w)  "Limited Partners" means the limited partners whose names are set forth on Exhibit A attached to this Agreement, and such other persons as are admitted to the Partnership as substitute or additional Partners and are named as Limited Partners in any amended Certificate of the Partnership.  Further, it includes the General Partner in its capacity as a holder of a Limited Partnership Interest, where no distinction is required by the context in which the term is used herein.  Reference to a "Limited Partner" shall be to any one of the Limited Partners.

(x)  "Management Agreement" means that certain Management Agreement, dated as of the Closing Date, between the Partnership and M.L. Property Management, Inc., pertaining to the operation and management of the Property.

(y)  "Memorandum" means that certain Confidential Private Placement Memorandum dated as of July 19, 1993, including all amendments or supplements thereto relating to the sale of Units of limited partnership of the Partnership.

(z)  "Net Cash From Operations" means the gross cash proceeds from Partnership operations (including sales and dispositions of Property in the ordinary course of business) less the portion thereof used to pay all cash expenditures incurred

incident to the normal operation of partnership business including those expenses of the General Partner reimbursed by the Partnership pursuant to the terms hereof, or to establish reserves for all Partnership expenses, debt payments, capital improvements, replacements, and contingencies, all deemed by the General Partner in its sole and absolute discretion to be reasonably necessary for proper operation of the Partnership's business. "Net Cash From Operations" shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowances, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this Section 1.12(z) and Section 1.12(aa) hereof.

(aa) "Net Cash From Sales or Refinancings" means the net cash proceeds from all sales and other dispositions (other than in the ordinary course of business) and all refinancings of Partnership Property, less any portion thereof used to establish reserves, all as determined by the General Partner. "Net Cash From Sales or Refinancings" shall include all principal and interest payments with respect to any note or other obligation received by the Partnership in connection with sales and other dispositions (other than in the ordinary course of business) of Partnership Property.

(bb) "Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations.

(cc) "Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

-19-

(dd) "Partner Nonrecourse Debt" has the meaning set forth in Section 1.704-2(b)(4) of the Regulations.

(ee) "Partner Nonrecourse Debt Minimum Gain" means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Regulations.

(ff) "Partner Nonrecourse Deductions" has the meaning set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Regulations.

(gg) "Partners" means all General Partners and all Limited Partners, where no distinction is required by the context in which the term is used herein. "Partner" means any one of the Partners.

(hh) "Partnership" means the partnership formed pursuant to this Agreement and the partnership continuing the business of this Partnership in the event of dissolution as herein provided.

(ii) "Partnership Minimum Gain" has the meaning set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

(jj) "Partnership Property" means all real and personal property acquired by the Partnership and any improvements thereto, and shall include both tangible and intangible property.

(kk) "Person" means a any individual, trust, estate, partnership, association, company, corporation or other entity.

(ll) "Prime Rate" means the prime lending rate of interest established from time to time by Chemical Bank, New York, N.Y.

(mm) "Priority Return" means a sum equivalent to fifteen percent (15%) per annum, determined on the basis of a year of 365 or 366 days, as the case may be, for the actual number of days in the period for which the Priority Return is being determined, cumulative but not compounded, of the average daily balance of the aggregate Capital Contributions of the Interest Holders from time to time during the period to which the Priority Return relates, commencing on the first date any money is paid that relates to the Priority Return.

(nn) "Profits and Losses" means, for each fiscal year or other period, an amount equal to the Partnership's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(i) Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.12(nn) shall be added to such taxable income or loss;

(ii) Any expenditures of the Partnership described in Section 705(a)(2)(B) of the Code or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.12(nn), shall be subtracted from such taxable income or loss;

-21-

(iii) In the event the Gross Asset Value of any Partnership asset is adjusted pursuant to Sections 1.12(t)(ii) or 1.12(t)(iii) hereof, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such assets for purposes of computing Profits or Losses;

(iv) Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(v) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period, computed in accordance with Section 1.12(p) hereof;

(vi) To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) or Section 743(b) of the Code is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in complete liquidation of a Partner's or Holder's Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

-22-

(vii) Notwithstanding any other provision of this Section 1.12(nn), any items that are specially allocated pursuant to Sections 4.4 and 4.6 (Special Allocations and Curative Allocations) hereof shall not be taken into account in computing Profits or Losses.

The amounts of the items of Partnership income, gain, loss, or deduction available to be specially allocated pursuant to Sections 4.4 and 4.6 (Special Allocations and Curative Allocations) hereof shall be determined by applying rules analogous to those set forth in Sections 1.12(nn)i through vi above.

(oo) "Property" means that certain land and buildings thereon known as Candlewood Square Apartments located at 8140 Southwest 22nd Street, North Lauderdale, Broward County, Florida.

(pp) "Regulations" means the Income Tax Regulations promulgated under the Code as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

(qq) "Section" means the designated Section of this Agreement if no reference is specified; otherwise, the designated Section of the specified statute or regulation or the comparable provision of any successor statute or regulation.

(rr) "Substitute Partner" means a Partner, other than the existing General Partner and the existing Limited Partners listed on Exhibit A, who is subsequently admitted to the Partnership pursuant to the provisions of Sections 9 and 11 herein, and

possesses all rights and obligations granted to (and imposed upon) General Partners or Limited Partners, as the case may be, pursuant to this Agreement.

(ss) "Transfer" means the mortgage, pledge, hypothecation, transfer, sale, assignment or other disposition of any part of all of any Interest in the Partnership, whether voluntarily, by operation of law or otherwise.

(tt)   "Uniform Act" means the Florida Revised Uniform Limited Partnership Law, as amended from time to time.

(uu)   "Unit" means a percentage ownership interest in the Partnership representing an initial capital contribution of $22,000.00 to the Partnership.

(vv)   "Unit Holder" means any person who holds a Unit. "Unit Holders" means all such persons.

(ww) "Unreturned Capital of the Partners" means as at any given time, an amount equal to the excess, if any, of (i) the aggregate capital contributions theretofore made by the Partners to the Partnership pursuant to Section 5.1 and 10, computed without interest thereon, over (ii) all amounts theretofore distributed or distributable to the Partners pursuant to Section 8, but in no event less than zero.

## SECTION 2

### CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

2.1   **General Partners.**   The names, addresses, and Capital Contributions of each General Partner are set forth on Exhibit A attached hereto.

2.2  **Limited Partners.**   The names, addresses, Capital Contributions, and Interests of the Limited Partners are set forth on Exhibit A attached hereto.

2.3  **Capital Accounts.**  Each Partner shall have a Capital Account equal to the amount of his capital contribution to the Partnership made on or before the execution of this Agreement pursuant to Exhibit A and any additional capital contributions pursuant to Section 7 and as contemplated in accordance with the provisions of this Agreement, and such Capital Account shall be credited with the cash and the fair market value of the property contributed to the Partnership (net of liabilities assumed by the Partnership and liabilities to which such contributed property is subject), and his distributive share of Partnership income (including income exempt from tax) and gain (or items thereof). Each Partner's Capital Account shall be debited with the cash and the Partnership's fair market value of property distributed to him (net of liabilities assumed by such Partner and liabilities to which such distributed property is subject), his distributive share of the Partnership losses and deductions (or items thereof) and his distributive share of expenditures of the Partnership described in Code Section 705(a)(2)(B) or otherwise required to be treated as expenditures described in Section 705(a)(2)(B). The amount of income and gain credited to each Partner's Capital Account shall be the amount of profits allocated to each Partner in accordance with the provisions of Sections 4 and 7 hereof. The amount of losses and deductions debited to each Partner's Capital Account shall be the amount of loss allocated to each

-25-

Partner in accordance with the provisions of Sections 4 and 7 hereof. If there is any question with respect to a Partner's Capital Account (including but not limited to, whether such Capital Account is being maintained in a manner consistent with the Code), it shall be resolved by the General Partners in their reasonably exercised discretion, applying principles consistent with this Agreement, the Uniform Act and applicable provisions of the Code and the Regulations thereof.

    2.4   **Determination of Balance in Capital Accounts.** Except as otherwise provided in this Agreement, whenever it is necessary to determine the Capital Account of any Partner for purposes of Section 7 or 8, the Capital Account of the Partner shall be determined after giving effect to all allocations provided for herein for the current year in respect of transactions effected prior to the date as of which such determination is to be made.

    2.5   **Withdrawal of Capital.** Except as specifically provided in this Agreement, no Partner shall be entitled to withdraw any part of his Capital Account or to receive any distribution from the Partnership, and no Partner shall be entitled or required to make any additional capital contribution to the Partnership except as specifically provided herein.

    2.6   **Capital Accounts of New Partners.** Each Limited Partner, including any additional, new, or Substitute Limited Partner, who shall receive any Interest in the Partnership or whose Interest in the Partnership shall be increased by means of a Transfer to him of all or part of the Interest of another

Partner in accordance with Sections 7 and 9 and as contemplated by this Agreement, shall have a Capital Account which reflects such Transfer.

2.7   **Allocation Among Partners.**   Whenever amounts are allocated or distributed to the Partners, the total amount allocated or distributed to all the Limited Partners shall be ninety nine (99%) percent.  Such amount shall be allocated or distributed among the Limited Partners in the proportion that the Interest each owns bears to the aggregate Interest of all the Limited Partners at the time of such allocation or distribution. Whenever amounts are allocated or distributed to the Partners, such amounts shall be allocated or distributed to the General Partner in accordance with its Partnership interests which are stated as follows:

M.L. Property Management, Inc. . . . . . One(1%)Percent

In the event of Transfers or dilutions in accordance with Section 7.2 et. seq. of any Partnership Interests, the provisions and allocations in this Section 2.7 shall be subject to such adjustments as are provided therein.

2.8   **Partner's Loans.**   Loans by any Partner to the Partnership shall not be considered contributions to the capital of the Partnership.

2.9   **Liability of Limited Partner.**   A Limited Partner shall not be bound by, or personally liable for, any of the debts, contracts, liabilities or other obligations of the Partnership or the General Partner(s), and the liability of each Limited Partner shall be limited solely to the amount of his contribution to the

-27-

capital of the Partnership required by the provisions of Sections 2.2, 7 and 10.  No Partner with a negative balance in his Capital Account shall have any obligation to the Partnership or the other Partners to restore such negative balance.  Notwithstanding any of the foregoing provisions to the contrary, to the extent required by applicable law, a Partner receiving a distribution in part of full return of his capital contribution shall be liable to the Partnership for any sum, not in excess of such amount returned plus interest, necessary to discharge the liabilities of the Partnership to creditors who extended credit or whose claims arose before such distribution, excluding liabilities of the Partnership represented by debt, the repayment of which is secured solely by the Property.

2.10  **Interest on Capital Contributions.**  No interest shall be paid on any capital contributed to the Partnership, except as may be otherwise provided in this Agreement.

### SECTION 3

### CONTROL AND MANAGEMENT

3.1  **General.**  Except as specifically limited herein, the General Partner shall have full, exclusive and complete discretion in the management and control of the Partnership for accomplishing the purposes set forth in Section 1.3.  The General Partner agrees to manage and control the affairs of the Partnership to the best of its ability, and to conduct the operations contemplated under this Agreement in a careful and prudent manner and in accordance with good industry practice.

The General Partner shall have full power and authority to execute all documents and take all other actions on behalf of the Partnership.

3.2  **Powers of the General Partner.**  Subject to any limitation expressly set forth in this Agreement, the General Partner shall perform or cause to be performed, at the Partnership's expense and in his name, the coordination of all management and operational functions relating to the Property so that the Property is operated in a first-class manner.  Without limiting the generality of the foregoing, the General Partner (subject to the provisions of Section 3.3) is expressly authorized on behalf of the Partnership to:

(a)  operate any business normal or customary for the owner of a project similar to the Property;

(b)  borrow money on behalf of the Partnership on a secured or unsecured basis, or refinance or modify any loan to the Partnership which affects the assets of the Partnership;

(c)  perform any and all acts necessary or appropriate to the acquisition and operation of the Property, including, but not limited to, making applications for rezoning or objections to rezoning of other property, and commencing, defending, and/or settling litigation regarding the Partnership, the Property or any aspect thereof;

(d)  procure and maintain with responsible companies such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partner;

-29-

(e)   take and hold all property of the Partnership, real, personal and mixed, in the Partnership name, or in the name of a nominee of the Partnership solely for the purpose of placing a deed of trust or mortgage on the Property or closing a loan relating to the Property;

(f)   execute and deliver on behalf of and in the name of the Partnership, or in the name of a nominee of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale, financing statements, security agreements, easements, assignments and any and all other instruments necessary or incidental to the conduct of the Partnership's business and the financing thereof;

(g)   bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of, or against, the Partnership;

(h)   establish reasonable reserve funds from income derived from the Partnerships' operations to provide for future contingencies;

(i)   loan funds to the Partnership, directly or through an affiliate, and to charge interest therefor;

(j)   coordinate all accounting and clerical functions of the Partnership and employ such accountants, lawyers, managers, agents and other management or service personnel as may from time to time be required to carry on the business of the Partnership;

-30-

(k)   enter into the Management Agreement, as provided at Paragraph 6.1, et seq., of the within Partnership Agreement, or any subsequent leases or use agreements pertaining to the Property;

(l)   negotiate, execute, deliver and perform any and all mortgages, financing, notes, letters of credit, insurance, certificates and/or agreement including the proposed Intercontintental Bank Mortgage (as defined in the Memorandum) and any and all amendments, modifications, addendums, renewals, etc., related thereto and necessary or convenient in connection therewith; and,

(m)   designate, in writing, representatives with authority to approve/disapprove, consent to or act on behalf of the Partnership in connection with the performance of the within Agreement, the Management Agreement and any and all other instruments or documents necessary or convenient therewith.

3.3   <u>Limitations on Power of the General Partner</u>. Notwithstanding the generality of the foregoing, the General Partner shall not be empowered without the consent of the Limited Partner owning at least two-thirds (2/3rds) of the Interest in the Partnership (allocated pursuant to Section 2.7 of this Agreement) to:

(a)   do any act in contravention of this Agreement;

(b)   do any act that would make it impossible to carry on the ordinary business of the Partnership;

(c)   confess a judgment against the Partnership

-31-

(d) possess Partnership property or assign any rights in specific Partnership property for other than a Partnership purpose;

(e) admit a person as a General Partner into the Partnership;

(f) change or reorganize the Partnership into any other legal form;

(g) require the Limited Partners to make any contribution to the capital of the Partnership not provided for in Sections 2, 7 or Section 10 of this Agreement;

(h) utilize the proceeds to be received by the Partnership pursuant to Section 5.1 for purposes other than as set forth under the caption "Sources and Uses of Proceeds" in the Memorandum;

(i) relieve the General Partner of any liability under this Agreement due to its assignment of interest in the Partnership; or

(j) admit additional or Substitute Limited Partners, except as provided in Sections 9 and 11 of this Agreement.

3.4 **No Management Powers by Limited Partners.** The Limited Partners shall take no part in the conduct or control of the Partnership business and shall have no right or authority to act for or to bind the Partnership. The exercise of any of the rights and powers of a Limited Partner pursuant to the terms of this Agreement shall not be deemed as taking part in the day-to-day affairs of the Partnership or the exercise of control over Partnership affairs.

-32-

3.5    **Liability of General Partner.**   The General Partner shall not be personally liable for the return of any portion of the Aggregate Capital Contributions of the Limited Partners.

3.6    **Right to Engage in Other Ventures.**   Any Partner may engage in or possess an interest in another business venture of any nature or description independently or with others including, but not limited to, real estate business in all its phases, which shall include, without limitation, the ownership, operation, management, syndication and development of real property, and neither the Partnership nor any Partner shall have any rights in or to such independent ventures or the income or profits derived therefrom by virtue of this Agreement.

3.7    **Limitation on Obligations of the General Partner.**   The General Partner shall not be required to devote all of its time or business efforts to the affairs of the Partnership, but shall devote such of its time and attention as is reasonably advisable and necessary to manage the affairs of the Partnership.   Except as otherwise specifically set forth below, the General Partner shall not be liable to the Limited Partners because any taxing authorities disallow or adjust any deductions or credits in the Partnership's income tax returns.

3.8    **Indemnification of General Partner and Partnership.** The General Partner shall not be liable, responsible or accountable in damages or otherwise to any other Partner for any act performed or failure to act by them in good faith and within the scope of this Agreement, unless such act or failure to act is attributable to gross negligence, malfeasance or fraud.   The

-33-

Partnership (but no Partner individually) shall indemnify and hold harmless the General Partner for any loss, damage, liability, cost or expense (including reasonable attorney's fees) arising out of any act or failure to act by the General Partner if such act or failure to act is in good faith within the scope of this Agreement and is not attributable to gross negligence, malfeasance or fraud.  The General Partner shall indemnify and hold harmless the Partnership and the Partners for any loss, damage, liability, cost or expense (including reasonable attorney's fees) arising out of any act or failure to act by such General Partner, where such act or failure to act is attributable to gross negligence, malfeasance or fraud.

**3.9   Dealings with the General Partner and Affiliates.** Provided the General Partner shall have the Owner's written approval, the Partnership is authorized to enter into business agreements, contracts, and other transactions with the General Partner or any Affiliates of the General Partner or the Affiliates of the shareholders of the General Partner ("Affiliates of General Partner"), and is authorized to pay fees, commissions or other consideration to the General Partner or Affiliates of the General Partner, including without limitation, real estate brokerage commissions, insurance premiums, rental property management fees, consulting fees, leasing commissions and mortgage brokerage fees.  Unless such transactions are expressly authorized herein, any such transactions between the

Partnership and a General Partner or Affiliates of a General Partner shall be on terms not less favorable to the Partnership than those available from non-affiliated parties.

<u>SECTION 4</u>

<u>ALLOCATIONS OF INCOME, NET LOSSES AND CREDITS</u>

4.1  <u>Allocation of Profits and Losses.</u>  All profits, gains, losses, credits and deductions of the Partnership, as determined for federal income tax purposes, shall be allocated in the following order of priority (and for these purposes only, the calculations under this Section and under Section 4.2 shall treat and refer to the Limited Partners as one class and the General Partner as another class, but any gain or loss allocated to the Limited Partners or the General Partner, as a group, shall be allocated among the Limited Partners and the General Partner as prescribed in Section 2.7) (unless otherwise provided herein).

(a)  <u>Allocation of Profits and Gains.</u>  Profits of the Partnership, as determined for federal income tax purposes, and gains of the Partnership shall be allocated ninety nine (99%) percent to the Limited Partners and one (1%) percent to the General Partner.

(b)  <u>Allocation of Losses.</u>  Losses and tax credits of the Partnership, as determined for federal income tax purposes, shall be allocated ninety nine (99%) percent to the Limited Partners and one (1%) percent to the General Partner.

4.2  <u>Dissolution and Winding Up.</u>  All profits and net losses of the Partnership, as determined for federal income tax purposes, in connection with a sale of substantially all of the

-35-

assets of the Partnership and/or the dissolution and winding up of the Partnership, shall be allocated in the manner provided in Sections 4.1 and 5.1.

    **4.3**   **Distributive Share; Charges and Credits to Capital Accounts.**  For purposes of Subchapter K of the Code, the distributive shares for any fiscal year of the Partners in each item of Partnership taxable income, gain, loss, deduction or credit shall be in the same proportions as their respective shares of items allocated under Paragraphs 4.1 and 4.2 (except as may be otherwise provided in the within Agreement).  All profits, losses and distributions shared by the Partners shall be credited or charged, as the case may be, to their Capital Accounts, and allocated between or among the members of each class of Partners in accordance with their respective sharing ratios within such class; provided, that, upon a sale pursuant to the liquidation of the Partnership, profits and losses shall be allocated in a manner that will first equalize to the extent possible the Capital Accounts of all Partners and then in accordance with their respective sharing ratios.  Each Partner shall share in profits, losses and cash contributions from the first day of the calendar month during which said Partner was admitted to the Partnership, if he is admitted on or after the first day of such month and on or before the fifteenth day thereof, and he shall share in profits, losses and cash distributions from the sixteenth day of the calendar month during which he was admitted to the Partnership, if he is admitted on or after the sixteenth day of such month and on or before the 1st day of such month.  For

such purposes and to the extent permitted by the Uniform Act, the date of admission to the Partnership of a Partner shall be the date of his execution of this Agreement, if his subscription for an Interest is accepted by the General Partner.

4.4 **Special Allocations.**  The following special allocations shall be made in the following order:

(a)   **Minimum Gain Chargeback.**   Except as otherwise provided in Section 1.704-2(f) of the Regulations, notwithstanding any other provision of this Section 4, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, each General Partner and Interest Holder shall be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Person's share of the net decrease in Partnership Minimum pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each General Partner and Interest Holder pursuant thereto.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations. This Section 4.4(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

(b)   **Partner Minimum Gain Chargeback.**   Except as otherwise provided in Section 1.704-2(i)4 of the Regulations, notwithstanding any other provision of this Section 4, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Partnership

-37-

Notwithstanding anything to the contrary contained elsewhere in this Agreement, if any gain arises from the sale or other disposition of any Partnership asset which shall be treated as income under the depreciation or investment credit recapture provisions of the Code, then the full extent of such gain shall be allocated to the Partners on the basis that the Partnership deductions for depreciation or investment credit giving rise to such recapture where actually allocated.   In the event that subsequently enacted provisions of or relating to the Code result in other recapture income to the Partnership, no allocation of such recapture income shall be made to any Partner who has not received the benefit of those items giving rise to such other recapture income.

### SECTION 5

### DISTRIBUTIONS

**5.1   (a)   Cash Flow Distributions.**   After providing for the satisfaction of the current debts and obligations of the Partnership, including any priority return and making any provision for reasonable amounts for replacements and reserves, the General Partner shall, after the end of each fiscal quarter of the Partnership, make distributions of Cash Flow from operations to the Partners out of the Partnership funds, to the extent available, which shall be allocated ninety nine (99%) percent to the Limited Partners and one (1%) percent to the General Partner, in accordance with the provisions of this Agreement.

-46-

(b)     **Proceeds from Refinancing, Sale or Other Disposition of the Property.**   Distribution of Capital Items (other than any sale or other disposition of substantially all of the assets of the Partnership) shall be made as expeditiously as possible, in the following order of priority:

(i)  first, to repay any New Additional Partner or Existing Partner who has contributed Excess Additional Capital, all moneys, plus accrued interest that may then be due thereon; and

(ii) then ninety nine (99%) percent to the Limited Partners and one (1%) percent to the General Partner to the extent necessary to reduce the Unreturned Capital of the Partners to zero; and

(iii) the balance, ninety nine (99%) percent to the Limited Partners and one (1%) percent to the General Partner is accordance with their then respective percentage interest in the Partnership.

(c)   **Proceeds Available Upon Dissolution.**   Upon the sale or disposition of substantially all of the assets of the Partnership and/or the dissolution and winding up of the Partnership, the assets of the Partnership, after making payment of or provision for payment of all liabilities and obligations of the Partnership (other than in regard to any loans made pursuant to Section 7.0) shall be distributed, as expeditiously as possible, in the following order of priority:

**5.4   Priorities of Limited Partners.**   No Limited Partner shall have any priority over any other Limited Partner as to the return of his contributions to the capital of the Partnership or as to compensation by way of income, except as may be otherwise provided in this Agreement.

### SECTION 6

### CERTAIN MATTERS RELATING TO MANAGEMENT OF THE PARTNERSHIP; PARTNERSHIP EXPENSES; REPLACEMENT RESERVE ACCOUNT

**6.1   Property Management.**   M.L. Property Management, Inc., an entity controlled by Murray Liebowitz, shall enter into a Management Agreement (a copy of which is appended to the Memorandum as Exhibit "B"), wherein M.L. Property Management, Inc. shall receive a management fee equal to five (5%) percent of the gross receipts from the ownership and operation of the Property actually received by the Partnership, as more fully provided for in the Management Agreement.   M.L. Property Management, Inc. shall act as managing agent of the Property pursuant to the Property Management Agreement, and in such capacity shall perform on behalf of the Partnership all services customarily performed by a property management company, in accordance with sound management practices.

**6.2   Partnership Expenses.**   Except as herein otherwise provided, the Partnership shall be responsible for paying all direct costs and expenses of holding, owning, developing and operating the Property, including, without limitation, debt service; compensation of M.L. Property Management, Inc., as managing agent; cost of utilities, supplies, insurance premiums,

-50-

taxes, advertising expenses, bookkeeping and accounting directly related to the Property; legal expenses; office supplies; and all other fees, costs and expenses directly attributable to the operation of the Property and the Partnership. In the event any such costs and expenses are or have been advanced by a Partner on behalf of the Partnership, then except as expressly provided herein to the contrary, such Partner shall be entitled to be reimbursed for such payment pursuant to Section 7.1 of this Agreement, so long as payment is reasonably necessary for Partnership business and is reasonable in amount.

6.3    **Replacement Reserve Account.**    The General Partner may establish a replacement reserve account (the "Replacement Reserve Account") and may deposit therein from time to time such amounts from revenues from operations before any other distributions under Section 5 as they shall determine in their sole discretion to be appropriate  The Replacement Reserve Account may be charged with any expenditures for the acquisition, repair or construction of items which are treated as capital expenditures (as opposed to expense deductions) under generally accepted accounting principles.  Nothing contained in this Section 6.3 shall in any way limit or restrict the right of the General Partner to use other assets of the Partnership (other than deposits to the Replacement Reserve Account) for the acquisition, repair, or construction of items which are treated as capital expenditures under generally accepted accounting principles.

-51-

subject Property subject to the Sale contemplated by this Section 8 of this Agreement, together with any and all other approvals as may be required by any other written contract or agreement which is binding upon the Partnership (and which prohibits a prepayment of any mortgage or other lien or encumbrance against the Property).

8.3   **Response to Notice of Sale.**   Written response by the Limited Partner(s) to any notice of sale from the General Partner to the Limited Partner(s) shall be sent to the General Partner within ten (10) business days of receipt of the notice by the Limited Partner(s) and any failure to respond in writing within ten (10) business days from receipt of such notice shall be deemed an approval of sale by the said Limited Partner(s).

### SECTION 9

### TRANSFER OF INTEREST OF PARTNERS OR ADMISSION OF OTHER PARTNERS

9.1   **Method of Transfer.**   No transfer of all or part of a Partner's Unit(s) or interest in the Partnership may be effected except as permitted in this Section 9, and then only if a counterpart of the instrument of Transfer, executed and acknowledged by the parties thereof, is delivered to the Partnership.   A permitted Transfer shall be effective as of the date specified in the instrument related thereto.

9.2   **Transfers by Partners.**   (a)   Except as provided in Section 10 and this Section 9, the General Partner shall not Transfer any part or all of its Partnership interest, and no Limited Partner shall Transfer any part or all of his Interest,

-64-

except as hereinafter provided, and then only if the transferee is either a citizen or resident of the United States. The foregoing prohibitions shall not apply to the following:

### As to the General Partners

(i) any transfer by a General Partner to an Affiliate or a transfer by a General Partner on account of bankruptcy or dissolution of such General Partner or any pledge of its Partnership interest by the General Partner to secure a loan to the General Partner or guaranteed by the General Partner; provided, however, that (a) without the written consent of the Limited Partners owning a majority of the Interest in the Partnership, no such person shall become a Substitute General Partner of the Partnership, and (b) without the written consent of the Limited Partners owning at least a majority of the Units of the Partnership, which consent shall not be unreasonably withheld, no assignment by a General Partner of its interest as a General Partner shall relieve such Partner of any liability hereunder.

### As to the Limited Partner

(ii) any transfer of the Partnership interest of a deceased, incompetent, insolvent, bankrupt or dissolved Limited Partner to his executors, administrators or legal representatives or by any of such persons to accomplish any Transfer described under Subsection (b) above (as used in this Section 9, "transferee" shall include such persons); provided, however, that (i) the effectiveness of any of the aforesaid transactions may be conditions, in the discretion of the General Partner, upon

-65-

receipt by the Partnership of a legal opinion (the cost of which shall be borne by the transferor), satisfactory in form and substance to the General Partner, to the effect that such transaction will not violate the Act or any other applicable securities laws, (ii) no Transfer shall be permitted if, in the reasonable opinion of counsel to the Partnership (which may be secured by the General Partner, in its discretion, at the expense of the Partnership), the Partnership's continued tax status as a partnership for federal income tax purposes would be jeopardized by such a Transfer, (iii) no Transfer shall be permitted without the consent of the General Partner if the Transfer would result in the "termination" of the Partnership pursuant to Section 708 of the Code.

9.3 **Rights of Transferee.** No transferee of the Partnership interest of a Partner shall have the right to become a Substitute Partner, unless:

(a) his transferor has stated such intention in the instrument of assignment;

(b) the transferee has executed an instrument reasonably satisfactory to the General Partners accepting and adopting the terms and provisions of this Agreement;

(c) the transferor or transferee has paid any reasonable expenses in connection with the admission of the transferee as a Substitute Partner; and

each was the holder.   Distributions shall be made to the holder
of  record  of  the  Partnership  interest  on  the  date  of
distribution.

<div align="center">

**SECTION 10**

**DISSOLUTION AND TERMINATION**

</div>

   **10.1   Events of Dissolution.**   Except as provided in Section
10.2, the Partnership shall be dissolved and its business wound
up upon the earliest to occur of:

      (a)   December 31, 2030;

      (b)   with the prior written consent of the Limited
Partners owning two-thirds (2/3rds) of the Interest, determining
that the Partnership should be dissolved;

      (c)   the Partnership becoming insolvent or bankrupt;

      (d)   the insolvency, bankruptcy or dissolution of the
General Partner; or

      (e)   the sale or disposition of all or substantially
all of the Partnership's assets, unless the Partnership as a part
of the consideration for any such sale or other disposition
acquires a note, in which case the Partnership shall be dissolved
following the sale by it of its entire interest in such note, or
the full collection of the balance thereof.

      For the purposes of this Agreement, a bankruptcy or an
entity shall be deemed to occur when such entity files a petition
in bankruptcy, or voluntarily takes advantage of any bankruptcy,
or insolvency law, or is adjudicated a bankrupt, or if a petition
or answer is filed proposing the adjudication of such entity as a
bankrupt and such entity either consents to the filing thereof or

<div align="center">

-68-

</div>

such petition or answer is not discharged or denied prior to the expiration of sixty (60) days from the date of such filing; and the insolvency of an entity shall be deemed to occur when the assets of such entity are sufficient to pay its liabilities and it shall so admit in writing.

10.2  **Continuation of Partnership.**  The General Partner agrees to serve as general partner of the Partnership until the Partnership is terminated.  Upon the occurrence of any event set forth in Section 10.1(d) with respect to the General Partner(s), the business of the Partnership shall be continued on the terms and conditions of this Agreement is, within ninety (90) days after such event, Limited Partners owning in the aggregate at least two-thirds (2/3rds) of the Interest in the Partnership shall elect in writing that the business of the Partnership should be continued and shall designate one or more persons to be substituted as General Partner(s).  In the event that the Limited Partners elect so to continue the Partnership with a new General Partner(s), such new General Partner(s) shall succeed to all of the powers, privileges and obligations of the General Partner, and the interest in the Partnership of any person or entity no longer serving as the General Partner shall become a Limited Partner's interest hereunder in the manner provided in Section 9.4

10.3  **Obligations Survive Dissolution.**  The dissolution of the Partnership shall not release or relieve any of the parties hereto of their contractual obligations under this Agreement.

-69-

representative of all or any part of the Partnership interest of the insane or incompetent Limited Partner shall be governed by the provisions of Section 9.

<div align="center">SECTION 12</div>

<div align="center">ACCOUNTING</div>

**12.1   Fiscal Year.**  The fiscal year of the Partnership shall be the calendar year.

**12.2   Books, Records and Accounting Method.**  The General Partner shall keep, or cause to be kept, full and accurate records of all transactions of the Partnership in accordance with the principles and practices generally accepted for the accrual method of accounting (the Partnership may adopt the cash method of accounting at any time upon the written determination to do so by the General Partner).

**12.3   Location of Books and Records.**  Unless otherwise changed by the General Partner, all such books of account shall, at all times, be maintained in the principal place of business of the Partnership.  Such principal office shall be open during reasonable business hours for the reasonable inspection and examination by the Limited Partners and their authorized representatives of such books of account, which parties shall have the right to make copies thereof.

**12.4   Federal Tax Returns.**  The General Partner shall prepare, or cause to be prepared, a federal information tax return in compliance with the Code, and any required state and local tax returns for the Partnership for each tax year of the Partnership; and, in connection therewith, shall made any

<div align="center">-71-</div>

available or necessary elections, including elections with respect to the useful lives of the properties of the Partnership and the rates of depreciation on such properties.

### SECTION 13

### REPORTS AND STATEMENTS

13.1 **Tax Return Information.** By the tenth (10th) day of April of the fiscal year of the Partnership, the General Partner, at the expense of the Partnership, shall cause to be delivered to the Limited Partners such information as shall be necessary (including a statement for that year of the Limited Partner's share of net income, net gains, net losses and other items of the Partnership) for the preparation by the Limited Partners of their federal, state and local income and other tax returns.

13.2 **Financial Statements.** Within one hundred (100) days after the end of each fiscal year of the Partnership, the General Partners shall cause to be delivered to the Limited Partners a financial statement of the Partnership for such fiscal year, prepared at the expense of the Partnership, prepared by an independent certified public accountant, which financial statement shall set forth, as of the end of and for such fiscal year, the following:

(a) a profit and loss statement and a balance sheet of the Partnership;

(b) the balance in the capital account of each Partner; and

(c) such other information as, in the judgment of the General Partner, shall be reasonably necessary for the Partners to be advised of the financial status and results of operations of the Partnership.

## SECTION 14

### BANK ACCOUNTS

**14.1   General.**   The General Partner shall open and maintain (in the name of the Partnership) a bank account or accounts in a bank or savings and loan association, the deposits of which are insured by an agency of the United States government, in which shall be deposited all funds of the Partnership.   Withdrawals from such account or accounts shall be made upon the signature or signatures of such person or persons as the General Partner shall designate.   There shall be no commingling of the assets of the Partnership with the assets of any other entity or person.

## SECTION 15

### POWER OF ATTORNEY

**15.1   General.**   The Limited Partners give to the General Partner, the power of attorney contained in this Section and constitute and appoint the General Partner, with full power of substitution and resubstitution, as their attorney-in-fact with full power and authority to act in their name on their behalf with respect to the execution, acknowledgment, swearing to and filing of the following documents, subject to all of the provisions of this Agreement:

-73-

## SECTION 16

### NOTICES

16.1 **General.** Whenever any notice is required or permitted to be given under any provision of this Agreement, such notice shall be in writing, signed by or on behalf of the person giving the notice, and shall be deemed to have been given on the earlier to occur of (i) actual delivery or (ii) when mailed by certified mail, postage prepaid, return receipt requested, addressed to the person or persons to whom such notice is to be given as follows (or at such other address as shall be stated in a notice similarly given):

(a) such notice shall be given to the General Partner, at the principal place of business of the Partners;

(b) if the Limited Partners, such notice shall be given to the Limited Partners at their respective addresses indicated on Schedule "A" attached hereto;

(c) a copy of such notice shall be given to the Counsel for the Partnership, Lawrence E. Bathgate II, Esquire, Bathgate, Wegener, Dugan & Wolf, P.C., One Airport Road, Lakewood, New Jersey 08701;

(d) a copy of such Notice shall be given to the Accountant for the Partnership, Robert Krim, Cranberry Commons, Building C, 446 State Highway #35, Eatontown, New Jersey 07724; and

(e) whenever any written notice is given in accordance with this Section 16.1 to a Limited Partner, the failure of any Limited Partner to respond to said Notice in writing within ten

-76-

(10) business days of receipt of said Notice shall be deemed an approval and consent of said Limited Partner to the proposal set forth in said Notice.   The only action which shall be deemed a disapproval or a vote in opposition by the Limited Partner to any contemplated action by the Partnership and/or the General Partner shall be a written response expressly stating such disapproval or opposition from the Limited Partner to the General Partner within ten (10) business days of the receipt of the Notice.

## SECTION 17

### BINDING EFFECT

17.1   **General.**   Except as herein otherwise provided to the contrary, this Agreement shall be binding upon and inure to the benefit   of   the   parties   hereto,   their   heirs,   personal representatives, successors and assigns.

## SECTION 18

### AMENDMENTS

18.1   **General.**   No amendment, modification or waiver of this Agreement, or any part hereof, shall be valid or effective unless in writing and signed by the General Partner and by the Limited Partners owning in the aggregate at least two-thirds (2/3) of the Interest of the Partnership; and no waiver of any breach or condition of this Agreement shall be deemed to be a waiver of any other   condition   or   subsequent   breach,   whether   of   like   or different nature.   Notwithstanding the above, this Agreement may be amended without the prior agreement of the Limited Partners whenever required by law or by this Agreement or necessary to effect changes of a ministerial nature which do not adversely

-77-

affect the rights or increase the obligations of the Limited Partners, including, without limitation, changes in Partners or their addresses, the admission of Limited Partners and the addition of Substitute Limited or New Additional Partners.

## SECTION 19

### APPLICABLE LAWS

**19.1   General.**   This Agreement shall be governed by and construed in accordance with the laws of the State of Florida.

## SECTION 20

### COUNTERPARTS

**20.1   General.**   This Agreement may be executed in several counterparts, and all such counterparts, so executed, taken together shall constitute one agreement, binding on all the parties hereto, notwithstanding that all the parties are not signatory to the original or the same counterpart.

## SECTION 21

### MISCELLANEOUS

**21.1   Severability.**   Each provision hereof is intended to be severable and the invalidity or illegality of any portion of this Agreement shall not affect the validity or legality of the remainder hereof.

**21.2   Captions.**   Section and Subsection captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or extend or describe the scope of this Agreement or the intent of any provision hereof.

21.3  **Person and Gender.**  The masculine gender shall include the feminine and neuter genders, and the singular shall include the plural.

21.4  **Miscellaneous.**  The General Partner is authorized to perform the ministerial duty of qualifying this Partnership under the laws of any state in which it is necessary to file documents or instruments of qualification.  A Partnership office or principal place of business in any state may be designated from time to time by the General Partner.

**IN WITNESS WHEREOF**, the parties hereto have subscribed and sworn to this Certificate and Agreement of Limited Partnership as of the day and year first above written.

PARK PLAZA ASSOCIATES, LTD.
BY:

ATTEST:                    GENERAL PARTNER

M.L. PROPERTY MANAGEMENT, INC.

By: _____
SHELDON LIEBOWITZ, Secty.    MURRAY LIEBOWITZ, PRESIDENT


WITNESS:                    LIMITED PARTNERS


_____    _____
                           PAUL MARCUS

_____    _____
                           DANI SIEGAL

_____    _____
                           ADRIAN VAN ZON

_____    _____
                           MURRAY LIEBOWITZ

_____    _____
                           SHELDON LIEBOWITZ

_____    _____
                           NORMAN FOSBACK

_____    _____
                           GLEN PARKER

_____    _____
                           JERRY HOFFMAN, TRUSTEE FOR
            JOAN OSIAS HOFFMAN TRUST UNDER DATE 5/15/93

_____    _____
                           JOAN HOFFMAN, TRUSTEE FOR
            JOAN OSIAS HOFFMAN TRUST UNDER DATE 5/15/93


-80-

**EXHIBIT A**
**Page 1 of 2**

**General Partner**

|  | %Interests-CapitalContribution (Amount ofCash/Agreed Value) |
|---|---|

M.L. Management Co., Inc.                1%        $   22,000.00
c/o Murray Liebowitz
2600 E. Commercial Boulevard
Suite 213
Ft. Lauderdale, Florida 33308

**Limited Partners**

% Interests  Capital Contribution
(Amount of Cash/Agreed Value)

Paul Marcus                              45%       $  990,000.00
864 East 25th Street
Paterson, New Jersey 07513

Dani Siegel                              14%       $  308,000.00
Genetra Affiliates, Inc.
29 W. 56th Street
New York, New York 10019

Adrian Van Zon                           10%       $  220,000.00
555 W. 57th Street
New York, New York 10019

Murray Liebowitz                          9%       $  198,000.00
c/o M.L. Property Management, Inc.
2600 E. Commercial Boulevard
Suite 213
Ft. Lauderdale, FL  33308

Sheldon Liebowitz                         9%       $  198,000.00
c/o M.L. Property Management, Inc.
2600 E. Commercial Boulevard
Suite 213
Ft. Lauderdale, Florida 33308

EXHIBIT A
Page 2 of 2

## Limited Partners cont'd.

| | % Interests | Capital Contribution (Amount of Cash/Agreed Value) |
|---|---|---|
| Norman Fosback<br>2600 N.E. 39th Avenue<br>Ft. Lauderdale, Florida 33306 | 4% | $ 88,000.00 |
| Drs. Jerry and Joan Hoffman***<br>***Trustees for<br>Joan Osias Hoffman Trust<br>dated May 15, 1984<br>10 Compass Lane<br>Ft. Lauderdale, Florida 33308 | 4% | $ 88,000.00 |
| Glenn Parker<br>The Institute for<br>Economic Research<br>3471 N. Federal Highway<br>Ft. Lauderdale, Florida 33306 | 4% | $ 88,000.00 |
| Total All Partners: | 100% | $ 2,200,000.00 |

-82-

# EXHIBIT B

## PROPERTY MANAGEMENT AGREEMENT

## COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private Placement Memorandum relating to the placement of units in Park Plaza Associates, Ltd. (the "Partnership"), hereby agrees to become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of the Amended and Restated Certificate and Agreement of Limited Partnership of Park Plaza Associates, Ltd.

DATE: _Aug. 5 1993_         _____
                            (signature)


MAILING ADDRESS:

_6-BAYBERRY DR._            _PAUL MARCUS_
_SADDLE RIVER, N.J._        (Please Print Name)


STATE OF _New Jersey_ )

COUNTY OF _Morris_ )

I HEREBY CERTIFY that on this day, before me an officer duly authorized in the State aforesaid and in the County aforesaid, to take acknowledgments, personally appeared _PAUL MARCUS_ to me known to be the person described in and who executed the foregoing instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State last aforesaid this ___5th___ day of ___August___, 1993.

                            _James K Barry_
                            Notary Public
                            My Commission Expires:

                            JAMES K. BARRY
                            NOTARY PUBLIC OF NEW JERSEY
                            MY COMMISSION EXPIRES DEC. 13, 1993


CSP-29

## COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private Placement Memorandum relating to the placement of units in Park Plaza Associates, Ltd. (the "Partnership"), hereby agrees to become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of the Amended and Restated Certificate and Agreement of Limited Partnership of Park Plaza Associates, Ltd.

DATE: _7/3/93_

_____
(Signature)

MAILING ADDRESS:

_____

_____

_ADRIAN VAN ZON_
(Please Print Name)

STATE OF New York )

COUNTY OF Queens )

I HEREBY CERTIFY that on this day, before me an officer duly authorized in the State aforesaid and in the County aforesaid, to take acknowledgments, personally appeared _Adrian Van Zon_ to me known to be the person described in and who executed the foregoing instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State last aforesaid this _5_ day of _August_, 1993.

_____
Notary Public
My Commission Expires:

LEON ALTMAN
Notary Public, State of New York
No. 41-0055250
Qualified in Queens County
Commission Expires Oct. 31, 1993

CSP-28

**COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE
AND AGREEMENT OF LIMITED PARTNERSHIP**

The undersigned, having received a Confidential Private Placement Memorandum relating to the placement of units in Park Plaza Associates, Ltd. (the "Partnership"), hereby agrees to become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of the Amended and Restated Certificate and Agreement of Limited Partnership of Park Plaza Associates, Ltd.

DATE: AUGUST 10, 1993

(signature)

MAILING ADDRESS:

_____

_____                    Dani Siegel
                                                (Please Print Name)

STATE OF New York,

COUNTY OF New York

I HEREBY CERTIFY that on this day, before me an officer duly authorized in the State aforesaid and in the County aforesaid, to take acknowledgments, personally appeared Dani Siegel to me known to be the person described in and who executed the foregoing instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State last aforesaid this 10th day of August, 1993.

Notary Public
My Commission Expires:

GRACE EMILIO
Notary Public, State of New York
No. 43-4869024
Qualified in Richmond County
Commission Expires August 18, 1994

CSP-27

## COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private Placement Memorandum relating to the placement of units in Park Plaza Associates, Ltd. (the "Partnership"), hereby agrees to become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of the Amended and Restated Certificate and Agreement of Limited Partnership of Park Plaza Associates, Ltd.

DATE: _____3/25/93_____                _____
                                       (signature)

MAILING ADDRESS:

_2899 NE 25 Ct._____          Glen King Parker
                                  (Please Print Name)
_Ft. Lauderdale, FL 33305_

STATE OF Florida    )

COUNTY OF Broward   )

I HEREBY CERTIFY that on this day, before me an officer duly authorized in the State aforesaid and in the County aforesaid, to take acknowledgments, personally appeared Glen King Parker to me known to be the person described in and who executed the foregoing instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State last aforesaid this _29_ day of _____July_____, 1993.

                        _____
                        Notary Public
                        My Commission Expires:

                        NOTARY PUBLIC STATE OF FLORIDA
                        MY COMMISSION EXP. OCT. 25,1996
                        BONDED THRU GENERAL INS. UND.

CSP-28

## COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private Placement Memorandum relating to the placement of units in Park Plaza Associates, Ltd. (the "Partnership"), hereby agrees to become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of the Amended and Restated Certificate and Agreement of Limited Partnership of Park Plaza Associates, Ltd.

DATE: 8/2/93                    _Norman G. Forback_
                                (signature)

MAILING ADDRESS:

2600 N.E. 30th Ave            _Norman G. Forback_
Ft. Laud., FL                  (Please Print Name)

STATE OF Florida    )

COUNTY OF Broward )

I HEREBY CERTIFY that on this day, before me an officer duly authorized in the State aforesaid and in the County aforesaid, to take acknowledgments, personally appeared Norman G. Forback to me known to be the person described in and who executed the foregoing instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State last aforesaid this __2__ day of ___August___, 1993.

                        _Joan M. Appel_
                        Notary Public
                        My Commission Expires:

NOTARY PUBLIC STATE OF FLORIDA
MY COMMISSION EXP.OCT. 25,1995
BONDED THRU GENERAL INS. UND.

CSP-29

## COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE
## AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private Placement Memorandum relating to the placement of units in Park Plaza Associates, Ltd. (the "Partnership"), nereby agrees to become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of the Amended and Restated Certificate and Agreement of Limited Partnership of Park Plaza Associates, Ltd.

DATE: _Aug 3, 1993_

_____ (signature)
_Jean O Hoffner_

MAILING ADDRESS:

_10 Compass Lane_
_Ft. Lauderdale, Fl. 33308_

_Jerome J. Hoffman_
_Jean O Hoffman_
_____
(Please Print Name)

STATE OF        ) _MA_

COUNTY OF       ) _Berkshire_

I HEREBY CERTIFY that on this day, before me an officer duly authorized in the State aforesaid and in the County aforesaid, to take acknowledgments, personally appeared _____ to me known to be the person described in and who executed the foregoing instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State last aforesaid this _3 Rd_ day of _August_ , 1993.

_Elizabeth Savalitt_
Notary Public
My Commission Expires:
_August 28, 1998_

CSP-29

**M.S.L. Property Management, Inc.**
**2600 E. Commercial Blvd.#200**
**Fort Lauderdale, FL 33308**
**(954)491-4511**
**(954)491-4504 Fax**

TO:      The Partners

FROM:  Murray and Sheldon Liebowitz

DATE:   January 22nd, 2003

RE:      Park Plaza Fourth Quarter and Year End Cash Flow Report

Enclosed please find your copy of the Year End Cash Flow Report. There is no check due to the lawsuit filed by Paul Marcus.

We have completed a very successful year. Occupancy has averaged approximately 96.5%, income is $98,959 above budget, expense is $86,404 higher mainly due to the increased cost of insurance and higher real estate taxes. (see page 6) We have filed an appeal for a real estate tax reduction and hope for a refund. Insurance continues to be a major problem. During the year we have continued to search for alternatives with different brokers and as of now, we have been unsuccessful. We continue the search and have a glimmer of hope based upon recent conversation.

We have retained an attorney in New Jersey who will file an answer to the complaint.

Sheldon and I wish all of you a healthy and happy new year.

ENC: Cash Flow Report

Park Plaza/4th quarter2002

ATTACHMENT / EXHIBIT F

3 AL05 4SCOF16 67HOT  HARBOR INN APARTMENTS

MONTHLY COMPARISON OF CHANGE IN FUNDS - 2002

PAGE 1

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FUNDS AVAILABLE BEGINNING O' MONTH | 210,436.75 | 114,979.73 | 151,804.41 | 196,206.12 | 134,663.82 | 159,965.84 | 194,207.05 | 120,773.26 | 127,167.61 | 154,098.19 | 138,652.63 | 152,663.78 | 1,855,619.13 |
| INCREASE, (DECREASE) IN FUNDS | (95,457.02) | 36,824.68 | 44,401.71 | (61,542.30) | 25,302.02 | 34,241.21 | (73,433.79) | 6,394.35 | 26,930.58 | (15,445.56) | 14,011.15 | (1,207.58) | (58,980.55) |
| FUNDS AVAILABLE END OF MONTH | 114,979.73 | 151,804.41 | 196,206.12 | 134,663.82 | 159,965.84 | 194,207.05 | 120,773.26 | 127,167.61 | 154,098.19 | 138,652.63 | 152,663.78 | 151,456.20 | 1,796,638.64 |
| NET CASH FLOW FOR THE MONTH | 53,216.24 | 59,397.80 | 63,449.65 | 58,341.72 | 54,004.06 | 50,804.44 | 47,514.35 | 48,812.55 | 44,130.03 | 50,975.96 | 28,266.94 | 21,662.81 | 580,576.75 |
| 2001 R/E TAX REFUND | 74.11 | 0.00 | 3,742.05 | | | | | 110.86 | | | | | 3,742.05 |
| VENDOR REFUND | 0.00 | 294.00 | 147.00 | | | | 1.32 | | | | | | 146.29 |
| COURT COSTS REFUND | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 319.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 760.00 |
| ADJUSTED MONTHLY CASH FLOW | 53,290.35 | 59,691.80 | 63,596.65 | 62,083.77 | 54,004.06 | 50,804.44 | 47,834.67 | 48,923.41 | 44,130.03 | 50,975.96 | 28,266.94 | 21,662.81 | 585,265.09 |
| W/O-EVICT | 312.12 | 104.80 | 259.00 | 20.00 | 80.00 | 149.80 | 152.76 | 583.40 | 474.00 | 348.60 | 0.00 | 705.20 | 3,190.56 |
| CREDIT CHECKS | 290.00 | 509.00 | 355.50 | 143.50 | 466.00 | 576.00 | 201.00 | 379.50 | 472.50 | 171.50 | 292.00 | 488.00 | 4,554.50 |
| COURT COSTS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 140.00 | 140.00 | 147.00 | 147.00 | 147.00 | 434.00 |
| ACCT YEAR SND/ AUDITED | 1,500.00 | 600.00 | 400.00 | 2,700.00 | 2,000.00 | 1,100.00 | 1,200.00 | 350.00 | 350.00 | | | 262.50 | 5,362.50 |
| LEASING FEES | 880.67 | 479.60 | 0.00 | 0.00 | 700.00 | 0.00 | 479.60 | 1,200.00 | 700.00 | 1,200.00 | 1,300.00 | 147.00 | 10,635.03 |
| COMPUTER SUPPORT | 488.00 | 1,096.89 | 910.52 | 859.60 | 899.60 | 376.41 | 0.00 | 479.60 | 529.60 | 1,048.48 | 0.00 | 0.00 | 6,317.55 |
| MARKETING | 4,026.99 | 2,369.20 | 717.28 | 643.51 | 717.28 | 40.53 | 0.00 | 696.54 | 707.68 | 128.47 | 1,142.41 | 8,076.77 | 12,330.70 |
| LANDSCAPE | 0.00 | 550.00 | 734.47 | 1,092.27 | 542.72 | 609.24 | 13.25 | 696.54 | 0.00 | 1,504.27 | 288.78 | 1,142.41 | 12,330.70 |
| EMPLOYEES BONDS | 264.43 | 0.00 | 0.00 | 0.00 | 250.00 | 0.00 | 0.00 | 4,926.91 | 100.00 | 0.00 | 465.00 | 5,827.04 | 12,153.95 |
| COURTESY OFFICER | 0.00 | 0.00 | 0.00 | 128.65 | 28.28 | 47.65 | 0.00 | 28.28 | 100.00 | 100.00 | 400.00 | 400.00 | 497.29 |
| TAX APPEAL | 0.00 | 0.00 | 0.00 | 0.00 | 1,234.88 | 0.00 | 0.00 | 28.28 | 0.00 | 0.00 | 0.00 | 0.00 | 1,234.88 |
| UTILITY DEPOSIT ADJUST | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 279.89 | 279.89 | 191.25 | 0.00 | 0.00 | 279.89 | 279.89 |
| LEGAL FEE :INVESTORS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 191.25 | 0.00 | 0.00 | 191.25 | 191.25 |
| INSURANCE CONSULTING | 635.00 | 635.00 | 635.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,905.00 |
| EXCESS INSURANCE | 2,964.11 | 2,964.07 | 2,964.07 | 0.00 | 3,606.09 | 3,606.09 | 3,606.09 | 3,606.09 | 3,606.09 | 3,606.09 | 3,606.09 | 3,606.09 | 39,341.03 |
| MISCELLANEOUS EXTERIOR | 1,585.08 | 3,147.66 | 6,354.31 | 1,895.76 | 2,020.24 | 6,550.55 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,175.00 | 23,684.60 |
| MISCELLANEOUS INTERIOR | 931.00 | 0.00 | 804.14 | 780.00 | 837.72 | 0.00 | 375.03 | 0.00 | 0.00 | 0.00 | 0.00 | 1,807.89 | 1,807.89 |
| CAPITAL IMPROVEMENT | 14,176.97 | 13,558.52 | 10,708.89 | 9,642.98 | 5,368.38 | 7,033.06 | 7,137.33 | 9,081.40 | 7,137.33 | 8,450.97 | 6,893.74 | 107,293.81 | 107,293.81 |
| FIX UP BUDGET | 693.00 | 0.00 | 0.00 | 884.14 | 6,466.45 | 5,629.86 | 12,884.67 | 2,731.00 | 2,731.00 | 487.76 | 5,452.05 | 45,015.47 | 45,015.47 |
| TOTAL EXTRAORDINARY EXPENSES | 28,747.37 | 22,867.12 | 19,194.94 | 23,626.07 | 28,702.04 | 16,563.47 | 31,266.46 | 42,529.06 | 17,199.45 | 16,421.52 | 14,255.79 | 22,870.39 | 284,245.64 |
| PARTNERS DISTRIBUTIONS CASH FLOW | 120,000.00 | 0.00 | 0.00 | 100,000.00 | 0.00 | 0.00 | 90,000.00 | 0.00 | 0.00 | 50,000.00 | 0.00 | 0.00 | 360,000.00 |
| TOTAL | 148,747.37 | 22,867.12 | 19,194.94 | 123,626.07 | 28,702.04 | 16,563.47 | 121,266.46 | 42,529.06 | 17,199.45 | 66,421.52 | 14,255.79 | 22,870.39 | 644,245.64 |
| INCREASE, (DECREASE) IN FUNDS | (95,457.02) | 36,824.68 | 44,401.71 | (61,542.30) | 25,302.02 | 34,241.21 | (73,433.79) | 6,394.35 | 26,930.58 | (15,445.56) | 14,011.15 | (1,207.58) | (58,980.55) |

1&205 4$COP16 6?N0TH&2BOR : 1NN APARTMENTS

STATEMENT OF CASH DISBURSEMENTS AND CASH RECEIPTS
2002

PAGE 2

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MARKET RENT ROLL | 255,474.00 | 255,474.00 | 257,099.00 | 257,194.00 | 257,279.00 | 257,313.00 | 257,409.00 | 257,374.00 | 261,409.00 | 261,399.00 | 261,509.00 | 261,759.00 | 3,104,948.00 |
| RECEIPTS FROM OPERATIONS | | | | | | | | | | | | | |
| CURRENT RENT ROLL | 252,619.20 | 253,578.25 | 255,930.65 | 256,007.70 | 257,206.50 | 257,408.84 | 257,540.70 | 258,163.67 | 258,724.59 | 259,995.10 | 259,986.00 | | 3,085,038.17 |
| LESS: | | | | | | | | | | | | | |
| VACANCY | (9,909.80) | (9,745.20) | (9,973.40) | (9,659.00) | (7,067.40) | (8,046.70) | (8,292.26) | (8,572.90) | (9,236.01) | (9,255.40) | (11,683.50) | (103,448.60) | |
| SERVICE APARTMENTS | (2,557.00) | (2,557.00) | (2,537.00) | (2,537.00) | (2,592.00) | (1,602.00) | (2,000.00) | (2,802.00) | (2,602.00) | (2,602.00) | (2,602.00) | (30,994.00) | |
| RENT UP ALLOWANCE | 0.00 | (445.00) | (1,864.00) | (2,003.59) | (549.00) | (1,326.00) | (1,916.00) | (1,037.00) | (1,037.00) | (2,803.00) | (4,005.00) | (21,443.18) | |
| GROSS COLLECTABLE RENTS | 240,152.40 | 240,831.05 | 248,550.25 | 241,808.11 | 246,998.10 | 245,496.14 | 245,716.44 | 245,072.77 | 246,274.94 | 244,080.58 | 242,232.70 | 241,935.50 | 2,929,151.98 |
| PLUS ADJUSTMENTS: | | | | | | | | | | | | | |
| LAST MONTH'S RENT APPLIED | (2,936.10) | (2,479.00) | (1,466.00) | (1,641.00) | (2,938.80) | (3,018.30) | (3,093.50) | (3,140.40) | (3,757.00) | (4,547.00) | (1,989.00) | (2,101.40) | (40,307.50) |
| RETURNED CHECKS-NET | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ACCRUAL ADJUSTMENT | 31,317.89 | (443.44) | 9,932.92 | (21,975.31) | 9,536.69 | (29,697.08) | 8,587.40 | (3,509.88) | (1,137.39) | (273.30) | (3.80) | (1,494.80) | (1,160.10) |
| ADDITIONAL INCOME | 8,248.01 | 11,366.56 | 5,292.18 | 8,900.57 | 8,452.37 | 4,818.93 | 7,212.50 | 7,927.81 | 4,912.73 | 6,431.76 | 6,231.76 | 6,431.76 | 86,222.02 |
| GROSS OPERATING COLLECTIONS | 276,783.00 | 249,275.17 | 255,109.35 | 227,092.37 | 262,048.36 | 217,599.69 | 258,422.84 | 246,350.30 | 244,293.28 | 247,595.10 | 246,471.66 | 242,465.28 | 2,973,906.40 |
| OTHER RECEIPTS | | | | | | | | | | | | | |
| CONTRIBUTIONS FROM OWNERS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| BANK BORROWING | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| MISCELLANEOUS REIMBURSEMENT | 74.11 | 294.00 | 147.00 | 3,742.05 | 0.00 | 0.00 | 320.32 | 110.86 | 0.00 | 0.00 | 0.00 | 0.00 | 4,688.34 |
| SECURITY DEPOSITS RECEIVED-NET | (34.10) | 7,935.10 | 4,520.00 | 4,845.00 | 4,765.00 | 1,927.80 | 4,441.80 | 1,933.00 | (328.00) | 7,339.82 | 5,559.00 | 5,511.42 | 48,575.84 |
| TOTAL RECEIPTS | 276,823.01 | 257,504.27 | 259,976.35 | 235,679.42 | 266,813.36 | 219,527.49 | 263,184.96 | 248,394.16 | 244,465.28 | 254,934.92 | 252,030.66 | 247,976.70 | 3,027,310.58 |
| EXPENDITURES | | | | | | | | | | | | | |
| OPERATING EXPENSES | 76,752.49 | 74,367.33 | 71,960.30 | 71,827.52 | 74,814.54 | 72,870.56 | 78,082.72 | 77,555.62 | 80,425.23 | 74,676.84 | 75,064.53 | 79,351.66 | 910,457.34 |
| FIRST MORTGAGE: PRINCIPAL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| INTEREST | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 977,630.04 |
| ESCROW | 35,323.83 | 35,323.83 | 35,323.83 | 35,323.83 | 35,323.83 | 35,323.83 | 35,323.83 | 35,323.83 | 35,323.83 | 35,323.83 | 62,474.00 | 35,323.83 | 451,037.01 |
| SECOND MORTGAGE: PRINCIPAL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| INTEREST | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| PRINCIPAL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| INTEREST | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| FIX UP EXPENDITURES | 693.00 | 0.00 | 0.00 | 0.00 | 6,469.45 | 5,623.86 | 16,132.71 | 2,731.00 | 2,731.00 | 487.76 | 0.00 | 0.00 | 45,015.47 |
| TOTAL EXTRAORDINARY | 25,090.26 | 11,439.75 | 11,474.97 | 39,693.94 | 39,778.00 | 25,486.17 | 29,700.53 | 43,937.10 | 29,021.25 | 73,048.85 | 18,808.59 | 37,922.24 | 360,379.75 |
| DISTRIBUTION TO OWNER | 120,000.00 | 0.00 | 0.00 | 120,000.00 | 0.00 | 90,000.00 | 90,000.00 | 0.00 | 0.00 | 50,000.00 | 0.00 | 3.00 | 360,000.00 |
| TOTAL EXPENDITURES | 339,328.75 | 212,600.08 | 206,228.17 | 120,312.46 | 217,853.99 | 220,767.79 | 331,496.98 | 251,150.59 | 228,970.48 | 274,006.45 | 247,817.17 | 223,966.70 | 3,104,519.61 |
| INCREASE (DECREASE) IN CASH BALANCE | (62,505.74) | 44,904.19 | 53,748.18 | (84,633.04) | 28,959.37 | (1,260.30) | (68,312.02) | (2,756.43) | 15,194.80 | (19,071.53) | 4,373.49 | 14,010.00 | (77,349.03) |
| CASH BALANCE | | | | | | | | | | | | | |
| LANDMARK-CDNG | 5,113.99 | 39,374.13 | 35,513.42 | 9,154.26 | 9,305.27 | 12,490.06 | 20,990.14 | 5,587.95 | 116,733.97 | 57,042.12 | 9,402.95 | 16,539.69 | |
| LANDMARK-M/M | 84,682.11 | 240,439.98 | 298,048.87 | 239,774.99 | 268,583.35 | 264,138.24 | 187,326.14 | 199,971.90 | 104,020.68 | 144,641.00 | 197,653.66 | 203,526.92 | |
| REPO ACCOUNT | 145,113.82 | 0.00 | 0.00 | | | | | | | | | | |
| TOTAL CASH ON HAND | 234,909.92 | 279,814.11 | 333,562.29 | 248,929.25 | 277,888.62 | 276,628.30 | 208,316.28 | 205,559.85 | 220,754.65 | 201,683.12 | 206,056.61 | 220,066.61 | |

1&205 4$COP16 6?N0T

JAL05.45COPL6.67HIULBARCDR IN4 APARTMENTS

SCHEDULE OF FUNDS AVAILABLE
2002
PAGE 3

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **FUNDS AVAILABLE** | | | | | | | | | | | | |
| CASH ON HAND | 234,909.92 | 279,814.11 | 333,562.29 | 248,929.25 | 277,808.62 | 276,628.30 | 208,116.28 | 205,559.85 | 220,754.65 | 201,683.12 | 220,056.61 | 220,066.61 |
| **ADJUSTMENTS ADD:** | | | | | | | | | | | | |
| ESCROW BALANCE R/E TAX | 28,260.26 | 57,037.02 | 85,813.78 | 114,590.54 | 143,367.30 | 172,144.06 | 200,920.82 | 229,697.58 | 258,474.34 | 287,251.10 | (0.00) | 23,247.83 |
| ESCROW BALANCE INS | 33,900.52 | 40,447.99 | 46,995.06 | 53,542.13 | 6,547.07 | 6,547.07 | 13,094.14 | 19,641.21 | 26,188.28 | 32,735.35 | 32,735.35 | 32,735.35 |
| PREPAID INSURANCE | 25,389.52 | 18,739.61 | 10,553.06 | 8,325.42 | 52,028.68 | 35,662.74 | 19,256.80 | 34,868.57 | 40,245.49 | 40,245.49 | 42,087.14 | 56,490.19 |
| EXCESS INSURANCE | 5,928.18 | 2,964.07 | 0.00 | 0.00 | 18,788.42 | 13,141.23 | 47,894.04 | 30,448.60 | 22,836.44 | 22,816.40 | 19,030.36 | 15,224.27 |
| RECEIVABLES | 155.60 | 702.00 | 107.02 | 107.02 | 244.32 | 878.10 | 513.50 | 280.90 | 912.10 | 2,245.90 | 2,668.70 | 635.40 |
| UTILITY DEPOSITS | 2,929.89 | 2,929.89 | 2,929.89 | 2,929.89 | 2,939.99 | 2,939.99 | 2,929.89 | 2,650.00 | 2,650.00 | 2,650.00 | 2,650.00 | 2,650.00 |
| PREPAID LEGAL FEES | 0.00 | 0.00 | 1,244.00 | 1,244.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| RESERVE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| PREPAID RENTS | (34,848.82) | (36,456.15) | (44,245.97) | (22,314.88) | (21,988.07) | (2,925.57) | (11,147.37) | (7,499.70) | (4,899.70) | (5,960.20) | (5,775.20) | (2,851.10) |
| SECURITY DEPOSITS | (152,868.51) | (158,324.51) | (154,378.51) | (157,582.51) | (159,408.71) | (158,213.21) | (159,566.57) | (158,355.12) | (154,470.97) | (157,266.97) | (157,249.98) | (144,007.08) |
| ACCRUALS / REAL EST TA | (28,776.76) | (57,553.52) | (86,330.28) | (115,107.04) | (143,883.80) | (172,660.56) | (201,437.32) | (230,214.08) | (258,990.84) | (287,767.60) | (247,547.19) | (156,490.10) |
| FIX UP RESERVE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (0.00) | (0.00) |
| CAPITAL IMPROV RES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **TOTAL ADJUSTMENTS** | (119,930.19) | (128,009.70) | (137,356.17) | (114,265.43) | (117,922.77) | (82,421.25) | (87,543.02) | (78,392.24) | (66,656.46) | (63,030.49) | (53,392.83) | (68,610.41) |
| **TOTAL FUNDS AVAILABLE (DEFICIT)** | 114,979.73 | 151,804.41 | 196,206.12 | 134,663.82 | 159,965.85 | 194,207.05 | 120,773.26 | 127,167.61 | 154,098.19 | 138,652.63 | 152,663.78 | 151,456.20 |
| PREPAID LEGAL | 0.00 | 0.00 | (1,244.00) | (1,244.00) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ESCROW EXCESS | 516.50 | 516.50 | 516.50 | 516.50 | 516.50 | 516.50 | 516.50 | 516.50 | 516.50 | 516.50 | 516.50 | 0.00 |
| PREPAID INSURANCE | (25,389.52) | (18,739.61) | (10,553.06) | (8,325.42) | (52,028.68) | (35,662.74) | (19,256.80) | (34,868.57) | (40,245.49) | (40,245.49) | (42,087.14) | (56,490.19) |
| EXCESS INSURANCE | (5,928.18) | (2,964.07) | 0.00 | 0.00 | (18,788.42) | (13,141.23) | (47,894.04) | (30,448.60) | (22,836.44) | (22,816.44) | (19,030.36) | (15,224.27) |
| ESCROW BALANCE INS | (33,900.52) | (40,447.99) | (46,995.06) | (53,542.13) | 0.00 | (6,547.07) | (13,094.14) | (19,641.21) | (26,188.28) | (32,735.35) | 0.00 | 0.00 |
| UTILITY DEPOSIT'S | (2,929.89) | (2,929.89) | (2,929.89) | (2,929.89) | (2,939.99) | (2,939.99) | (2,929.89) | (2,650.00) | (2,650.00) | (2,650.00) | (2,650.00) | (2,650.00) |
| RECEIVABLES | (155.60) | (2,205.90) | (1,306.00) | (1,351.02) | (244.32) | (878.10) | (512.50) | (280.90) | (912.10) | (2,245.90) | (2,668.70) | (635.40) |
| **CASH AVAILABLE** | 47,192.12 | 85,033.45 | 131,693.81 | 67,787.86 | 86,491.04 | 135,384.52 | 37,602.39 | 39,794.83 | 61,380.81 | 38,455.95 | 39,480.47 | 53,208.51 |
| **CAPITAL IMPROVEMENT RESERVE** | | | | | | | | | | | | |
| ORIGINAL BUDGET | 14,176.97 | 27,735.49 | 38,812.09 | 49,520.98 | 59,163.96 | 63,244.46 | 70,278.32 | 79,359.72 | 86,497.05 | 94,948.02 | 101,843.76 | 107,293.81 |
| AMOUNT INCURRED TO DATE | (14,176.97) | (27,735.49) | (38,812.09) | (49,520.98) | (59,161.96) | (63,244.46) | (70,278.32) | (79,359.72) | (86,497.05) | (94,948.02) | (101,843.76) | (107,293.81) |
| **REMAINING BUDGET** | 0.00 | (10.00) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **FIX UP RESERVE ALLOCATION (REGULAR)** | | | | | | | | | | | | |
| ORIGINAL BUDGET | 693.00 | 693.00 | 693.00 | 693.00 | 693.00 | 693.00 | 693.00 | 693.00 | 693.00 | 45,015.47 | 45,015.47 | 45,015.47 |
| AMOUNT INCURRED TO DATE | (693.00) | (693.00) | (693.00) | (693.00) | (693.00) | (693.00) | (693.00) | (693.00) | (693.00) | (45,015.47) | (45,015.47) | (45,015.47) |
| **REMAINING BUDGET** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

JAL05.45COPL6.67HOT

SCHEDULE OF ADDITIONAL INCOME
2002

PAGE 4

**ADDITIONAL INCOME**

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LAUNDRY | 97.99 | 170.89 | 55.13 | 68.53 | 67.12 | 120.13 | 0.00 | 72.61 | 0.00 | 146.66 | 66.62 | 68.13 | 931.81 |
| REDECORATION FEE | 900.00 | 1,100.00 | 1,000.00 | 700.00 | 700.00 | 900.00 | 500.00 | 1,100.00 | 100.00 | 400.00 | 200.00 | 200.00 | 8,000.00 |
| PET FEE | 1,150.00 | 1,100.00 | 250.00 | 1,300.00 | 700.00 | 300.00 | 1,200.00 | 500.00 | 200.00 | 1,450.00 | 575.00 | 800.00 | 9,525.00 |
| INTEREST-MONEY MARKET | 251.57 | 277.17 | 440.16 | 480.95 | 446.54 | 423.20 | 859.74 | 347.11 | 280.70 | 290.44 | 274.37 | 287.09 | 4,715.04 |
| TERMINATION FEE | 1,618.25 | 5,537.75 | 415.00 | 2,509.00 | 3,020.00 | 0.00 | 926.00 | 1,136.30 | 1,566.00 | 1,792.00 | 1,067.00 | 512.76 | 20,100.06 |
| CORE MACHINE | 37.88 | 0.00 | 39.29 | 19.62 | 20.29 | 0.00 | 21.16 | 21.04 | 26.28 | 46.26 | 0.00 | 0.00 | 232.02 |
| APPLICATION FEES | 1,305.00 | 885.00 | 865.00 | 1,485.00 | 1,355.00 | 870.00 | 550.00 | 820.00 | 375.00 | 960.00 | 1,080.00 | 670.00 | 11,220.00 |
| LATE CHARGES | 1,556.10 | 1,614.70 | 1,129.60 | 666.50 | 1,071.40 | 1,430.10 | 1,427.30 | 1,719.70 | 1,311.70 | 1,746.60 | 1,634.80 | 1,298.00 | 16,606.50 |
| NSF FEES | 150.00 | 150.00 | 60.00 | 90.00 | 180.00 | 120.00 | 150.00 | 120.00 | 30.00 | 60.00 | 180.00 | 210.00 | 1,500.00 |
| ENTRANCE GATE CARD | 300.00 | 375.00 | 370.00 | 265.00 | 320.00 | 355.00 | 395.00 | 405.00 | 165.00 | 275.00 | 240.00 | 280.00 | 3,745.00 |
| BELLSOUTH PHONE COMMISSION | 275.00 | 0.00 | 0.00 | 135.50 | 180.00 | 195.75 | 0.00 | 186.75 | 0.00 | 60.00 | 180.00 | 210.00 | 793.00 |
| MISCELLANEOUS | 216.10 | 86.00 | 0.00 | 0.00 | 473.00 | 104.75 | 455.00 | 120.00 | 300.00 | 475.00 | 0.00 | 0.00 | 3,125.85 |
| FORFEITED SECURITY | 0.00 | 0.00 | 485.00 | 430.00 | 99.92 | 0.00 | 455.00 | 42.05 | 431.05 | 0.00 | 0.00 | 0.00 | 1,120.07 |
| MORTGAGE ESCROW INTEREST | 390.92 | 0.00 | 165.00 | 245.82 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 689.86 | 0.00 | 0.00 | 1,346.60 |
| BACK RENT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 688.10 | 1,277.00 | 118.00 | 832.00 | 832.00 | 0.00 | 2,915.10 |
| CARWASH | 0.00 | 70.05 | 0.00 | 69.65 | 0.00 | 0.00 | 0.00 | 102.30 | 0.00 | 0.00 | 83.97 | 0.00 | 325.97 |
| **TOTAL ADDITIONAL INCOME** | 8,248.81 | 11,366.56 | 5,292.18 | 8,900.57 | 8,452.37 | 4,818.93 | 7,232.50 | 7,927.81 | 4,912.73 | 8,331.82 | 6,431.76 | 4,325.98 | 86,222.02 |
| PLUS: | | | | | | | | | | | | | |
| ADDITIONAL INCOME RECEIVED | 8,248.81 | 11,366.56 | 5,292.18 | 8,900.57 | 8,452.37 | 4,818.93 | 7,232.50 | 7,927.81 | 4,912.73 | 8,331.82 | 6,431.76 | 4,325.98 | 86,222.02 |
| **TOTAL ADDITIONAL INCOME** | 8,248.81 | 11,366.56 | 5,292.18 | 8,900.57 | 8,452.37 | 4,818.93 | 7,232.50 | 7,927.81 | 4,912.73 | 8,331.82 | 6,431.76 | 4,325.98 | 86,222.02 |

SCHEDULE OF OPERATING EXPENSES - 2002

PAGE 5

3AJO5.4SCOP16.67OHOUR OR IN APARTMENTS

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING EXPENSES** | | | | | | | | | | | | | |
| EMPLOYEE LEASING/PAYROLL | 20,623.32 | 20,566.02 | 19,767.33 | 19,242.64 | 20,003.32 | 20,921.45 | 20,653.92 | 22,263.24 | 21,331.94 | 20,955.49 | 22,023.73 | 20,806.47 | 249,198.87 |
| ELECTRIC APT VACANT | 74.11 | 0.00 | 124.54 | 109.82 | 87.33 | 120.17 | 167.73 | 86.12 | 93.11 | 111.73 | 112.88 | 86.05 | 1,173.61 |
| ELECTRIC HOUSE | 1,988.39 | 2,047.45 | 1,713.18 | 1,798.47 | 1,717.32 | 1,883.56 | 1,263.92 | 1,900.16 | 1,709.81 | 1,778.82 | 1,742.85 | 1,852.53 | 21,396.44 |
| WATER & SEWER | 8,406.82 | 8,501.92 | 8,081.51 | 6,531.00 | 6,692.20 | 6,580.88 | 7,040.52 | 6,531.00 | 6,678.00 | 6,563.72 | 6,386.01 | 6,364.01 | 84,357.59 |
| GAS | 246.07 | 258.22 | 181.30 | 310.27 | 226.27 | 189.54 | 196.40 | 2,375.97 | 330.49 | 168.61 | 174.10 | 262.57 | 2,719.84 |
| SANITATION | 6,333.17 | 6,166.67 | 6,333.15 | 6,293.25 | 6,235.77 | 6,375.97 | 6,375.97 | 6,375.97 | 6,231.49 | 6,231.49 | 6,231.49 | 6,231.49 | 75,415.88 |
| TELEPHONE | 862.77 | 1,399.67 | 913.29 | 905.05 | 888.75 | 995.45 | 713.19 | 713.17 | 330.49 | 947.76 | 562.34 | 2,713.84 | 11,945.72 |
| MANAGEMENT FEE | 12,559.94 | 12,420.00 | 12,609.88 | 12,692.12 | 12,535.43 | 12,772.54 | 12,515.75 | 12,646.45 | 12,650.00 | 12,559.38 | 12,620.77 | 12,433.22 | 151,015.57 |
| MARKETING | 1,623.51 | 1,823.57 | 1,667.93 | 1,667.93 | 1,783.11 | 1,877.97 | 1,874.94 | 1,697.29 | 1,703.93 | 1,670.50 | 2,410.50 | 1,957.69 | 22,948.55 |
| OFFICE EXPENSE | 1,572.16 | 1,353.92 | 935.52 | 1,635.40 | 1,349.83 | 1,503.41 | 1,033.41 | 1,596.20 | 1,596.20 | 895.01 | 1,593.20 | 1,573.20 | 17,333.09 |
| PROPERTY INSURANCE | 8,186.55 | 8,186.55 | 6,756.87 | 16,305.94 | 16,305.94 | 16,305.94 | 16,386.48 | 16,386.48 | 16,516.67 | 16,516.67 | 16,516.67 | 16,930.69 | 162,811.37 |
| LICENSES & TAXES | 535.00 | 0.00 | 0.00 | 395.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,852.00 | 595.75 | 236.00 | 2,839.00 | 7,452.75 |
| REAL ESTATE TAXES | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 47,347.15 | 47,347.15 | 382,461.90 |
| BOOKKEEPING FEES | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 11,160.00 |
| REPAIRS & MAINTENANCE | 10,357.42 | 9,106.79 | 8,890.71 | 9,788.52 | 9,315.36 | 9,896.30 | 9,726.18 | 9,728.11 | 7,025.39 | 9,591.11 | 8,955.78 | 10,899.24 | 114,085.83 |
| REPLACEMENTS | 6,531.13 | 6,384.80 | 4,572.13 | 7,185.40 | 7,594.40 | 4,418.43 | 8,679.14 | 7,025.14 | 5,057.20 | 5,057.20 | 6,257.57 | 7,331.76 | 82,033.21 |
| MISCELLANEOUS | 1,500.00 | 1,554.80 | 554.60 | 835.33 | 835.33 | 561.85 | 957.30 | 995.10 | 1,170.67 | 970.90 | 977.71 | 1,111.67 | 11,700.00 |
| LANDSCAPING | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 38,400.00 |
| EMPLOYEE INSURANCE | 641.69 | 641.69 | 1,017.58 | 1,558.54 | 1,028.53 | 1,028.53 | 1,028.53 | 1,028.53 | 1,028.53 | 1,017.58 | 1,409.62 | 1,244.45 | 12,675.80 |
| **TOTAL OPERATING EXPENSES** | 113,735.60 | 111,330.64 | 108,923.63 | 110,097.79 | 119,977.24 | 118,041.26 | 122,945.42 | 122,718.86 | 125,588.47 | 119,970.27 | 140,228.35 | 143,129.50 | 1,457,147.21 |
| | | | | | | | | | | | | | |
| **EXTRA ORDINARY EXPENDITURES:** | | | | | | | | | | | | | |
| W/O-EVICT | 112.12 | 104.80 | 259.00 | 20.80 | 80.00 | 149.80 | 152.76 | 583.40 | 474.00 | 348.60 | 0.00 | 705.30 | 3,190.58 |
| CREDIT CHECKS | 290.00 | 509.00 | 355.50 | 343.50 | 446.00 | 576.00 | 201.00 | 379.50 | 472.50 | 171.50 | 292.00 | 488.00 | 4,524.50 |
| COURT COSTS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 140.00 | 0.00 | 0.00 | 147.00 | 147.00 | 434.00 |
| WEINBERG (1 YEAR END ACCT) | 0.00 | 0.00 | 0.00 | 2,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 541.25 | 1,504.27 | 0.00 | 262.50 | 5,553.75 |
| LANDSCAPE | 4,026.59 | 2,169.20 | 734.47 | 1,082.27 | 542.72 | 609.24 | 594.51 | 0.00 | 0.00 | 0.00 | 288.50 | 448.50 | 12,303.95 |
| LEASING FEE IR/E COMMISSIO | 1,500.00 | 600.00 | 400.00 | 700.00 | 700.00 | 1,100.00 | 1,200.00 | 1,200.00 | 700.00 | 1,200.00 | 1,200.00 | 2,400.00 | 12,900.00 |
| LEASING FEE (TENANTS REFER | 1,285.00 | 0.00 | 0.00 | 2,439.31 | 1,050.48 | 0.00 | 2,020.24 | 2,485.58 | 0.00 | 0.00 | 0.00 | 0.00 | 9,280.69 |
| MISCELLANEOUS EXTERIOR | 931.00 | 0.00 | 0.00 | 804.14 | 0.00 | 0.00 | 780.00 | 407.72 | 700.00 | 375.00 | 0.00 | 0.00 | 1,807.80 |
| MISCELLANEOUS INTERIOR | 0.00 | 550.00 | 0.00 | 0.00 | 250.00 | 0.00 | 0.00 | 4,926.91 | 0.00 | 0.00 | 0.00 | 12,153.95 | 12,153.95 |
| BONUS | 880.67 | 479.60 | 0.00 | 0.00 | 899.60 | 0.00 | 0.00 | 479.60 | 100.00 | 100.00 | 400.00 | 5,827.04 | 7,807.89 |
| COMPUTER SUPPORT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 376.41 | 40.53 | 696.54 | 707.60 | 1,048.48 | 1,128.18 | 1,142.41 | 8,074.77 |
| MARKETING | 488.00 | 1,096.89 | 910.52 | 643.51 | 999.60 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,317.55 |
| INSURANCE CONSULTING | 635.00 | 635.00 | 635.00 | 128.65 | 28.28 | 47.65 | 28.28 | 28.28 | 529.60 | 128.28 | 0.00 | 0.00 | 1,905.00 |
| COURTESY OFFICER | 164.43 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 497.29 |
| ROOFING REPAIR | 300.00 | 0.00 | 795.00 | 1,925.00 | 600.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,175.00 | 10,769.00 |
| PROPERTY INS/ pre paid uti | 0.00 | 0.00 | 0.00 | 6,966.47 | 22,594.50 | 18,358.89 | 18,358.89 | 18,358.89 | 18,358.89 | 18,921.00 | 18,358.94 | 18,358.94 | 160,906.72 |
| CAPITAL IMPROVEMENT | 14,176.97 | 1,558.51 | 12,114.18 | 9,971.26 | 9,871.26 | 5,168.18 | 10,106.27 | 7,137.33 | 7,137.33 | 6,450.97 | 6,893.74 | 5,453.06 | 106,906.72 |
| FIX UP | 693.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 487.76 | 0.00 | 0.00 | 0.00 |
| **TOTAL EXTRA ORDINARY EXPENDITURES** | 25,783.26 | 21,439.75 | 16,230.87 | 29,691.94 | 46,255.57 | 31,116.23 | 45,421.26 | 56,901.97 | 31,752.25 | 32,536.61 | 28,408.59 | 37,922.04 | 404,160.34 |

3AJ05.4SCOP16.67HARBOUR 11N APARTMENTS

ANALYSIS OF ACTUAL OPERATING CASH FLOW TO BUDGET - 2002
MONTH: December
CASH BASIS

PAGE 6

| | CURRENT MONTH | BUDGET AMOUNT | VARIANCE | YEAR TO DATE | BUDGET AMOUNT | VARIANCE | MARKET RENT | ANNUAL BUDGET |
|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | |
| CURRENT RENT ROLL | 259,986.00 | 252,619.20 | 7,366.80 | 3,285,038.17 | 3,031,430.40 | 53,607.77 | 261,374.00 | 3,031,430.40 |
| VACANCY 5% | (11,683.50) | (12,630.96) | 947.46 | (151,571.52) | (151,571.52) | 48,122.92 | | (151,571.52) |
| SERVICE APARTMENTS | (2,602.00) | (2,557.00) | (45.00) | (30,994.00) | (30,684.00) | (310.00) | | (30,684.00) |
| RENT UP ALLOWANCE .50% | (3,765.00) | (1,263.10) | (2,503.90) | (21,443.59) | (15,157.15) | (6,286.44) | (15,157.15) | (15,157.15) |
| ADDITIONAL INCOME | 4,325.98 | 8,500.00 | (4,174.02) | 86,222.02 | 102,000.00 | (15,777.98) | | 102,000.00 |
| **NET REVENUE** | 246,261.48 | 244,668.14 | 1,593.34 | 3,015,374.00 | 2,936,017.73 | 79,356.27 | | 2,936,017.73 |
| **OPERATING EXPENSES** | | | | | | | | |
| (1)EMPLOYEE LEASING,PAYROLL | 20,806.47 | 20,616.67 | (189.80) | 249,198.87 | 245,000.00 | (4,198.87) | | 245,000.00 |
| ELECTRIC | 1,938.58 | 2,000.00 | 61.42 | 22,570.05 | 24,000.00 | 1,429.95 | | 24,000.00 |
| WATER & SEWER | 6,364.01 | 9,000.00 | 2,635.99 | 86,552.94 | 108,000.00 | 21,447.06 | | 108,000.00 |
| GAS | 262.57 | 250.00 | (12.57) | 2,719.89 | 3,000.00 | 280.11 | | 3,000.00 |
| SANITATION | 6,818.68 | 6,166.67 | (652.01) | 75,842.33 | 74,000.00 | (1,842.33) | | 74,000.00 |
| TELEPHONE | 542.15 | 750.00 | 207.85 | 11,316.35 | 9,000.00 | (2,316.35) | | 9,000.00 |
| MANAGEMENT FEE | 12,431.20 | 12,231.41 | (199.79) | 151,015.57 | 146,800.89 | (4,214.68) | | 146,800.89 |
| ADVERTISING | 2,412.50 | 1,666.67 | (745.83) | 21,857.27 | 20,000.00 | (1,857.27) | | 20,000.00 |
| OFFICE EXPENSE | 1,573.20 | 1,250.00 | (323.20) | 17,333.09 | 15,000.00 | (2,333.09) | | 15,000.00 |
| (2) PROPERTY INSURANCE | 16,530.69 | 8,762.04 | (7,768.65) | 162,811.33 | 105,144.50 | (57,666.83) | | 105,144.50 |
| LICENSES & FEES | 2,839.00 | 625.00 | (2,214.00) | 7,452.75 | 7,500.00 | 47.25 | | 7,500.00 |
| (4) F/F & REAL ESTATE TAXES | 47,347.15 | 28,776.76 | (18,570.39) | 382,461.90 | 345,321.10 | (37,140.80) | | 345,321.10 |
| BOOKKEEPING FEES | 930.00 | 930.00 | 0.00 | 11,160.00 | 11,160.00 | 0.00 | | 11,160.00 |
| REPAIRS & MAINTENANCE | 9,191.62 | 9,000.00 | (191.62) | 114,095.83 | 108,000.00 | (6,095.83) | | 108,000.00 |
| REPLACEMENTS | 7,311.96 | 6,458.33 | (853.63) | 82,037.27 | 77,500.00 | (4,537.27) | | 77,500.00 |
| MISCELLANEOUS | 77.86 | 75.00 | (2.86) | 12,039.23 | 7,700.04 | (4,339.19) | | 7,700.04 |
| LANDSCAPE MAINTENANCE | 3,200.00 | 3,200.00 | 0.00 | 38,400.00 | 38,400.00 | 0.00 | | 38,400.00 |
| EMPLOYEE INSURANCE | 1,246.45 | 641.69 | (604.76) | 12,675.80 | 7,700.28 | (4,975.52) | | 7,700.28 |
| **TOTAL OPERATING EXPENSES** | 143,129.50 | 131,127.23 | (30,002.27) | 1,457,147.21 | 1,357,526.77 | (99,640.44) | | 1,357,526.77 |
| **CASH FLOW BEFORE DEBT SERVICE** | 103,131.98 | 113,540.91 | (28,408.93) | 1,558,206.79 | 1,578,490.96 | (20,284.17) | | 1,578,490.96 |
| **DEBT SERVICE** | | | | | | | | |
| INTEREST | 81,469.17 | 81,469.17 | 0.00 | 977,630.04 | 977,630.04 | 0.00 | | 977,630.04 |
| PRINCIPAL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| TOTAL | 81,469.17 | 81,469.17 | 0.00 | 977,630.04 | 977,630.04 | 0.00 | | 977,630.04 |
| **NET OPERATING CASH FLOW** | 21,662.81 | 50,071.74 | (28,408.93) | 580,576.75 | 600,860.92 | (20,284.17) | | 600,860.92 |

(1) INCLUDES PAYROLL TAX AND WORKER COMPENSATION
(2) COSTS OF INSURANCE 0184,224.76). NEW POLICY IN MAY 2002
(3) MONTH TO MONTH: 11 APARTMENT UNITS
(4) R/E TAX AND PP TAX FOR 2002 0182,461.90 R/E TAX UNDER APPEAL budget 0145,321.10

3AJ05.4SCOP16.67HOT

JALOS.4SCOP16.67HOTHARBOR IN / APARTMENTS

**MONTHLY COMPARISON OF ACTUAL OPERATING CASH FLOW - 2002**
**CASH BASIS**

PAGE 6A

| REVENUE | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CURRENT RENT ROLL | 252,619.20 | 253,578.25 | 255,930.65 | 256,007.70 | 257,206.50 | 257,400.84 | 257,540.70 | 258,163.67 | 258,216.97 | 258,724.59 | 259,575.10 | 259,986.00 | 3,085,038.17 |
| VACANCY 5% | (9,909.80) | (9,745.20) | (9,979.40) | (9,659.00) | (9,371.40) | (8,064.70) | (8,292.26) | (8,572.90) | (9,236.01) | (9,935.40) | (9,935.40) | (11,643.50) | (105,752.60) |
| SERVICE APARTMENTS | (2,557.00) | (2,557.00) | (2,537.00) | (2,537.00) | (2,602.00) | (2,602.00) | (2,602.00) | (2,602.00) | (2,602.00) | (2,602.00) | (2,602.00) | (2,602.00) | (30,110.00) |
| RENT UP ALLOWANCE | 0.00 | (445.00) | (1,864.00) | (2,203.59) | (549.00) | (1,226.00) | (930.00) | (1,916.00) | (1,765.00) | (4,905.00) | (1,765.00) | (1,643.59) | (21,443.59) |
| ADDITIONAL INCOME | 8,248.81 | 11,266.56 | 5,292.18 | 8,900.57 | 9,872.37 | 7,223.50 | 7,212.50 | 7,927.81 | 4,912.73 | 8,331.82 | 6,431.76 | 4,325.98 | 87,642.02 |
| | 248,401.21 | 252,197.61 | 253,842.43 | 250,708.68 | 255,450.47 | 253,315.07 | 253,928.94 | 253,000.56 | 251,107.67 | 252,415.40 | 249,664.46 | 246,261.48 | 3,015,374.00 |
| EMPLOYEE LEASING/PAYROLL | 20,623.32 | 20,566.02 | 19,767.33 | 19,242.64 | 20,043.32 | 20,921.65 | 20,653.92 | 20,263.24 | 21,331.94 | 20,955.69 | 22,023.73 | 20,806.47 | 249,198.87 |
| ELECTRIC | 2,062.50 | 2,047.45 | 1,837.72 | 1,900.29 | 1,804.45 | 2,003.73 | 1,411.62 | 1,986.26 | 1,800.55 | 1,855.75 | 1,938.50 | 1,928.05 | 22,370.05 |
| WATER & SEWER | 8,406.82 | 8,501.92 | 8,001.51 | 6,531.00 | 6,692.20 | 6,580.88 | 7,040.52 | 6,531.00 | 6,678.09 | 6,581.37 | 6,553.74 | 6,963.74 | 85,063.94 |
| GAS | 246.07 | 258.22 | 181.30 | 310.27 | 226.27 | 189.54 | 195.48 | 175.97 | 330.49 | 168.61 | 174.10 | 262.57 | 2,719.89 |
| SANITATION | 6,233.77 | 6,166.67 | 6,429.15 | 6,235.85 | 6,238.77 | 6,238.83 | 6,227.10 | 6,238.49 | 6,279.03 | 6,361.23 | 6,364.56 | 6,818.68 | 75,842.31 |
| TELEPHONE | 863.71 | 859.01 | 913.29 | 987.05 | 88.35 | 995.45 | 1,024.07 | 717.33 | 831.60 | 1,399.40 | 878.60 | 947.75 | 11,311.65 |
| MANAGEMENT FEE | 12,559.94 | 12,420.06 | 12,602.90 | 12,692.12 | 12,535.43 | 12,772.54 | 12,515.75 | 12,646.45 | 12,650.03 | 12,620.77 | 12,433.22 | 12,431.21 | 151,015.57 |
| MARKETING | 1,623.51 | 1,823.57 | 1,949.52 | 1,667.93 | 1,782.11 | 1,977.97 | 1,878.94 | 1,667.29 | 1,703.93 | 1,670.50 | 2,410.30 | 21,857.27 | 21,857.27 |
| OFFICE EXPENSE | 1,573.16 | 1,353.92 | 935.53 | 1,625.48 | 1,349.83 | 1,503.41 | 1,033.41 | 1,033.41 | 1,596.20 | 895.00 | 1,753.18 | 1,573.20 | 17,313.00 |
| PROPERTY INSURANCE | 8,186.55 | 8,186.55 | 6,756.87 | 16,385.94 | 16,385.94 | 16,385.94 | 16,386.48 | 16,386.48 | 16,386.48 | 16,516.67 | 16,516.67 | 16,530.69 | 162,011.33 |
| LICENSES & FEES | 155.00 | 0.00 | 155.00 | 395.00 | 0.00 | 0.00 | 0.00 | 2,432.00 | 2,852.00 | 595.75 | 226.00 | 2,839.00 | 7,652.75 |
| REAL ESTATE TAXES | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 47,347.35 | 202,160.00 | 381,140.00 |
| BOOKKEEPING FEES | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 11,160.00 |
| REPAIRS & MAINTENANCE | 10,357.42 | 9,106.79 | 4,490.71 | 9,704.52 | 9,738.08 | 9,335.96 | 8,958.30 | 9,728.18 | 9,485.36 | 9,591.11 | 8,955.78 | 9,191.62 | 114,085.83 |
| REPLACEMENTS | 6,581.37 | 6,384.80 | 4,672.13 | 7,169.87 | 7,504.47 | 4,618.42 | 4,649.39 | 7,023.91 | 7,023.91 | 5,457.20 | 6,257.57 | 7,311.75 | 82,037.27 |
| MISCELLANEOUS | 315.19 | 108.19 | 554.60 | 521.60 | 835.53 | 581.65 | 957.10 | 979.14 | 695.18 | 1,003.76 | 170.67 | 977.86 | 7,700.47 |
| LANDSCAPE MAINTENANCE | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 38,400.00 |
| EMPLOYEE INSURANCE | 641.69 | 641.69 | 1,017.58 | 1,559.54 | 1,028.53 | 1,028.53 | 1,028.53 | 1,028.53 | 1,028.53 | 1,017.58 | 1,409.62 | 1,246.45 | 13,675.80 |
| TOTAL OPERATING EXPENSES | 113,715.80 | 111,330.64 | 108,923.61 | 128,097.76 | 119,977.24 | 118,041.26 | 121,945.42 | 122,710.86 | 125,588.47 | 119,970.27 | 138,928.35 | 141,129.50 | 1,457,167.21 |
| CASH FLOW BEFORE DEBT SERVICE | 134,685.41 | 140,866.97 | 144,918.82 | 139,810.89 | 135,473.23 | 132,273.80 | 120,983.52 | 130,281.72 | 125,599.20 | 132,445.13 | 109,736.11 | 103,131.98 | 1,558,206.79 |
| DEBT SERVICE | | | | | | | | | | | | | |
| PRINCIPAL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| INTEREST | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 977,630.04 |
| | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 977,630.04 |
| NET OPERATING CASH FLOW | 53,216.24 | 59,397.80 | 63,449.65 | 58,341.72 | 54,004.06 | 50,804.64 | 47,514.35 | 48,812.55 | 44,130.03 | 50,975.96 | 28,266.94 | 21,662.81 | 580,576.75 |

JALOS.4SCOP16.67HOT

JALOS.4SCOP16.6THOTHARBOR INN APARTMENTS

**FIX UP BUDGET TO ACTUAL 2002**

| | BUDGET | TRF FROM UNALLOCATED | ADDITIONAL BUDGET | YEAR TO DATE ACTUAL | BALANCE |
|---|---|---|---|---|---|
| ROOF SECTING | 24,600.00 | | 2,667.29 | 27,267.29 | 0.00 |
| TENNIS CT. REPAIRS/PAIN | 3,920.51 | | | 1,920.51 | 0.00 |
| PAINTING SIGNS & DOORS | 5,259.59 | | | 5,259.59 | 0.00 |
| ELASTO COATING ROOF | 28,124.30 | | | | 28,124.30 |
| LIST | | | | | 0.00 |
| LIST | | | | | 0.00 |
| LIST | | | | | 0.00 |
| LIST | | | | | 0.00 |
| LIST | | | | | 0.00 |
| LIST | | | | | 0.00 |
| LIST | | | | | 0.00 |
| LIST | | | | | 0.00 |
| UNALLOCATED | 0.00 | | | 0.00 | 0.00 |
| SUB TOTAL | 61,904.40 | 0.00 | 2,667.29 | 36,447.39 | 28,124.30 |
| M L MGMT 21% FEE | 13,692.92 | 0.00 | 560.13 | 8,568.08 | 5,684.97 |
| TOTAL FIX UP EXPEND | 75,597.32 | 0.00 | 3,227.42 | 45,015.47 | 33,809.27 |

| | | |
|---|---|---|
| TOTAL EXPEND | 36,447.39 | |
| M L MGMT 21% FEE | 8,346.95 | |
| MGT FEES PAID | | (8,568.08) |
| BALANCE | | (221.13) |

---

CAPITAL IMPROVEMENT BUDGET 2002                                             PAGE 7

| | 2002 BUDGET | YEAR TO DATE ACTUAL | BALANCE | DEC 2002 | 2003 |
|---|---|---|---|---|---|
| WASHERS/DRYERS | 26,617.02 | 24,996.96 | 1,620.06 | 1,449.43 | 4,325.00 |
| REFRIGERATOR | 16,465.26 | 16,465.26 | 0.00 | 948.08 | 3,280.00 |
| STOVE | 1,712.22 | 1,031.54 | 680.68 | 491.54 | 0.00 |
| MICROWAVE | 6,146.96 | 6,146.96 | 0.00 | 702.48 | 0.00 |
| DISHWASHERS | 7,585.90 | 7,585.90 | 0.00 | 689.80 | 0.00 |
| CERAMIC TILES | 29,255.51 | 16,247.29 | 13,008.22 | 1,170.72 | 0.00 |
| POOL HEATER | 1,287.88 | 1,287.88 | 0.00 | 0.00 | 0.00 |
| CABINETS & COUNTER TOPS | 28,032.00 | 28,032.00 | 0.00 | 0.00 | 19,503.69 |
| GYM EQUIPMENT | 2,605.00 | 2,605.00 | 0.00 | 0.00 | 0.00 |
| FENCE | 2,895.00 | 2,895.00 | 0.00 | 0.00 | 0.00 |
| LIST | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| UNALLOCATED | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL CAPITAL IMPROVEMENT | 122,602.78 | 107,293.81 | 15,308.97 | 5,452.05 | 27,108.69 |

**EXTRAORDINARY EXPENSE 2002**

| | BUDGET | YEAR TO DATE ACTUAL | BALANCE |
|---|---|---|---|
| MISCELLANOUS EXTERIOR/INT | 10,795.00 | 10,795.00 | 0.00 |
| ROOFING REPAIR | 2,425.74 | 2,425.74 | 0.00 |
| POOL REPAIR | 1,612.91 | 1,612.91 | 0.00 |
| PROPERTY LIGHTING | 3,612.91 | 3,612.91 | 0.00 |
| PAINTING- POOL DECK/RAILS | 2,439.31 | 2,439.31 | 0.00 |
| GATE REPAIRS | 2,395.40 | 2,395.40 | 0.00 |
| FIRE INSPECTION | 837.72 | 837.72 | 0.00 |
| LIST | | | 0.00 |
| LIST | | | 0.00 |
| LIST | | | 0.00 |
| LIST | | | 0.00 |
| LIST | | | 0.00 |
| TOTAL | 22,506.08 | 22,506.08 | 0.00 |

JALOS 4SCCP16.67HOTHARBOR I1N APARTMENTS

**DEPOSITS RECAP 2002**

PAGE 8

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RENT ROLL | 252,619.20 | 253,578.25 | 255,930.65 | 256,007.70 | 257,206.50 | 257,480.84 | 258,540.70 | 258,163.67 | 258,216.97 | 258,724.59 | 259,575.10 | 259,986.00 | 3,085,018.17 |
| LESS: | | | | | | | | | | | | | |
| VACANCY | (9,909.80) | (9,745.20) | (2,979.40) | (9,659.00) | (7,067.40) | (8,064.70) | (8,292.26) | (8,572.90) | (8,303.03) | (9,236.01) | (9,935.40) | (11,683.50) | (103,448.60) |
| SERVICE | (2,557.00) | (2,537.00) | (2,537.00) | (2,592.00) | (2,592.00) | (2,602.00) | (2,602.00) | (2,602.00) | (2,602.00) | (2,602.00) | (2,602.00) | (2,602.00) | (10,994.00) |
| LAST MONTH'S APPLIED | (2,936.10) | (2,479.00) | (8,466.00) | (1,641.00) | (2,592.00) | (3,018.00) | (3,093.50) | (3,140.40) | (3,757.00) | (4,547.00) | (1,989.00) | (2,301.40) | (40,307.50) |
| RENT UP ALLOWANCE | 0.00 | (445.00) | (1,864.00) | (2,003.59) | (549.00) | (1,326.00) | (930.00) | (1,916.00) | (1,037.00) | (2,803.00) | (4,805.00) | (3,301.40) | (21,443.59) |
| RENT ROLL | 234,534.19 | 237,908.61 | 250,017.17 | 218,193.80 | 253,595.99 | 212,780.76 | 251,210.14 | 238,422.69 | 239,380.55 | 239,263.20 | 238,139.30 | 238,139.30 | 2,887,664.38 |
| ACCRUAL ADJUSTMENT: | | | | | | | | | | | | | |
| OPENING ARREARS | 1,347.00 | 155.60 | 2,205.90 | 62.80 | 107.02 | 244.32 | 878.00 | 512.50 | 280.90 | 912.10 | 2,245.90 | 2,068.70 | 11,020.44 |
| OPENING (PREPAID) | (4,722.80) | (34,849.20) | (34,456.15) | (44,245.97) | (22,314.88) | (31,908.47) | (2,925.57) | (11,147.37) | (7,405.09) | (4,899.70) | (5,960.20) | (212,695.89) | (212,695.89) |
| CLOSING (ARREARS) | (155.60) | (2,205.90) | (62.80) | (107.02) | (244.32) | (878.00) | (512.50) | (280.90) | (912.10) | (2,245.90) | (2,068.70) | (635.40) | (10,100.24) |
| CLOSING PREPAID | 34,849.20 | 36,456.15 | 44,245.97 | 22,314.88 | 31,908.87 | 2,925.57 | 11,147.37 | 7,405.09 | 4,899.70 | 5,960.20 | 5,779.20 | 2,951.10 | 210,824.19 |
| RENTS COLLECTED | | | | | | | | | | | | | |
| OTHER DEPOSITS: | | | | | | | | | | | | | |
| LAUNDRY | 97.99 | 170.89 | 44.53 | 67.12 | 120.13 | 72.61 | 146 | 64 | 68.13 | 931.91 | | | |
| R/T DEPOSITS | 4,125.50 | 4,300.00 | 2,371.00 | 4,679.00 | 3,381.00 | 4,075.00 | 1,282.00 | 745.50 | 3,346.00 | 4,455.00 | 5,830.00 | 42,379.50 | |
| REDECORATION FEE | 900.00 | 1,100.00 | 1,000.00 | 700.00 | 700.00 | 1,100.00 | 500.00 | 100.00 | 400.00 | 400.00 | 200.00 | 9,105.00 | |
| PET FEE | 1,150.00 | 1,100.00 | 250.00 | 1,300.00 | 700.00 | 900.00 | 1,200.00 | 500.00 | 200.00 | 400.00 | 800.00 | 9,525.00 | |
| INTEREST-MM & REPO | 251.57 | 277.17 | 448.16 | 480.95 | 446.54 | 423.20 | 899.74 | 288.70 | 200.44 | 274.37 | 575.00 | 4,135.04 | |
| TERMINATION FEE | 1,618.25 | 5,537.75 | 415.00 | 2,509.00 | 3,020.00 | 0.00 | 926.00 | 347.11 | 1,566.00 | 1,792.00 | 287.07 | 20,100.06 | |
| COKE MACHINE | 37.88 | 39.29 | 19.62 | 20.29 | | 21.36 | 46.26 | 26.28 | 512.76 | 332.02 | | | |
| APPLICATION | 1,305.00 | 885.00 | 865.00 | 1,485.00 | 1,355.00 | 870.00 | 820.00 | 375.00 | 960.00 | 1,080.00 | 670.00 | 11,220.00 | |
| LATE CHARGES | 1,614.70 | 1,129.60 | 665.50 | 1,430.10 | 1,427.30 | 550.00 | 1,717.70 | 1,311.70 | 1,746.60 | 1,634.80 | 1,298.00 | 16,606.50 | |
| SECURITY | 5,260.00 | 11,140.00 | 8,380.00 | 7,743.00 | 8,693.00 | 4,943.00 | 6,443.00 | 8,606.00 | 2,045.00 | 8,194.00 | 7,886.00 | 89,752.82 | |
| CLEANING | | 70.05 | | 65 | | | | 102.30 | | 89.97 | | 125.27 | |
| DAMAGE | | | 165.00 | 475.00 | 99.02 | 0.00 | 0.00 | 431.05 | 0.00 | 0.97 | | 1,136.07 | |
| ENTRANCE GATE CARD | 300.00 | 375.00 | 370.00 | 265.00 | 320.00 | 355.00 | 395.00 | 165.00 | 275.00 | 240.00 | | 3,745.00 | |
| MISCELLANEOUS-INCOME | 216.10 | 86.00 | 495.00 | 400.00 | 473.00 | 104.75 | 455.00 | 120.00 | 301.00 | 475.00 | | 3,135.85 | |
| MISCELLANEOUS-REIM | 74.11 | 294.00 | 147.00 | 3,742.05 | | | 320.32 | 110.86 | | | | 4,688.34 | |
| NSF FEES | 150.00 | 150.00 | 60.00 | 90.00 | 180.00 | 120.00 | 150.00 | 30.00 | 60.00 | 0.00 | 210.00 | 1,500.00 | |
| BACK RENT | 275.00 | | | | | | 688.10 | 1,277.00 | 118.00 | 180.00 | 793.00 | 2,915.10 | |
| BELLSOUTH PHONE COMMISSION | 0.00 | 0.00 | | | | 195.75 | | | | | 832.00 | | |
| MORTGAGE ESCROW INTEREST | 390.92 | 0.00 | | 285.82 | | | | 186.75 | | 689.86 | | 1,366.60 | |
| TOTAL DEPOSITS | 285,859.19 | 265,209.17 | 265,479.35 | 240,948.42 | 275,420.36 | 225,923.69 | 269,259.16 | 258,349.16 | 247,083.78 | 261,192.92 | 259,320.66 | 256,190.24 | 3,110,627.06 |
| BANK DEPOSITS: | | | | | | | | | | | | | |
| CHKG: | | | | | | | | | | | | | |
| MONEY MARKET: | 285,547.01 | 265,104.37 | 265,738.35 | 240,927.62 | 275,340.36 | 225,773.89 | 269,106.40 | 257,765.76 | 246,609.78 | 260,844.32 | 259,320.66 | 254,527.27 | 3,106,605.79 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| FORFEITED SECURITY DEPOSITS | 0.00 | 0.00 | 0.00 | (20.80) | (80.00) | (149.80) | (152.76) | (583.40) | (474.00) | (348.60) | 0.00 | 0.00 | 0.00 |

JALOS.4SCOP14.67HOT

3AL05.45C/P16.67NOTHARBOR 11N APARTMENTS

PAGE 9

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **MISCELLANEOUS DEPOSITS** 2,002 | | | | | | | | | | | | | |
| **MISCELLANEOUS-INCOME** | | | | | | | | | | | | | |
| POOL/GYM KEY | | | | | | | | | 25.00 | 125.00 | | | 150.00 |
| TRANSFER FEES | 0.00 | | | | | | | | 251.00 | 350.00 | | | 601.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| **TOTAL MISCELLANEOUS-INCOME** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 276.00 | 475.00 | 0.00 | 0.00 | 751.00 |
| **MISCELLANEOUS)J)LIST** | | | | | | | | | | | | | |
| REIMB. FROM VENDORS | 74.11 | | | | | | | 110.86 | | | | | 184.97 |
| FPL REFUND | | | | | | | 1.32 | | | | | | 1.12 |
| 2001 R/E TAX REF/MD | | | | 3,742.05 | | | | | | | | | 3,742.05 |
| COURT COST REIMB | | 294.00 | 147.00 | | | | 319.00 | | | | | | 760.00 |
| BANK ERROR RETURN | | | | 0.00 | | | | | | | | 0.00 | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| **TOTAL MISCELLANEOUS REIMBURSEMENT** | 74.11 | 294.00 | 147.00 | 3,742.05 | 0.00 | 0.00 | 320.32 | 110.86 | 0.00 | 0.00 | 0.00 | 0.00 | 4,688.34 |
| **TOTAL MISCELLANEOUS** | 74.11 | 294.00 | 147.00 | 3,742.05 | 0.00 | 0.00 | 320.32 | 110.86 | 276.00 | 475.00 | 0.00 | 0.00 | 5,439.34 |

3AL05.45C0P16.67NOT

3AL05 4SCOP1.6 6?HOTBABOR IN N APARTMENTS

DISBURSEMENT RECAP - 2002

PAGE 10

| OPERATING EXPENSES | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EMPLOYEE LEASING/PAYROLL | 20,623.32 | 20,566.02 | 19,767.33 | 19,242.64 | 20,043.32 | 20,921.45 | 20,653.92 | 22,263.24 | 21,331.94 | 20,955.49 | 22,023.73 | 20,806.47 | 249,198.87 |
| HOSPITALIZATION INS. | 641.69 | 641.69 | 1,017.58 | 21.90 | 1,028.53 | 1,028.53 | 1,028.53 | 1,028.53 | 1,028.53 | 1,017.58 | 1,409.62 | 1,246.45 | 11,139.16 |
| AUTO EXPENSES | 74.31 | 2,047.45 | 124.54 | 109.82 | 87.33 | 120.17 | 167.77 | 86.12 | 93.13 | 111.72 | 112.88 | 86.05 | 1,173.61 |
| ELECTRIC APT VACANT | 1,998.39 | 1,711.18 | 1,711.18 | 1,798.47 | 1,717.12 | 1,883.56 | 1,263.92 | 1,900.14 | 1,709.81 | 1,778.82 | 1,742.85 | 1,852.13 | 21,394.44 |
| ELECTRIC HOUSE | 8,406.82 | 8,501.92 | 8,081.51 | 6,531.00 | 6,692.20 | 6,980.88 | 7,040.52 | 6,531.00 | 6,678.09 | 6,581.27 | 6,563.01 | 6,334.01 | 21,114.61 |
| WATER & SEWER | 246.07 | 258.22 | 181.30 | 310.27 | 226.27 | 189.54 | 196.48 | 175.97 | 330.49 | 168.61 | 262.57 | 262.57 | 2,753.49 |
| GAS | 6,233.77 | 6,166.67 | 6,429.15 | 6,235.85 | 6,238.77 | 6,238.83 | 6,237.30 | 6,238.49 | 6,279.01 | 6,161.22 | 6,164.56 | 6,818.66 | 75,042.13 |
| SANITATION | 863.03 | 913.22 | 987.05 | 884.35 | 995.45 | 995.45 | 1,034.07 | 831.60 | 831.60 | 1,199.40 | 878.60 | 947.75 | 11,311.65 |
| TELEPHONE | 12,559.94 | 12,620.06 | 12,609.98 | 12,692.12 | 12,535.43 | 12,772.54 | 12,515.75 | 12,646.45 | 12,650.00 | 12,559.38 | 12,620.77 | 13,053.33 | 151,015.57 |
| MANAGEMENT FEE | 1,623.51 | 1,823.57 | 1,949.52 | 1,667.99 | 1,703.11 | 1,977.97 | 1,878.74 | 1,697.29 | 1,703.93 | 1,670.50 | 2,410.50 | 2,410.50 | 21,857.27 |
| ADVERTISING | 1,572.16 | 1,352.92 | 925.52 | 1,625.48 | 1,349.83 | 1,503.41 | 2,132.77 | 1,033.41 | 1,596.20 | 895.01 | 1,793.18 | 1,573.20 | 17,313.09 |
| OFFICE EXPENSE | 535.00 | | | 395.00 | | | | | 2,852.00 | 595.75 | 236.00 | 2,839.00 | 7,452.75 |
| PROPERTY INSURANCE | | | | | | | | | | | | | 0.00 |
| LICENSES & TAXES | | | | | | | | | | | | | 0.00 |
| REAL ESTATE TAXES: | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 930.00 | 11,160.00 |
| BOND INT & PRE: | 10,357.42 | 9,106.79 | 8,890.71 | 9,708.50 | 9,755.00 | 9,335.96 | 9,896.10 | 9,728.10 | 9,495.16 | 9,591.11 | 8,955.78 | 9,591.62 | 11,160.00 |
| REPAIRS & MAINTENANCE | 6,581.37 | 6,384.80 | 4,572.13 | 7,169.87 | 7,504.47 | 4,618.42 | 9,649.39 | 8,400.33 | 7,039.93 | 5,857.20 | 6,257.57 | 7,311.75 | 82,037.27 |
| REPLACEMENTS | 315.19 | 108.19 | 554.60 | 521.60 | 835.53 | 581.85 | 957.10 | 979.14 | 695.18 | 1,003.76 | 370.67 | 977.86 | 7,700.67 |
| SEC DEPOSIT INT PAID | | | | | | | 100.00 | | | | | | 100.00 |
| MISCELLANEOUS | | | | | | | | | | | | | 0.00 |
| COMPUTER EXPENSE | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 38,400.00 |
| LANDSCAPE MAINTENANCE | | | | | | | | | | | | | 100.00 |
| LIST | | | | | | | | | | | | | |
| LIST | | | | | | | | | | | | | |
| TOTAL OPERATING EXPENSES | 76,755.49 | 74,167.31 | 71,960.30 | 73,827.52 | 74,814.54 | 72,899.56 | 77,002.72 | 77,555.62 | 80,425.23 | 74,676.84 | 75,064.53 | 79,251.66 | 910,457.34 |
| FIRST MORTGAGE: PRINCIPAL | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 81,469.17 | 977,630.04 |
| INTEREST | 35,323.83 | 35,323.83 | 35,323.83 | 35,323.83 | 35,323.83 | 35,323.83 | 35,323.83 | 35,323.83 | 35,323.83 | 35,323.83 | 62,474.98 | 35,323.83 | 451,017.01 |
| ESCROW - RE TAXES | | | | | | | | | | | | | 0.00 |
| SECOND MORTGAGE: PRINCIPAL | | | | | | | | | | | | | 0.00 |
| INTEREST | | | | | | | | | | | | | 0.00 |
| TOTAL DEBT | 116,793.00 | 116,793.00 | 116,793.00 | 116,793.00 | 116,793.00 | 116,793.00 | 116,793.00 | 116,793.00 | 116,793.00 | 116,793.00 | 143,944.05 | 116,793.00 | 1,428,667.05 |
| BANK LOANS: PRINCIPAL | | | | | | | | | | | | | 0.00 |
| INTEREST | | | | | | | | | | | | | 0.00 |
| SECURITY DEPOSIT REFUNDED | 5,102.10 | 1,464.90 | 1,860.00 | 2,898.00 | 1,928.00 | 3,015.20 | 2,001.20 | 6,673.00 | 2,173.00 | 2,872.00 | 2,675.00 | 2,374.58 | 41,176.98 |
| SECURITY DEPOSIT TRANSFER | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| DISTRIBUTIONS TO OWNERS | 120,000.00 | 0.00 | 0.00 | 100,000.00 | 0.00 | 0.00 | 90,000.00 | 0.00 | 0.00 | 50,000.00 | 0.00 | 0.00 | 360,000.00 |
| OTHER EXPENDITURES | 25,983.26 | 21,439.75 | 17,474.87 | 29,693.94 | 46,246.45 | 31,116.23 | 45,821.26 | 56,801.97 | 31,752.25 | 32,536.61 | 28,808.59 | 37,922.04 | 405,395.22 |
| N S F CHECKS | 4,125.00 | 4,100.00 | 1,643.00 | 2,171.00 | 4,679.00 | 3,381.00 | 4,073.00 | 3,282.00 | 745.50 | 3,386.00 | 4,455.00 | 5,839.00 | 42,279.50 |
| TOTAL EXPENDITURES | 348,755.85 | 220,304.98 | 211,731.17 | 325,581.46 | 246,460.99 | 227,183.99 | 337,571.18 | 261,105.59 | 231,888.98 | 280,264.45 | 254,947.17 | 242,180.28 | 3,187,976.09 |

3AL05 4SCOP1.6 6?HOT

3AL05 4SCOP16.6?HOTHARBOR I 8U APARTMENTS

PAGE 11

## DISTRIBUTION TO PARTNERS
## 2002

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GENERAL PARTNERS: | | | | | | | | | | | | | |
| M.L. PROPERTY MANAGEMENT | 1,200.00 | | | 1,000.00 | | | 900.00 | | | 500.00 | | | 3,600.00 |
| | | | | | | | | | | | | | 0.00 |
| TOTAL GENERAL PARTNERS | 1,200.00 | 0.00 | 0.00 | 1,000.00 | 0.00 | | 900.00 | 0.00 | 0.00 | 500.00 | 0.00 | 0.00 | 3,600.00 |
| LIMITED PARTNERS: | | | | | | | | | | | | | |
| PAUL MARCUS | 47,520.00 | | | 39,600.00 | | | 35,640.00 | | | 19,800.00 | | | 142,560.00 |
| DANI SIEGEL | 23,760.00 | | | 19,800.00 | | | 17,820.00 | | | 9,900.00 | | | 71,280.00 |
| ADRIAN VAN ZON | 11,880.00 | | | 9,900.00 | | | 8,910.00 | | | 4,950.00 | | | 35,640.00 |
| GLEN PARKER | 5,940.00 | | | 4,950.00 | | | 4,455.00 | | | 2,475.00 | | | 17,820.00 |
| NORMAN FOSBACK | 5,940.00 | | | 4,950.00 | | | 4,455.00 | | | 2,475.00 | | | 17,820.00 |
| MURRAY LIEBOWIT... | 5,940.00 | | | 4,950.00 | | | 4,455.00 | | | 2,475.00 | | | 17,820.00 |
| SHELDON LIEBOWITZ | 5,940.00 | | | 4,950.00 | | | 4,455.00 | | | 2,475.00 | | | 17,820.00 |
| JOAN & JEROME WIFFMAN | 5,940.00 | | | 4,950.00 | | | 4,455.00 | | | 2,475.00 | | | 17,820.00 |
| DEAN MARCUS | 5,940.00 | | | 4,950.00 | | | 4,455.00 | | | 2,475.00 | | | 17,820.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| TOTAL LIMITED PARTNERS | 118,800.00 | 0.00 | 0.00 | 99,000.00 | 0.00 | | 89,100.00 | 0.00 | 0.00 | 49,500.00 | 0.00 | 0.00 | 356,400.00 |
| TOTAL | 120,000.00 | 0.00 | 0.00 | 100,000.00 | 0.00 | | 90,000.00 | 0.00 | 0.00 | 50,000.00 | 0.00 | 0.00 | 360,000.00 |

3AL05 4SCOP16.6?HOT

JALO5,4SCOP16,67HOTHARBOR 10M APARTMENTS

PAGE 12

## OTHER EXPENDITURES-DETAIL 2002

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **EXTRAORDINARY ITEMS** | | | | | | | | | | | | | |
| W/O-EVICT | 312.12 | 104.80 | 259.00 | 20.80 | 80.00 | 149.80 | 152.76 | 583.40 | 474.00 | 348.60 | 0.00 | 705.30 | 3,190.58 |
| CREDIT CHECKS | 290.00 | 509.00 | 355.50 | 343.50 | 446.00 | 576.00 | 201.00 | 379.50 | 472.50 | 171.50 | 292.00 | 488.00 | 4,524.50 |
| COURT COSTS | | | 0.00 | | | | | 140.00 | 0.00 | | 147.00 | 147.00 | 434.00 |
| WEINBERG ( YEAR END ACCT) | | | | 734.47 | 2,000.00 | | | | | 1,504.27 | | 262.50 | 5,162.50 |
| LANDSCAPE | 4,026.99 | 2,369.20 | 2,750.00 | 1,082.27 | 542.72 | 609.24 | 13.25 | 694.51 | 700.00 | | 288.78 | 465.00 | 12,310.70 |
| LEASING FEE (R/E COMMISSIO) | 1,500.00 | 600.00 | 400.00 | 700.00 | 700.00 | | 1,100.00 | 1,200.00 | 700.00 | | 1,300.00 | 2,400.00 | 10,600.00 |
| LEASING FEE (TENANTS REFER) | | 0.00 | 0.00 | | | | | | | | | | 0.00 |
| MISCELLANEOUS | 1,285.00 | | | 2,439.31 | 1,050.48 | | 2,020.24 | 2,485.59 | | | | | 9,280.69 |
| MISCELLANEOUS EXTERIOR | 931.00 | | | 884.14 | | | 780.00 | 837.72 | | 375.03 | | | 3,807.89 |
| MISCELLANEOUS INTERIOR | | 550.00 | | | | | | 4,924.55 | 100.00 | 120.00 | | | 2,153.95 |
| BUILDING | | 479.60 | | | | | | 479.60 | 529.60 | 1,048.40 | | 5,827.04 | 4,113.95 |
| COMPUTER SUPPORT | 880.67 | | | | 250.00 | | | | | | 400.00 | | |
| PROPERTY INS | | | | | 859.60 | | | | | | | | |
| GYM EQUIPMENT | | | | | 22,594.50 | 10,358.89 | | | | | | | 160,770.48 |
| TAX APPEAL | | | | | | | | | | | | | 0.00 |
| LEGAL FEE INVESTOR | 1,452.50 | 1,536.74 | 1,152.50 | | 1,234.88 | | | | | 10,358.89 | 10,358.89 | 10,857.74 | 160,770.48 |
| PROPERTY LIGHTING | | | 2,352.66 | | 235.28 | | | 1,024.07 | 191.25 | | | | 2,605.00 |
| MARKETING | 488.00 | 1,096.89 | 910.52 | 643.51 | 717.28 | 376.41 | 40.53 | 696.54 | 707.60 | 128.82 | 1,128.18 | 1,142.41 | 8,076.77 |
| INSURANCE CONSULTING | 635.00 | 635.00 | 635.00 | | | | | | | | | | 3,612.91 |
| COURTESY OFFICER | 264.43 | | | 128.65 | 28.28 | 47.65 | | 28.28 | | | | | 497.29 |
| PREPAID LEGAL FEES | | | 1,244.00 | | (1,240.00) | | | | | | | | |
| REFRIGERATORS | 1,759.96 | 1,104.70 | 1,072.70 | 1,331.22 | 805.46 | 1,186.98 | 1,683.46 | 615.94 | 418.74 | 866.00 | 2,652.00 | 948.00 | 14,445.26 |
| WASHERS & DRYERS | 2,699.76 | 2,675.48 | 1,526.16 | 2,055.16 | 4,174.12 | 597.92 | 2,001.28 | 2,700.33 | 2,700.31 | 1,543.85 | 1,798.00 | 1,440.42 | 24,996.34 |
| STOVES | 540.00 | | | | | | | | | | | 491.54 | 1,031.54 |
| MICROWAVES | 766.68 | 359.34 | 718.68 | 522.40 | 718.68 | 733.68 | 1,338.02 | 244.90 | 752.68 | 256.74 | 702.40 | 702.40 | 6,146.98 |
| DISHWASHERS | 420.00 | 1,028.00 | 770.60 | | 714.70 | 489.80 | 971.10 | | 979.60 | 735.00 | 689.80 | 689.80 | 7,585.90 |
| POOL HEATER | | | | | | | | | | | | 1,287.88 | 1,287.88 |
| ROOFING REPAIR | 300.00 | | 1,287.88 | 3,925.00 | | | | 2,645.27 | | 3,761.12 | | | 10,795.00 |
| CERAMIC TILES | | 1,450.50 | 795.00 | 1,370.61 | 600.00 | | | 3,000.00 | | | 2,175.00 | 1,170.72 | 16,247.29 |
| FENCE | 1,841.07 | 1,147.50 | 1,147.50 | 1,147.50 | | | | | | | | | 2,895.00 |
| CABINETS & COUNTER TOPS | 4,697.00 | 2,795.00 | 2,260.00 | 2,282.00 | 3,210.00 | 2,360.00 | 1,240.00 | 3,800.00 | 600.00 | 2,240.00 | 1,453.00 | | 24,032.00 |
| **TOTAL EXTRAORDINARY** | 25,090.26 | 21,439.75 | 17,474.47 | 29,691.94 | 39,718.00 | 25,486.37 | 29,700.53 | 43,917.30 | 29,021.25 | 31,048.85 | 28,808.59 | 37,922.04 | 160,379.75 |
| **FIX UP EXPENDITURES** | | | | | | | | | | | | | |
| ROOF SECURING | | | | | 6,468.45 | 5,629.86 | | | | | | | 27,267.29 |
| TENNIS CT -REPAIRS/PAINT | | | | | | | 12,200.22 | 1,699.08 | 1,265.68 | | | | 3,920.51 |
| PAINTING SIGNS & DOORS | | | | | | | 3,920.51 | 5,259.59 | | | | | 5,259.59 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| M L MGMNT FEE 21% | 693.00 | | | | | | | 5,936.00 | 1,461.32 | 487.76 | | | 8,568.08 |
| **TOTAL FIX UP EXPENDITURES** | 693.00 | 0.00 | 0.00 | 0.00 | 6,468.45 | 5,629.86 | 16,120.73 | 12,804.67 | 2,731.00 | 487.76 | 0.00 | 0.00 | 45,015.47 |
| **TOTAL OTHER EXPENDITURES** | 25,783.26 | 21,439.75 | 17,474.47 | 29,691.94 | 46,246.45 | 31,116.23 | 45,821.26 | 56,801.97 | 31,752.25 | 37,922.04 | 28,808.59 | 37,922.04 | 405,395.22 |

JALOS 4SCOP16.67HOT HARBOR INN APARTMENTS

PAGE 13

**ACCRUAL SCHEDULE 2002**

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING EXPENSES** | | | | | | | | | | | | | |
| PAYROLL | | | | | | | | | | | | | 0.00 |
| P/R TAXES W/H | | | | | | | | | | | | | 0.00 |
| PAYROLL TAXES | | | | | | | | | | | | | 0.00 |
| HOSPITALIZATION INS. | | | | | | | | | | | | | 0.00 |
| AUTO EXPENSES | | | | | | | | | | | | | 0.00 |
| ELECTRIC | | | | | | | | | | | | | 0.00 |
| WATER & SEWER | | | | | | | | | | | | | 0.00 |
| GAS | | | | | | | | | | | | | 0.00 |
| SANITATION | | | | | | | | | | | | 0.00 | 0.00 |
| TELEPHONE | | | | | | | | | | | | 0.00 | 0.00 |
| MANAGEMENT FEE | | | | | | | | | | | | 0.00 | 0.00 |
| ADVERTISING | | | | | | | | | | | | | 0.00 |
| OFFICE EXPENSE | | | | | | | | | | | | | 0.00 |
| PROPERTY INSURANCE | | | | | | | | | | | | | 0.00 |
| 145,321.10 P/F REAL ESTATE TAXES | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 47,347.15 | 47,347.15 | 382,461.90 |
| 382,461.90 COURT COST | | | | | | | | | | | | | 0.00 |
| LICENSES & TAXES | | | | | | | | | | | | | 0.00 |
| PROFESSIONAL FEES | | | | | | | | | | | | | 0.00 |
| REPAIRS & MAINTENANCE | | | | | | | | | | | | | 0.00 |
| REPLACEMENTS | | | | | | | | | | | | | 0.00 |
| XMAS PARTY & BONUSES | | | | | | | | | | | | | 0.00 |
| CONTRACT LABOR | | | | | | | | | | | | | 0.00 |
| MISCELLANEOUS | | | | | | | | | | | | 0.00 | 0.00 |
| **TOTAL ACCRUAL** | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 28,776.76 | 47,347.15 | 47,347.15 | 382,461.90 |
| **PREPAID EXPENSES** | | | | | | | | | | | | | |
| 12,076.20 INSURANCE-FLOOD 01/24/2002-01/21/2003 | 1,006.33 | 1,006.33 | 1,006.33 | 1,006.33 | 1,006.33 | 1,006.33 | 1,006.33 | 1,006.33 | 1,006.33 | 1,006.33 | 1,006.33 | 1,006.33 | 12,075.96 |
| 498.85 EMPLOYEE PRACT-PRIME 12/01/02-11/30/2003 | 27.55 | 27.55 | 27.55 | 27.55 | 27.55 | 27.55 | 27.55 | 27.55 | 27.55 | 27.55 | 27.55 | 41.57 | 344.62 |
| 1,562.29 E & O Insurance 12/01/02-11/30/2003 | | | | | | | | | | 130.19 | 130.19 | 130.19 | 390.57 |
| 184,224.76 INSURANCE-APT PKG 05/01/02-05/31/03 | 7,152.67 | 7,152.67 | 7,152.67 | 5,722.99 | 15,352.06 | 15,352.06 | 15,352.06 | 15,352.60 | 15,352.60 | 15,352.60 | 15,352.60 | 15,352.60 | 150,000.18 |
| **TOTAL PREPAID EXPENSES** | 8,186.55 | 8,186.55 | 8,186.55 | 6,756.87 | 16,385.94 | 16,385.94 | 16,385.94 | 16,386.48 | 16,386.48 | 16,516.67 | 16,516.67 | 16,530.69 | 162,811.33 |

**M.S.L. Property Management, Inc.**
2600 E. Commercial Blvd.#200
Fort Lauderdale, FL 33308
(954)491-4511
(954)491-4504 Fax

TO:    The Partners

FROM:  Murray and Sheldon Liebowitz

DATE:  January 22nd, 2003

RE:    Harbor Inn Fourth Quarter and Year End Cash Flow Report

Enclosed please find your copy of the Year End Cash Flow Report. There is no check due to the lawsuit filed by Paul Marcus.

We have completed a very successful year. Occupancy has averaged approximately 96.5%, income is $79,000 above budget, expense is $100,000 higher mainly due to the increased cost of insurance and higher real estate taxes. (see page 6) We have filed an appeal for a real estate tax reduction and hope for a refund. Insurance continues to be a major problem. During the year we have continued to search for alternatives with different brokers and as of now, we have been unsuccessful.  We continue the search and have a glimmer of hope based upon recent conversation.

We have retained an attorney in New Jersey who will file an answer to the complaint.

Sheldon and I wish all of you a healthy and happy new year.


ENC: Cash Flow Report


Harbor Inn/4th quarter2002


ATTACHMENT / EXHIBIT ___4___

3AL05.45COP16.67BOM S.L.  PROPERTY MANAGEMENT CO. INC

PARK PLAZA ASSOCIATES

ENTITY NAME: PARK PLAZA ASSOC
TODAYS DATE: 01/18/2001
PREPARED BY:       EP
MONTH #:    12

| DESCRIPTION | PAGE NUMBER | PRESS ALT-A TO GO TO BEGINNING CELL NUMBER | PRINT COMMAND |
|---|---|---|---|
| MONTHLY COMPARISON OF CHANGE IN FUNDS | 1 | 13 | ALT-M |
| STATEMENT OF CASH DISBURSEMENTS AND CASH RECEIPTS | 2 | 1 | ALT-A |
| SCHEDULE OF FUNDS AVAILABLE | 3 | 2 | ALT-B |
| SCHEDULE OF ADDITIONAL INCOME | 4 | 3 | ALT-C |
| SCHEDULE OF OPERATING EXPENDITURES | 5 | 4 | ALT-D |
| ANALYSIS OF ACTUAL OPERATING CASH FLOW TO BUDGET | 6 | 5 | ALT-E |
| MONTHLY COMPARISON OF ACTUAL OPERATION CASH FLOW | 6A | 5A | ALT-H |
| FIX UP BUDGET TO ACTUAL | 7 | 6 | ALT-F |
| DEPOSIT RECAP | 8 | 7 | ALT-G |
| MISCELLANEOUS DEPOSITS | 9 | 8 | ALT-H |
| DISBURSMENT RECAP | 10 | 9 | ALT-I |
| DISTRIBUTION TO PARTNERS | 11 | 10 | ALT-J |
| OTHER EXPENDITURES-DETAIL | 12 | 11 | ALT-K |
| ACTUAL SCHEDULE | 13 | 12 | ALT-L |
| ALL PAGES | ALL | | ALT-Z |

3AL05.45COP16.67BOT

JALOS, ASCOP16, 6THOTH.S.L. PROPERTY MANAGEMENT CO. INC

PARK PLAZA ASSOCIATES

PAGE 1

## MONTHLY COMPARISON OF CHANGE IN FUNDS 2002

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FUNDS AVAILABLE BEGINNING OF MONTH | 292,240.33 | 194,043.68 | 218,613.51 | 247,861.61 | 567,597.51 | 611,664.26 | 647,368.48 | 480,186.68 | 377,069.44 | 349,678.93 | 262,781.86 | 285,730.82 | 292,240.33 |
| INCREASE, (DECREASE) IN FUNDS | (98,196.65) | 24,569.83 | 29,248.10 | 319,735.90 | 44,066.75 | 35,704.22 | (167,181.80) | (130,507.75) | (114,287.58) | (86,896.94) | 18,937.53 | 18,937.52 | 12,428.01 |
| FUNDS AVAILABLE END OF MONTH | 194,043.68 | 218,613.51 | 247,861.61 | 567,597.51 | 611,664.26 | 647,368.48 | 480,186.68 | 377,069.44 | 349,678.93 | 262,781.86 | 285,730.82 | 304,668.34 | 4,547,265.33 |
| **OTHER INCOME:** | | | | | | | | | | | | | |
| R/E TAX REFUND | | | | | | | | 7,440.70 | | | | | 7,440.70 |
| COURT COSTS REIMB | 967.00 | 843.00 | 673.00 | 1,018.63 | 490.20 | 446.90 | 758.00 | 378.25 | 585.00 | 568.20 | 573.88 | 418.39 | 7,720.45 |
| VENDOR REFUND | | | 75.58 | 1,394.35 | 254.34 | 88.63 | | | | | | | 2,355.70 |
| NET LOAN PROCEEDS | | | | 2,908,843.79 | | | | | | | | | 2,908,843.79 |
| PRIOR PERIOD LOAN COSTS | | | | 24,514.40 | | | | | | | | | 24,514.40 |
| NET CASH FLOW FOR THE MONTH | 66,001.12 | 62,573.57 | 59,822.40 | 67,869.98 | 55,346.80 | 45,158.91 | 43,201.59 | 43,946.46 | 37,611.37 | 33,026.55 | 32,550.77 | | 593,138.97 |
| ADJUSTED MONTHLY CASH FLOW | 66,968.12 | 63,416.57 | 60,570.98 | 3,004,181.15 | 56,091.34 | 45,694.44 | 43,959.59 | 51,765.41 | 38,196.37 | 46,537.65 | 33,600.03 | 32,969.18 | 3,544,011.21 |
| W/O-EVICT | 454.55 | 2,344.42 | 250.00 | 2,171.61 | 971.20 | 2,075.05 | 1,979.24 | 2,727.72 | 1,551.70 | 953.17 | 2,412.37 | 630.39 | 18,444.96 |
| CREDIT CHECKS | 143.50 | 197.00 | 344.50 | 163.00 | 313.00 | 182.50 | 218.50 | 272.50 | 339.00 | 385.00 | 274.50 | 294.50 | 3,127.00 |
| COURT COSTS | 2,440.00 | 2,250.00 | 2,010.00 | 1,760.00 | 1,144.00 | 1,737.00 | 1,969.00 | 613.00 | 660.00 | 385.00 | 274.50 | 1,810.00 | 18,052.50 |
| LEASING FEES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 450.00 | 500.00 | 500.00 | 500.00 | 0.00 | 0.00 | 2,450.00 |
| COMPUTER SUPPORT | 779.43 | 865.52 | 389.96 | 389.96 | 389.96 | 389.96 | 389.96 | 389.96 | 389.96 | 0.00 | 0.00 | 0.00 | 4,374.67 |
| YEAR END ACCOUNTING | 0.00 | 0.00 | 0.00 | 2,750.00 | 2,000.00 | 0.00 | 0.00 | 0.00 | 350.00 | 500.00 | 0.00 | 262.50 | 5,362.50 |
| PAYROLL BONUS | 0.00 | 160.00 | 0.00 | 0.00 | 500.00 | 0.00 | 0.00 | 100.00 | 100.00 | 0.00 | 0.00 | 4,481.04 | 8,355.71 |
| MARKETING | 1,320.80 | 772.00 | 0.00 | 0.00 | 891.53 | 0.00 | 2,514.67 | 746.54 | 0.00 | 0.00 | 0.00 | 620.00 | 9,667.78 |
| PAYROLL | 1,206.15 | 745.09 | 550.00 | 496.57 | 591.53 | 435.00 | 908.27 | | 600.00 | 612.50 | 1,053.13 | 4,101.04 | 4,101.18 |
| LANDSCAPE | 1,422.89 | 727.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 600.00 | 0.00 | 1,321.44 | 1,321.44 | 5,340.00 |
| COURTESY OFFICER | 1,951.13 | 1,723.79 | 1,704.91 | 1,798.06 | 2,684.58 | 2,088.74 | 2,052.49 | 1,013.80 | 568.55 | 2,052.49 | 2,052.49 | 2,137.82 | 21,908.85 |
| EXCESS INSURANCE | 2,409.53 | 2,409.53 | 2,409.57 | 3,093.97 | 3,093.97 | 3,093.97 | 3,093.97 | 3,093.97 | 3,093.97 | 3,093.97 | 3,093.97 | 3,093.97 | 31,960.93 |
| LEGAL FEES TENANT EVICT | 0.00 | 0.00 | 1,650.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 230.00 | 0.00 | 0.00 | 0.00 | 1,292.00 |
| LEGAL FEES MARCUS | 0.00 | 1,992.00 | 140.75 | 0.00 | 135.25 | 0.00 | 0.00 | 401.00 | 131.25 | 0.00 | 0.00 | 0.00 | 568.25 |
| LEGAL FEES TAX APPEAL | | | | | | | | | | | | | 401.00 |
| UTILITY DEPOSIT ADJ | | | | | | | | | | | | | |
| CAPITAL IMPROVEMENT | 1,027.88 | 3,616.86 | 1,192.04 | 551,024.97 | | | | | | | | | 558,863.75 |
| MISC INTERIOR REPAIR | 2,239.49 | 0.00 | | | | | | | | | | 2,989.49 | 2,989.49 |
| EXTRAORDINARY R & M | 4,353.05 | 3,431.67 | 4,237.30 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,288.10 | 1,288.10 | 12,024.22 | 12,024.22 |
| COMPUTER SOFT WARE | 470.00 | 470.00 | 470.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,410.00 | 1,410.00 |
| MORTGAGE COSTS | 24,250.00 | 0.00 | 264.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 24,514.40 | 24,514.40 |
| INSURANCE CONSULTING | | | | | | | | | 2,455.43 | | | 2,455.43 | 2,455.43 |
| FIX UP | 2,188.74 | 16,535.06 | 11,144.17 | 21,360.03 | | | | | | | | 55,112.00 | 55,112.00 |
| TOTAL EXTRAORDINARY EXPENSES | 45,164.76 | 38,846.74 | 31,322.88 | 596,445.32 | 12,024.59 | 9,990.22 | 11,140.39 | 12,273.16 | 10,805.86 | 10,805.86 | 10,651.46 | 14,031.64 | 793,503.25 |
| PARTNERS DISTRIBUTIONS REFINANCE | 120,000.00 | 0.00 | 0.00 | 2,000,000.00 | 0.00 | 0.00 | 0.00 | 170,000.00 | 0.00 | 150,000.00 | 0.00 | 0.00 | 2,170,000.00 |
| PARTNERS DISTRIBUTIONS OPERATING | 0.00 | 0.00 | 0.00 | 100,000.00 | 0.00 | 0.00 | 200,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 570,000.00 |
| TOTAL | 165,164.76 | 38,846.74 | 31,322.88 | 2,696,445.25 | 12,024.59 | 9,990.22 | 211,140.39 | 182,273.16 | 10,805.86 | 160,805.86 | 10,651.46 | 14,031.64 | 3,531,503.18 |
| INCREASE, (DECREASE) IN FUNDS | (98,196.64) | 24,569.83 | 29,248.10 | 319,735.90 | 44,066.75 | 35,704.22 | (167,181.80) | (130,507.75) | 27,390.51 | (114,287.58) | 22,948.97 | 18,937.52 | 12,428.02 |

PARK PLAZA ASSOCIATES

STATEMENT OF CASH DISBURSEMENTS AND CASH RECEIPTS
2002

PAGE 2

JALOS.45COP16.67HOTH.S.L. PROPERTY MANAGEMENT CO. INC

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RECEIPTS FROM OPERATIONS: | | | | | | | | | | | | | |
| MARKET RENT ROLL | 200,268.00 | 200,268.00 | 200,268.00 | 200,268.00 | 200,268.00 | 200,268.00 | 200,268.00 | 200,268.00 | 200,268.00 | 200,268.00 | 200,268.00 | 200,268.00 | 2,403,216.00 |
| CURRENT RENT ROLL | 194,543.00 | 194,688.00 | 195,050.25 | 195,111.00 | 197,594.00 | 197,477.60 | 198,252.77 | 198,934.20 | 199,058.00 | 199,705.40 | 199,898.00 | 200,268.00 | 2,370,671.06 |
| LESS | | | | | | | | | | | | | |
| VACANCY | (4,956.85) | (5,108.13) | (6,966.55) | (6,293.26) | (4,596.33) | (6,418.87) | (7,331.50) | (4,903.18) | (5,939.50) | (4,622.79) | (79,388.77) | | |
| SERVICE APARTMENTS | (1,357.40) | (1,357.40) | (11,003.00) | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (16,280.80) | | |
| RENT UP ALLOWANCE | (364.50) | (364.50) | (1,357.40) | (404.50) | (404.50) | (404.50) | (404.50) | (689.00) | (414.50) | (714.50) | (544.50) | (5,738.50) | |
| GROSS COLLECTABLE RENTS | 187,864.25 | 187,857.97 | 187,682.55 | 187,102.55 | 189,534.84 | 191,519.37 | 188,072.00 | 187,247.13 | 192,482.92 | 191,694.00 | 191,353.33 | 2,269,453.99 | |
| PLUS ADJUSTMENTS: | | | | | | | | | | | | | |
| LAST MONTH'S RENT APPL ED | (769.00) | (2,926.79) | (2,279.20) | (3,322.03) | (3,356.80) | 14,300.50 | (3,980.00) | (3,900.00) | (4,141.60) | (4,173.00) | (1,994.80) | (36,641.80) | |
| RETURNED CHECKS-NET | 2,107.06 | 2,396.90 | (2,658.00) | (1,021.40) | 11,064.53 | 15,380.00 | 12,300.00 | (846.90) | (5,799.95) | (2,009.57) | | | |
| ACCRUAL ADJUSTMENT | 7,257.44 | 6,939.73 | 2,700.20 | 6,620.23 | 7,468.04 | 9,608.23 | (13,766.90) | 5,800.22 | 7,700.67 | 2,428.19 | (2,309.57) | 365.38 | |
| ADDITIONAL INCOME | | | 7,717.91 | | | 11,228.08 | 11,677.09 | 9,801.37 | 9,508.67 | 9,804.83 | 7,238.87 | 103,134.29 | |
| GROSS OPERATING COLLECTIONS | 196,459.75 | 194,047.81 | 191,224.26 | 190,313.78 | 193,018.68 | 191,519.37 | 180,245.18 | 198,868.72 | 192,951.04 | 203,754.02 | 197,057.72 | 2,169,453.99 | |
| OTHER RECEIPTS: | | | | | | | | | | | | | |
| CONTRIBUTIONS FROM OWNER | | | | | | | | | | | 0.00 | |
| BANK BORROWING | | | | | | | | | | | 0.00 | |
| MISCELLANEOUS-REIMBURSEMENT ITEMS | 2,212.14 | 1,410.75 | 748.58 | 20,090.54 | 1,933.81 | 665.55 | 750.00 | 177,818.95 | 4,739.99 | 519.80 | 766.19 | 8,720.57? | |
| SECURITY DEPOSITS RECEIVED-NET | 3,028.00 | 7,637.79 | 3,374.00 | | 6,048.50 | (1,813.00) | 11,677.09 | 4,669.00 | 623.60 | 2,206.00 | 2,818.68 | 48,584.78 | |
| TOTAL RECEIPTS | 201,699.89 | 203,096.35 | 198,436.04 | 8,696,539.76 | 215,957.03 | 214,085.66 | 179,190.18 | 388,364.67 | 203,509.26 | 204,533.90 | 209,642.99 | 11,105,560.57 | |
| EXPENDITURES: | | | | | | | | | | | | | |
| OPERATING EXPENSES | 73,900.73 | 76,704.29 | 75,761.02 | 72,224.70 | 77,060.39 | 76,051.65 | 76,831.45 | 73,725.00 | 80,238.76 | 76,427.55 | 78,521.88 | 78,584.76 | 916,122.18 |
| FIRST MORTGAGE: PRINCIPAL | 0.00 | 0.00 | 0.00 | 5,310,200.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,310,000.00 |
| INTEREST | 31,090.42 | 31,090.42 | 31,090.42 | 37,390.42 | 0.00 | 50,858.33 | 50,858.33 | 50,858.33 | 50,858.33 | 50,858.33 | 50,858.33 | 50,858.33 | 481,367.99 |
| ESCROW | 23,835.28 | 23,835.28 | 23,835.28 | 130,413.60 | 0.00 | 29,475.08 | 29,475.08 | 29,475.08 | | | | 29,475.08 | 125,558.75 |
| SECOND MORTGAGE: PRINCIPAL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| INTEREST | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,737.13 | 5,737.13 | |
| THIRD MORTGAGE/BANK LOAN | | | | | | | | | | | | | |
| PRINCIPAL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| INTEREST | 2,368.74 | 16,539.06 | 13,144.17 | 16,414.59 | 15,775.66 | 6,665.76 | 1,494.11 | 853.88 | 713.12 | 1,670.52 | 3,085.46 | 83,428.90 | |
| FIX UP EXPENDITURES | 40,954.24 | 21,788.00 | 15,769.14 | 494,124.20 | 43,194.90 | 22,282.84 | 45,707.54 | 27,116.81 | 41,156.75 | 51,000.00 | 29,459.77 | 870,120.49 | |
| EXTRAORDINARY EXPENDITURES | | | | | | | | | | | | | |
| DISTRIBUTION TO OWNER | 120,000.00 | | 2,100,200.00 | | | 200,000.00 | 170,000.00 | 150,000.00 | | | | 2,740,000.00 | |
| TOTAL EXPENDITURES | 294,149.41 | 172,037.09 | 161,600.01 | 531,797.81 | 136,669.88 | 194,443.76 | 409,528.16 | 352,769.33 | 169,236.23 | 319,160.75 | 187,788.72 | 191,664.00 | 10,793,600.21 |
| INCREASE (DECREASE) IN CASH BALANCE | (92,449.52) | 31,059.26 | 36,836.01 | 8,164,559.95 | 19,187.15 | 19,641.90 | (230,337.98) | 35,595.34 | 34,293.03 | (119,460.92) | 16,745.18 | 8,978.99 | 352,060.26 |
| CASH BALANCE | | | | | | | | | | | | | |
| LANDMARK | 23,581.77 | 19,650.59 | 22,096.96 | 150,313.00 | 550,452.53 | 551,454.14 | 552,612.11 | 551,680.43 | 554,624.35 | 555,614.15 | 506,445.91 | 506,445.91 | |
| CITY NATIONAL-CDBG | 198,278.97 | 233,269.41 | 14,467.40 | 16,426.53 | 6,370.43 | 7,939.66 | 633.14 | 21,844.34 | 11,364.49 | 3,257.62 | 507,331.62 | 4,314.49 | |
| CITY NATIONAL-M/M | 221,860.74 | 253,920.00 | 267,659.05 | 657,195.42 | 333,643.75 | 162,739.00 | 128,695.12 | 181,637.47 | 73,675.61 | 147,672.07 | 184,703.05 | | |
| TOTAL CASH ON HAND | | | 269,756.01 | 421,735.42 | 900,042.97 | 920,564.17 | 690,236.89 | 725,822.23 | 760,115.26 | 640,654.35 | 657,399.53 | 666,378.52 | |
| CASH BALANCE | 221,860.74 | 253,920.00 | | | | | | | | | | 10,793,600.21 | 352,060.26 |

JALO5, ASCOP16.6THCTH.S.L   PROPERTY MANAGEMENT CO. INC

PAX PLAZA ASSOCIATES

SCHEDULE OF FUNDS AVAILABLE
2002

PAGE 3

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **FUNDS AVAILABLE** | | | | | | | | | | | | |
| CASH ON HAND | 221,860.74 | 252,920.00 | 289,756.01 | 821,735.02 | 900,922.97 | 920,564.87 | 690,226.89 | 725,822.23 | 760,115.26 | 640,654.35 | 657,299.53 | 666,378.52 |
| **ADJUSTMENTS:ADD:** | | | | | | | | | | | | |
| ESCROM TAX | 62,760.96 | 79,291.06 | 95,821.16 | 198,963.02 | 115,710.52 | 132,230.62 | 148,790.74 | 165,330.85 | 165,330.85 | 165,330.85 | 165,330.85 | 16,540.11 |
| ESCROM INSURANCE | 27,736.07 | 35,041.25 | 42,346.43 | 69,613.97 | 12,004.88 | 24,949.96 | 37,894.84 | 48,134.81 | 48,134.81 | 48,134.81 | 48,134.81 | 12,934.97 |
| PREPAID INSURANCE | 19,770.35 | 15,760.92 | 10,311.60 | 8,470.98 | 139,057.92 | 127,059.31 | 115,060.70 | 105,755.09 | 97,452.06 | 91,452.03 | 74,621.57 | 66,920.25 |
| PREPAID INTEREST | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| RECEIVABLES-OTHER | 967.74 | 599.99 | 599.99 | 26,480.98 | 449.99 | 299.99 | 149.99 | 149.99 | 500.00 | 350.00 | 1,608.90 | 0.00 |
| PREPAID RENTS | 10,097.07 | 9,640.92 | 8,962.82 | 20,359.70 | 6,897.45 | 8,476.39 | 7,509.10 | 149.99 | 8,945.34 | 2,756.24 | 2,592.84 | 12,375.93 |
| UTILITY DEPOSITS | 17,121.00 | 17,121.00 | 17,121.00 | 17,121.00 | 17,121.00 | 17,121.00 | 17,121.00 | 25,945.00 | 25,945.00 | 19,645.00 | 14,705.62 | 14,705.62 |
| ARBOR INSURANCE RES | 0.00 | 0.00 | 0.00 | 170,200.00 | 170,000.00 | 170,000.00 | 29,940.00 | 29,940.00 | 19,645.00 | 19,645.00 | 19,645.00 | 19,645.00 |
| PREPAID RENTS | (8,813.17) | (8,221.97) | (10,609.29) | (8,221.97) | (5,265.32) | (5,990.24) | (5,295.02) | (7,624.56) | (7,624.56) | (7,624.56) | (9,934.11) | (9,934.11) |
| SECURITY DEPOSITS | (147,492.03)/(152,201.03) | (156,437.01) | (156,437.01) | (156,770.90) | (155,256.00) | (157,004.00)/(149,203.00) | (156,998.00) | (159,207.00)/(155,869.00) | (159,207.00)/(155,902.00) | (155,902.00) | (156,724.00) | 5,364.09 |
| ACCRUALS R/E TAX | (14,536.10) | (33,041.25) | (42,651.47)/(49,590.30) | (42,650.50) | (72,650.50) | (99,180.60)/(115,710.70) | (132,240.80) | (156,770.90)/(185,301.00) | (156,770.90)/(185,301.00) | (185,301.00) | | |
| FIX UP RESERVE | 4,819.10 | 2,409.57 | 0.00 | 0.00 | 8,204.01 | 9,334.13 | 15,090.29 | 16,031.90 | 12,937.93 | 9,403.96 | 15,409.87 | |
| ACCRUALS EXCESS INS | 0.00 | 0.00 | 0.00 | (18,354.80) | (20,090.21) | (16,493.92) | (11,179.59) | (11,583.59) | (10,120.47) | (8,443.95) | | |
| CAPITAL IMPROV RES | 0.00 | 0.00 | 0.00 | (534,330.39) | (495,502.45) | (472,000.39)/(451,478.99) | (439,075.95) | (439,075.95) | 414,059.16 | | | |
| **TOTAL ADJUSTMENTS** | (127,817.06) | (134,306.49) | (141,894.40) | (254,138.31) | (289,258.71) | (273,196.39)/(210,040.23) | (374,143.30) | (383,245.62)/(377,872.49) | (414,059.16)/(386,490.60)/(349,497)/(332,809.66) | (386,498.80) | 348,349.97 | 332,809.86 |
| **TOTAL FUNDS AVAILABLE (BEF CIT)** | 194,043.68 | 218,613.51 | 247,861.61 | 567,597.51 | 611,664.26 | 647,368.48 | 480,186.68 | 349,576.93 | 377,069.44 | 262,781.86 | 285,730.82 | 304,668.34 |
| **SUBTRACT:** | | | | | | | | | | | | |
| ESCROW EXCESS R/E TAX | (46,330.86) | (46,330.86) | (46,330.86) | (132,348.62) | (33,060.02) | (33,070.02)/(33,080.04) | (33,090.05) | (33,090.05) | 16,559.95 | (29.85) | | |
| ESCROW INSURANCE | (21,736.07) | (35,041.25) | (42,346.43) | (69,613.97) | (24,004.88) | (24,949.96) | (37,894.84) | (48,134.81) | (48,134.81) | (48,134.81) | (16,540.11) | (16,540.11) |
| PREPAID INSURANCE | (19,770.35) | (15,760.92) | (10,311.60) | (4,470.98) | (139,057.92) | (127,059.31)/(115,060.70) | (105,755.09) | (105,755.09) | (91,452.06)/(91,452.03) | (48,134.81)/(74,621.57) | (10.02) | (12,934.97) |
| PREPAID INTEREST | 0.00 | 0.00 | 0.00 | (16,480.98) | 0.00 | 0.00 | 0.00 | 0.00 | (91,452.06) | (66,920.25) | (66,920.25) | |
| ARBOR INSURANCE RES | (4,819.10) | (2,409.57) | 0.00 | (170,200.00) | (170,000.00) | (170,000.00)/(170,000.00) | (16,031.90) | (16,031.90) | (9,403.96) | 0.00 | 0.00 | |
| ACCRUALS EXCESS INS | (17,121.00) | (17,121.00) | 0.00 | (8,284.01) | (8,284.01) | (9,334.13)/(15,090.29) | (16,031.90) | (12,937.93)/(9,403.96) | (12,937.93)/(9,403.96) | (9,403.96) | (15,409.87) | 12,375.93 |
| UTILITY DEPOSITS | (17,121.00) | (17,121.00) | (17,121.00) | (17,121.00) | (17,121.00) | (17,121.00) | (17,121.00) | (25,945.00) | (25,945.00)/(19,645.00) | (19,645.00) | (14,705.62) | (14,705.62) |
| RECEIVABLES | (11,932.36) | (10,146.09) | (9,142.01) | (29,412.69) | (7,327.44) | (8,726.56) | (10,454.73) | (4,059.29) | (7,485.34) | (9,106.24) | (11,968.74) | (14,705.62) |
| **CASH AVAILABLE** | 66,433.94 | 91,903.82 | 122,709.71 | 103,669.67 | 224,280.99 | 257,107.59 | 68,275.08 | 108,667.79 | 168,234.35 | 84,569.97 | 137,069.71 | 161,546.46 |
| **FIX UP RESERVE ALLOCATION** | | | | | | | | | | | | |
| ORIGINAL BUDGET | 2,368.74 | 18,907.60 | 32,051.97 | 55,121.00 | 73,262.00 | 85,431.56 | 80,792.98 | 80,792.98 | 80,792.98 | 80,792.98 | 80,792.98 | 80,792.98 |
| AMOUNT INCURRED TO DATE | (2,368.74) | (18,907.80) | (32,051.97) | (36,757.20) | (53,171.79) | (68,947.64) | (77,107.51) | (77,107.51) | (77,801.19) | (74,672.51) | (80,343.03) | (83,428.89) |
| REMAINING BUDGET | 0.00 | 0.00 | 0.00 | 18,356.80 | 20,090.21 | 16,483.92 | 13,179.58 | 11,485.47 | 10,851.53 | 10,120.47 | 8,449.95 | 5,364.09 |
| **CAPITAL IMPROVMENT RESERVE** | | | | | | | | | | | | |
| ORIGINAL BUDGET | 3,027.08 | 6,644.74 | 7,836.78 | 558,865.75 | 540,717.75 | 528,546.19 | 525,186.77 | 525,186.77 | 525,186.77 | 525,186.77 | 525,186.77 | 525,186.77 |
| AMOUNT INCURED TO DATE | (3,027.08) | (6,644.74) | (7,836.78) | (24,235.36) | (45,235.20) | (56,457.80) | (86,110.82) | (86,110.82) | (111,128.61)/(138,687.97) | (138,687.97)/(176,836.80)/(192,376.91) | (192,376.80) | (192,376.91) |
| REMAINING BUDGET | 0.00 | 0.00 | 0.00 | 534,330.39 | 495,502.45 | 472,000.39 | 439,075.95 | 439,075.95 | 414,058.16 | 386,498.80 | 348,349.97 | 332,809.86 |

JALOS.4SCOP16.6THOTH.S.L. PROPERTY MANAGEMENT CO. INC

PARK PLAZA ASSOCIATES

PAGE 4

## SCHEDULE OF ADDITIONAL INCOME
## 2002

| ADDITIONAL INCOME | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LAUNDRY | 2,517.24 | 2,567.72 | 2,673.16 | 2,623.95 | 2,505.62 | 2,774.31 | 2,708.51 | 2,531.47 | 2,458.96 | 2,621.58 | 2,621.15 | 2,626.31 | 31,249.98 |
| BACK RENT | 0.00 | 0.00 | 0.00 | 0.00 | 300.00 | 0.00 | 1,700.00 | 200.00 | 575.00 | 25.00 | 794.20 | 415.00 | 4,009.20 |
| INTEREST-MONEY MARKET | 279.84 | 223.04 | 263.04 | 488.96 | 1,187.29 | 1,358.42 | 1,421.64 | 1,018.32 | 1,181.31 | 1,166.76 | 960.55 | 959.41 | 10,508.58 |
| TERMINATION FEE | 0.00 | 0.00 | 100.00 | 1,078.00 | 0.00 | 575.00 | 575.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,753.00 |
| COKE MACHINE | 86.00 | 0.00 | 71.00 | 16.15 | 41.30 | 0.00 | 43.95 | 100.70 | 0.00 | 98.85 | 0.00 | 0.00 | 467.95 |
| APPLICATION FEES | 550.00 | 1,165.00 | 540.00 | 585.00 | 595.00 | 900.00 | 515.00 | 1,125.00 | 540.00 | 460.00 | 675.00 | 450.00 | 8,100.00 |
| LATE CHARGES | 2,976.28 | 2,418.97 | 2,323.71 | 2,315.22 | 2,142.24 | 2,375.25 | 2,209.62 | 1,760.94 | 1,785.60 | 2,970.99 | 3,226.60 | 2,366.65 | 28,874.07 |
| RE DECORATING FEE | 100.00 | 450.00 | 650.00 | 700.00 | 450.00 | 1,100.00 | 600.00 | 1,800.00 | 800.00 | 210.00 | 1,000.00 | 700.00 | 8,760.00 |
| FORFEITED SECURITY | 103.08 | 0.00 | 950.00 | 450.00 | 150.00 | 0.00 | 795.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,448.08 |
| ATT CABLE | 0.00 | 0.00 | 0.00 | 0.00 | 271.59 | 259.92 | 259.92 | 0.00 | 0.00 | 0.00 | 268.48 | 0.00 | 739.99 |
| PET FEE | 225.00 | 0.00 | 25.00 | 186.00 | 140.00 | 0.00 | 0.00 | 400.00 | 250.00 | 100.00 | 0.00 | 0.00 | 1,421.00 |
| N.S.F. FEES | 220.00 | 20.00 | 120.00 | 57.47 | 65.00 | 120.00 | 210.00 | 110.00 | 110.00 | 120.00 | 160.00 | 100.00 | 1,412.47 |
| BELLSOUTH COMM | 0.00 | 0.00 | 0.00 | 99.50 | 0.00 | 440.25 | 0.00 | 124.50 | 0.00 | 1,260.00 | 0.00 | 121.50 | 2,045.75 |
| INTEREST-ABROR | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 289.44 | 630.44 | 0.00 | 564.34 | 0.00 | 0.00 | 1,484.22 |
| | | | | | | | | | | | | | |
| ADDITIONAL INCOME RECEIVED | 7,257.44 | 6,919.73 | 7,717.91 | 8,620.25 | 7,868.04 | 9,068.23 | 11,328.08 | 9,801.37 | 7,700.87 | 9,508.67 | 9,804.83 | 7,738.87 | 103,334.29 |
| PLUS: | | | | | | | | | | | | | 0.00 |
| TOTAL ADDITIONAL INCOME | 7,257.44 | 6,919.73 | 7,717.91 | 8,620.25 | 7,868.04 | 9,068.23 | 11,328.08 | 9,801.37 | 7,700.87 | 9,508.67 | 9,804.83 | 7,738.87 | 103,334.29 |

JALOS.4SCOP16.6THOT

JA4O5.45COP16.6%HOT   PROPERTY MANAGEMENT CO. INC

PARK PLAZA ASSOCIATES

SCHEDULE OF OPERATING EXPENSE

2002

PAGE 5

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING EXPENSES** | | | | | | | | | | | | | |
| EMPLOYEE LEASING | 20,941.48 | 20,571.12 | 20,569.63 | 20,701.10 | 20,560.93 | 20,407.03 | 20,521.09 | 20,583.29 | 20,576.67 | 20,670.25 | 20,669.17 | 20,704.77 | 249,477.31 |
| ELECTRIC - VACANT | 208.40 | 318.61 | 458.09 | 531.98 | 502.68 | 329.45 | 399.97 | 462.66 | 366.77 | 280.24 | 279.97 | 200.13 | 4,359.07 |
| ELECTRIC - HOUSE | 4,297.88 | 3,937.28 | 4,035.06 | 3,383.19 | 4,049.68 | 3,985.47 | 3,684.00 | 3,809.94 | 3,694.57 | 3,984.94 | 4,028.00 | 4,074.57 | 47,345.58 |
| WATER & SEWER | 9,885.57 | 9,988.04 | 10,819.40 | 10,239.90 | 10,350.93 | 10,641.35 | 10,621.46 | 10,037.71 | 9,773.61 | 10,703.93 | 9,934.90 | 10,239.71 | 123,196.54 |
| GAS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SANITATION | 6,333.96 | 6,333.96 | 6,333.96 | 6,333.96 | 6,333.96 | 6,405.96 | 6,333.96 | 6,333.96 | 6,333.96 | 6,333.96 | 6,333.96 | 6,496.34 | 76,441.90 |
| TELEPHONE | 893.36 | 1,035.79 | 1,288.34 | 935.16 | 1,233.73 | 1,010.93 | 1,088.37 | 1,004.33 | 1,007.55 | 1,175.18 | 1,212.13 | 1,553.39 | 13,553.19 |
| MANAGEMENT FEE | 9,403.14 | 9,921.81 | 9,501.14 | 9,541.14 | 9,514.14 | 9,501.14 | 9,935.50 | 9,361.33 | 9,179.07 | 9,200.92 | 9,352.46 | 9,665.00 | 114,248.42 |
| MARKETING | 951.76 | 2,255.00 | 1,597.70 | 1,545.25 | 2,212.14 | 9,231.04 | 8,672.62 | 9,352.33 | 7,733.25 | 5,088.61 | 6,659.00 | 7,795.71 | 69,430.47 |
| OFFICE EXPENSE | 1,355.81 | 1,566.36 | 1,295.39 | 1,103.69 | 1,048.88 | 992.24 | 1,356.12 | 899.34 | 1,062.27 | 1,365.77 | 1,084.49 | 1,021.31 | 10,751.04 |
| PROPERTY INSURANCE | 5,599.32 | 5,599.32 | 5,599.32 | 4,597.71 | 11,988.61 | 11,988.61 | 11,988.61 | 11,988.61 | 11,998.60 | 12,146.16 | 12,152.40 | 14,344.74 | 14,264.42 |
| LICENSES & TAXES | 535.00 | 0.00 | 150.00 | 0.00 | 160.00 | 0.00 | 50.00 | 0.00 | 0.00 | 0.00 | 206.00 | 1,315.35 | 4,852.34 |
| REAL ESTATE TAXES | 16,530.10 | 16,530.10 | 16,530.10 | 16,530.10 | 16,530.10 | 16,530.10 | 16,530.10 | 16,530.10 | 16,530.10 | 16,530.10 | 26,945.92 | 26,945.92 | 219,192.84 |
| BOOKKEEPING FEES | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 9,072.00 |
| REPAIRS & MAINTENANCE | 8,453.91 | 8,505.15 | 8,786.78 | 8,695.76 | 8,984.79 | 8,935.40 | 9,231.04 | 8,672.62 | 9,179.07 | 9,200.92 | 10,362.46 | 9,665.00 | 108,542.32 |
| REPLACEMENTS | 5,775.61 | 5,156.44 | 4,979.64 | 5,117.35 | 5,177.61 | 5,484.32 | 5,432.98 | 5,203.00 | 7,733.25 | 5,888.61 | 6,659.00 | 6,422.44 | 69,430.47 |
| MISCELLANEOUS | 159.02 | 692.04 | 1,070.78 | 1,031.12 | 961.94 | 958.14 | 1,114.21 | 506.70 | 824.00 | 910.65 | 1,084.49 | 10,234.31 | 10,234.31 |
| LANDSCAPING | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,000.00 | 2,200.00 | 26,200.00 |
| EMPLOYEE INSURANCE | 1,640.78 | 1,691.67 | 1,607.07 | 1,605.07 | 1,475.07 | 1,699.89 | 1,841.23 | 1,641.33 | 2,200.00 | 1,641.33 | 1,641.33 | 1,641.33 | 21,056.92 |
| **TOTAL OPERATING EXPENSES** | 96,030.15 | 98,933.71 | 97,890.44 | 95,041.40 | 105,579.10 | 104,570.16 | 105,340.16 | 102,243.75 | 105,787.69 | 105,103.01 | 117,613.96 | 117,685.00 | 1,254,797.35 |
| **EXTRA ORDINARY EXPENDITURES:** | | | | | | | | | | | | | |
| W/O-EVICT | 454.55 | 2,244.42 | 250.50 | 2,171.61 | 931.30 | 2,073.05 | 1,979.20 | 2,787.73 | 1,557.70 | 953.17 | 2,432.37 | 630.37 | 18,445.96 |
| CREDIT CHECKS | 143.50 | 197.00 | 344.50 | 263.00 | 313.00 | 182.50 | 218.50 | 272.50 | 339.00 | 385.00 | 234.50 | 294.50 | 3,187.50 |
| COURT COSTS/LEGAL | 2,440.00 | 4,242.00 | 7,060.00 | 1,760.00 | 1,144.00 | 1,737.00 | 1,960.00 | 623.00 | 2,000.00 | 2,000.00 | 685.00 | 1,810.00 | 24,575.43 |
| COURTESY OFFICER | 1,951.13 | 1,733.79 | 1,784.91 | 1,798.06 | 2,684.58 | 2,088.74 | 2,053.43 | 1,013.80 | 568.55 | 2,052.49 | 2,052.49 | 2,137.81 | 11,908.85 |
| PPE DEPOSIT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 500.00 | 500.00 | 500.00 | 500.00 | 15,670.00 | 15,670.00 |
| COMPUTER SUPPORT | 729.43 | 865.52 | 389.96 | 389.96 | 389.96 | 389.96 | 389.96 | 389.96 | 389.96 | 1,288.10 | 0.00 | 0.00 | 5,662.77 |
| MISC EXTERIOR REPAIR | 0.00 | 0.00 | 0.00 | 0.00 | 1,214.00 | 0.00 | 3,624.00 | 2,635.00 | 0.00 | 0.00 | 6,550.00 | 850.00 | 14,627.00 |
| COUNTER TOPS | 567.75 | 1,809.89 | 0.00 | 4,205.00 | 4,295.00 | 697.00 | 0.00 | 2,490.00 | 0.00 | 0.00 | 1,164.91 | 1,591.91 | 16,627.59 |
| PROPERTY INS | 0.00 | 0.00 | 0.00 | 40,927.56 | 4,114.00 | 4,035.58 | 4,035.58 | 4,035.58 | 4,535.58 | 5,106.12 | 4,035.58 | 4,441.00 | 81,681.91 |
| YEAR END ACCOUNTING | 0.00 | 0.00 | 0.00 | 2,750.00 | 2,000.00 | 0.00 | 0.00 | 0.00 | 350.00 | 0.00 | 0.00 | 262.50 | 5,362.50 |
| PROPERTY LIGHTING | 0.00 | 140.75 | 0.00 | 0.00 | 2,378.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,437.08 |
| LEGAL FEES MARCUS | 0.00 | 0.00 | 0.00 | 0.00 | 238.25 | 191.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 568.25 |
| MARKETING | 1,310.80 | 772.00 | 650.00 | 496.57 | 691.55 | 425.00 | 988.27 | 746.54 | 600.00 | 613.50 | 1,053.13 | 1,331.44 | 9,667.78 |
| EXTRAORDINARY R & M | 4,353.05 | 1,433.67 | 4,237.50 | 3,208.90 | 5,821.26 | 1,620.00 | 7,714.90 | 0.00 | 4,500.00 | 0.00 | 22,020.94 | 5,732.10 | 62,622.72 |
| LANDSCAPE | 1,206.15 | 1,432.89 | 745.09 | 727.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,101.18 |
| INSURANCE CONSULTING | 470.00 | 470.00 | 470.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,810.00 |
| GYM EQUIPMENT | 0.00 | 0.00 | 0.00 | 0.00 | 1,132.50 | 1,132.50 | 1,445.51 | 935.66 | 0.00 | 0.00 | 0.00 | 1,410.00 | 676.17 |
| PAYROLL BONUS | 0.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 500.00 | 481.54 | 4,355.71 |
| CAPITAL IMPROVEMENT | 3,027.88 | 4,166.98 | 3,431.53 | 3,280.28 | 12,393.28 | 2,514.47 | 9,113.93 | 9,383.33 | 7,353.73 | 8,320.71 | 9,665.78 | 6,128.11 | 78,282.92 |
| FIX UP | 2,368.74 | 16,539.06 | 3,144.17 | 4,705.23 | 16,414.59 | 15,775.84 | 6,665.74 | 953.96 | 953.96 | 711.12 | 1,670.52 | 3,005.86 | 83,129.90 |
| LOAN COSTS | 24,250.00 | 0.00 | 264.00 | 426,641.81 | 0.00 | 0.00 | 0.00 | 1,494.11 | 0.00 | 0.00 | 0.00 | 0.00 | 451,156.11 |
| EXPENDITURES | 43,322.98 | 38,327.10 | 28,933.31 | 498,829.43 | 59,609.49 | 38,058.70 | 52,373.30 | 28,710.92 | 41,067.07 | 32,243.52 | 55,671.32 | 32,745.83 | 502,393.18 |
| **TOTAL** | | | | | | | | | | | | | |

JAL05.45CO$16.67MOTH S.L. PROPERTY MANAGEMENT CO. INC

PARK PLAZA ASSOCIATES

PAGE 6

ANALYSIS OF ACTUAL OPERATING CASH FLOW TO BUDGET - 2002

MONTH: NOVEMBER

CASH BASIS

| | CURRENT MONTH | BUDGET AMOUNT | VARIANCE | YEAR TO DATE | BUDGET AMOUNT | VARIANCE | MARKET RENT | ANNUAL BUDGET |
|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | |
| (1)CURRENT RENT ROLL | 199,898.00 | 194,543.00 | 5,355.00 | 2,370,871.06 | 2,334,516.00 | 36,355.06 | 200,268.00 | 2,334,516.00 |
| VACANCY 5% | (4,622.79) | (9,727.15) | 5,104.36 | (79,189.77) | (116,725.80) | 37,336.03 | | (116,725.80) |
| SERVICE APARTMENTS | (1,357.40) | (1,357.40) | 0.00 | (16,288.80) | (16,288.80) | 0.00 | | (16,288.80) |
| RENT UP ALLOWANCE .50% | (564.50) | (972.72) | 408.22 | (5,738.50) | (11,672.58) | 5,934.08 | | (11,672.58) |
| ADDITIONAL INCOME | 7,738.87 | 7,000.00 | 738.87 | 103,334.29 | 84,000.00 | 19,334.29 | | 84,000.00 |
| **NET REVENUE** | 201,092.18 | 189,485.74 | 11,606.45 | 2,372,988.28 | 2,273,828.82 | 98,959.46 | | 2,273,828.82 |
| **OPERATING EXPENSES** | | | | | | | | |
| (2)EMPLOYEE LEASING | 20,704.77 | 20,600.00 | (104.77) | 243,477.31 | 247,200.00 | (2,277.31) | | 247,200.00 |
| ELECTRIC | 4,274.70 | 4,333.33 | 58.63 | 51,704.65 | 52,000.00 | 295.35 | | 52,000.00 |
| WATER & SEWER | 10,339.71 | 10,000.00 | (339.71) | 123,196.54 | 120,000.00 | (3,196.54) | | 120,000.00 |
| GAS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| SANITATION | 6,496.34 | 6,500.00 | 3.66 | 76,441.90 | 78,000.00 | 1,558.10 | | 78,000.00 |
| TELEPHONE | 1,212.19 | 1,000.00 | (212.19) | 12,553.19 | 12,000.00 | (553.19) | | 12,000.00 |
| MANAGEMENT FEE | 10,074.94 | 9,474.29 | (600.65) | 118,264.42 | 111,691.44 | (4,572.98) | | 111,691.44 |
| ADVERTISING | 2,418.25 | 1,666.67 | (751.58) | 20,329.30 | 20,000.00 | (329.30) | | 20,000.00 |
| OFFICE EXPENSE | 1,094.56 | 1,000.00 | (94.56) | 14,244.78 | 12,000.00 | (2,244.78) | | 12,000.00 |
| (3)PROPERTY INSURANCE | 12,352.45 | 6,551.53 | (5,800.87) | 74,618.24 | 78,312.00 | 3,693.76 | | 74,618.24 |
| LICENSES & FEES | 0.00 | 413.50 | 413.50 | 4,955.36 | 4,950.00 | (5.36) | | 4,950.00 |
| (4)P/P & REAL ESTATE TAX | 26,945.92 | 16,530.10 | (10,415.82) | 239,192.84 | 198,361.25 | (40,831.59) | | 198,361.25 |
| BOOKKEEPING FEE | 756.00 | 756.00 | 0.00 | 9,072.00 | 9,072.00 | 0.00 | | 9,072.00 |
| REPAIRS & MAINTENANCE | 9,665.02 | 8,400.00 | (1,265.02) | 108,542.92 | 100,800.00 | (7,742.92) | | 100,800.00 |
| REPLACEMENTS | 6,422.48 | 5,250.00 | (1,172.48) | 69,430.47 | 63,000.00 | (6,430.47) | | 63,000.00 |
| MISCELLANEOUS | 1,084.48 | 1,000.00 | (84.48) | 10,324.31 | 12,000.00 | 1,675.69 | | 12,000.00 |
| LANDSCAPE MAINTENANCE | 2,200.00 | 2,200.00 | 0.00 | 26,200.00 | 26,400.00 | 200.00 | | 26,400.00 |
| EMPLOYEE INSURANCE | 1,841.32 | 1,691.67 | (149.65) | 23,056.92 | 20,300.00 | (2,756.92) | | 20,300.00 |
| **TOTAL OPERATING EXPENSES** | 117,603.08 | 97,366.09 | (20,317.00) | 1,254,797.35 | 1,168,393.03 | (86,404.31) | | 1,168,393.03 |
| **CASH FLOW BEFORE DEBT SERVICE** | 83,409.10 | 92,119.65 | (8,710.55) | 1,117,390.94 | 1,105,435.79 | 12,555.15 | | 1,105,435.79 |
| **DEBT SERVICE** | | | | | | | | 397,085.04 |
| PRINCIPAL | | | | | | | | |
| INTEREST | 50,858.33 | 50,858.33 | 0.00 | 524,850.97 | 524,850.97 | 0.00 | | 524,850.97 |
| TOTAL DEBT | 50,858.33 | 50,858.33 | 0.00 | 524,850.97 | 524,850.97 | 0.00 | | 397,085.04 |
| **NET OPERATING CASH FLOW** | 32,550.77 | 41,261.32 | (8,710.55) | 592,539.97 | 580,584.82 | 12,555.15 | | 708,350.75 |

(1) THERE ARE 4 MONTH TO MONTH RESIDENTS
(2) INCLUDES PAYROLL TAX AND WORKERS COMPENSATION
(3) COSTS OF INS $140,849.73 NEW POLICY 1ST PAYMENT MAY 02
(4) TOTAL P/E TAX & PP TAX $193,192.83. THE ORG BUDGET WAS $198,361.25

JAL05.45CO$16.67MOT7

JAL05.4SCOP16.67HOTM.S.L. PROPERTY MANAGEMENT CO. INC

PARK PLAZA ASSOCIATES

PAGE 6A

MONTHLY COMPARISON OF ACTUAL OPERATING CASH FLOW - 2002

CASH BASIS

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | | | | |
| CURRENT RENT RCLL | 194,543.00 | 194,688.00 | 195,850.25 | 196,111.00 | 197,594.00 | 197,877.60 | 198,252.77 | 198,358.84 | 198,934.20 | 199,058.00 | 199,705.40 | 199,898.00 | 2,370,871.06 |
| VACANCY 5% | (4,956.85) | (5,308.33) | (11,003.00) | (6,346.55) | (6,293.26) | (4,596.33) | (8,418.67) | (9,149.81) | (7,331.50) | (4,803.18) | (5,939.50) | (4,622.79) | (79,389.77) |
| SERVICE APARTMENTS | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (16,288.80) |
| RENT UP ALLOWANCE | (364.50) | (364.50) | (404.50) | (404.50) | (404.50) | (404.50) | (404.50) | (604.50) | (635.50) | (414.50) | (714.50) | (544.50) | (5,738.50) |
| ADDITIONAL INCOME | 7,257.44 | 6,919.73 | 7,737.93 | 8,529.25 | 7,848.04 | 9,068.23 | 11,328.08 | 9,803.37 | 7,700.87 | 9,604.83 | 7,738.87 | — | 101,314.29 |
| **REVENUE** | 195,121.69 | 194,577.70 | 190,803.26 | 196,202.80 | 197,406.88 | 200,587.60 | 199,400.08 | 197,046.50 | 197,257.17 | 201,991.59 | 201,698.83 | 201,092.18 | 2,371,768.28 |
| **EMPLOYEE LEASING:** | | | | | | | | | | | | | |
| ELECTRIC | 22,571.12 | 22,571.12 | 20,569.62 | 20,701.10 | 20,560.93 | 20,407.81 | 20,521.09 | 20,683.29 | 20,576.67 | 20,670.25 | 20,669.17 | 20,704.77 | 249,477.33 |
| WATER & SEWER | 4,506.28 | 4,175.89 | 4,494.15 | 3,915.17 | 4,552.36 | 4,294.92 | 4,283.97 | 4,272.60 | 4,261.34 | 4,265.28 | 4,307.07 | 4,274.70 | 51,704.65 |
| GAS | 9,895.67 | 9,988.04 | 10,129.40 | 10,130.90 | 10,250.93 | 10,641.25 | 10,621.46 | 10,017.74 | 9,773.61 | 10,703.93 | 9,914.90 | 10,239.71 | 123,096.54 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SANITATION | 6,333.96 | 6,333.96 | 6,333.96 | 6,333.96 | 6,333.96 | 6,333.96 | 6,405.96 | 6,333.96 | 6,333.96 | 6,533.96 | 6,533.96 | 6,496.34 | 76,441.90 |
| TELEPHONE | 899.14 | 1,033.74 | 895.06 | 895.06 | 1,239.70 | 1,010.81 | 1,088.37 | 1,004.53 | 1,007.55 | 477.50 | 1,175.18 | 1,212.17 | 12,553.19 |
| MANAGEMENT FEE | 9,569.76 | 9,756.90 | 9,728.80 | 9,945.06 | 9,870.34 | 10,029.38 | 10,027.38 | 9,555.32 | 9,662.86 | 10,099.58 | 10,693.36 | 10,679.59 | 119,617.33 |
| MARKETING | 951.76 | 2,255.00 | 1,597.75 | 1,545.25 | 1,628.00 | 1,478.57 | 1,479.29 | 1,703.93 | 1,703.93 | 1,672.50 | 2,410.25 | 2,424.25 | 20,328.00 |
| OFFICE EXPENSE | 1,155.81 | 1,566.36 | 1,295.19 | 1,103.69 | 1,058.08 | 932.24 | 1,356.12 | 696.34 | 1,062.27 | 1,365.77 | 1,315.35 | 1,094.50 | 14,264.70 |
| PROPERTY INSURANCE | 5,599.32 | 5,599.32 | 5,599.32 | 497.71 | 11,908.61 | 11,908.61 | 11,998.61 | 11,998.61 | 12,146.16 | 12,146.16 | 12,152.40 | 12,152.40 | 127,493.44 |
| LICENSES & FEES | 935.00 | 0.00 | 150.00 | 0.00 | 0.00 | 600.00 | 50.00 | 0.00 | 1,151.20 | 0.00 | 206.00 | 0.00 | 4,852.36 |
| REAL ESTATE TAXES | 16,510.10 | 16,510.10 | 16,510.10 | 16,510.10 | 16,510.10 | 16,510.10 | 16,510.10 | 16,510.10 | 16,510.10 | 16,510.10 | 24,945.92 | 24,945.92 | 217,492.84 |
| BOOKKEEPING FEES | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 9,072.00 |
| REPAIRS & MAINTENANCE | 8,443.91 | 8,505.33 | 8,784.79 | 8,495.78 | 8,794.79 | 8,293.40 | 9,231.04 | 8,471.62 | 8,189.07 | 9,280.92 | 10,183.46 | 9,665.02 | 106,542.92 |
| APPLIANCES | 5,275.63 | 5,155.44 | 4,979.16 | 5,117.35 | 5,177.81 | 5,884.12 | 5,472.38 | 5,203.62 | 7,731.23 | 5,888.61 | 4,659.08 | 6,422.48 | 69,430.47 |
| MISCELLANEOUS | 132.02 | 692.84 | 1,070.04 | 1,021.12 | 961.84 | 956.14 | 1,114.21 | 506.70 | 826.00 | 1,010.41 | 1,084.14 | 1,084.14 | 10,314.31 |
| LANDSCAPE MAINTENANCE | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 26,200.00 |
| EMPLOYEE INSURANCE | 1,640.78 | 1,691.67 | 1,691.67 | 1,810.07 | 1,475.07 | 1,659.89 | 1,642.17 | 1,841.32 | 1,841.32 | 1,841.32 | 1,841.32 | 1,841.32 | 21,057.92 |
| **TOTAL OPERATING EXPENSES** | 96,030.15 | 98,913.71 | 97,890.44 | 95,343.40 | 105,579.10 | 104,570.36 | 105,340.16 | 102,243.71 | 108,707.47 | 105,100.81 | 117,613.96 | 117,693.08 | 1,256,798.35 |
| **CASH FLOW BEFORE DEBT SERVICE** | 99,091.54 | 95,663.99 | 92,912.82 | 100,360.40 | 91,827.78 | 96,017.24 | 94,059.92 | 94,804.79 | 88,469.70 | 96,887.78 | 83,884.88 | 83,609.10 | 1,117,999.94 |
| DEBT SERVICE | 33,090.42 | 33,090.42 | 33,090.42 | 33,090.42 | 36,480.98 | 50,858.33 | 50,858.33 | 50,858.33 | 50,858.33 | 50,858.33 | 50,858.33 | 50,858.33 | 524,850.97 |
| **NET OPERATING CASH FLOW** | 66,001.12 | 62,573.57 | 59,822.40 | 67,169.98 | 55,346.80 | 45,158.91 | 43,201.59 | 43,946.46 | 37,611.37 | 46,029.45 | 33,026.55 | 32,550.77 | 591,138.97 |

JAL05.4SCOP16.67HOT

PARK PLAZA ASSOCIATES

PAGE 7

JAJOS 4SCJP16. 67HOTH S L   PROPERTY MANAGEMENT CO. INC

## FIX UP BUDGET TO ACTUAL 2000 & 2001

| | FUNDED BUDGET | YEAR TO DATE ACTUAL | AVAILABLE | Dec |
|---|---|---|---|---|
| PAINTING HALLS/STAIRS/DO | 35,718.48 | 35,718.48 | 0.00 | |
| TENNIS COURT REPAIR | 2,786.81 | 2,786.81 | 0.00 | |
| ENTRANCE SYSTEM | 18,834.96 | 18,834.96 | 0.00 | |
| LANDSCAPE UPGRADE | 12,117.57 | 8,223.41 | 3,894.16 | |
| HALLWAY CARPET CLEAN | 3,864.81 | 3,864.81 | 0.00 | |
| LIST | 0.00 | 0.00 | 0.00 | |
| LIST | 0.00 | 0.00 | 0.00 | |
| LIST | 0.00 | 0.00 | 0.00 | |
| LIST | 0.00 | 0.00 | 0.00 | |
| LIST | 0.00 | 0.00 | 0.00 | |
| LIST | 0.00 | 0.00 | 0.00 | |
| LIST | 0.00 | 0.00 | 0.00 | |
| LIST | 0.00 | 0.00 | 0.00 | |
| TOTAL EXPENDITURES | 73,382.63 | 69,428.47 | 3,954.16 | |
| PRIOR YEAR MGT FEE | 0.00 | 0.00 | | |
| 4 L MGNT 213 FEE | 15,410.35 | 14,000.43 | 1,409.92 | |
| TOTAL FIX UP EXPENSE | 88,792.98 | 83,428.90 | 5,364.08 | |

M LMGNT 213 FEE BASED ON       69,428.47

MANAGEMENT FEE PAYABLE         14,579.98
MGNT FEE PAID                 (14,000.43)

MANAGEMENT FEE DUE                579.55

## EXTRAORDINARY TO ACTUAL 2002

| | BUDGET | YEAR TO DATE ACTUAL | AVAILABLE BALANCE | Dec |
|---|---|---|---|---|
| BATHROOM TILE REPAIRS | 2,989.49 | 2,989.49 | 0.00 | |
| LIST | 0.00 | 0.00 | 0.00 | |
| LIST | 0.00 | 0.00 | 0.00 | |
| TOTAL EXTRAORDINARY | 2,989.49 | 2,989.49 | 0.00 | |

## CAPITAL IMPROVEMENT BUDGET TO ACTUAL 2002

| | FUNDED BUDGET | YEAR TO DATE ACTUAL | AVAILABLE BALANCE | Dec |
|---|---|---|---|---|
| GOLF CART | 7,825.00 | 7,825.00 | 0.00 | 1,275.00 |
| PATIO FURN | 2,756.00 | 2,756.00 | 0.00 | 1,378.00 |
| WINDOWS | 10,280.12 | 10,280.12 | 0.00 | 1,248.98 |
| ELEVATOR UPGRADE | 7,667.00 | | 1,459.00 | |
| ROOF REPAIRS & ROOF HATCHS | 2,342.60 | 2,342.60 | 0.00 | |
| GYM EQUIPMENT | 1,081.42 | 1,081.42 | 0.00 | 1,400.00 |
| STOVES | 8,770.00 | 8,770.00 | 0.00 | 1,669.02 |
| DISHWASHERS | 11,184.02 | 11,184.02 | 0.00 | 850.00 |
| REFRIGERATOR | 7,525.00 | 7,525.00 | 0.00 | |
| OFFICE REMODEL | 7,217.53 | 4,676.17 | 2,541.36 | 1,705.20 |
| A/C REPLACE | 14,799.10 | 14,799.10 | 0.00 | 982.01 |
| BATHROOM TILE | 9,374.53 | 9,374.53 | 0.00 | 941.48 |
| MISC UPGRADES | 20,799.25 | 20,799.25 | 0.00 | |
| FIRE DOORS | 11,478.06 | 11,478.06 | 0.00 | 2,499.42 |
| POOL UPGRADES | 11,008.22 | 11,008.22 | 0.00 | |
| PROPERTY LIGHTING | 20,135.10 | 20,135.10 | 0.00 | |
| COUNTER TOPS | 9,920.40 | 9,920.40 | 0.00 | 1,591.00 |
| UNALLOCATED | 3,817.52 | 3,817.52 | 0.00 | |
| | 2,326.88 | 2,326.88 | 0.00 | |
| | 5,482.42 | 5,482.42 | 0.00 | |
| | 16,627.00 | 16,627.00 | 0.00 | |
| | 328,809.50 | 328,809.50 | 328,809.50 | |
| TOTAL | 535,186.77 | 192,376.91 | 332,809.86 | 15,540.11 |

TELEPHONE ENTRANCE       117.66   TREE TRIMMING
AWNINGS              2,877.42

## LOAN COSTS

| EXPENSE | AMOUNT |
|---|---|
| APPLICATION | 26,266.00 |
| LENDER INSP | |
| INTEREST GP LOAN | 2,842.21 |
| TITLE INS | 25,276.00 |
| SURVEY | 4,500.00 |
| LEGAL FEES | 10,000.00 |
| MORTGAGE PLACEMENT | 85,000.00 |
| MORTGAGE PLACEMENT | 85,000.00 |
| MORTGAGE PLACEMENT | 85,000.00 |
| DOC STAMPS | 11,095.00 |
| INT TAX | 6,340.00 |
| PRUDENTIAL FEES | 3,000.00 |
| MISC | 1,271.00 |
| TOTAL | 161,156.21 |

JAJOS. 45CJP16. 67HOT

JALO5.45COP16.67HOTH.S.L. PROPERTY MANAGEMENT CO. INC

PAXX PLAZA ASSOCIATES

PAGE 8

## DEPOSITS RECAP 2002

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RENT ROLL | 194,541.00 | 194,608.00 | 195,850.25 | 196,111.00 | 197,594.00 | 197,877.60 | 198,252.77 | 198,358.84 | 198,934.20 | 199,058.00 | 199,705.60 | 199,898.00 | 2,370,871.06 |
| LESS: | | | | | | | | | | | | | |
| VACANCY | (4,956.85) | (5,308.12) | (11,002.00) | (6,766.55) | (6,293.26) | (4,596.32) | (8,438.87) | (9,149.81) | (7,331.50) | (4,602.18) | (5,939.50) | (4,622.79) | (79,289.71) |
| SERVICE | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (1,357.40) | (16,288.80) |
| LAST MONTH'S APPLIED | (769.00) | (2,926.79) | (2,279.20) | (3,212.02) | (4,300.50) | (4,300.50) | (5,388.00) | (3,800.00) | (2,100.00) | (4,141.60) | (1,994.89) | (1,357.40) | (36,561.80) |
| RENT UP ALLOWANCE | (364.50) | (364.50) | (404.50) | (404.50) | (404.50) | (404.50) | (404.50) | (604.50) | (689.00) | (414.50) | (714.50) | (564.50) | (5,738.50) |
| ACCRUAL ADJUSTMENT: | | | | | | | | | | | | | |
| CLOSING PREPAID | 7,934.79 | 8,833.17 | 10,609.29 | 9,231.97 | 5,265.32 | 17,878.97 | 5,996.24 | 9,395.00 | 7,624.16 | 3,596.11 | 9,934.11 | 9,934.11 | 102,891.05 |
| CLOSING (ARREARS) | (10,609.29) | (9,446.00) | (9,542.02) | (6,877.45) | (10,304.74) | (7,909.02) | (6,788.24) | (6,755.24) | (10,359.66) | (14,705.62) | (13,744.89) | (14,705.62) |  |
| BACK RENT | 0.00 | 223.04 | 263.04 | 488.96 | 300.00 | 0.00 | 1,700.00 | 200.00 | 575.00 | 25.00 | 794.20 | 415.00 | 4,009.20 |
| OPENING (PREPAID) | (6,332.38) | (7,934.79) | (8,833.17) | (10,609.29) | (9,231.97) | (5,265.32) | (17,878.97) | (5,990.24) | (9,395.00) | (7,624.16) | (3,596.11) | (9,934.11) |  |
| OPENING ARREARS | 2,557.24 | 2,557.72 | 2,673.16 | 2,621.95 | 2,505.62 | 2,774.31 | 2,708.51 | 2,531.47 | 2,456.96 | 2,631.58 | 2,635.15 | 2,626.31 | 31,249.98 |
| RENTS COLLECTED | 199,202.31 | 197,228.08 | 187,306.35 | 181,692.53 | 185,160.44 | 198,283.40 | 168,917.10 | 189,067.35 | 186,403.40 | 182,542.37 | 191,969.10 | 189,318.85 | 2,233,277.57 |
| OTHER DEPOSITS: | | | | | | | | | | | | | |
| R/T DEPOSITS | 8,210.00 | 649.00 | 4,674.00 | 0.00 | 4,117.00 | 3,840.00 | 3,270.00 | 2,497.00 | 3,627.00 | 5,654.00 | 6,872.00 | 2,708.00 | 50,318.00 |
| LAUNDRY | 0.00 | 0.00 | 0.00 | 1,074.00 | 0.00 | 0.00 | 1,700.00 | 200.00 | 575.00 | 25.00 | 413.00 | 0.00 |  |
| BACK RENT | 219.84 | 0.00 | 0.00 | 1,187.29 | 0.00 | 1,358.43 | 1,421.64 | 1,018.49 | 1,181.31 | 1,166.76 | 960.55 | 959.41 | 10,508.58 |
| INTEREST-MONEY MARKET | 0.00 | 0.00 | 71.00 | 0.00 | 0.00 | 0.00 | 575.00 | 110.72 | 0.00 | 0.00 | 0.00 | 0.00 | 1,753.00 |
| TERMINATION FEE | 86.00 | 20.00 | 0.00 | 43.79 | 0.00 | 120.00 | 175.95 | 100.00 | 0.00 | 0.00 | 88.85 | 0.00 | 1,467.95 |
| COKE MACHINE | 230.00 | 20.00 | 0.00 | 57.47 | 0.00 | 120.00 | 0.00 | 0.00 | 120.00 | 120.00 | 160.00 | 100.00 | 1,412.47 |
| N.S.F. FEES | 550.00 | 60.00 | 540.00 | 585.00 | 595.00 | 900.00 | 515.00 | 540.00 | 460.00 | 460.00 | 675.00 | 450.00 | 8,100.00 |
| APPLICATION FEES | 2,976.22 | 1,165.00 | 2,325.71 | 2,315.22 | 2,024.24 | 2,375.25 | 2,209.62 | 1,135.00 | 770.99 | 3,226.60 | 2,366.65 | 2,716.00 | 28,874.07 |
| LATE CHARGES | 3,038.00 | 2,418.97 | 9,629.00 | 4,181.00 | 4,181.00 | 3,337.00 | 13,297.00 | 1,785.60 | 5,689.00 | 1,410.00 | 5,689.00 | 3,816.00 | 74,350.08 |
| SECURITY | 500.00 | 8,700.00 | 650.00 | 700.00 | 450.00 | 1,100.00 | 600.00 | 1,297.00 | 800.00 | 210.00 | 1,000.00 | 700.00 | 8,760.00 |
| RE DECORATING FEE | 300.00 | 450.00 | 950.00 | 450.00 | 350.00 | 0.00 | 600.00 | 1,800.00 | | | | | 2,448.08 |
| DAMAGES | 103.00 | 0.00 | | | 271.59 | 0.00 | 795.00 | | | | | | 799.99 |
| ATT CABLE | | | | | | 259.92 | 259.92 | | 266.48 | 768.20 | | 7,018.20 |  |
| MISCELLANEOUS-REIM. | 2,212.14 | 1,410.75 | 748.58 | 450.00 | 20,894.54 | 685.53 | 758.00 | 171,818.95 | 4,729.99 | 564.34 | 573.88 | | 202,571.33 |
| PET FEE | 225.00 | 75.00 | 25.00 | | 160.00 | | | 630.44 | 250.00 | 100.00 | | 748.20 | 1,491.00 |
| JADOR INTEREST | | | | | | | 289.44 | | | 1,360.00 | | | 2,045.75 |
| BELLSOUTH TELEPHONE COMM | | | | 93.50 | | 440.25 | | 124.90 | | | | 131.50 |  |
| TOTAL DEPOSITS | 209,919.93 | 202,571.14 | 204,815.56 | 8,697,381.15 | 221,249.92 | 219,121.11 | 191,563.18 | 393,481.67 | 207,598.56 | 206,333.24 | 214,880.90 | 203,720.62 |  |
| BANK DEPOSITS: | | | | | | | | | | | | | |
| CPNG-UNITED | 209,465.34 | 202,571.14 | 206,035.34 | 8,697,381.15 | 221,249.92 | 219,121.11 | 189,582.98 | 389,753.95 | 207,598.56 | 205,180.07 | 212,456.53 | 203,720.62 | 9,180,064.45 |
| MONEY MARKET-UNITED | | | | | | | | | | | | | 0.00 |
| TOTAL DEPOSITS | 209,465.34 | 202,571.14 | 206,035.34 | 8,697,381.15 | 221,249.92 | 219,121.11 | 189,582.98 | 389,753.95 | 207,598.56 | 205,180.07 | 212,456.53 | 203,720.62 | 9,730,571.93 |
| | (2,344.42) | | | | | | | | | | | | 0.00 |
| FORFEITED SECURITY DEPOSITS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

JALO5.45COP16.67HOT

JALO5,4SCOP16.67HOTM, S.L. PROPERTY MANAGEMENT CO. INC

PARK PLAZA ASSOCIATES

PAGE 9

## MISCELLANEOUS DEPOSITS 2002

### MISCELLANEOUS-INCOME

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LIST | | | | | | 0.00 | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| TOTAL MISCELLANEOUS-INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

### MISCELLANEOUS-REIMBURSEMENTS

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LEGAL | 967.00 | 843.00 | 673.00 | 1,318.63 | 490.20 | 446.90 | 758.00 | 378.25 | 585.00 | 568.20 | 573.88 | 418.39 | 7,720.45 |
| EMPLOYEE INS | 1,245.14 | 567.75 | | | | | | | | | | | 1,812.89 |
| EMPLOYEE LOAN | | | 75.58 | | 150.00 | 150.00 | | | 149.99 | 150.00 | | 350.00 | 949.99 |
| VENDOR | | | | 1,934.35 | 254.34 | 88.63 | | | | | | | 2,352.30 |
| NEW LOAN | | | | 8,500,200.00 | 20,000.00 | | | 170,000.00 | | | | | 8,520,000.00 |
| ARBOR REFUND | | | | | | | | 7,440.70 | | | | | 170,000.00 |
| REAL TAX REFUND | | | | | | | | | | | | | 7,440.70 |
| FPL REFUND | | | | | | | | | 3,995.00 | 6,300.00 | | | 10,295.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| TOTAL MISCELLANEOUS-REIMBURSEMENT | 2,212.14 | 1,410.75 | 748.58 | 8,502,952.98 | 20,894.54 | 685.53 | 758.00 | 177,818.95 | 4,729.99 | 7,018.20 | 573.88 | 768.39 | 8,720,571.93 |

| TOTAL MISCELLANEOUS | 2,212.14 | 1,410.75 | 748.58 | 8,502,952.98 | 20,894.54 | 685.53 | 758.00 | 177,818.95 | 4,729.99 | 7,018.20 | 573.88 | 768.39 | 8,720,571.93 |

JALO5 4SCOP16.67HOT

PAGE 10

PARK PLAZA ASSOCIATES

JAJOS.4SCOPI6.6THOM S.L. PROPERTY MANAGEMENT CO. INC

DISBURSEMENT RECAP-2002

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING EXPENSES** | | | | | | | | | | | | | |
| EMPLOYEE LEASING | 20,941.48 | 22,571.12 | 20,569.63 | 20,701.10 | 20,560.93 | 20,407.81 | 20,521.09 | 20,583.29 | 20,576.67 | 20,670.25 | 20,669.17 | 20,704.77 | 249,477.31 |
| HOSPITALIZATION INS. | 1,640.76 | 1,691.67 | 1,691.67 | 220.18 | 3,475.07 | 1,699.89 | 1,841.17 | 1,841.32 | 1,841.32 | 1,841.32 | 1,841.32 | 1,841.32 | 21,466.00 |
| AUTO EXPENSES | 208.40 | 338.61 | 458.09 | 531.98 | 502.68 | 229.65 | 399.97 | 462.68 | 366.77 | 280.34 | 279.97 | 200.13 | 4,159.07 |
| ELECTRIC -VACANT | 4,297.88 | 3,937.28 | 4,036.06 | 3,181.13 | 4,040.68 | 1,965.47 | 3,684.02 | 3,884.57 | 3,984.34 | 3,984.34 | 4,028.00 | 4,074.57 | 47,145.59 |
| ELECTRIC | 3,988.04 | 3,988.04 | 4,039.40 | 12,129.30 | 10,590.93 | 10,641.25 | 10,621.46 | 10,017.74 | 9,773.61 | 10,703.93 | 4,924.00 | 123,196.54 | |
| WATER & SEWER | 10,380.93 | 10,641.25 | 10,017.74 | 9,773.61 | 10,703.93 | 9,913.70 | 10,339.71 | | | | | | |
| SANITATION | 6,333.96 | 6,333.96 | 6,333.96 | 6,333.96 | 6,333.96 | 6,333.96 | 6,405.96 | 6,333.96 | 6,333.96 | 6,333.96 | 6,333.96 | 6,496.20 | 76,441.90 |
| TELEPHONE | 859.36 | 1,015.74 | 1,286.94 | 895.06 | 1,259.78 | 1,010.81 | 1,098.57 | 1,007.55 | 677.50 | 677.50 | 1,175.16 | 1,212.13 | 11,963.66 |
| MANAGEMENT FEE | 9,694.09 | 9,756.00 | 9,728.89 | 9,540.18 | 9,800.14 | 9,970.34 | 9,955.53 | 9,852.43 | 9,852.43 | 9,862.86 | 10,099.58 | 10,074.94 | 118,284.42 |
| ADVERTISING | 993.74 | 1,035.74 | 1,597.75 | 1,505.25 | 1,620.00 | 1,478.57 | 1,889.50 | 9,955.53 | 1,703.93 | 1,670.50 | 1,670.50 | 2,418.25 | 20,229.40 |
| OFFICE EXPENSE | 2,235.00 | 2,235.00 | 1,295.33 | 1,103.69 | 1,058.88 | 992.24 | 1,356.12 | 899.34 | 1,062.27 | 1,365.77 | 1,315.35 | 1,094.56 | 14,264.78 |
| PROPERTY INSURANCE | 1,155.81 | 1,566.36 | | | | | | | | | | | |
| LICENSES & TAXES | 535.00 | | 150.00 | | 160.00 | 600.00 | 50.00 | | | | 206.00 | | 4,852.36 |
| REAL ESTATE TAXES | | | | | | | | | 3,151.36 | | | | |
| BOOKKEEPING FEES | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 756.00 | 9,072.00 |
| REPAIRS & MAINTENANCE | 8,455.91 | 8,505.35 | 9,746.70 | 8,595.76 | 8,794.79 | 8,925.00 | 9,233.94 | 8,672.62 | 8,139.07 | 9,230.92 | 10,318.46 | 9,665.00 | 108,484.28 |
| REPLACEMENTS | 5,775.61 | 5,156.44 | 4,979.68 | 5,117.35 | 5,177.61 | 5,084.22 | 5,432.98 | 5,201.06 | 7,733.25 | 5,088.61 | 6,659.00 | 6,422.48 | 69,100.47 |
| SEC DEPOSIT INT PAID | | | | | | | | | | | | | |
| MISCELLANEOUS | 159.02 | 692.84 | 1,070.78 | 1,031.12 | 961.94 | 956.14 | 1,114.21 | 506.70 | 826.00 | 910.65 | 1,010.43 | 1,084.48 | 10,324.31 |
| COMPUTER EXPENSE | | | | | | | | | | | | | |
| PROFESSIONAL FEES | | | | | | | | | | | | | |
| LANDSCAPE MAINTENANCE | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,000.00 | 2,200.00 | 26,200.00 |
| **TOTAL OPERATING EXPENSES** | 73,900.73 | 76,704.29 | 75,761.02 | 73,124.70 | 77,500.39 | 76,055.65 | 76,823.45 | 73,735.00 | 80,259.76 | 76,427.55 | 78,521.88 | 78,564.76 | 916,122.18 |
| **FIRST MORTGAGE:** PRINCIPAL | 33,090.42 | 33,090.42 | 33,090.42 | 33,090.42 | | | 50,858.33 | 50,858.33 | 50,858.33 | 50,858.33 | 50,858.33 | 50,858.33 | 481,160.69 |
| INTEREST | 23,835.28 | 23,835.28 | 23,835.28 | | | 28,475.08 | 28,475.08 | 28,475.08 | 0.00 | 0.00 | 28,475.08 | 28,475.08 | 335,555.75 |
| **SECOND MORTGAGE:** PRINCIPAL | | | | 21,090.42 | | | | | | | | | |
| INTEREST | | | | 130,015.40 | | | | | | | | 5,731.19 | 41,746.59 |
| ESCROW - 1E TAXES | | | 5,330,000.00 | 5,330,000.00 | | | | | | | | | 5,330,000.00 |
| **BANK LOANS:** PRINCIPAL | | | | | | | | | | | | | 0.00 |
| INTEREST | | | | | | | | | | | | | 0.00 |
| **TOTAL DEBT** | 56,925.70 | 56,925.70 | 56,925.70 | 5,491,505.82 | 0.00 | 80,333.41 | 80,333.41 | 80,333.41 | 50,858.33 | 50,858.33 | 56,595.52 | 80,333.41 | 5,928,718.74 |
| SECURITY DEPOSIT REFUNDED | 10.00 | 1,070.21 | 3,165.80 | 1,031.00 | 2,247.19 | 3,266.50 | 5,102.50 | 1,620.00 | 1,000.00 | 786.40 | 1,482.00 | 1,000.00 | 25,766.10 |
| SECURITY DEPOSIT TRANSFER | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| DISTRIBUTIONS TO OWNERS | 120,000.00 | 0.00 | 0.00 | 2,100,200.00 | 0.00 | 0.00 | 200,000.00 | 170,000.00 | 0.00 | 150,000.00 | 0.00 | 0.00 | 2,740,200.00 |
| OTHER EXPENDITURES | 43,322.98 | 38,327.10 | 28,913.31 | 498,829.43 | 59,609.49 | 38,058.70 | 52,373.30 | 24,710.82 | 38,129.14 | 41,867.87 | 32,671.32 | 32,745.83 | 953,549.39 |
| R/T CHARGES | 8,210.00 | 649.00 | 4,674.00 | 0.00 | 4,117.00 | 3,840.00 | 7,270.00 | 2,497.00 | 3,627.00 | 5,656.00 | 6,872.00 | 2,708.00 | 50,118.00 |
| **TOTAL EXPENDITURES** | 202,369.41 | 173,756.30 | 169,439.83 | 8,187,572.95 | 143,034.07 | 201,552.26 | 421,900.16 | 356,886.23 | 173,863.23 | 325,594.15 | 198,143.72 | 195,372.00 | 10,852,484.41 |

JAJOS.4SCOPI6.6THOM S.L.

3AL05.4SCOP16.6THOT

PARK PLAZA ASSOCIATES

PAGE 11

DISTRIBUTION TO PARTNERS
2003

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **GENERAL PARTNERS:** | | | | | | | | | | | | | |
| M.S.L. PRO MANAGEMENT | 1,200.00 | 0.00 | 0.00 | 21,000.00 | 0.00 | 0.00 | 2,000.00 | 1,700.00 | 0.00 | 1,500.00 | 0.00 | 0.00 | 27,400.00 / 0.00 |
| **TOTAL GENERAL PARTNERS** | 1,200.00 | 0.00 | 0.00 | 21,000.00 | 0.00 | 0.00 | 2,000.00 | 1,700.00 | 0.00 | 1,500.00 | 0.00 | 0.00 | 27,400.00 |
| **LIMITED PARTNERS:** | | | | | | | | | | | | | |
| PAUL MARCUS | 48,000.00 | | | 840,300.00 | 0.00 | | 80,000.00 | 88,000.00 | | 80,000.00 | | | 1,096,000.00 |
| DANI SIEGEL | 14,800.00 | | | 294,000.00 | | | 28,000.00 | 21,800.00 | | 21,000.00 | | | 381,600.00 |
| BRASIK, INC. | 12,000.00 | | | 210,000.00 | | | 20,000.00 | 17,000.00 | | 15,000.00 | | | 274,000.00 |
| GLEN PARKER | 4,800.00 | | | 84,300.00 | | | 8,000.00 | 6,800.00 | | 6,000.00 | | | 109,400.00 |
| NORMAN FOSBACK | 4,800.00 | | | 84,300.00 | | | 8,000.00 | 6,800.00 | | 6,000.00 | | | 109,400.00 |
| LIEBOWITZ FLP | 10,800.00 | | | 189,000.00 | | | 18,000.00 | 15,300.00 | | 13,500.00 | | | 246,600.00 |
| SHELDON LIEBOWITZ | 10,800.00 | | | 189,000.00 | | | 18,000.00 | 15,300.00 | | 13,500.00 | | | 246,600.00 |
| DR. J. HOFFMAN TTE J. OS | 4,800.00 | | | 84,000.00 | | | 8,000.00 | 6,800.00 | | 6,000.00 | | | 109,600.00 |
| DEAN MARCUS | 6,000.00 | | | 105,000.00 | | | 10,000.00 | 8,500.00 | | 7,500.00 | | | 137,000.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| **TOTAL LIMITED PARTNERS** | 118,800.00 | 0.00 | 0.00 | 2,079,500.00 | 0.00 | 0.00 | 198,000.00 | 168,300.00 | 0.00 | 148,500.00 | 0.00 | 0.00 | 2,712,600.00 |
| **TOTAL** | 120,000.00 | 0.00 | 0.00 | 2,100,000.00 | 0.00 | 0.00 | 200,000.00 | 170,000.00 | 0.00 | 150,000.00 | 0.00 | 0.00 | 2,740,000.00 |

3AL05.4SCOP16.6THOT

3AL05.4SCOP16.6THOT

JALOS 45COPL6 6760TH S L     PROPERTY MANAGEMENT CO. INC        PARK PLAZA ASSOCIATES        PAGE 12

OTHER EXPENDITURES-DETAIL
2002

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **EXTRAORDINARY ITEMS** | | | | | | | | | | | | | |
| W/O-BUILT | 454.55 | 2,214.42 | 250.50 | 2,171.61 | 951.30 | 1,073.05 | 1,979.20 | 2,727.72 | 1,557.70 | 951.17 | 2,432.37 | 630.37 | 18,445.96 |
| COURTESY OFFICER | 1,951.13 | 1,723.79 | 1,784.91 | 1,799.06 | 2,684.58 | 2,022.49 | 1,011.60 | 568.55 | 2,052.49 | 2,052.49 | 2,137.82 | 21,908.85 | |
| CREDIT CHECKS | 113.50 | 197.00 | 144.50 | 763.00 | 313.00 | 181.50 | 272.50 | 319.00 | 395.00 | 234.50 | 294.50 | 3,187.50 | |
| COURT COSTS | 2,440.00 | 2,250.00 | 2,010.00 | 1,760.00 | 337.00 | 949.00 | 660.00 | 613.00 | 660.00 | 2,000.00 | 685.00 | 1,810.00 | 261,156.21 |
| LOAN COSTS | 24,250.00 | | 264.40 | 216,641.81 | | | | | | | | | |
| PROFESSIONAL FEES | | 1,992.00 | 1,050.00 | | | | 450.00 | | 2,455.43 | | | | 5,497.43 |
| LEASING FEES | | | | | | | 389.96 | 389.96 | 389.96 | 1,288.10 | 500.00 | | 2,450.00 |
| COMPUTER SUPPORT | 779.43 | 865.52 | 389.96 | 389.96 | 389.96 | 389.96 | 389.96 | 389.96 | 389.96 | 319.82 | | 326.10 | 5,662.77 |
| MISC EXTERIOR REPAIR | | | | | | | 2,625.00 | 9,535.00 | 2,530.00 | 15,798.72 | 6,550.00 | | 39,620.62 |
| COUNTER TOPS | | 0.00 | | 1,341.90 | | 687.00 | 625.00 | 2,490.00 | | 2,261.00 | 850.00 | | 16,627.00 |
| UTILITY DEPOSIT-FPL | | | | 4,275.00 | | 0.00 | 13,220.00 | | | | 1,168.00 | 1,591.00 | 5,362.50 |
| YEAR END ACCOUNTING | | | | 2,750.00 | 2,000.00 | | | | | 1,258.90 | | 262.90 | 3,437.08 |
| PROPERTY LIGHTING | | | | | | | | | 350.00 | | | | |
| EXTRAORDINARY R & M | 4,353.05 | 3,433.67 | 4,237.50 | 3,208.30 | 5,821.26 | 1,620.00 | 7,314.90 | | 4,500.00 | | 22,000.94 | 2,499.42 | 62,521.77 |
| MAILBOXES | 1,310.80 | 772.00 | 650.00 | 995.57 | 6,902.75 | | 980.37 | 746.54 | 600.00 | 612.90 | 600.00 | 4,481.04 | 8,355.71 |
| OFFICE REMODEL | | | | 2,375.07 | | | | 1,308.57 | | 1,638.78 | 1,705.14 | | 4,676.17 |
| LANDSCAPE | 1,206.15 | 1,422.89 | 745.09 | 727.05 | 3,982.75 | 2,274.49 | | | | | 1,093.13 | 5,712.10 | 1,321.44 |
| INSURANCE CONSULTING | 470.00 | 470.00 | 470.00 | | | | 0.00 | | | | | | 4,101.18 |
| LEGAL FEES MARCUS | | | 140.75 | 236.25 | | | | 191.25 | | | | | 568.25 |
| BATHROOM TILE REP-LIES | | 750.00 | 2,239.49 | 1,632.34 | | | 1,518.59 | 2,402.29 | 2,565.19 | 2,065.97 | 1,703.24 | 22,124.59 | |
| PAYROLL BONUS | | 160.00 | | 500.00 | | 1,934.76 | 2,145.79 | 2,514.67 | 100.00 | | 600.00 | | |
| A/C UNIT | | | | 2,037.39 | 2,039.39 | 1,152.50 | 1,443.51 | 925.66 | 1,356.43 | 1,705.14 | | | |
| GYM EQUIPMENT | | | | | 1,152.50 | | 1,171.30 | | 513.20 | 1,918.34 | 1,592.66 | 1,705.20 | 14,793.10 |
| STOVES | 1,055.78 | 961.03 | 281.20 | 1,412.45 | 1,490.24 | 732.20 | 1,246.06 | 645.00 | 1,235.14 | | 989.80 | 942.03 | 15,373.50 |
| DISHWASHERS | 707.70 | 903.30 | | 213.54 | 215.06 | 789.80 | | 2,716.64 | | 429.00 | 2,315.22 | 542.44 | 20,799.83 |
| REFRIGERATOR | 1,224.40 | 1,749.13 | 910.84 | 2,437.54 | 1,412.40 | 2,067.14 | 2,716.64 | 1,003.84 | 5,806.13 | | 341.48 | 14,061.93 | |
| INSURANCE PREPAID | 567.75 | 1,689.83 | | 40,917.56 | 7,363.04 | 4,144.09 | 4,035.58 | 4,035.58 | 4,535.58 | | 4,035.58 | 4,441.49 | 78,799.97 |
| ARBOR RESERVE | | | | 190,000.00 | | | | | | | | 190,000.00 | |
| **TOTAL EXTRAORDINARY** | 40,954.24 | 21,788.04 | 15,763.14 | 494,124.20 | 43,194.90 | 22,282.84 | 45,707.54 | 27,316.81 | 37,265.26 | 41,156.75 | 51,000.00 | 29,659.97 | 870,120.49 |
| **FIX UP EXPENDITURES** | | | | | | | | | | | | | |
| PAINTING HALLS/STAIRS/DO | 2,368.74 | 16,041.62 | 7,793.74 | 2,056.20 | 0.00 | 2,798.65 | 2,778.03 | | | | | | 0.00 |
| TENNIS COURT REHB | | | 986.81 | 1,800.00 | | | | | 718.33 | 560.37 | | 1,881.50 | 35,718.68 |
| LANDSCAPE UPGRADE | | | | | 1,110.79 | 2,405.36 | 332.04 | 645.50 | | | 1,552.86 | 878.26 | 2,786.84 |
| IRRIGANCE SYSTEM | | | | | 14,464.00 | 3,430.02 | 940.93 | | | | | | 8,223.41 |
| HALL MAT CARPET CLEANING | | | | | | 3,464.81 | | | | | | | 18,824.95 |
| LIST | | | | | | | | | | | | | 3,464.81 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| LIST | | | | | | | | | | | | | 0.00 |
| **TOTAL FIX UP EXPENDITURES** | 2,368.74 | 16,039.06 | 13,144.17 | 498,825.43 | 16,414.59 | 15,775.86 | 6,665.76 | 1,494.11 | 38,119.14 | 41,867.87 | 52,671.33 | 3,085.86 | 83,428.90 |
| M L MGMNT FEE 211 | 497.44 | 4,363.62 | 849.01 | 809.80 | 3,277.01 | 2,624.76 | 840.61 | 853.88 | 711.12 | 1,670.52 | 326.10 | 953.549.39 | |
| **TOTAL OTHER EXPENDITURES** | 43,322.98 | 18,327.10 | 28,921.33 | 55,609.49 | 38,658.70 | 52,373.30 | 28,710.92 | 38,119.14 | 41,867.87 | 52,671.33 | 12,745.83 | 14,000.43 | |

JALOS 45COPL6 6760T

PARK PLAZA ASSOCIATES

PAGE 13

JALOS.4SCOP16.67HOM.S.L. PROPERTY MANAGEMENT CO. INC

ACCRUAL SCHEDULE 2002

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING EXPENSES** | | | | | | | | | | | | | |
| PAYROLL | | | | | | | | | | | | | 0.00 |
| P/R TAXES W/H | | | | | | | | | | | | | 0.00 |
| PAYROLL TAXES | | | | | | | | | | | | | 0.00 |
| HOSPITALIZATION INS. | | | | 1,589.89 | | | | | | | | | 1,589.89 |
| AUTO EXPENSES | | | | | | | | | | | | | 0.00 |
| ELECTRIC | | | | | | | | | | | | | 0.00 |
| WATER & SEWER | | | | | | | | | | | | | 0.00 |
| GAS | | | | | | | | | | | | | 0.00 |
| SANITATION | | | | | | 0.00 | | | | | | | 0.00 |
| TELEPHONE | | | | | | | 0.00 | | | | | | 0.00 |
| MANAGEMENT FEE | | | | | | | | | | 0.00 | | | 0.00 |
| ADVERTISING | | | | | | | | | | | | | 0.00 |
| OFFICE EXPENSE | | | | | | | | | | | | | 0.00 |
| PROPERTY INSURANCE | | | | | | | | | | | | | 0.00 |
| REAL ESTATE TAXES | 16,530.10 | 16,530.10 | 16,530.10 | 16,530.10 | 16,530.10 | 16,530.10 | 16,530.10 | 16,530.10 | 16,530.10 | 16,530.10 | 26,945.92 | 26,945.92 | 219,192.84 |
| LICENSES & TAXES | | | | | | | | | | | | | 0.00 |
| COURT COST | | | | | | | | | | | | | 0.00 |
| PROFESSIONAL FEE: | | | | | | | | | | | | | 0.00 |
| REPAIRS & MAINTENANCE | | | | | | | | | | | | | 0.00 |
| REPLACEMENTS | | | | | | | | | | | | | 0.00 |
| XMAS PARTY & BON.SES | | | | | | | | | | | | | 0.00 |
| CONTRACT LABOR | | | | | | | | | | | | | 0.00 |
| MISCELLANEOUS | | | | | | | | | | | | | 0.00 |
| **TOTAL ACCRUAL** | 16,530.10 | 16,530.10 | 16,530.10 | 18,119.99 | 16,530.10 | 16,530.10 | 16,530.10 | 16,530.10 | 16,530.10 | 16,530.10 | 26,945.92 | 26,945.92 | 220,782.77 |
| **PREPAID EXPENSES** | | | | | | | | | | | | | |
| INSURANCE-FLOOD 2,683.00 08/11/02-08/11/03 | 223.58 | 223.58 | 223.58 | 223.58 | 223.58 | 223.58 | 223.58 | 223.58 | 223.58 | 223.58 | 223.58 | 223.58 | 2,733.96 |
| INS Trans disc 10/02 to 9/03 1,770.55 | | | | 27.55 | 27.55 | 27.55 | 27.55 | 27.55 | 27.55 | 27.55 | 27.55 | 147.55 | 443.65 |
| EMPLOYEE CRIME 405.51 | 27.55 | 27.55 | 27.55 | 27.55 | 27.55 | 27.55 | 27.55 | 27.55 | 27.55 | 147.55 | 147.55 | 147.55 | 318.84 |
| INSURANCE-ART PKG 140,849.73 05/1/02-05/1/03 | 5,348.19 | 5,348.19 | 5,348.19 | 4,446.58 | 11,737.48 | 11,737.48 | 11,737.48 | 11,737.48 | 11,737.48 | 11,737.48 | 11,737.48 | 11,737.48 | 114,390.99 |
| **TOTAL PREPAID EXPENSES** | 5,599.32 | 5,599.32 | 5,599.32 | 4,697.71 | 11,988.61 | 11,988.61 | 11,988.61 | 11,988.61 | 11,998.61 | 12,146.16 | 12,146.16 | 12,152.40 | 137,893.44 |

PARK PLAZA ASSOCIATES

JALOS.4SCOP16.67HOT

# M.S.L. Property Management, Inc.

2600 E. Commercial Blvd., Suite 200
Fort Lauderdale, FL 33308
(954) 491-4511 / (954) 491-4504 Fax

Paul Marcus
6 Baybery Drive
Suite 6
Saddle River, NJ 07458

January 2nd, 2001

RE:  Park Plaza Apartments
     Harbor Inn Apartments

Dear Paul:

Sometime this month I will be reviewing the cash available for Partners Distribution. It would be helpful to know whether you still plan to litigate, since it would determine the amount I can distribute.

Happy New Year.

Sincerely,

Murray Liebowitz
baf

Park Plaza/marcus new year

ATTACHMENT / EXHIBIT __H__

RS(1631)
**SHAPIRO & CROLAND, ESQS.**
Attorneys at Law
Continental Plaza II
411 Hackensack Avenue
Hackensack, New Jersey 07601
Tel. (201) 488-3900
Fax (201) 488-9481
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| PAUL MARCUS, | : | |
| Plaintiff, | : | Civil Action No.: 02cv5433(HAA) |
| | : | |
| vs. | : | |
| | : | |
| MURRAY LIEBOWITZ, | : | |
| M.S.L. PROPERTY MANAGEMENT, INC., | : | |
| a Florida corporation, | : | |
| HARBOR INN OF CS ASSOCIATES, LTD., | : | **CERTIFICATION OF** |
| a Florida limited partnership, | : | **DAVID O. MARCUS, ESQ.** |
| PARK PLAZA ASSOCIATES, LTD., | : | |
| a Florida limited partnership, and | : | |
| LIEBOWITZ FAMILY LIMITED PARTNERSHIP,: | | |
| a Florida limited partnership, | : | |
| | : | |
| Defendants. | : | |

APR - 4 2003

AT 8:30_____M
WILLIAM T. WALSH
CLERK

**DAVID O. MARCUS**, of full age, certifies as follows:

    1.      I am an attorney with the firm of Shapiro & Croland, counsel for plaintiff Paul Marcus. I am admitted to practice before this Court. This certification is submitted in support of the plaintiff's cross-motion to permit him to conduct jurisdictional discovery prior to the determination of the defendants' motion to dismiss.

2.      Attached are true copies of the following exhibits:

Exhibit A - Subpoena Duces Tecum directed to Lawrence Bathgate, Esq.;

Exhibit B - Subpoena Duces Tecum directed to Robert Krim;

Exhibit C - Notice of Deposition of Murray Liebowitz; and

Exhibit D - Notice of Deposition of M.S.L. Property, Inc.

3.      The enclosed subpoenas and notices are in the process of being served as of the date of preparation of this certification.

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
DAVID O. MARCUS

Dated: March 17, 2003

2

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
## UNITED STATES DISTRICT COURT

DISTRICT OF __New Jersey__

PAUL MARCUS

          V.

MURRAY LIEBOWITZ, M.S.L. PROPERTY
MANAGEMENT, INC., a Florida corporation,
HARBOR INN OF CS ASSOCIATES, LTD., a
Florida limited partnership, PARK PLAZA
ASSOCIATES, LTD., a Florida limited
partnership, and LIEBOWITZ FAMILY LIMITED
PARTNESHIP, a Florida limited partnership

## SUBPOENA IN A CIVIL CASE

CASE NUMBER: [1]

TO: LAWRENCE BATHGATE, ESQ.,
    Bathgate, Wegener & Wolf, 1 Airport Road, Lakewood, New Jersey 08701

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  |  |
|  | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION   Shapiro & Croland, Esq.<br>411 Hackensack Avenue, Hackensack, New Jersey 07601 | DATE AND TIME<br>March 24, 2003<br>10:00 A.M. |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

### SEE SCHEDULE "A" ANNEXED HERETO.

| PLACE<br>   Shapiro & Croland, Esqs.<br>411 Hackensack Avenue, Hackensack, New Jersey 07601 | DATE AND TIME<br>March 24, 2003<br>10:00 A.M. |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>*[signature]*       Attorney for Plaintiff | DATE<br>March 1), 2003 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
David O. Marcus, Esq., c/o Shapiro & Croland
411 Hackensack Avenue, Hackensack, New Jersey 07601 (201) 488-3900

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

ATTACHMENT / EXHIBIT A

AO 88 (Rev. 1/94) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
              DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

## Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in

person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

A.   **Definitions**.

1.      "Person" means natural persons, firms, proprietorships, associations, partnerships, corporations and every other type of organization or entity, including governmental entities.

2.      "Identify" means when used in reference to

(a)     A document, to state separately (i) its description (e.g. letter, report, memorandum, etc.), (ii) its date, (iii) its subject matter, (iv) the identify of each author or signor, (v) its present location and the identity of its custodian;

(b)     An oral statement, communication, conference or conversation, to state separately (i) its date and the place where it occurred, (ii) its substance, (iii) the identify of each person participating in the communication or conversation; and (iv) the identify of all notes, memoranda and other documents memorializing, referring or relating to the subject matter of the statement;

(c)     A natural person or persons, to state separately (i) the full name of each such person, (ii) his or her present, or last known, business address or his or present, or last known residential address, and (iii) the employer of the person at the time to which the interrogatory answer is directed and the person's title or position at that time;

(d)     An organization or entity other than a natural person (e.g. a company, corporation, firm, association, or partnership), to state separately (i) the full name and type of organization or entity (ii) the date and state of organization or incorporation, (iii) the address of each of its principal places of business, and (iv) the nature of the business conducted.

3.      "Document" or "documents" means any written, typed, printed, recorded or graphic matter, however produced or reproduced, of any type or description, regardless of origin or location, including without limitation all correspondence, records, tables, charts, analyses,

graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters (sent or received), telegrams, telexes, messages (including but not limited to reports of telephone conversations and conferences), studies, books, periodicals, magazines, booklets, circular, bulletins, instructions, papers, files, minutes, other communications (including, but not limited to, inter and intra office communications), questionnaires, contracts, memoranda or agreements, assignments, licenses, ledgers, books of account, orders, invoices, statements, bills, checks, vouchers, notebooks, receipts, acknowledgments, data processing cards, computer generated matter, computer disks, photographs, photographic negatives, phonograph records, tape recordings, wire recording, other mechanical recordings, transcripts or logs of any such records, all other data compilations  from which information can be obtained, or translated if necessary and any other tangible thing of a similar nature.

4.      "Describe", "state" and "set forth" means to state the substance of the event, circumstances, communication, representation, conversation, meeting, transaction, occasion, or other occurrence in question; state the date, time, place and identify of all persons present or participating; describe what each person said and did; state the approximate duration of each occurrence; state the method or means of communication employed; identify all documents relating thereto; and identify all persons having knowledge of each occurrence, as well as the date and means when and how such knowledge was first acquired.

5.      "You" shall mean Lawrence Bathgate.

6.      "Harbor Inn" shall mean Harbor Inn of CS Associates, Ltd., a Florida limited partnership.

7.      "Park Plaza" shall mean Park Plaza Associates, Ltd., a Florida limited partnership.

8.    "Liebowitz" shall mean Murray Liebowitz.

9.    "MSL" shall mean M.S.L. Property Management, Inc.

10.   The "Harbor Inn Property" shall mean the property owned by Harbor Inn located at 801 Harbor Drive, Coral Springs, Florida.

11.   The "Park Plaza Property" shall mean the property owned by Park Plaza located in North Fort Lauderdale, Florida.

**B.     Instructions:**

1.    Each request, unless otherwise stated, seeks documents which were created or which relate to events which occurred from the time period January 1, 1992 to the present.

2.    In producing the documents called for by this notice, you are requested to identify the documents produced according to the number and letters of the request herein to which they relate.

3.    If any document is withheld by you under claim of privilege, you are requested to furnish a list signed by the person supervising the production of the documents called for by this notice, identifying each document for which the privilege is claimed, together with the following information with respect to each such document: date, sender, addressee, number of pages, subject matter, the basis on which privilege is claimed, persons to whom copies were furnished, together with their employer and job titles.

4.    This notice shall be deemed continuing and you are required to produce in the form of supplementary document production any document requested herein that is unavailable to you at the time of the production called for, but which becomes available to you or to any of your attorneys, agents or representatives up to the conclusion of the proceeding herein.

3

## SCHEDULE A

1.    Documents concerning the acquisition by Harbor Inn of the Harbor Inn Property.

2.    Documents concerning the acquisition by Park Plaza of the Park Plaza Property.

3.    Documents concerning the formation of Harbor Inn.

4.    Documents concerning the formation of Park Plaza.

5.    Documents concerning the services rendered by you in connection with the preparation of the partnership agreement for Harbor Inn.

6.    Documents concerning the services rendered by you in connection with the preparation of the partnership agreement of Park Plaza.

7.    Documents reflecting communications between you and Liebowitz concerning Harbor Inn.

8.    Documents reflecting communications between you and Liebowitz concerning Park Plaza.

9.    Documents reflecting communications between you and MLS concerning Harbor Inn.

10.   Documents reflecting communications between you and MLS concerning Park Plaza.

11.   Documents reflecting communications between you and any partner of Harbor Inn concerning their investment in the partnership.

12.   Documents reflecting communications between you and any partner of Park Plaza concerning their investment in the partnership.

13.   Trust account ledgers maintained by you and any law firm with which you were a partner or shareholder reflecting the capital contributions made by the investors in Harbor Inn and Park Plaza in connection with the syndication of those entities.

14.   Documents reflecting any or filings prepared by and/or submitted by you or the law firm of which you were a partner or shareholder on behalf of Harbor Inn and Park Plaza.

15.   Files maintained in connection with any legal work you performed in connection with the acquisition of the Harbor Inn Property.

16.   Files maintained in connection with any legal work you performed in connection with the acquisition of the Park Plaza Property.

17.    Files maintained in connection with legal work performed for MSL

18.    Files maintained in connection with legal work performed for Liebowitz.

AO 88 (Rev. 1/94) Subpoena in a Civil Case

Issued by the

UNITED STATES DISTRICT COURT

DISTRICT OF  New Jersey

PAUL MARCUS
v.
MURRAY LIEBOWITZ, M.S.L. PROPERTY
MANAGEMENT, INC., a Florida corporation,
HARBOR INN OF CS ASSOCIATES, LTD., a
Florida limited partnership, PARK PLAZA
ASSOCIATES, LTD., a Florida limited
partnership, and LIEBOWITZ FAMILY LIMITED
PARTNESHIP, a Florida limited partnership

**SUBPOENA IN A CIVIL CASE**

CASE NUMBER:

TO:  Robert S. Krim, 3343 State, Route 66, Neptune, New Jersey 07753

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  |  |
|  | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION  Shapiro & Croland, Esq. 411 Hackensack Avenue, Hackensack, New Jersey 07601 | DATE AND TIME March 25, 2003 10:00 A.M. |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

SEE SCHEDULE "A" ANNEXED HERETO.

| PLACE  Shapiro & Croland, Esqs. 411 Hackensack Avenue, Hackensack, New Jersey 07601 | DATE AND TIME March 25, 2003 10:00 A.M. |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)  *David O. Marcus*   Attorney for Plaintiff | DATE March 11, 2003 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
David O. Marcus, Esq., c/o Shapiro & Croland
411 Hackensack Avenue, Hackensack, New Jersey 07601 (201) 488-3900

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

If action is pending in district other than district of issuance, state district under case number.

ATTACHMENT / EXHIBIT  B

AO 88 (Rev. 1/94) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                              DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in

person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

A.  **Definitions.**

1.      "Person" means natural persons, firms, proprietorships, associations, partnerships, corporations and every other type of organization or entity, including governmental entities.

2.      "Identify" means when used in reference to

(a)      A document, to state separately (i) its description (e.g. letter, report, memorandum, etc.), (ii) its date, (iii) its subject matter, (iv) the identify of each author or signor, (v) its present location and the identity of its custodian;

(b)      An oral statement, communication, conference or conversation, to state separately (i) its date and the place where it occurred, (ii) its substance, (iii) the identify of each person participating in the communication or conversation; and (iv) the identify of all notes, memoranda and other documents memorializing, referring or relating to the subject matter of the statement;

(c)      A natural person or persons, to state separately (i) the full name of each such person, (ii) his or her present, or last known, business address or his or present, or last known residential address, and (iii) the employer of the person at the time to which the interrogatory answer is directed and the person's title or position at that time;

(d)      An organization or entity other than a natural person (e.g. a company, corporation, firm, association, or partnership), to state separately (i) the full name and type of organization or entity (ii) the date and state of organization or incorporation, (iii) the address of each of its principal places of business, and (iv) the nature of the business conducted.

3.      "Document" or "documents" means any written, typed, printed, recorded or graphic matter, however produced or reproduced, of any type or description, regardless of origin or location, including without limitation all correspondence, records, tables, charts, analyses,

graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters (sent or received), telegrams, telexes, messages (including but not limited to reports of telephone conversations and conferences), studies, books, periodicals, magazines, booklets, circular, bulletins, instructions, papers, files, minutes, other communications (including, but not limited to, inter and intra office communications), questionnaires, contracts, memoranda or agreements, assignments, licenses, ledgers, books of account, orders, invoices, statements, bills, checks, vouchers, notebooks, receipts, acknowledgments, data processing cards, computer generated matter, computer disks, photographs, photographic negatives, phonograph records, tape recordings, wire recording, other mechanical recordings, transcripts or logs of any such records, all other data compilations  from which information can be obtained, or translated if necessary and any other tangible thing of a similar nature.

4.      "Describe", "state" and "set forth" means to state the substance of the event, circumstances, communication, representation, conversation, meeting, transaction, occasion, or other occurrence in question; state the date, time, place and identify of all persons present or participating; describe what each person said and did; state the approximate duration of each occurrence; state the method or means of communication employed; identify all documents relating thereto; and identify all persons having knowledge of each occurrence, as well as the date and means when and how such knowledge was first acquired.

5.      "You" shall mean Robert S. Krim.

6.      "Harbor Inn" shall mean Harbor Inn of CS Associates, Ltd., a Florida limited partnership.

7.      "Park Plaza" shall mean Park Plaza Associates, Ltd., a Florida limited partnership.

2

8.    "Liebowitz" shall mean Murray Liebowitz.

9.    "MSL" shall mean M.S.L. Property Management, Inc.

10.    The "Harbor Inn Property" shall mean the property owned by Harbor Inn located at 801 Harbor Drive, Coral Springs, Florida.

11.    The "Park Plaza Property" shall mean the property owned by Park Plaza located in North Fort Lauderdale, Florida.

**B.    Instructions:**

1.    Each request, unless otherwise stated, seeks documents which were created or which relate to events which occurred from the time period January 1, 1992 to the present.

2.    In producing the documents called for by this notice, you are requested to identify the documents produced according to the number and letters of the request herein to which they relate.

3.    If any document is withheld by you under claim of privilege, you are requested to furnish a list signed by the person supervising the production of the documents called for by this notice, identifying each document for which the privilege is claimed, together with the following information with respect to each such document: date, sender, addressee, number of pages, subject matter, the basis on which privilege is claimed, persons to whom copies were furnished, together with their employer and job titles.

4.    This notice shall be deemed continuing and you are required to produce in the form of supplementary document production any document requested herein that is unavailable to you at the time of the production called for, but which becomes available to you or to any of your attorneys, agents or representatives up to the conclusion of the proceeding herein.

3

## SCHEDULE A

1.    Documents concerning the acquisition by Harbor Inn of the Harbor Inn Property.

2.    Documents concerning the acquisition by Park Plaza of the Park Plaza Property.

3.    Documents concerning the formation of Harbor Inn.

4.    Documents concerning the formation of Park Plaza.

5.    Documents concerning accounting services rendered by you for Harbor Inn.

6.    Documents concerning accounting services rendered by you of Park Plaza.

7.    Documents reflecting communications between you and Liebowitz concerning Harbor Inn.

8.    Documents reflecting communications between you and Liebowitz concerning Park Plaza.

9.    Documents reflecting communications between you and MLS concerning Harbor Inn.

10.   Documents reflecting communications between you and MLS concerning Park Plaza.

11.   Documents reflecting communications between you and any partner of Harbor Inn concerning the partnership.

12.   Documents reflecting communications between you and any partner of Park Plaza concerning the partnership.

14.   Files maintained in connection with any accounting work you performed in connection with Harbor Inn.

15.   Files maintained in connection with any accounting work you performed in connection with Park Plaza.

16.   Files maintained in connection with any accounting work performed for MSL.

17.   Files maintained in connection with any accounting work performed for Liebowitz.

4

RS(1631)
**SHAPIRO & CROLAND, ESQS.**
Attorneys at Law
Continental Plaza II
411 Hackensack Avenue
Hackensack, New Jersey 07601
Tel. (201) 488-3900
Fax (201) 488-9481
Attorneys for Plaintiff

<div align="center">

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

</div>

| | | |
|---|---|---|
| PAUL MARCUS, | : | Civil Action No.: 02cv5433(HAA) |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| MURRAY LIEBOWITZ, | : | |
| M.S.L. PROPERTY MANAGEMENT, INC., | : | |
| a Florida corporation, | : | |
| HARBOR INN OF CS ASSOCIATES, LTD., | : | |
| a Florida limited partnership, | : | **NOTICE TO TAKE** |
| PARK PLAZA ASSOCIATES, LTD., | : | **ORAL DEPOSITION** |
| a Florida limited partnership, and | : | |
| LIEBOWITZ FAMILY LIMITED PARTNERSHIP, | : | |
| a Florida limited partnership, | : | |
| | : | |
| Defendants. | : | |

TO:   WILLIAM D. GRAND, ESQ.
       Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, LLP
       Metro Corporate Campus One
       P.O. Box 5600
       Woodbridge, NJ 07095-0988

PLEASE TAKE NOTICE that pursuant to Fed. R. Civ. P. 30, testimony will be taken by

deposition upon oral examination before a person authorized by the laws of the State of New

<div align="center">

ATTACHMENT / EXHIBIT C

</div>

Jersey to administer oaths, on March 26, 2003 at 10:00 A.M., at the offices of Shapiro &

Croland, attorneys for plaintiff, Continental Plaza II, 411 Hackensack Avenue, Hackensack, New

Jersey  07601, with respect to all matters relevant to the subject matter involved in this action, at

which time and place you will produce, on behalf of plaintiff the following person (s) whose

testimony is to be taken:

**MURRAY LIEBOWITZ**

SHAPIRO & CROLAND
Attorneys for Plaintiff


By: _DAVID O. MARCUS_

DAVID O. MARCUS

Dated:  March **11** , 2003

2

A.    **Definitions.**

1.       "Person" means natural persons, firms, proprietorships, associations, partnerships, corporations and every other type of organization or entity, including governmental entities.

2.       "Identify" means when used in reference to

(a)       A <u>document</u>, to state separately (i) its description (e.g. letter, report, memorandum, etc.), (ii) its date, (iii) its subject matter, (iv) the identify of each author or signor, (v) its present location and the identity of its custodian;

(b)       An <u>oral</u> statement, communication, conference or conversation, to state separately (i) its date and the place where it occurred, (ii) its substance, (iii) the identify of each person participating in the communication or conversation; and (iv) the identify of all notes, memoranda and other documents memorializing, referring or relating to the subject matter of the statement;

(c)       A <u>natural person or persons</u>, to state separately (i) the full name of each such person, (ii) his or her present, or last known, business address or his or present, or last known residential address, and (iii) the employer of the person at the time to which the interrogatory answer is directed and the person's title or position at that time;

(d)       An <u>organization or entity</u> other than a natural person (e.g. a company, corporation, firm, association, or partnership), to state separately (i) the full name and type of organization or entity (ii) the date and state of organization or incorporation, (iii) the address of each of its principal places of business, and (iv) the nature of the business conducted.

3.       "Document" or "documents" means any written, typed, printed, recorded or graphic matter, however produced or reproduced, of any type or description, regardless of origin

3

or location, including without limitation all correspondence, records, tables, charts, analyses, graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters (sent or received), telegrams, telexes, messages (including but not limited to reports of telephone conversations and conferences), studies, books, periodicals, magazines, booklets, circular, bulletins, instructions, papers, files, minutes, other communications (including, but not limited to, inter and intra office communications), questionnaires, contracts, memoranda or agreements, assignments, licenses, ledgers, books of account, orders, invoices, statements, bills, checks, vouchers, notebooks, receipts, acknowledgments, data processing cards, computer generated matter, computer disks, photographs, photographic negatives, phonograph records, tape recordings, wire recording, other mechanical recordings, transcripts or logs of any such records, all other data compilations from which information can be obtained, or translated if necessary and any other tangible thing of a similar nature.

4.      "Describe", "state" and "set forth" means to state the substance of the event, circumstances, communication, representation, conversation, meeting, transaction, occasion, or other occurrence in question; state the date, time, place and identify of all persons present or participating; describe what each person said and did; state the approximate duration of each occurrence; state the method or means of communication employed; identify all documents relating thereto; and identify all persons having knowledge of each occurrence, as well as the date and means when and how such knowledge was first acquired.

5.      "You" shall mean Murray Liebowitz.

6.      "Harbor Inn" shall mean Harbor Inn of CS Associates, Ltd., a Florida limited partnership.

7.    "Park Plaza" shall mean Park Plaza Associates, Ltd., a Florida limited partnership.

8.    "MSL" shall mean M.S.L. Property Management, Inc.

9.    The "Harbor Inn Property" shall mean the property owned by Harbor Inn located at 801 Harbor Drive, Coral Springs, Florida.

10.   The "Park Plaza Property" shall mean the property owned by Park Plaza located in North Fort Lauderdale, Florida.

11.   "Bathgate" shall mean Lawrence Bathgate.

12.   "Krim" shall mean Robert S. Krim.

B.   <u>Instructions:</u>

1.    Each request, unless otherwise stated, seeks documents which were created or which relate to events which occurred from the time period January 1, 1992 to the present.

2.    In producing the documents called for by this notice, you are requested to identify the documents produced according to the number and letters of the request herein to which they relate.

3.    If any document is withheld by you under claim of privilege, you are requested to furnish a list signed by the person supervising the production of the documents called for by this notice, identifying each document for which the privilege is claimed, together with the following information with respect to each such document: date, sender, addressee, number of pages, subject matter, the basis on which privilege is claimed, persons to whom copies were furnished, together with their employer and job titles.

4.    This notice shall be deemed continuing and you are required to produce in the form of supplementary document production any document requested herein that is unavailable

5

to you at the time of the production called for, but which becomes available to you or to any of

your attorneys, agents or representatives up to the conclusion of the proceeding herein.

## SCHEDULE A

1.    Documents concerning the acquisition by Harbor Inn of the Harbor Inn Property.

2.    Document concerning the acquisition by Park Plaza of the Park Plaza Property.

3.    Documents concerning the formation of Harbor Inn.

4.    Documents concerning the formation of Park Plaza.

5.    Documents concerning the preparation of the partnership agreement for Harbor Inn.

6.    Documents concerning the services rendered by Bathgate in connection with Park Plaza.

7.    Documents concerning the services rendered by Krim in connection with Harbor Inn.

8.    Documents reflecting communications between you and Bathgate concerning Harbor Inn.

9.    Documents reflecting communications between you and Bathgate concerning Park Plaza.

10.   Documents reflecting communications between you and Paul Marcus concerning Harbor Inn.

11.   Documents reflecting communications between you and Paul Marcus concerning Park Plaza.

12.   Documents reflecting your ownership of any interest in real estate in the State of New Jersey, either individually or as partner or shareholder of any entity.

13.   Documents reflecting your ownership of an interest in any entity formed pursuant to the laws of the State of New Jersey.

14.   Documents reflecting distributions made to the partners of Park Plaza and Harbor Inn from January 1, 2002 to the present.

7

RS(1631)
**SHAPIRO & CROLAND, ESQS.**
Attorneys at Law
Continental Plaza II
411 Hackensack Avenue
Hackensack, New Jersey 07601
Tel. (201) 488-3900
Fax (201) 488-9481
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PAUL MARCUS, | : |
|                Plaintiff, | : |
| | : |
|       vs. | : |
| | : |
| MURRAY LIEBOWITZ, | : |
| M.S.L. PROPERTY MANAGEMENT, INC., | : |
| a Florida corporation, | : |
| HARBOR INN OF CS ASSOCIATES, LTD., | : |
| a Florida limited partnership, | : |
| PARK PLAZA ASSOCIATES, LTD., | : |
| a Florida limited partnership, and | : |
| LIEBOWITZ FAMILY LIMITED PARTNERSHIP, | : |
| a Florida limited partnership, | : |
| | : |
|                Defendants. | : |

Civil Action No.: 02cv5433(HAA)

**NOTICE TO TAKE
ORAL DEPOSITION**

TO:    WILLIAM D. GRAND, ESQ.
        Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, LLP
        Metro Corporate Campus One
        P.O. Box 5600
        Woodbridge, NJ  07095-0988

      PLEASE TAKE NOTICE that pursuant to Fed. R. Civ. P. 30, testimony will be taken by

deposition upon oral examination before a person authorized by the laws of the State of New

ATTACHMENT / EXHIBIT ___D___

Jersey to administer oaths, on March 26, 2003 at 10:00 A.M., at the offices of Shapiro & Croland, attorneys for plaintiff, Continental Plaza II, 411 Hackensack Avenue, Hackensack, New Jersey 07601, with respect to all matters relevant to the subject matter involved in this action, at which time and place you will produce, on behalf of plaintiff the following person (s) whose testimony is to be taken:

**CUSTODIAN OF RECORDS,**
**M.S.L. PROPERTY MANAGEMENT, INC.**

SHAPIRO & CROLAND
Attorneys for Plaintiff

By: _David O. Marcus_
DAVID O. MARCUS

Dated: March 11, 2003

2

A.     **Definitions.**

1.      "Person" means natural persons, firms, proprietorships, associations, partnerships, corporations and every other type of organization or entity, including governmental entities.

2.      "Identify" means when used in reference to

(a)      A <u>document</u>, to state separately (i) its description (e.g. letter, report, memorandum, etc.), (ii) its date, (iii) its subject matter, (iv) the identify of each author or signor, (v) its present location and the identity of its custodian;

(b)      An <u>oral</u> statement, communication, conference or conversation, to state separately (i) its date and the place where it occurred, (ii) its substance, (iii) the identify of each person participating in the communication or conversation; and (iv) the identify of all notes, memoranda and other documents memorializing, referring or relating to the subject matter of the statement;

(c)      A <u>natural person or persons</u>, to state separately (i) the full name of each such person, (ii) his or her present, or last known, business address or his or present, or last known residential address, and (iii) the employer of the person at the time to which the interrogatory answer is directed and the person's title or position at that time;

(d)      An <u>organization or entity</u> other than a natural person (e.g. a company, corporation, firm, association, or partnership), to state separately (i) the full name and type of organization or entity (ii) the date and state of organization or incorporation, (iii) the address of each of its principal places of business, and (iv) the nature of the business conducted.

3.      "Document" or "documents" means any written, typed, printed, recorded or graphic matter, however produced or reproduced, of any type or description, regardless of origin

3

or location, including without limitation all correspondence, records, tables, charts, analyses, graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters (sent or received), telegrams, telexes, messages (including but not limited to reports of telephone conversations and conferences), studies, books, periodicals, magazines, booklets, circular, bulletins, instructions, papers, files, minutes, other communications (including, but not limited to, inter and intra office communications), questionnaires, contracts, memoranda or agreements, assignments, licenses, ledgers, books of account, orders, invoices, statements, bills, checks, vouchers, notebooks, receipts, acknowledgments, data processing cards, computer generated matter, computer disks, photographs, photographic negatives, phonograph records, tape recordings, wire recording, other mechanical recordings, transcripts or logs of any such records, all other data compilations from which information can be obtained, or translated if necessary and any other tangible thing of a similar nature.

4.       "Describe", "state" and "set forth" means to state the substance of the event, circumstances, communication, representation, conversation, meeting, transaction, occasion, or other occurrence in question; state the date, time, place and identify of all persons present or participating; describe what each person said and did; state the approximate duration of each occurrence; state the method or means of communication employed; identify all documents relating thereto; and identify all persons having knowledge of each occurrence, as well as the date and means when and how such knowledge was first acquired.

5.       "You" shall mean Murray Liebowitz.

6.       "Harbor Inn" shall mean Harbor Inn of CS Associates, Ltd., a Florida limited partnership.

7.      "Park Plaza" shall mean Park Plaza Associates, Ltd., a Florida limited partnership.

8.      "MSL" shall mean M.S.L. Property Management, Inc.

9.      The "Harbor Inn Property" shall mean the property owned by Harbor Inn located at 801 Harbor Drive, Coral Springs, Florida.

10.     The "Park Plaza Property" shall mean the property owned by Park Plaza located in North Fort Lauderdale, Florida.

11.     "Bathgate" shall mean Lawrence Bathgate.

12.     "Krim" shall mean Robert S. Krim.

**B.      Instructions:**

1.      Each request, unless otherwise stated, seeks documents which were created or which relate to events which occurred from the time period January 1, 1992 to the present.

2.      In producing the documents called for by this notice, you are requested to identify the documents produced according to the number and letters of the request herein to which they relate.

3.      If any document is withheld by you under claim of privilege, you are requested to furnish a list signed by the person supervising the production of the documents called for by this notice, identifying each document for which the privilege is claimed, together with the following information with respect to each such document: date, sender, addressee, number of pages, subject matter, the basis on which privilege is claimed, persons to whom copies were furnished, together with their employer and job titles.

4.      This notice shall be deemed continuing and you are required to produce in the form of supplementary document production any document requested herein that is unavailable

5

to you at the time of the production called for, but which becomes available to you or to any of your attorneys, agents or representatives up to the conclusion of the proceeding herein.

## SCHEDULE A

1.  Documents concerning the acquisition by Harbor Inn of the Harbor Inn Property.

2.  Document concerning the acquisition by Park Plaza of the Park Plaza Property.

3.  Documents concerning the formation of Harbor Inn.

4.  Documents concerning the formation of Park Plaza.

5.  Documents concerning the preparation of the partnership agreement for Harbor Inn.

6.  Documents concerning the services rendered by Bathgate in connection with Park Plaza.

7.  Documents concerning the services rendered by Krim in connection with Harbor Inn.

8.  Documents reflecting communications between you and Bathgate concerning Harbor Inn.

9.  Documents reflecting communications between you and Bathgate concerning Park Plaza.

10. Documents reflecting communications between you and Paul Marcus concerning Harbor Inn.

11. Documents reflecting communications between you and Paul Marcus concerning Park Plaza.

12. Documents reflecting your ownership of any interest in real estate in the State of New Jersey, either individually or as partner or shareholder of any entity.

13. Documents reflecting your ownership of an interest in any entity formed pursuant to the laws of the State of New Jersey.

14. Documents reflecting distributions made to the partners of Park Plaza and Harbor Inn from January 1, 2002 to the present.

7

RS (1631)
**SHAPIRO & CROLAND**
Attorneys at Law
Continental Plaza II
411 Hackensack Avenue
Hackensack, New Jersey 07601
Tel. (201) 488-3900
Fax (201) 488-9481
Attorneys for Plaintiff



## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAUL MARCUS, | : |
| Plaintiff, | :    Civil Action No.: 02cv5433 (HAA) |
| vs. | : |
| MURRAY LIEBOWITZ, | : |
| M.S.L. PROPERTY MANAGEMENT, INC., | : |
| a Florida corporation, | : |
| HARBOR INN OF CS ASSOCIATES, LTD., | :    **NOTICE OF CROSS MOTION** |
| a Florida limited partnership, | : |
| PARK PLAZA ASSOCIATES, LTD., | : |
| a Florida limited partnership, and | : |
| LIEBOWITZ FAMILY LIMITED PARTNERSHIP,: |  |
| a Florida limited partnership, | : |
| Defendants. | : |

**PLEASE TAKE NOTICE** that on ___April 28, 2003___, the undersigned attorneys for

plaintiff Paul Marcus, shall move before the Honorable Harold A. Ackerman, United States

District Judge, District of New Jersey, Martin Luther King, Jr., Federal Building and Courthouse,

50 Walnut Street, Newark, New Jersey, for an order:

         A.     authorizing the plaintiff to conduct jurisdictional discovery prior to the

Court's determination of the defendants' motion to dismiss and/or transfer this action;

> B.    setting a schedule for the completion of jurisdictional discovery;

> C.    ordering defendants to manage and administer the defendant partnership in

the ordinary course pending this action, and

> D.    compelling defendants to distribute their Cash Flow from the last calendar

quarter of 2002 forward per their respective agreements.

**PLEASE TAKE FURTHER NOTICE** that in support of the within Motion, plaintiff

shall rely upon the Certifications of Paul Marcus and David O. Marcus, Esq. together with the

Memorandum of Law submitted herewith.

> SHAPIRO & CROLAND
> Attorneys for Plaintiff, Paul Marcus

> _____
> DAVID O. MARCUS

Dated:  March 17, 2003

William D. Grand, Esq. (WG-9206)
**GREENBAUM, ROWE, SMITH, RAVIN, DAVIS & HIMMEL LLP**
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, New Jersey 07095
(732) 549-5600
Attorneys for Defendants

<div align="center">

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| PAUL MARCUS,<br><br>            Plaintiffs,<br><br>v.<br><br>MURRAY LIEBOWITZ,<br>M.S.L. PROPERTY<br>MANAGEMENT, INC., a<br>Florida corporation,<br>HARBOR INN OF CS<br>ASSOCIATES, LTD., a<br>Florida limited<br>partnership, and PARK<br>PLAZA ASSOCIATES, LTD., a<br>Florida limited<br>partnership, and LIEBOWITZ<br>FAMILY LIMITED<br>PARTNERSHIP, a Florida<br>limited partnership,<br><br>            Defendants. | Hon. Harold A. Ackerman, U.S.D.J.<br><br>Civil Action No. 2:02cv05433 (HAA)<br><br>**CERTIFICATION OF MURRAY LIEBOWITZ** |



**MURRAY LIEBOWITZ**, of full age, certifies as follows:

1.    I am a resident of the State of Florida and I live at

7070 Sienna Court, Boca Raton Florida.

## A. DEFENDANT M.S.L. PROPERTY MANAGEMENT INC.

2.    I am President of M.S.L. Property Management, Inc. formerly known as M.L. Property Management, Inc. (hereinafter referred to as "MSL").  MSL is a Florida corporation that maintains it offices at 2600 E. Commercial Blvd., Suite 200, Fort Lauderdale, Florida.

3.    My son, Sheldon Liebowitz, and I each own a fifty (50%) percent interest in MSL.  Sheldon is also a resident of the State of Florida.

4.    MSL owns no property in the State of New Jersey, does not maintain offices in the State of New Jersey, and does no business in the State of New Jersey.

## B. DEFENDANT HARBOR INN OF CS ASSOCIATES, LTD.

5.    I was one of the original limited partners of defendant Harbor Inn of CS Associates, Ltd.  ("Harbor Inn").  Harbor Inn is a Florida limited partnership that was formed in 1993. Harbor Inn maintains an address at 2600 E. Commercial Blvd., Suite 200, Fort Lauderdale, Florida.

6.    Harbor Inn's sole asset is an apartment complex located in Coral Springs, Florida.  Harbor Inn owns no property in the State of New Jersey, does not maintain offices in the State of New Jersey, and does no business in the State of New Jersey.

**7.**   The Harbor Inn partnership agreement provides in § 19.1 that "this agreement shall be governed by and construed in accordance with the laws of the State of Florida."

**8.**   On March 31, 1993, Harbor Inn entered into a Property Management Agreement with MSL.


### C. DEFENDANT PARK PLAZA ASSOCIATES, LTD.

9.   I was also one of the original limited partners in Park Plaza Associates, Ltd. ("Park Plaza"). Park Plaza is a Florida limited partnership that was formed in 1993, and maintains an address at 2600 E. Commercial Blvd., Suite 200, Fort Lauderdale, Florida.

10.   The Park Plaza partnership agreement provides in § 19.1 that "this agreement shall be governed by and construed in accordance with the laws of the State of Florida."

11.   Park Plaza's sole asset is an apartment complex located in North Lauderdale, Florida. Park Plaza owns no property in the State of New Jersey, does not maintain offices in the State of New Jersey, and does no business in the State of New Jersey.

12.   On August 11, 1993, Park Plaza entered into a Property Management Agreement with MSL. The Property Management Agreement with MSL is identical in form to the Property Management between Harbor Inn and MSL. A true copy of the

-3-

Property Management Agreement between Park Plaza and MSL is attached hereto as Exhibit A.

13.  As set forth above, neither MSL, Harbor Inn, nor Park Plaza do any business in the State of New Jersey or solicit any business in the State of New Jersey.  The only remote connection that these entities have with the State of New Jersey is that in 1993, Larry Bathgate, Esq., a New Jersey attorney, prepared the partnership agreements and the management agreements for both Park Plaza and Harbor Inn.  Thereafter, the partnership agreements were circulated to the general and limited partners for execution in counterparts.

14.  Paul Marcus is the only partner who apparently signed the partnership agreements in the State of New Jersey.  Based upon where each of the other signatures were notarized, it appears that the following other parties to the partnership agreements signed the agreements in either Florida or New York, as follows:

| Murray Liebowitz | Florida |
| Sheldon Liebowitz | Florida |
| Adrian Van Zon | New York |
| Dani Siegel | New York |
| Jerome J. Hoffman | Florida |
| Norman Fosback | Florida |
| Glen King Parker | Florida |

-4-

Joan O. Hoffman        Florida

15.  All the governing documents as well as all of the books and records for Park Plaza and Harbor Inn are maintained in Florida by MSL and its outside accountant.

16.  Elliot Weinberg of Weinberg Associates, P.A., a Florida accountant, is the outside accountant for both Park Plaza and Harbor Inn.  Mr. Weinberg maintains his offices in Boca Raton, Florida.

### D. **DEFENDANT THE LIEBOWITZ FAMILY PARTNERSHIP**

17.  I am a partner in The Liebowitz Family Partnership, a Florida limited partnership.  In or about February 2001, I transferred my limited partnership interests in both Harbor Inn and Park Plaza to The Liebowitz Family Partnership.

18.  The Liebowitz Family Partnership has no property in the State of New Jersey, does no business in the State of New Jersey, and has no offices in the State of New Jersey.  The Liebowitz Family Partnership's only assets are the limited partnership interests that it holds in Harbor Inn and Park Plaza.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Murray Liebowitz

Dated February ___7___, 2003

## PROPERTY MANAGEMENT AGREEMENT

THIS AGREEMENT (the "Agreement") made as of this 11ᵗᵉ day of August, 1993, between:

PARK PLAZA ASSOCIATES, LTD.
A Florida Limited Partnership,
2600 E. Commercial Blvd., Suite 213
Fort Lauderdale, Florida 33308
(as "Owner")

AND

M. L. PROPERTY MANAGEMENT, INC.,
A Florida Corporation,
2600 E. Commercial Blvd., Suite 213
Fort Lauderdale, Florida 33308
(as the "Management Company").

### ARTICLE 1

### Establishment of Agency and Renting Responsibility

1.1 <u>Exclusive Agency.</u>  The Owner hereby appoints the Management Company and the Management Company hereby accepts appointment to manage the property, on the terms and conditions hereinafter provided, as sole and exclusive management agent in connection with renting and operating the apartment complex now known as Candlewood Square Apartments, located at 8140 Southwest 22nd Street, North Lauderdale, Broward County, Florida (the "Property").  The Owner intends to rename the Property to "The Park Plaza Apartments".

1.2 <u>Owner's Representative.</u>  The Owner shall designate one (1) or more person(s) to serve as the "Owner's Representatives" in all dealings with the Management Company

ATTACHMENT / EXHIBIT A

hereunder.   Whenever the approval or consent or other actions o
the Owner is called for hereunder, such approval, consent o
action shall be binding on the Owner, if it is set forth in i
written instrument executed by the Owner's Representatives.
Initially, the exclusive Owner's Representatives shall be Robert
S. Krim and Lawrence E. Bathgate, II.   The Owner shall have the
right to replace either or both of said exclusive Owner's
Representatives, from time to time, by a vote of the majority of
the Limited Partnership interests in the Owner.

      1.3   <u>Renting of Apartments.</u>   Throughout the term of
this Agreement, the Management Company shall be responsible for
and shall use its best efforts to supervise the leasing of any
and all vacant apartments on the Property.   The Management
Company is hereby authorized to lease, renew and extend leases on
apartments located within the Property and to execute and deliver
on behalf of Owner leases and other instruments as shall be
appropriate to accomplish the renting of such apartments,
utilizing standard form leases previously approved by the Owner
and such lease terms and rental rates as shall have been
previously approved by the Owner.   In negotiating leases and
securing tenants, the Management Company shall be authorized to
employ on behalf of the Owner the services of real estate brokers
and other professionals when the Management Company reasonably
deems it necessary.   Commissions paid to any such brokers or
professionals employed by the Management Company shall be paid by

the Owner.  In order to promote the leasing of the apartments, the Management Company may place newspaper advertising and engage in other forms of advertising, at the Owner's expense.

## ARTICLE 2

### Services to be Performed by Management Company

2.1   **Expenses of Owner.**   Everything done by the Management Company under the provisions of this Agreement shall be done as the agent of and for the best interests of the Owner, and the Management Company is hereby granted all authority reasonably necessary to carry out the spirit and intent of this Agreement consistent with the best interests of the Owner. Except as otherwise specifically provided in this Article 2, all obligations or expenses incurred by the Management Company hereunder shall be for the account of, on behalf of, and at the expense of the Owner.  The Management Company shall not be obligated to incur any liability or obligation for the account of the Owner without receiving prior assurance that the funds necessary to discharge such liability or obligation will be provided.  Notwithstanding anything to the contrary set forth in this Agreement, the decision(s) of the Management Company regarding the incurring of any expense or any expenditure of funds may be overridden in any instance at the discretion of the Owner, provided that any such countermand shall be in writing, addressed to the Management Company and signed by the Owner.

2.2 **Employment of Personnel.**  The Management Company shall supervise the hiring, performance and discharge of all personnel employed by the Owner in running the Property in order to properly maintain and operate the Property.  Such personnel shall in every instance be deemed employees of the Owner.  All reasonable salaries, wages and other compensation (as permitted in Section 2.1 hereof) of personnel employed by the Owner hereunder, including medical and health insurance, social security taxes, workers' compensation and insurance, shall be the obligation of the Owner.  Notwithstanding the foregoing, the decision of the Management Company may be overridden by the Owner in any instance deemed appropriate by the Owner, provided that any countermand shall be in writing, addressed to the Management Company and signed by the Owner.

2.3 **Service Contracts.**  The Management Company, at the Owner's expense and subject to prior authorization of the Owner, shall (in the Owner's name) enter into contracts for water, electricity, gas, telephone, pest extermination, trash removal and other services deemed by the Management Company or the Owner to be necessary or advisable for the proper operation of the Property.

2.4 **Supervision of Improvements.**  When requested by the Owner, the Management Company on behalf of, at the sole cost and expense of, and in the name of Owner, shall supervise (or cause the supervision of) the construction, reconstruction, completion, addition, extension or modification of improvements

-4-

to the Property where such work constitutes other than normal maintenance and repair, for additional compensation as set forth hereinafter.   In such instance, the Management Company may negotiate contracts with all necessary contractors, subcontractors, materialmen, suppliers, architects, and engineers on behalf of, and in the name of, Owner, and may compromise and settle any dispute or claim arising therefrom, or behalf of, and in the name of Owner; provided only that the Management Company shall act in good faith and in the best interest of the Owner at all times.   The Management Company will furnish all personnel necessary for proper supervision of the work, and may, without abating any fee payable hereunder, assign personnel located at the Property to such supervisory work.   Owner acknowledges that the Management Company, or an affiliate of the   Management Company, may bid on any such work, and that the Management Company, or an affiliate of the Management Company, may be selected to perform part or all of the work; provided that if the Management Company desires to select itself, or its affiliate to do any work, it shall first notify the Owner of the terms upon which it, or its affiliate, proposes to contract for the work, and terms upon which independent contractors have offered to perform, and shall state the reasons for preferring itself, or its affiliate, over independent contractors, and the Owner shall have ten (10) days to disapprove the Management Company, or its affiliate, and to request performance by an independent contractor.   Only the Owner shall have the power to compromise or

-5-

settle any dispute or claim arising from work performed by the Management Company, or its affiliate; and it is expressly understood that the selection of the Management Company, or its affiliate, will not abate any fee payable hereunder.

      2.5   **Insurance.**  At Owner's expense, the Management Company in its capacity as Management Company shall use its best efforts to obtain and keep in force all forms of insurance required by law or reasonably deemed by the Management Company necessary or needed to adequately protect Owner and the Management Company in connection with the ownership and operation of the Property and the management related services, including but not limited to Workmen's Compensation Insurance, Public Liability Insurance, Boiler Insurance, Fire and Extended Coverage Insurance, and Burglary and Theft Insurance. All insurance coverage shall be placed with such companies, in such amounts and with such beneficial interest appearing therein as shall be reasonably acceptable to Owner and reasonably obtainable by the Management Company and shall be in conformity with the requirements of any mortgage on the Property. Owner, on behalf of itself and its insurance carriers hereby waives all claims and causes of action against the Management Company in respect of damage to the Property caused by Casualty (an "Insurable Casualty") insurable (whether insured or not) under the terms of Fire and Extended Coverage property insurance policies and endorsements obtainable in the State of Florida.

      Owner agrees that no insurance carrier of the Owner shall ever have a claim against the Management Company in respect of an

Insurable Casualty to the Property, whether by assignment, subrogation, or otherwise.  Owner assumes all risks in connection with the adequacy of any insurance coverage, and waives any claim against the Management Company for any liability, cost or expense arising out of any uninsured, in part or in full, of any nature whatsoever; provided, however, that Public Liability Insurance shall be maintained in an amount of not less than $1 Million initial coverage and an umbrella for $5 Million (or an aggregate of $6 Million). All liability insurance coverage maintained by Owner with respect to the Property shall list the Management Company as additional insured and said coverage is a condition precedent to the Management Company's responsibilities hereunder.  Evidence of these policies listing the Management Company as additional insured may be provided after the Management Company has accepted appointment hereunder but must be provided prior to the Management Company actually assuming management of the Property.  The Management Company shall use its best efforts to investigate and make a written report to the insurance company as to all accidents, claims for damage relating to the ownership, operation and maintenance of the Property, any damage or destruction to the Property and the estimated cost of repair thereof, and shall prepare any and all reports for any insurance company in connection therewith.  All such reports shall be timely filed with the insurance company as required under the terms of the insurance policy involved.  The Management Company with the prior approval of Owner is authorized to settle any and all claims against insurance companies arising out of any policies, including the execution of proofs of loss, the adjustment of losses, signing of receipts and

Z

collection of monies.  The Management Company is further authorized to contract for the maintenance and repair of said damage subject to the prior approval of Owner of a budget therefor. In the event of an emergency, the Management Company shall have the right to make such repairs of said damage as deemed reasonably necessary to protect the Property, but will not receive any fees for such services unless and until approved by the owner.

The Management Company shall receive, as an additional fee for such services, eleven (11%) percent overhead and ten (10%) percent profit of all the costs of the repairs covered by any casualty as a general contractor's fee for which the Management Company shall be responsible for all costs incurred by the Management Company in adjusting such loss and contracting for repairs to the Property provided there are insurance proceeds available for such additional fee exceeding the cost of repairing the damage or restoring the loss.  Nothing in this Section 2.5 or any insurance obtained or applied for by Owner or the Management Company shall be construed as implying that Owner or Management Company is subject to a liability it would not otherwise be subject to.

2.6  **Collection of Money.**  The Management Company shall supervise and manage, in compliance with any and all applicable laws, the collection by the Owner of all rent, security deposits and other charges from tenants on the Property, and such other rents and charges as shall otherwise be due to the Owner with respect to the Property.  The Owner hereby authorizes the Management Company to reasonably request, demand, collect, receive and receipt for all such rentals, security deposits and

other charges and to reasonably institute legal proceedings (including the hiring of attorneys) in the name of, and at the expense of, the Owner for the collection of such rentals, deposits and other charges due from tenants and for the necessary dispossession of tenants and other persons from the Property.

All monies collected by the Management Company shall not be mingled with monies of the Management Company and shall be deposited into a special operating bank account maintained by the Management Company for the Owner, or, in the case of security deposits, (and if required by Florida law) into a special security deposit bank account. Said bank accounts shall be in the name of the Owner and only those employees of the Management Company who are covered by employee dishonesty insurance or bonding shall be authorized to handle and draw upon funds. All employee dishonesty insurance shall be in an amount not less than $50,000, and obtained from reputable bona fide insurers, authorized to do business in the State of Florida.

2.7  <u>Reports, Reporting and Other Matters.</u>

(a)  <u>Records.</u>  All statements, receipts, invoices, checks, leases, contracts, financial statements, books and records, and all other instruments and documents relating to or arising from the operation or management of the Property shall be maintained by the Management Company, and the Owner and the Management Company shall have the right to inspect and to copy all such matters at all reasonable times, and from time to time, during the term of this Agreement and for a reasonable time

thereafter, not to exceed three (3) years. Upon termination of this Agreement, all such books, records and other information shall be the property of the Owner; provided, however, that the Management Company shall have the right to inspect such books, records and other information and to make copies thereof during the three (3) year period referred to in the preceding sentence.

(b) **Monthly Report.** Within thirty (30) days after the end of each month, the Management Company shall deliver to the Owner a statement of cash flow showing the results of operations for that month prepared in accordance with the Owner's accounting methods. The Management Company will be compensated for this additional expense.

(c) **Returns Required by Law.** The Management Company shall execute and file punctually when due, on behalf of itself and/or the Owner, all forms, reports and returns required by law with respect to the Ownership of the Property, including those forms, reports and returns relating to the employment of personnel.

2.8 **Refinancing, Sale or Disposition of Property.** The Management Company shall cooperate with, and advise and assist, the Owner in any desired refinancing, sale or other disposition of the Property. In that regard, the Management Company shall be responsible for supervising the preparation of all financial, lease, and operational information, data and reports desired or required with respect thereto, and shall advise and consult with any prospective lenders or buyer designated by Owner concerning

-10-

all operational and management functions and requirements of the Property. The Management Company will be compensated for this additional expense. In the event of a refinance, the parties agree that the Management Company's fee shall be equal to one (1%) percent of the new mortgage.

### ARTICLE 3

### Relationship of Management Company to Owner

3.1    Compensation of Management Company.    For the period commencing on the date of this Agreement and so long as the Management Company is acting as manager of the Property pursuant to this Agreement, the Management Company shall receive for its services performed under this Agreement an initial set up fee of five thousand dollars ($5,000.00) plus compensation equal to five percent (5%) of the gross receipts from the ownership and operation of the Property actually received by the Owner (the "Management Fee"), such compensation to be paid monthly in arrears. The term "gross receipts" shall not include tenant security deposits (until taken as liquidated damages), prepaid rent (until such rent has accrued), sales tax paid by tenants (except to the extent of the Owner's allowance, if any, for collecting such taxes), utility expenses paid by tenants, cable television chages paid by tenants (except to the extent of the Owner's portion, if any, of such charges), insurance proceeds and returned premiums, condemnation proceeds or payments in lieu

thereof, or tax refunds.   The Management Company shall, from the funds collected and deposited, cause to be disbursed regularly and punctually.

   3.2   **Use and Maintenance of Property.**   The Management Company will not permit the Property to be used for any purpose which might terminate or otherwise invalidate any policy insuring the Property or which might render any loss thereunder uncollectible, or which would be in violation of any governmental or other restrictions.   At all times during the term of this Agreement, the Management Company shall operate and maintain the Property in a manner consistent with the desires of the Owner. The Management Company shall use its best efforts to secure full compliance by  tenants with the terms and conditions of their respective leases.   The Management Company shall perform such other acts and deeds as are reasonable, necessary and appropriate to discharge its duties under this Agreement.

   3.3   **Term, Extension of Term and Termination.**   Unless earlier terminated as herein provided, this Agreement shall commence on the date the Owner becomes the owner of the Property (the "Closing Date") and shall continue until December 31, 2030, and shall not be terminated except for conditions listed in this paragraph.   Notwithstanding the foregoing, in the event of damage or destruction causing the Property to become untenantable or in the event of a taking by condemnation, or similar proceedings, of a substantial portion of the Property, this Agreement may be terminated by the Management Company or by the Owner upon thirty

-12-

(30) days written notice to the other as the case may be.  In the event of a sale or other disposition of the Property, the Management Company's obligation hereunder shall cease and terminate effective as of the closing thereof, and no further compensation shall be due to Management Company hereunder except for any unpaid compensation or expense reimbursements which accrued prior to such closing.  Within sixty (60) days after any such termination, the Management Company shall deliver to Owner, as required by Section 2.7(b), a statement of cash flow for the quarter year or portion thereof ending on the date of termination.  In addition to the foregoing events of termination, this Agreement may be terminated by the Owner for the following causes:

(i)  Misfeasance or malfeasance in connection with the performance of the Management Company's duties and responsibilities as provided herein; or

(ii) fraud, embezzlement, breach of trust of or by the Management Company; or

(iii) any felonious act with respect to, or the wilfull and knowing refusal to perform reasonably all or any material portion of, the Management Company's duties hereunder; or

(iv)  the filing of any bankruptcy, insolvency, receivership or similar proceeding by or against the Management Company; or

(v)   death or disablement of both Sheldon Liebowitz and Murray Liebowitz (the primary principals of the Management Company).

The Owner shall give the Management Company written notice and a reasonable opportunity to cure any default of the Management Company's obligation hereunder.

3.4   **No Assignment by Management Company, Etc.**   Without the prior written consent of the Owner, the Management Company shall not assign, transfer or convey any of its rights or interests hereunder nor shall it delegate any of the obligations or duties required to be kept or performed by it hereunder.

3.5   **Notices.**   All notices, demands, consents, approvals and requests given by either party to the other hereunder shall be in writing and shall be personally delivered or sent by registered or certified mail, return receipt requested, postage prepaid, to the parties at the following addresses:

If to the Owner:

Park Plaza Associates, Ltd.
Attention Murray Liebowitz
2600 E. Commercial Blvd.
Suite 213
Fort Lauderdale, Florida 33308

with a cc to Partnership attorneys:

Bathgate, Wegener, Dugan & Wolf, P.C.
Attention Lawrence E. Bathgate II, Esquire
One Airport Road, P.O. Box 2043
Lakewood, New Jersey  08701; and

-14-

with a cc to all Limited Partners.

If to the Management Company:

M.L. Property Management, Inc.
Attention Murray Liebowitz
2600 E. Commercial Blvd.
Suite 213
Fort Lauderdale, Florida 33308


If to Owner's Representative:

Lawrence E. Bathgate, II, Esq.
Bathgate, Wegener, Dugan & Wolf
One Airport Road, P.O. Box 2043
Lakewood, New Jersey 08701

        -and-

Robert S. Krim, C.F.P.
Krim, Hilker & Associates
446 State Highway # 35
Eatontown, New Jersey 07724; and

with a cc to all Limited Partners.

Any party may at any time change its respective address by sending written notice to the other party of the change in the manner hereinabove provided.

3.6   **Miscellaneous.**   (a)   If any term or provision of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to such person or circumstance (other than those as to which it is held invalid or unenforceable) shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

(b) The failure of the Owner or the Management Company to seek redress for any violation of, or to insist upon the strict performance of, any term or condition of this Agreement shall not prevent a subsequent act by the Owner or the Management Company, which would have originally constituted a violation of this Agreement by the Owner or the Management Company, from having all the force and effect of any original violation. The Owner or the Management Company may restrain any breach or threatened breach by the Owner or the Management Company of any term or condition herein contained, but the mention herein of any particular remedy shall not preclude the Owner or the Management Company from any other remedy it might have against the other either at law or in equity. The failure by the Owner or the Management Company to insist upon the strict performance of any one of the terms or conditions of this Agreement, or to exercise any right, remedy or elections herein contained or permitted by law, shall not constitute or be construed as a waiver or relinquishment for the future of such term, condition, right, remedy or election, but the same shall continue and remain in full force and effect. Except as the Owner's rights of termination are limited herein, all rights and remedies that the Owner or the Management Company may have at law, in equity or otherwise upon breach of any term or condition of this Agreement, shall be distinct, separate and cumulative rights and remedies

and no one of them, whether exercised by the Owner or the Management Company, shall be deemed to be in exclusion of any other right or remedy of the Owner or the Management Company.

(c)    This Agreement contains the entire agreement between the parties hereto with respect to the matters herein contained and any agreement hereafter made shall be ineffective to effect any change or modification, in whole or in part, unless such agreement is in writing and signed by the party against whom enforcement of the change or modification is sought.

(d)    In the event that the Owner or the Management Company shall fail to perform any duty or fulfill any obligation hereunder, to the material detriment of the other, the nondefaulting party, in addition to any rights or remedies otherwise available to it under law, shall have the right (but shall not be obligated) to perform any such duty or fulfill any such obligation of the defaulting party.

(e)    This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without reference to the laws of any other State.

(f)    Nothing contained in this Agreement shall be deemed or construed to create a partnership or joint venture between the Owner and the Management Company or to cause the Management Company to be responsible in any way for the debts or obligations of the Owner or any other person (but nothing contained herein shall affect the Management Company's responsibility to transmit payments for the account of the Owner

-17-

as provided herein), it being the intention of the parties that the only relationship hereunder is that of principal and agent, and the Management Company will not represent to any one that its relationship to the Owner is other than that set forth herein.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals, or caused these presents to be signed by their proper corporate officers and their proper corporate seal to be hereto affixed, the day and year first above written.

OWNER:

PARK PLAZA ASSOCIATES, LTD.

ATTEST:

Sheldon Liebowitz
Secretary

BY: M.L. PROPERTY MANAGEMENT, INC.,
a Florida Corporation,
the General Partner

By: _____
Murray Liebowitz, President

MANAGEMENT COMPANY:

ATTEST:

Sheldon Liebowitz
Secretary

M.L. PROPERTY MANAGEMENT, INC.

By: _____
Murray Liebowitz, President

-18-

## ACCEPTANCE OF APPOINTMENT

The undersigned hereby accept appointment to serve as the Owner's Representative under the foregoing Management Agreement.

Dated this ___11___ day of ___August___, 1993.

_____
Lawrence E. Bathgate, II

_____
Robert S. Krim

-19-

William D. Grand, Esq. (WG-9206)
**Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP**
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, New Jersey 07095
(732) 549-5600
Attorneys for Defendants

<div align="center">

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| PAUL MARCUS,<br><br>                    Plaintiffs,<br><br>v.<br><br>MURRAY LIEBOWITZ,<br>M.S.L. PROPERTY MANAGEMENT,<br>INC., a Florida<br>corporation, HARBOR INN OF<br>CS ASSOCIATES, LTD., a<br>Florida limited<br>partnership, and PARK PLAZA<br>ASSOCIATES, LTD., a Florida<br>limited partnership, and<br>LIEBOWITZ FAMILY LIMITED<br>PARTNERSHIP, a Florida<br>limited partnership,<br><br>                    Defendants. | Hon. Harold A. Ackerman, U.S.D.J.<br><br>Civil Action No. 2:02cv05433 (HAA)<br><br><br>**NOTICE OF MOTION TO DISMISS**<br>**COMPLAINT** |



**TO:**   Robert P. Shapiro
          Shapiro & Croland
          Continental Plaza II
          411 Hackensack Avenue
          Hackensack, New Jersey 07601
          Attorneys for Plaintiff

**PLEASE TAKE NOTICE** that on April 28, 2003, the undersigned

attorneys for defendants Murray Liebowitz, M.S.L. Property

Management, Inc., Harbor Inn of CS Associates, Ltd., Park Plaza Associates, Ltd., and The Liebowitz Family Partnership shall move before the Honorable Harold A. Ackerman, United States District Judge, District of New Jersey, Martin Luther King, Jr. Federal Building and Courthouse, Newark, New Jersey, for an Order to dismiss the Complaint for lack of personal jurisdiction, improper venue under 28 U.S.C. § 1391(a), and, forum non conveniens or, in the alternative, to transfer the case pursuant to 28 U.S.C. § 1404(a) to the Southern District of Florida.

> GREENBAUM, ROWE, SMITH,
> RAVIN, DAVIS & HIMMEL LLP
> Attorneys for Defendants
>
> By: _William D. Grand_
>       William D. Grand

Dated:    April 4, 2003

William D. Grand, Esq. (WG-9206)
**GREENBAUM, ROWE, SMITH, RAVIN, DAVIS & HIMMEL LLP**
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, New Jersey 07095
(732) 549-5600
Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAUL MARCUS,<br><br>                  Plaintiffs,<br><br>v.<br><br>MURRAY LIEBOWITZ,<br>M.S.L. PROPERTY<br>MANAGEMENT, INC.,<br>a Florida corporation,<br>HARBOR INN OF CS<br>ASSOCIATES, LTD.,<br>a Florida limited<br>partnership, and<br>PARK PLAZA ASSOCIATES,<br>LTD., a Florida limited<br>partnership, and<br>LIEBOWITZ FAMILY LIMITED<br>PARTNERSHIP,<br>a Florida limited<br>partnership,<br><br><br>                  Defendants. | Hon. Harold A. Ackerman, U.S.D.J.<br><br>Civil Action No. 2:02cv05433 (HAA)<br><br><br>**CERTIFICATION OF SERVICE** |

       **David S. Schechter**, of full age, upon his certification,

says:

1.    I am an associate of the law firm of Greenbaum, Rowe, Smith, Ravin, Davis & Himmel LLP, attorneys for defendants.

2.    On February 10, 2003, I served true and correct copies of:

- Certification of Murray Liebowitz
- Brief in support of our motion to dismiss for lack of personal jurisdiction, improper venue, forum non conveniens, and, in the alternative, to transfer under 28 U.S.C. § 1404(a).
- Notice of Motion
- Proposed Form of Order

3)    I caused the motion papers to be delivered by hand delivery to:

                Clerk US District Court
                M.L. King, Jr. Federal Courthouse
                50 Walnut Street
                P.O. Box 419
                Newark, NJ 07101

                Honorable Harold A. Ackerman's Chambers
                United States Post Office & Court House
                Room 305
                Federal Square, P.O. Box 999
                Newark, NJ 07101-999


                Robert P. Shapiro
                SHAPIRO & CROLAND, ESQS.
                Continental Plaza II
                411 Hackensack Avenue
                Hackensack, New Jersey 07601
                Attorneys for Plaintiff

                _____
                DAVID S. SCHECHTER (DS-2164)

Dated: February 10, 2003

2

# GREENBAUM, ROWE, SMITH, RAVIN, DAVIS & HIMMEL LLP

| | | |
|---|---|---|
| ROBERT S. GREENBAUM | ROBERT J. KIPNEES | MICHELE GIBSON |
| ARTHUR M. GREENBAUM | W. RAYMOND FELTON | JODI L. ROSENBERG |
| PAUL A. ROWE | CHRISTINE F. LI | CIPORA S. WINTERS |
| WENDELL A. SMITH | MERYL A. G. GONCHAR | ROSEMARY CULCASI |
| ALAN E. DAVIS | MICHAEL K. FEINBERG | EMILY A. KALLER |
| DAVID L. BRUCK | STEVEN S. GOLDENBERG | MARK T. WUILLAMEY |
| MICHAEL B. HIMMEL | CARLTON T. SPILLER | GALIT KIERKUT |
| MICHAEL A. BACKER | JOSEPH M. ORIOLO | CHARLES A. BRUDER |
| DEAN A. GAVER | LLOYD H. TUBMAN | ARREN S. GOLDMAN |
| ROBERT C. SCHACHTER | ARON M. SCHWARTZ | DARREN C. BARREIRO |
| MARTIN L. LEPELSTAT | THOMAS DANIEL McCLOSKEY | OLIVIER SALVAGNO |
| DENNIS A. ESTIS | SABRINA A. KOGEL | STEVEN NUDELMAN |
| WILLIAM D. GRAND | JACQUELINE M. PRINTZ | DINA M. VANIDES |
| ALAN S. NAAR | LAWRENCE H. WERTHEIM | BRIAN R. SELVIN |
| DOUGLAS K. WOLFSON | DAVID B. HIMELMAN | PETER D. CRAWFORD, JR. |
| MARK H. SOBEL | GARY K. WOLINETZ | ERIC H. MELZER |
| HAL W. MANDEL | KEVIN T. McNAMARA | GINA M. PONTORIERO |
| BARRY S. GOODMAN | DANIEL M. MURPHY | EMER M. CONROY |
| PETER A. BUCHSBAUM | RICHARD L. HERTZBERG | |
| LAWRENCE P. MAHER | ELLEN A. SILVER | |
| THOMAS J. DENITZIO, JR. | ANDREA J. SULLIVAN | |
| ROBERT S. GOLDSMITH | MARC D. POLICASTRO | |
| JOHN D. NORTH | MARC J. GROSS | |
| KENNETH T. BILLS | LUKE J. KEALY | |
| THOMAS C. SENTER | CHRISTOPHER S. PORRINO | |
| MARGARET GOODZEIT | | |

| | |
|---|---|
| ROBERT SCHIAPPACASSE | |
| PETER LAMBRIANAKOS | |
| ROBERT BECKELMAN | |
| MAJA M. OBRADOVIC | |
| AVERY SCOTT TEITLER | |
| ELIAS B. BASSIL | |
| MARNIE B. GRODMAN | |
| MICHAEL A. KLEIN | |
| ADAM LAMPARELLO | |
| JOHN E. LANZA | |
| STEFANIE R. McNAMARA | |
| MARC D. MORY | |
| ALICE M. SHANAHAN | |
| JAMES L. FENNESSY | |
| KAMRAN KHURSHID | |
| KELLIE A. LAVERY | |
| JENNIFER J. McDERMOTT | |
| DAVID S. SCHECHTER | |

COUNSELLORS AT LAW

METRO CORPORATE CAMPUS ONE
P.O. BOX 5600
WOODBRIDGE, N. J. 07095-0988
(732) 549-5600
FAX (732) 549-1881

DELIVERY ADDRESS:
99 WOOD AVE. SOUTH
ISELIN, NEW JERSEY 08830-2712

6 BECKER FARM RD.
ROSELAND, NEW JERSEY 07068-1735
(973) 535-1600
FAX (973) 535-1698

EMAIL: INFO@GREENBAUMLAW.COM
WWW.GREENBAUMLAW.COM

OF COUNSEL

DANIEL L. GOLDEN

COUNSEL

| | |
|---|---|
| STEPHEN R. GELLER | ROBERT S. UNDERHILL |
| RICHARD A. WELLER | STEVEN FIRKSER |
| CHRISTINE F. MARKS | ALLEN V. BROWN |

WM. L. GREENBAUM (1914-1983)
ALLEN RAVIN (1957-1997)

REPLY TO: Woodbridge

April 4, 2003

**_VIA HAND DELIVERY_**
Clerk, United States District Court
Martin Luther King, Jr. Federal Building
50 Walnut Street
Newark, NJ  07102

                Re:    Paul Marcus v. Murray Liebowitz, et al.
                       Civil Action No.:2:02cv5433 (HAA)

Dear Sir or Madam:

        This firm is counsel to defendants in the above-referenced litigation. Defendants
respectfully request oral argument.  In accordance with L. Civ. R. 7.1(f) and the optional motion
procedures specified in Appendix N, the documents being filed are as follows:

**Original and Four Copies**

A.                      Defendants' Notice of Motion to Dismiss Complaint;

B.                      Defendants' Brief in Support of Motion to Dismiss Complaint;

C.                      Defendants' Certification of Murray Liebowitz; and

D.                      Defendants' Certification of Service.

GREENBAUM, ROWE, SMITH,
RAVIN, DAVIS & HIMMEL LLP

Clerk, United States District Court
April 4, 2003
Page 2

**Original and Four Copies**

A.                    Plaintiff's Notice of Cross Motion;

B.                    Plaintiff's Memorandum of Law,

C.                    Plaintiff's Certification of Paul Marcus;

D.                    Plaintiff's Certification of David O. Marcus; and

E.                    Plaintiff's Proposed Order.

**Original and Four Copies**

A.                    Defendants' Reply Brief in Further Support of Motion to Dismiss or
                      Transfer Based Upon Improper Venue and Lack of Personal Jurisdiction;

B.                    Defendants' Reply Certification of Murray Liebowitz; and

C.                    Defendants' Proposed Order.

**Original and Four Copies**

1.                    Certification of Service identifying all above motion papers.

Please return a "Filed" copy of the above motion papers in the enclosed postage-paid
envelopes.  Thank you for your attention to this matter.

Very truly yours,

William D. Grand

WDG/krm
Enclosures
cc:    Hon. Harold A. Ackerman, U.S.D.J. *(w/encls.) (via Hand Delivery)*
       David O. Marcus, Esq. *(w/encl.) (via telecopier and regular mail)*

RS(1631)
**SHAPIRO & CROLAND, ESQS.**
Attorneys at Law
Continental Plaza II
411 Hackensack Avenue
Hackensack, New Jersey 07601
Tel. (201) 488-3900
Fax (201) 488-9481
Attorneys for Plaintiff

FILED

RECEIVED-CLERK
U.S. DISTRICT COURT

2003 MAR 27  P 2: 25

MAR 27 2003

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

4

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---

PAUL MARCUS,

                Plaintiff,

    vs.

MURRAY LIEBOWITZ,
M.S.L. PROPERTY MANAGEMENT, INC.,
a Florida corporation,
HARBOR INN OF CS ASSOCIATES, LTD.,
a Florida limited partnership, and
PARK PLAZA ASSOCIATES, LTD.,
a Florida limited partnership,
LIEBOWITZ FAMILY LIMITED PARTNERSHIP,
a Florida limited partnership,

                Defendants.

---

Civil Action No.: 02cv5433(HAA)

**ACKNOWLEDGMENT**
**OF SERVICE**

      Service of the original Summons and the Complaint in the above matter is hereby

acknowledged on behalf of the following defendants:

        **MURRAY LIEBOWITZ**
        **M.S.L. PROPERTY MANAGEMENT, INC.**
        **HARBOR INN OF CS ASSOCIATES, LTD.**
        **PARK PLAZA ASSOCIATES, LTD.**
        **LIEBOWITZ FAMILY LIMITED PARTNERSHIP**

this _21st_ day of _January_ ,2003.

GREENBAUM, ROWE, SMITH, RAVIN,
DAVIS & HIMMEL, LLP

By:_William D. Grand_

WILLIAM D. GRAND

AO 440  (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

District of  New Jersey

PAUL MARCUS,

              Plaintiff,

           V.

MURRAY LIEBOWITZ, M.S.L. PROPERTY
MANAGEMENT, INC., a Florida corporation,
HARBOR INN OF CS ASSOCIATES, LTD.,
a Florida limited partnership, and
PARK PLAZA ASSOCIATES, LTD., a Florida
limited partnership, LIEBOWITZ
FAMILY LIMITED PARTNERSHIP,
a Florida limited partnership,

              Defendants.

**SUMMONS IN A CIVIL CASE**

CASE NUMBER:  *02 cv 5433 (MHA)*

TO: (Name and address of Defendant)  Murray Liebowitz
                      7070 Siena Court
                      Boca Raton, FL  33433

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

              Robert P. Shapiro, Esq.
              Shapiro & Croland
              Attorneys at Law
              411 Hackensack Avenue
              Hackensack, NJ 07601

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

WILLIAM T. WALSH

CLERK     *Darlene Curro*

(By) DEPUTY CLERK

DATE     NOV 1 8 2002

AO 440  (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

District of __New Jersey__

PAUL MARCUS,

              Plaintiff,

          V.

MURRAY LIEBOWITZ, M.S.L. PROPERTY
MANAGEMENT, INC., a Florida corporation,
HARBOR INN OF CS ASSOCIATES, LTD.,
a Florida limited partnership, and
PARK PLAZA ASSOCIATES, LTD., a Florida
limited partnership, LIEBOWITZ
FAMILY LIMITED PARTNERSHIP,
a Florida limited partnership,

              Defendants.

## SUMMONS IN A CIVIL CASE

CASE NUMBER: _02 CV 5433 (HAA)_

TO: (Name and address of Defendant)

    M.S.L. Property Management, Inc.
    2600 E. Commercial Blvd.
    Suite 200
    Ft. Lauderdale, FL  33308

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

    Robert P. Shapiro, Esq.
    Shapiro & Croland
    Attorneys at Law
    411 Hackensack Avenue
    Hackensack, NJ 07601

an answer to the complaint which is served on you with this summons, within _____20_____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

# WILLIAM T. WALSH

CLERK

(By) DEPUTY CLERK

DATE  NOV 1 8 2002

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

District of __New Jersey__

PAUL MARCUS,

                  **Plaintiff,**

         V.

MURRAY LIEBOWITZ, M.S.L. PROPERTY
MANAGEMENT, INC., a Florida corporation,
HARBOR INN OF CS ASSOCIATES, LTD.,
a Florida limited partnership, and
PARK PLAZA ASSOCIATES, LTD., a Florida
limited partnership, LIEBOWITZ
FAMILY LIMITED PARTNERSHIP,
a Florida limited partnership,

               **Defendants.**

## SUMMONS IN A CIVIL CASE

CASE NUMBER: 02cv5433 (WHW)

TO: (Name and address of Defendant)

    Harbor Inn of CS Associates, Ltd.
    c/o M.S.L. Property Management, Inc.
    2600 E. Commercial Blvd.
    Suite 200
    Ft. Lauderdale, FL  33308

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

    Robert P. Shapiro, Esq.
    Shapiro & Croland
    Attorneys at Law
    411 Hackensack Avenue
    Hackensack, NJ 07601

an answer to the complaint which is served on you with this summons, within _____20_____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

# WILLIAM T. WALSH

CLERK

(By) DEPUTY CLERK

NOV 18 2002

DATE

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

District of ___New Jersey___

PAUL MARCUS,

               Plaintiff,

       V.

MURRAY LIEBOWITZ, M.S.L. PROPERTY
MANAGEMENT, INC., a Florida corporation,
HARBOR INN OF CS ASSOCIATES, LTD.,
a Florida limited partnership, and
PARK PLAZA ASSOCIATES, LTD., a Florida
limited partnership, LIEBOWITZ
FAMILY LIMITED PARTNERSHIP,
a Florida limited partnership,

             Defendants.

**SUMMONS IN A CIVIL CASE**

CASE NUMBER: _02 cv 5483 (HAA)_

TO: (Name and address of Defendant)  Park Plaza Associates, Ltd.
c/o M.S.L. Property Management, Inc.
2600 E. Commercial Blvd.
Suite 200
Ft. Lauderdale, FL  33308

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Robert P. Shapiro, Esq.
Shapiro & Croland
Attorneys at Law
411 Hackensack Avenue
Hackensack, NJ 07601

an answer to the complaint which is served on you with this summons, within _____20_____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

WILLIAM T. WALSH

CLERK

(By) DEPUTY CLERK

NOV 18 2002

DATE

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

District of   <u>New Jersey</u>

PAUL MARCUS,

           Plaintiff,

        V.

MURRAY LIEBOWITZ, M.S.L. PROPERTY
MANAGEMENT, INC., a Florida corporation,
HARBOR INN OF CS ASSOCIATES, LTD.,
a Florida limited partnership, and
PARK PLAZA ASSOCIATES, LTD., a Florida
limited partnership, LIEBOWITZ
FAMILY LIMITED PARTNERSHIP,
a Florida limited partnership,

           Defendants.

**SUMMONS IN A CIVIL CASE**

CASE NUMBER: _02cv 5433 (WHW)_

TO: (Name and address of Defendant)  Liebowitz Family Limited Partnership
2600 E. Commercial Blvd.
Suite 200
Ft. Lauderdale, FL 33308

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

        Robert P. Shapiro, Esq.
        Shapiro & Croland
        Attorneys at Law
        411 Hackensack Avenue
        Hackensack, NJ 07601

an answer to the complaint which is served on you with this summons, within _____20_____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

WILLIAM T. WALSH

NOV 1 8 2002

CLERK

(By) DEPUTY CLERK

DATE

UNITED STATES DISTRICT COURT RECEIVED
DISTRICT OF NEW JERSEY WILLIAM T. WALSH, CLERK

2003 MAR 21  P 1: 44

UNITED STATES
DISTRICT COURT

Paul Marcus

      Plaintiff(s)

v.

Murray Liebowitz, etal
      Defendant(s)

NOTICE OF CALL FOR DISMISSAL
PURSUANT TO F.R.C.P. 4(m)

Civil Action No. 02-5433 (HAA)

PLEASE TAKE NOTICE, that the above captioned action will be dismissed on
**APRIL 10, 2003**  for failure to effect service of the summons and complaint within 120
days of the filing of the complaint unless you establish that service was effected within
said 120 days, by filing proof of service with the Clerk of the Court before the return
date of this notice.  If proof of service is not filed before the return date, counsel
is required to provide sufficient reason through writing for good cause  why this action
should not be dismissed.

# FILED

MAR 21 2003

AT 8:30
WILLIAM T. WALSH
CLERK

WILLIAM T. WALSH

by: Melisa N. Hopper
Deputy Clerk

Date:

Original: Clerk
    cc:  Hon. Harold A. Ackerman
         Hon. Ronald J. Hedges
         Parties

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
NEWARK, NEW JERSEY 07101-0419

FILED

NOV 1 2002

AT 8:30 ___
WILLIAM T. WALSH
CLERK

Local Civil Rule 10.1(b)
requires docket number and
name of district judge on all
pleadings filed with this office.

MARCUS

        Plaintiff(s)

  v.

LIEBOWITZ

        Defendant(s)

Civil Action No. 2:02cv05433

NOTICE OF ALLOCATION
and ASSIGNMENT

ALLOCATION: Pursuant to Local Civil Rule 40.1(a), I have allocated this action to NEWARK. Please file all pleadings and make all motions returnable there.

ASSIGNMENT: This action has been assigned to United States District Judge Harold A. Ackerman for trial. Discovery and other non-dispositive matters have been assigned to United States Magistrate Judge Stanley R. Chesler.

MEDIATION: You may consent to mediation of this action pursuant to Local Civil Rule 301.1. However, this matter may be referred to mediation by a judicial officer regardless of consent. See Attached.

MAGISTRATE JUDGE JURISDICTION: You may consent to conduct all proceeding, including trial and the entry of final judgment, before the United States Magistrate Judge in accordance with the provisions of 28 U.S.C. & 636(c).

NOTICE TO COUNSEL AND PRO SE LITIGANTS: The Court has directed that counsel and pro se litigants be advised that there will be STRICT ENFORCEMENT of Local Civil Rules 16.1 (pretrial conferences; scheduling; case management) and 26.1 (discovery). Sanctions may be imposed for failure to comply with the local rules and orders entered pursuant thereto. Sanctions may include dismissal of the action and suppression of the defense.

WILLIAM T. WALSH
CLERK

by Darlene Carr

_____
Deputy Clerk

Date: 11/14/02

DNJ-Civ-001(05/00)

ALTERNATIVE DISPUTE RESOLUTION
IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY


Mediation is the Alternative Dispute Resolution ( "ADR") program in this Court. Mediation is governed by Local Civil Rule 301.1. The mediation program under this rule is supervised by a judicial officer (at present United States Magistrate Judge Ronald J. Hedges) who is available to answer any questions about the program.


Any district judge or magistrate judge may refer a civil action to mediation. This may be done without the consent of the parties. However, the Court encourages parties to confer among themselves and consent to mediation. Moreover, you are reminded that, when counsel confer pursuant to Rule 26(f) of the Federal Rules of Civil Procedure and Local Civil Rule 26.1, one of the topics that must be addressed is the eligibility of a civil action for participation in ADR.


A civil action may be referred to mediation at any time. However, one of the advantages of mediation is that, if successful, it enables parties to avoid the time and expense of discovery and trial. Accordingly, the Court encourages parties to consent to mediation prior to or at the time that automatic disclosures are made pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure.


If parties consent to mediation, they may choose a mediator either from the list of certified mediators maintained by the Court or by the selection of a private mediator. If a civil action is referred to mediation without consent of the parties, the judicial officer responsible for supervision of the program will select the mediator.


Mediation is non-judgmental. The role of the mediator is to assist the parties in reaching a resolution of their dispute. The parties may confer with the mediator on an ex parte basis. Anything said to the mediator will be deemed to be confidential and will not be revealed to another party or to others without the party's consent. The first six hours of a mediator's time is free. The mediator's hourly rate thereafter is $250.00, which is borne equally by the parties.


If you would like further information with regard to the mediation program please review the Guidelines for Mediation, which are available on the Court's Web Site PACER, (pacer.njd.uscourts.gov) and appear as Appendix Q to the Local Civil Rules. You may also make inquiries of the judicial officer responsible for supervision of the program.


Civil actions in which there are pro se parties (incarcerated or not) are not eligible for mediation.


DNJ-Med-001(08/01)

RS (1631)
**SHAPIRO & CROLAND, ESQS.**
Attorneys at Law
Continental Plaza II
411 Hackensack Avenue
Hackensack, New Jersey 07601
Tel. (201) 488-3900
Fax (201) 488-9481
Attorneys for Plaintiff

FILED

NOV 12 2002

AT 8:30 .............M
WILLIAM T. WALSH
CLERK

RECEIVED-CLERK
U.S. DISTRICT COURT
2002 NOV 12 A 10: 53

## IN THE UNITED DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

PAUL MARCUS,

        Plaintiff,

    vs.

MURRAY LIEBOWITZ,
M.S.L. PROPERTY MANAGEMENT, INC.,
a Florida corporation,
HARBOR INN OF CS ASSOCIATES, LTD.,
a Florida limited partnership, and
PARK PLAZA ASSOCIATES, LTD.
a Florida limited partnership,
LIEBOWITZ FAMILY LIMITED PARTNERSHIP,
a Florida limited partnership,

        Defendants.

02 cv 5433 (AMD)

<u>Civil Action</u>

**COMPLAINT**

    Plaintiff, Paul Marcus, by way of Complaint against the defendants, says:

### THE PARTIES

    1.  Plaintiff Paul Marcus is a citizen of the State of New Hampshire who resides at 28920 Dublin Road, Peterborough, New Hampshire.  Plaintiff also maintains a residence at 6 Bayberry Drive, Saddle River, New Jersey.

    2.  Defendant, Murray Liebowitz, is an individual having an address or residing at Boca

1

Raton, Florida.  He also resides in South Egremont, Massachusetts.

3.  Defendant, M.S.L. Property Management, Inc. (hereinafter "ML Management"), is, on information and belief, a Florida corporation with offices at 2600 E. Commercial Blvd., Suite 200, Ft. Lauderdale, Florida.

4.  Defendant, Harbor Inn of CS Associates, Ltd. (hereinafter "Harbor Inn"), is a Florida limited partnership, having an address c/o M.S.L. Property Management, Inc., 2600 E. Commercial Blvd., Suite 200, Ft. Lauderdale, Florida.

5.  Defendant, Park Plaza Associates, Ltd. (hereinafter "Park Plaza"), is a Florida limited partnership having an address c/o M.S.L. Property Management, Inc., 2600 E. Commercial Blvd., Suite 200, Ft. Lauderdale, Florida. Collectively herein Harbor Inn and Park Plaza are the "partnerships".

6.  Liebowitz Family Limited Partnership is, on information and belief, a Florida limited partnership having its address at 2600 E. Commercial Blvd., Suite 200, Ft. Lauderdale, Florida.

### JURISDICTION AND VENUE

7.  The Court has original jurisdiction of this Complaint pursuant to 28 U.S.C. Section 1332(a)(1) in that there exists diversity of citizenship between the plaintiff and defendants as citizens of different states, and the amount in controversy far exceeds $75,000, exclusive of interest and costs.  This Court has supplemental jurisdiction over any state law claims and for declaratory relief pursuant to 28 U.S.C. Section 1332(a)(1), 28 U.S.C. Section 1367(a), and 28 U.S.C. Section 2201.

8.  Venue is properly placed in the United States District Court for the District of New Jersey in regard to all claims relating to the limited partnerships and investments at issue herein because a substantial part of the events and transactions giving rise to the investment and the management of the legal affairs of the transactions involving the parties occurred and continue to occur in this district.  Venue is proper under 28 U.S.C. Section 1391.

2

## BACKGROUND

9.      Harbor Inn was formed pursuant to Florida Law on March 29, 1993.

10.     The initial general partner of Harbor Inn was defendant M.L Management, then known as M.L. Property Management, Inc.  On or about March 31, 1993, one-half (1/2) of the general partner interest of Harbor Inn was transferred to CDS Industries, Inc., a Florida corporation owned and/or controlled by plaintiff Paul Marcus.

11.   The initial limited partners of Harbor Inn were Murray Liebowitz and Sheldon Liebowitz.  Effective March 31, 1993, the limited partners were allocated partnership interests based upon the parties' respective investments, namely 44.55% to plaintiff Paul Marcus (based upon his investment of $900,000 and 4.95% each to Murray Liebowitz and Sheldon Liebowitz.

12.   On or about March 31, 1993, Harbor Inn entered into a Property Management Agreement with defendant ML Management.

13.   Plaintiff transferred 4.95% of his limited partnership interest in Harbor Inn to Deane J. Marcus with the required and written agreement of all general and limited partners of Harbor Inn.  Adrienne Van Zon transferred his entire limited partnership interest in the entities to Erasin, Inc., with the required approval of all partners.

14.   Defendant Park Plaza was formed pursuant to Florida Law on July 20, 1993.

15.   The initial general partner of Park Plaza was defendant ML Management and the initial limited partners were Murray Liebowitz and Sheldon Liebowitz.  On or about August 11, 1993, the limited partnership interests of Park Plaza were allocated based upon the parties' respective investments, namely 40% to plaintiff Paul Marcus, based upon his investment of $880,000, and 9% each to Murray and Sheldon Liebowitz.

16.   On or about August 11, 1993, Park Plaza entered into a Property Management Agreement with defendant ML Management.

17.   Defendant Liebowitz induced plaintiff Paul Marcus to invest in these entities by his promise as set forth in the agreements that his company, defendant ML Management, would

3

continue to be owned, controlled and operated substantially by defendant Liebowitz and Harbor Inn would be managed by defendant Liebowitz who would be in primary control and supervision thereof. Liebowitz also induced plaintiff to invest by promising high income from the rentals of the property and the promise of substantial capital gains when properties were sold in five to ten years.

18. Defendants Harbor Inn and Park Plaza have substantially the same ownership and documentation relating to the formation of the entities involved, and contracts and commitments made by each, except the ownership percentages differ somewhat. All contractual issues relative to this matter involving one entity apply to the other as well.

19. In significant part, the management agreement of Harbor Inn provides as follows:

> "1.2 Owner's Representative. The Owner shall designate two (2) persons to serve as the "Owner's Representatives" in all dealings with the Management Company hereunder. Whenever the approval or consent or other actions of the Owner is called for hereunder, such approval, consent or action shall be binding on the Owner, if it is set forth in a written instrument executed by the Owner's Representatives. Initially, the exclusive Owner's Representatives shall be Robert Krim and Lawrence E. Bathgate, II, Esq."

The Park Plaza management agreement has a similar provision.

20. In addition, Liebowitz committed to plaintiff Paul Marcus by letter of March 15, 1993, that it would treat plaintiff as "Owner" for all matters requiring the owner's approval. Defendant Liebowitz induced plaintiff to invest in these entities by promising that plaintiff would thereby share in all management decisions with Liebowitz.

21. The Property Management Agreement of Harbor Inn provides in relevant part, *inter alia*:

-- for the renting of apartments to take place on form leases approved by the Owner (Section 1.3),

-- for commission agreements with brokers only with written authorization of the Owner (Section 1.3),

-- to engage in advertising other than newspapers only with approval of the Owner

4

(Section 1.3),

      -- to provide advance notice of expenditures to allow the Owner to approve or override same (Section 2.1),

      -- to provide advance notice of salaries and benefits of employees of Owner in order to allow the Owner to approve or override same (Section 2.2),

      -- for all service contracts only with Owner's approval (Section 2.3),

      -- to supervise construction and capital expenditures at the property at Owner's request, and to provide multiple bids and only perform work when noticed and approved (Section 2.4), and

      -- to secure adequate insurance coverages (Section 2.5).

Defendant ML Management is prohibited from delegating any of its obligations or duties under the management agreement (Section 3.4). The management agreement without a stated term is an agreement at will (Section 3.3).

      The Park Plaza management agreement with defendant ML Management has substantially similar provisions.

      22.    The Amended and Restated Agreement of Limited Partnership of Park Plaza Associates, dated August 11,1993, provides in relevant part:

      "1.10 <u>Voting of the Partners</u>.  Except as otherwise expressly provided herein to the contrary any vote, approval, consent, authorization or other action required to be taken or made by the (i) General Partner shall be made by a vote of the General Partner, and (ii) Limited Partners shall be made by a vote of the Limited Partners owning at least two-thirds (2/3) of the Interests in the Partnership."

* * * *

      "<u>Section 3.  Control and Management</u>.

3.1    <u>General</u>.      The General Partner shall have full, exclusive and complete discretion in the management and control of the Partnership for accomplishing the purposes set forth in Section 1.3 ...."

      "3.2    <u>Powers of General Partner</u>.  Subject to any limitation expressly set forth in this Agreement, the General Partner shall perform or cause to be

5

performed, ... all management and operational functions relating to the property.... Without limiting the generality of the foregoing, (subject to paragraph 3.3) the General Partner ... is expressly authorized on behalf of the Partnership to: ... (b) borrow money on behalf of the Partnership on a secured or unsecured basis, or refinance or modify any loan to the Partnership which affects the assets of the Partnership... (l) negotiate, execute, deliver and perform any and all mortgages, financings, notes, insurance certificates and agreements (including the proposed Intercontinental Bank Mortgage) as defined in the Memorandum and any and all amendments, modifications, addendums, renewals, etc., related thereto and necessary or consistent in connection therewith."

"3.3  Limitations on Power of the General Partner. Notwithstanding the generality of the foregoing, the General Partner shall not be empowered without the consent of the Limited Partners owning two-thirds (2/3rds) of the Interest in the Partnership ... to: ... (h) utilize the proceeds to be received by the Partnership pursuant to Section 5.1 for purposes other than as set forth under the caption 'Sources and Uses of Proceeds' in the Memorandum; ... (j) admit additional or Substitute Limited Partners, except as provided in Sections 9 and 11 of this Agreement."

\* \* \* \*

"3.9  Dealings with the General Partner and Affiliates.  Provided the General Partner shall have the Owner's written approval, the Partnership is authorized to enter into business agreements, contracts, and other transactions with the General Partner or any Affiliates of the General Partner ... and is authorized to pay fees, commissions or other consideration to the General Partner...."

\* \* \* \*

"Section 18.  Amendments.

"18.1  General. ... No waiver of any breach or condition of this Agreement shall be deemed to be a waiver of any other condition or subsequent breach, whether of like or different nature...."

23.    The Memorandum provided to the partners has a section entitled "Sources and

Uses of Proceeds", which provides as follows:

"Below is a summary of the expected sources of funds and uses of funds required to close the sale of the units and the proposed Intercontinental Bank Mortgage."

The summary reflects estimates based on tentative closing adjustments.  If the amounts change,

6

the General Partner may be required to contribute more or less than the amount shown under "Sources". There also may be additional capital calls of the Limited Partners pursuant to the Partnership Agreement if the amounts allocated under "Other Costs" is exceeded.

24.    In Section 3.2 of the Private Placement Memorandum for Park Plaza, it was stipulated and agreed that the General Partner:

> "... shall not be empowered without the consent of the Limited Partners owning at least two-thirds (2/3) of the units in the Partnership to (i) do any act in contravention of the Partnership Agreement, ...(v) utilize the proceeds to be received by the Partnership for purposes other than as set forth under the Sources and Uses of Proceeds in this Memorandum."

Under the Section "Plan of Financing", the following is reflected:

> "At present the Project is proposed to be encumbered by an Intercontinental Bank mortgage as reflected in the PROPOSED INTERCONTINENTAL BANK MORTGAGE DATA attached hereto as Exhibit "C".
> The Partnership has applied for a $2,500,000.00 Mortgage Loan (the "Proposed Intercontinental Bank Mortgage") with Intercontinental Bank to finance a portion of the cost of acquiring the Project. The Partnership expects to enter into a first lien permanent mortgage with Intercontinental Bank or mortgage of similar in terms. (See the "PROPOSED INTERCONTINENTAL BANK MORTGAGE DATA"). The proposed Intercontinental Bank Mortgage is anticipated to be payable as a 1 year ARM based on a 15 year amortization with a 3 year balloon with the entire principal balance payable in full on the last day of the thirty-sixty (36th) month following the Closing Date with an option to renew for three years with payment of one point. It is not expected that the Partnership will have available to it sufficient funds from operations to meet the balloon payment due on the proposed Intercontinental Bank at its maturity in three years. The General Partner anticipates selling the Project or refinancing the proposed Intercontinental Bank Mortgage when it comes due."

25.    On or about February 20, 2002, and again on March 13, 2002, upon notice that the defendants Liebowitz and ML Management intended to refinance the Park Plaza property, plaintiff Paul Marcus notified defendants that he objected to any refinance transaction unless a current mortgage matured and was due and payable or to secure a more favorable rate, and only in those instances for the minimum amount required to refinance. Plaintiff advised the Partnership and the General Partner of his objection to a refinance without the requisite consents

7

of two-thirds of the interest holders.   Plaintiff specifically objected to any refinance for more than the amount necessary to pay off the current mortgage.

### MISMANAGEMENT AND SELF-DEALING

26.  On various occasions and at various times, defendants Liebowitz and ML Management, on information and belief, have utilized the assets and contractors working for the partnerships herein for their own personal benefit outside of the partnerships and to perform services outside the scope of work for the partnerships but at the cost and expense of the partnerships.

27.  Defendants Liebowitz and ML Management have failed to secure required approvals and votes approving their actions on behalf of the partnerships, including but not limited to, approvals of lease forms, commission agreements, advertising, various expenditures, salaries and benefits, service contracts, loans, and quotations for work to be performed, and has acted as managing contractor without submitting bids for approval, and have made capital expenditures without the required approvals.

28.  Defendants Liebowitz and ML Management have failed to provide adequate insurance coverage and negligently expended funds of the partnerships on insurance representation without securing such coverages.

29.  Defendants Liebowitz and ML Management failed to advise and consult with the Owners' representatives, including plaintiff, as required by the contractual commitments undertaken, the promises made to plaintiff, and the letter agreement of defendants with the plaintiff.

30.  During the year 2001, in violation of the applicable partnership documents and without notice to plaintiff or approval by Harbor Inn, Park Plaza, or the partners, defendant Liebowitz transferred all or part of his interest in each entity to another entity called Liebowitz Family Limited Partnership. Defendants Liebowitz and ML Management caused and agreed to improper tax filings in connection with these transfers in order to further their personal interests.

8

31.  On or about April 29, 2002, over the plaintiffs' objections and without proper approval of the partners, defendant refinanced the Park Plaza property and increased its mortgage obligation by nearly $2.2 million.  The refinance transaction took place in Florida and New Jersey.

32.  As a part of the refinance transaction noted in the preceding paragraph, defendant ML Management paid to a third party a mortgage placement fee of $85,000 and also took a mortgage placement fee of $85,000.00 itself.  The mortgage closing statement improperly reported the transaction and omitted important disbursements.  Defendants are holding more than $500,000 in escrow for no reason and without approval.

33.  As a result of the refinance transaction and other transactions engaged in by defendants Liebowitz and ML Management in connection with the partnerships, the capital accounts of the partners in these partnerships is increasingly negative, exposing the partners to excessive taxes upon any sale or transfer.

34.  Defendants Liebowitz and ML Management have negligently managed the properties and failed to maintain the fair and reasonable return on investment for the partners to which they are entitled, in part by using reserves (more than $500,000 from past refinancings) to pay distributions, thereby giving the partners the false impression that the promised return on invested capital is being maintained when in fact the defendants' excessive borrowings have saddled the properties with excessive debt.  Defendants Liebowitz and ML Management are obscuring the true financial picture of the partnerships by the distribution of the partners' own capital as "distributions" and by providing unclear and misleading, contradictory monthly and quarterly statements

35.  Defendant Liebowitz violated his commitments to plaintiff and, on information and belief, transferred to his son a substantial interest in ML Management as well as the day-to-day responsibilities for managing the partnerships' properties.

9

## FIRST COUNT

### (Mismanagement and Self-Dealing)

36. Plaintiff repeats and incorporates herein the allegation of paragraphs 1 through 35, inclusive, as if set forth herein verbatim and at length.

37. As a direct and proximate result of the foregoing mismanagement and self dealing, the plaintiff and those similarly situated have been damaged and continue to be damaged.

## SECOND COUNT

### (Breach of Fiduciary Duty)

38. Plaintiff repeats and incorporates herein the allegation of paragraphs 1 through 37, inclusive, as if set forth herein verbatim and at length.

39. Defendants Liebowitz and ML Management have violated their fiduciary duties to plaintiff and the other partners of the partnerships, as well as their express and implied contractual and other responsibilities in managing the properties of the partnerships for the benefit of the partnerships and the partners. Contrary to their undertakings, they have acted in their own personal interest.

40. As a direct and proximate result of the foregoing, the plaintiff has been damaged and continue to be damaged, and, in addition, are grounds for removal of Liebowitz and ML Management as general partner and property manager of the partnerships, respectively, and to compel them to account to the partnerships for the actions taken under their management and control.

## THIRD COUNT

### (Breach of Contract; Declaratory Judgment)

41. Plaintiff repeats and incorporates herein the allegation of paragraphs 1 through 40, inclusive, as if set forth herein verbatim and at length.

42. The management agreements of defendant ML Management with the partnerships are without duration, are violative of legal requirements and public policy and require the Court to

10

declare them either terminated or that they are terminable at will.

43. Plaintiff demands that the Court adjudge and declare that the management agreements of the partnerships with defendant ML Management are breached, are thereby rendered terminated and null and void, and that in any event are terminable at the will of the Owner without defendant's participation in such decision because of their conflict of interest.

## FOURTH COUNT

### (Injunctive Relief)

44. Plaintiff repeats and incorporates herein the allegation of paragraphs 1 through 43, inclusive, as if set forth herein verbatim and at length.

45. Defendants Harbor Inn, Park Plaza, and Liebowitz Family Limited Partnership are joined in this action as necessary parties in order to be bound by the Court's judgment in the action.

46. Defendants Liebowitz and ML Management have charged and continue to threaten to charge to the partnerships any and all legal fees and costs of any legal action against them, despite the substance of the claims against them that they are in breach of their agreements and otherwise have caused damage and harm to the counterparty to the management agreements, the Owner. Plaintiff demands an order of this Court adjudging and declaring the rights of the partnerships to not be responsible for the fees and expenses of these defendants defending claims related to their own conduct, and to enjoin and restrain these defendants pendente lite from passing through to the partnerships their own legal fees and expenses herein, pending disposition of this Complaint.

## FIFTH COUNT

### (Conversion)

47. Plaintiff repeats and incorporates herein the allegation of paragraphs 1 through 46, inclusive, as if set forth herein verbatim and at length.

48. Defendants Liebowitz and ML Management have converted assets of the partnerships for which the plaintiff and the partnerships have been damaged and continue to be

11

damaged.

WHEREFORE, plaintiff Paul Marcus demands judgment against the defendants Murray Liebowitz, M.S. L. Property Management, Inc., Harbor Inn of CS Associates, Ltd., Park Plaza Associates, Ltd., and Liebowitz Family Limited Partnership, individually, jointly and severally, as follows:

A  For compensatory, special and punitive damages;

B.  For an accounting;

C.  Declaring and adjudging that the management agreements of 1993 between the partnerships and defendant M.S.L. Property Management, Inc. are breached, are null and void and are terminable at the will of either party, with the decision to terminate by owner to exclude any principal, agent or insider of M.S.L. Property Management from participating in such Owner's decision by reason of the manager's conflict of interest;

D.  Removing defendant M.L. Property Management, Inc. as general partner and manager of Harbor Inn and Park Plaza, for the appointment of an interim property manager with full authority to investigate and report on both past dealings by defendants as well as proper ongoing operations of the partnerships, and surcharging defendants for mismanagement, self-dealing and violation of the founding and other agreements of the entities and their principals;

E.  Temporarily, preliminarily and permanently enjoining defendants Liebowitz and M.S.L. Property Management, Inc. to secure the Owners' approval as required under the management and other agreements controlling the management and operation of the defendants Harbor Inn and Park Plaza;

F.  Declaring and adjudging that any and all transfers of partnership interests in Harbor Inn and/or Park Plaza from defendant Liebowitz to his own family partnership, defendant Liebowitz Family Limited Partnership are void and without legal effect;

G.  Temporarily, preliminarily and permanently enjoining defendants Liebowitz, M.S.L. Property Management, Inc., and Liebowitz Family Limited Partnership to return all partnership

12

interests to the original owner, to refile and resend all financial and tax filings from the time of improper transfer to date in order to reflect the proper owners of all partnership interests as ordered by the Court, and to enjoin and restrain defendants from treating the defendant Liebowitz Family Limited Partnership as having any partnership interest in either Harbor Inn or Park Plaza;

H. Adjudging and declaring that Harbor Inn and Park Plaza are not liable for the legal fees and expenses of Liebowitz and M.S.L. Property Management, Inc. in this action;

I. Temporarily, preliminarily and permanently enjoining and restraining defendants Liebowitz and M.S.L. Property Management, Inc. from passing through to Harbor Inn or Park Plaza any legal fees and expenses in this action;

J. For counsel fees, costs of suit; and

K. For such further and additional relief as the Court may deem just and equitable.

SHAPIRO & CROLAND
Attorneys for Plaintiff
Paul Marcus

By: _____
Robert P. Shapiro

Dated: November 5, 2002

13

## CERTIFICATION PURSUANT TO LOCAL RULE 11.2

I hereby certify that the matter in controversy is not the subject of any other action pending in any Court, or of any pending arbitration or administrative proceeding.

SHAPIRO & CROLAND
Attorneys for Plaintiff
Paul Marcus

By: _____
Robert P. Shapiro

Dated: November 5, 2002

14